UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Brian Houston, a married man; and other persons similarly situated (the Class), | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. 2:22-cv-00875-SPL-MTM |
| Maricopa County Arizona; Paul Penzone, Sheriff of Maricopa County, Arizona and Jane Doe Penzone, | ) | |
| Defendants. | ) | |

DEPOSITION OF CHRIS HEGSTROM,
30(b)(6) MARICOPA COUNTY SHERIFF'S OFFICE

Scottsdale, Arizona
January 8, 2026
10:13 a.m.

Reported By:
Ashley Stahl, RPR
Certified Reporter
Certification No. 51001

# I N D E X

WITNESS

CHRIS HEGSTROM,
30(b)(6) MARICOPA COUNTY SHERIFF'S OFFICE


| | | PAGE |
|---|---|---|
| Examination by | Mr. Straus | 7 |


## EXHIBITS MARKED


| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition................ | 22 |
| Exhibit 2 | Interrogatory Answers............... | 148 |
| Exhibit 3 | Verification........................ | 150 |
| Exhibit 4 | Email and Attachment; Bates GRAN000001-000089................... | 169 |
| Exhibit 5 | Screenshot.......................... | 175 |
| Exhibit 6 | Screenshot.......................... | 175 |




Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

DEPOSITION OF CHRIS HEGSTROM,
30(b)(6) MARICOPA COUNTY SHERIFF'S OFFICE

was taken on January 8, 2026, commencing at 10:13 a.m. at the law offices of KOZUB KLOBERDANZ, 7537 East McDonald Drive, Scottsdale, Arizona, before Ashley Stahl, RPR, a Certified Reporter in the State of Arizona.

* * *

APPEARANCES:

Representing Plaintiffs
KOZUB KLOBERDANZ
By: Daniel L. Kloberdanz, Esq.
7537 East McDonald Drive
Scottsdale, Arizona 85250
480-624-2700
Dkloberdanz@bkl-az-com

Representing Plaintiffs
ANDREW IVCHENKO, PLLC
By: Andrew Ivchenko, Esq.
4960 South Gilbert Road, Suite 1-226
Chandler, Arizona 85249
480-250-4514
Aivchenkopllc@gmail.com

Representing Plaintiffs (via Zoom)
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
By: Alex R. Straus, Esq.
Ruby Moscone, Esq.
Lia Tavarez, Esq.
Juan Acevedo, Esq.
280 South Beverly Drive, PH Suite
Beverly Hills, California 90212
866-252-0878
Astraus@milberg.com

Representing Defendants
BROENING OBERG WOODS & WILSON
By: Sarah L. Barnes, Esq.
Roshin Bhangoo, Esq. (via Zoom)
2800 North Central Avenue, Suite 1600
Phoenix, Arizona 85004
602-271-7700
Slb@bowwlaw.com
Rsb@bowwlaw.com

Also Present:
Jim Law, videographer
Amber Brashear, paralegal (via Zoom)

THE VIDEOGRAPHER: Good morning. We are going on the record at 10:13 a.m. on 1/8/26. 10:13:35 10:13:36

Please note that this deposition is being conducted virtually. Quality of recording depends on the quality of the camera and internet connection of participants. What is seen from the witness and heard on the screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record. 10:13:43 10:13:46 10:13:49 10:13:51 10:13:53 10:13:58 10:13:58

This is Media Unit 1 of the video-recorded deposition of Chris Hegstrom taken by the counsel for plaintiffs in the matter of Brian Houston, et al., plaintiffs, versus Maricopa County, et al., defendants, filed in the United States District Court, District of Arizona, cause number 2:22-cv-00875-SPL-MDM. The location of the deposition is 7537 East McDonald Drive, Scottsdale, Arizona, and also remotely. 10:14:00 10:14:02 10:14:07 10:14:11 10:14:14 10:14:17 10:14:29 10:14:35

My name is Jim Law, representing Veritext, and I am the videographer. The court reporter is Ashley Stahl from the firm Veritext. 10:14:37 10:14:41 10:14:44

I am not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome. 10:14:46 10:14:49 10:14:52

If there are any objections to proceeding, please state them at the time of your -- of your appearance. 10:14:53 10:14:56

Counsel and all present including remotely will now state their appearances and affiliations for the record beginning with the noticing attorney. 10:14:59 10:15:02 10:15:04

MR. STRAUS: My name is Alex Straus from the law firm Milberg on behalf of the plaintiff. 10:15:07 10:15:10

MR. KLOBERDANZ: Also in attendance in person Daniel Kloberdanz for the plaintiffs. 10:15:17 10:15:17

MR. IVCHENKO: And Andrew Ivchenko for the plaintiff. 10:15:21 10:15:23

MS. BARNES: Sarah Barnes of Broening Oberg Woods & Wilson for defendants along with Roshin Bhangoo who's on the Zoom as in -- to appear. 10:15:24 10:15:25 10:15:28

THE VIDEOGRAPHER: Can the other parties who are appearing remotely please identify yourselves? 10:15:34 10:15:37

MR. ACEVEDO: Yes. Good morning. My name is Juan Acevedo. I'm from Milberg, and I'm with Plaintiff. 10:15:42 10:15:45 10:15:48

MS. TAVAREZ: Lia Tavarez from Milberg with plaintiff. 10:15:49 10:15:53

MS. MOSCONE: Ruby Moscone with Milberg for plaintiff. 10:15:54 10:15:57

MS. BRASHEAR: Amber Brashear, Milberg, with plaintiff, and I'm a paralegal, not an attorney. 10:15:59 10:16:01

THE VIDEOGRAPHER: Will the court reporter please swear in the witness? And then counsel may 10:16:04 10:16:06

proceed. 10:16:08

10:16:17

CHRIS HEGSTROM, 30(b)(6) MARICOPA COUNTY SHERIFF'S OFFICE, the witness herein, having been first duly sworn by the Certified Reporter, was examined and testified as follows: 10:16:17

EXAMINATION 10:16:18

BY MR. STRAUS: 10:16:18

Q. Okay. Thank you, Mr. Hegstrom. Really appreciate your time. Obviously we think this is a very important matter, but I certainly acknowledge that your -- your regular day-to-day work is -- is probably far more important, and so we certainly appreciate you taking the time to be here today. 10:16:21 10:16:24 10:16:27 10:16:32 10:16:37 10:16:40

Spoke to you off the record, and I know that you have been deposed before, and so I think that will streamline things. I'm certainly interested in -- we do have some, you know, quite a number of things to cover, but I'm trying to get you out of here as -- as quickly as possible, so I will skip what I can skip. 10:16:43 10:16:46 10:16:49 10:16:53 10:16:55 10:16:56

When was, if you remember, just approximately, like, how long ago was your last deposition? 10:16:59 10:17:01

A. Ten years. 10:17:05

Q. Ten years. Okay. So I'll try to go 10:17:06

strictly -- you know, quickly through some of these, you know, pretty standard sort of instructions, but. 10:17:12 10:17:14

So, you know, you're under oath today, as you know, and your testimony has the same force and effect as testimony given in court before a judge. 10:17:19 10:17:21 10:17:25

Do you understand that? 10:17:28

A. I do. 10:17:28

Q. Great. 10:17:29

And you are appearing today as a Rule 36 -- sorry -- Rule 30(b)(6) designee for the defendant. That means you're testifying on behalf of the County and the Sheriff's Office, not just based on your own personal knowledge. Your testimony represents the knowledge, information, and positions of the defendants on the topics noticed today. 10:17:30 10:17:34 10:17:38 10:17:40 10:17:43 10:17:46 10:17:49

Is that your understanding? 10:17:50

A. Yes. 10:17:51

Q. Perfect. 10:17:51

And as a Rule 30(b)(6) witness, you are required to make a good-faith effort to educate yourself on the noticed topics including reviewing any documents, speaking with others who have relevant knowledge. 10:17:54 10:17:58 10:18:02 10:18:04

Did you understand that coming in today? 10:18:07

A. I did. 10:18:10

Q. Wonderful. 10:18:10

This stuff will go very quickly because I know you're, you know, a sophisticated deponent, but, you know, trying to establish as much as we can a clean record. So there's a couple things that will help in that regard. 10:18:11 10:18:14 10:18:17 10:18:20

You know, we don't shake our head or nod our head for yes and no. We try to make verbal answers. 10:18:23 10:18:26

I'm gonna do my very best not to interrupt you ever. There's no -- there's no appropriate time for me to interrupt you. If you've -- if you -- 10:18:28 10:18:31 10:18:35

Sorry, just accept that. 10:18:38

If I start speaking and you have not finished your answer, absolutely let me know, and I will stop that. It -- it will be inadvertent and hopefully won't happen. 10:18:41 10:18:44 10:18:47

And then just by the same token, there's gonna be a lot of questions, I would think, halfway through you're gonna know what I'm asking. And, you know, in conversation, we all interrupt each other from time to time, and it's perfectly appropriate, but here just for the clean record, try to let me finish my question and then -- and then answer. 10:18:51 10:18:54 10:18:57 10:18:59 10:19:01 10:19:04 10:19:09

If there's anything in my question that you don't understand, that probably means that I did not give a good question. And so, you know, just ask me to repeat it or to rephrase it or what have you if -- if there's something you don't -- don't understand. That's my obligation to 10:19:10 10:19:12 10:19:16 10:19:22 10:19:25

make sure that -- that you understand before you answer. 10:19:27 If you don't let me know that you didn't understand, then 10:19:29 I'll just assume that you understood the question, and we 10:19:33 can carry on. Even though we're all trying to get out of 10:19:36 here, you know, obviously speed is -- is not our friend. 10:19:41 We want to try to be as clear as possible. 10:19:45

Please don't speculate or guess an answer. You 10:19:45 can make an estimate if you're able to, and, you know, 10:19:50 the -- the example I like to give, you know, if I was to 10:19:53 ask you how big the desk is that I'm sitting at, you know, 10:19:56 you're not gonna be able to -- to give an estimate of 10:20:00 that, but if I was to ask you what -- how big the table 10:20:02 you're sitting at, you might be able to give me a 10:20:03 reasonable estimate, and that would be okay. But if it's 10:20:06 something you need to guess at or just speculate, you 10:20:10 know, it's better to just say that -- that you don't know 10:20:12 or -- or just tell me that you would need to guess. 10:20:15

There will be possibly a number of objections 10:20:18 from your counsel. If there's an objection that's for 10:20:21 privilege or your -- your attorney instructs you not to 10:20:25 answer, of course you don't have to answer that. 10:20:29 Otherwise, there may be objections that come on which are 10:20:32 perfectly appropriate to have on the record, but you're 10:20:35 still obligated to answer the question. 10:20:38

Okay. If -- I'm gonna try -- we do have a pretty 10:20:41

good system, I think, for the exhibits even though we're remote. I hope that proves to be the case and be very efficient, but any document that you're handed as an exhibit, take all the time that you need to review that. You don't have to be in a rush. It may be something you've seen before; it may be something you haven't seen before or haven't seen in a very long time, and so please take all the time you need for that. 10:20:45 10:20:47 10:20:51 10:20:54 10:20:58 10:21:01 10:21:02 10:21:04

As we mentioned off the record, you can take a break any time you want. Any reason, no reason. I will on the record offer a break largely -- you know, the people that are really doing the work here are you and the court reporter, and so I like to -- to offer a break at least once an hour for the court reporter if nothing else, but that -- that is -- you know, you're -- you're not held to that. You can take as many breaks as you want. 10:21:06 10:21:09 10:21:12 10:21:16 10:21:20 10:21:23 10:21:26 10:21:29

If there is any question -- you know, any answer that you give that later on in the deposition you realize maybe was incomplete or inaccurate, not a problem. Just let me know. And, you know, we're not -- it's not the sort of thing where we erase the record, but we correct the record and -- and anything that you want -- even after a break or whenever it is, if there's something that you want to correct, that's perfectly appropriate. 10:21:33 10:21:34 10:21:38 10:21:41 10:21:44 10:21:46 10:21:48 10:21:51

Okay. Do you understand all of these 10:21:53

instructions before we begin? 10:21:58
A. I do. 10:21:59
Q. Great. 10:21:59
MR. STRAUS: And I just want to make sure mostly for the court reporter. I hear you fine, but is the volume okay for -- for everyone that's absolutely critical? 10:21:59 10:22:03 10:22:06 10:22:10
MR. KLOBERDANZ: I -- can everybody hear okay? 10:22:11 10:22:14
MR. STRAUS: Like, the way that I'm speaking and that way that the witness is speaking, were -- are our volumes okay? 10:22:15 10:22:16 10:22:16
MS. BARNES: No. He -- Mr. Hegstrom -- 10:22:19
MR. KLOBERDANZ: Yeah. Yeah. I think --
MS. BARNES: -- is quite soft --
MR. KLOBERDANZ: I think the online people are having trouble hearing.
MS. BARNES: -- comparatively.
THE WITNESS: You want me to put the mic on?
UNIDENTIFIED SPEAKER: He doesn't have the mic on.
THE WITNESS: Sorry. Okay. I didn't know if you needed it. 10:22:31
MR. STRAUS: Just for the record, I -- I heard you fine, but we'll do it like that. Okay. Thank 10:22:31 10:22:33

you. 10:22:36
BY MR. STRAUS: 10:22:36
Q. Okay. 10:22:37
Do you have any questions before we begin? 10:22:37
A. I do not. 10:22:39
Q. Okay. 10:22:39
And please don't take offense at this. I just have to -- have to ask. 10:22:40 10:22:44
Are you currently under the influence of any medication or substance or any other medical or other condition that would impede your ability to answer truthfully today? 10:22:45 10:22:48 10:22:51 10:22:54
A. I am not. 10:22:55
Q. Okay. Wonderful. 10:22:56
Okay. So I just want to get into a little of your background. 10:22:59 10:23:03
When did you first begin working for Maricopa County Sheriff's Office? 10:23:04 10:23:08
A. The first time I began, I started in 2009. That went until 2000 and -- through 2016 and then back again in 2025. 10:23:08 10:23:13 10:23:21
Q. Okay. Great. 10:23:21
And what position did you initially hold when you were hired in 2009? 10:23:22 10:23:25
A. A detention officer. 10:23:27

Q. Detention officer. Okay. Great. That actually -- I was not aware of that. Okay. 10:23:30 10:23:33
And how long were you serving as a detention officer? 10:23:35 10:23:38
A. I served that role until 2015. 10:23:38
Q. Okay. 10:23:44
And then at what -- at that time, what did you evolve into or get promoted or however it happened? What was your next position? 10:23:45 10:23:50 10:23:53
A. I promoted to the Director of Media Relations. 10:23:55
Q. Okay. Wonderful. 10:23:59
And then -- and you had that -- is it correct to say that you had that position, Director of Media Relations, until that stint of your employment in 2016 ended? 10:24:00 10:24:03 10:24:06 10:24:10
A. Correct. 10:24:10
Q. Correct. Okay. 10:24:11
And then in 2016 when you were -- left the employ of the Sheriff's Office, what did -- what did you do in a professional capacity? 10:24:13 10:24:16 10:24:21
A. Went to work for the Arizona Department of Juvenile Corrections as a spokesperson. 10:24:22 10:24:25
Q. Okay. 10:24:29
And how long did you hold that position? 10:24:29
A. Almost a year. 10:24:31

Q. Okay. 10:24:32
And not asking about any, you know, personal matters if -- if you don't want to discuss, but why is it you that you left the Sheriff's Office at that time in 2016? 10:24:34 10:24:39 10:24:42 10:24:45
A. New administration coming on board that was gonna make some changes. 10:24:45 10:24:49
Q. Okay. Okay. Wonderful. 10:24:50
And then after working for the detention center -- well, let me ask you this. 10:24:53 10:24:58
How long did you work for the detention center? 10:24:59
A. For the -- for the juvenile corrections, or for the -- as a detention officer at the Maricopa County Sheriff's Office? 10:25:03 10:25:06 10:25:06
Q. Pardon me. For the juvenile center. 10:25:11
A. Just a little -- just about a year. 10:25:14
Q. Okay. 10:25:16
And then so -- so in or about 2017? Is that fair? 10:25:17 10:25:20
A. That's fair. 10:25:21
Q. And what did you do after that in a professional capacity? 10:25:21 10:25:25
A. I was a campaign manager for a senate campaign. 10:25:25
Q. Okay. 10:25:29
And was that the senate campaign of the former, 10:25:29

at that point, Sheriff Joe Arpaio? 10:25:32
A. Yes, it was. 10:25:36
Q. Okay. 10:25:37
And just as a quick aside, I was also a press secretary for a number of political campaigns, so we have some -- some overlap there, but that might be where our professional lives crossed. 10:25:37 10:25:42 10:25:46 10:25:51
So I don't need to know, you know, much about your education, but in terms of law enforcement work, was -- is that -- is that sort of the complete scope of your law enforcement work? 10:25:52 10:25:56 10:26:02 10:26:06
A. As far as it being a detention officer, yes. 10:26:07
Q. Yes. 10:26:12
A. Yes. 10:26:13
Q. So you never went back to doing that after moving on to the senate campaign; is that correct? 10:26:13 10:26:17
A. I went -- well, no. I went back to the Sheriff's Office last year, but as -- again as the Director of the Media Relations. 10:26:20 10:26:22 10:26:24
Q. Perfect. That was my understanding. Okay. 10:26:25
So is it correct that after the senate campaign ended that you then moved onto -- moved back to the Sheriff's Office, or was there something else that happened in between? 10:26:28 10:26:32 10:26:36 10:26:38
A. In between, I worked for the airline industry up 10:26:40

until the -- from 2018, I believe, until the -- January of '25. 10:26:44 10:26:49
Q. January of '25. 10:26:49
And what did you do for the airline industry? 10:26:52
A. I was a supervisor over baggage handling for both American -- 10:26:56 10:26:56
Q. Okay. 10:26:56
A. -- for Piedmont Airlines and then Southwest Airlines. 10:27:00 10:27:04
Q. Okay. 10:27:05
And was that also in Arizona? 10:27:05
A. It was. 10:27:06
Q. Okay. Okay. 10:27:07
And what made you decide to leave the airline industry and come back to work for the Sheriff's Office? 10:27:09 10:27:15
A. The -- the new sheriff, Jerry Sheridan, asked me to come back. 10:27:18 10:27:23
Q. Okay. Wonderful. 10:27:24
And you had -- is it correct to say that you had a relationship with Mr. Sheridan from your previous time with the Sheriff's Office, or did you have a relationship in some other form? 10:27:25 10:27:27 10:27:31 10:27:33
A. No. It was our relationship prior to. While I was working here for the Sheriff's Office last time. 10:27:35 10:27:39
Q. Wonderful. 10:27:43

And when you rejoined the Sheriff's Office in January of 2025, what was your title at that time? 10:27:43 10:27:46
A. Director of Media Relations and Communications. 10:27:49
Q. Okay. 10:27:52
And is that still your title currently? 10:27:52
A. It is. 10:27:54
Q. Okay. Wonderful. 10:27:55
Okay. Can you please describe the scope of your responsibilities in your current role? 10:27:56 10:28:03
A. I oversee social media, media relations, communications, internal -- internal and external throughout the office. 10:28:06 10:28:12 10:28:19
Q. Okay. 10:28:20
When you say internal communications, can you explain what that means? 10:28:21 10:28:23
A. Newsletters that go out internally, any communication that might come from the administration that needs to be delivered to everybody within the office. 10:28:24 10:28:28 10:28:31
Q. And who is your direct supervisor? Who do you report to? 10:28:33 10:28:38
A. I report to the chief of staff, Chad Willems. 10:28:38
Q. Okay. 10:28:42
And has that been the same throughout your time since the -- since January of 2025? 10:28:43 10:28:47
A. Yes. 10:28:50

Q. Wonderful. 10:28:51
What type of decisions or activities -- strike 10:28:54
that. 10:28:54
What type of decisions are you responsible for 10:29:01
making independently in your role with respect to 10:29:04
information shared with the public? 10:29:09
MS. BARNES: Form. 10:29:12
THE WITNESS: Can you clarify what you mean 10:29:13
by that? 10:29:19
MR. STRAUS: Absolutely. 10:29:20
BY MR. STRAUS: 10:29:20
Q. When you -- let me put it this way. 10:29:21
When you share information with the public, is 10:29:24
there a -- is that done through a directive that comes to 10:29:27
you either from your supervising -- your supervisor or 10:29:33
from someone else, or are you making those decisions 10:29:38
independently? 10:29:42
A. Could be both depending on the decision and what 10:29:42
we're talking about. 10:29:46
Q. Okay. 10:29:46
Do you ever advise leadership on how the 10:29:47
Sheriff's Office policies or practices should be 10:29:51
communicated to the public? 10:29:54
A. I do share my -- my opinion for decisions on that 10:29:55
matter. 10:30:01

Q. And do those -- are those decisions that you make independently, are those ever informed by the -- the way you think the -- the public would perceive those policies? 10:30:02 10:30:07 10:30:11
MS. BARNES: Form. 10:30:15
THE WITNESS: Yeah. Occasionally my -- my -- the way I would perceive it. Absolutely. 10:30:16 10:30:21
BY MR. STRAUS: 10:30:21
Q. Okay. 10:30:26
So does your role involve managing or overseeing the content that's published on the Maricopa County Sheriff's Office website? 10:30:26 10:30:31 10:30:37
A. Yes. 10:30:37
Q. And is it okay throughout this deposition if I'm referring to the Maricopa County Sheriff's Office if I refer to that just as the "Sheriff's Office"? 10:30:37 10:30:42 10:30:46
A. Yes. 10:30:49
Q. Yeah. Okay. Wonderful. 10:30:50
So just for the record, if I say "Sheriff's Office," I mean the Maricopa County Sheriff's Office. Okay. 10:30:51 10:30:53 10:30:55
So is it correct to say that during your tenure both -- you know, in both stints for the Sheriff's Office that you've worked for -- under Sheriff Joe Arpaio and also the current sheriff, Sheriff Sheridan; is that right? 10:30:56 10:31:01 10:31:05 10:31:11
A. That's correct. 10:31:16

Q. So there was never a time when you worked for Sheriff Penzone or any other sheriff besides those two; is that correct? 10:31:17 10:31:20 10:31:26

A. That's correct. 10:31:26

Q. Okay. 10:31:26

And your role did change at times, right, between when you were working for Sheriff Joe Arpaio, but there was a time, if I'm remembering your testimony right, that you were -- had the same title under Joe Arpaio as you do now under Sheriff Sheridan; is that correct? 10:31:27 10:31:31 10:31:37 10:31:40 10:31:45

A. That's correct. 10:31:47

Q. Perfect. 10:31:48

And do you -- did your role under those two sheriffs while working under that title, your current title, was there -- was it substantially the same sort of your role, responsibilities, those sorts of things under the -- the two administrations? 10:31:49 10:31:52 10:31:55 10:31:59 10:32:02

A. Yes. 10:32:04

Q. And were you expect -- I know there was a gap in your employment there, but were you expected to main continuity sort of in communication practices across those two administrations? 10:32:05 10:32:10 10:32:15 10:32:17

MS. BARNES: Form. 10:32:21

THE WITNESS: Yeah. The -- the role is basically the same. Some changes obviously with 10:32:22 10:32:23

technology and the changes in that, but yes. 10:32:27
BY MR. STRAUS: 10:32:29
Q. Okay. 10:32:29
And did your institutional knowledge carry over from your first stint with the Sheriff's Office to your current role with the Sheriff's Office? 10:32:29 10:32:35 10:32:38
A. Yes. 10:32:40
Q. Let me -- just gonna put -- have one of my colleagues hand you the notice of deposition for today, and we'll mark that as Plaintiff's Exhibit -- 10:32:40 10:32:50 10:32:54
MR. STRAUS: I don't know. Court Reporter, do you -- do you have a preference between numbers and letters? 10:32:57 10:32:58 10:32:58
THE COURT REPORTER: I've marked numbers on my stickers. 10:32:58 10:32:58
MR. STRAUS: Perfect. Okay. So we'll call this Exhibit 1. 10:32:58 10:33:13
(Deposition Exhibit No. 1 was marked for identification.) 10:33:13 10:33:16
MR. KLOBERDANZ: I have copies for you. 10:33:16
BY MR. STRAUS: 10:33:16
Q. And just while you're looking at that, I'll just tell you that my first question is just gonna be if you've seen this document before. 10:33:17 10:33:19 10:33:23
But take all the time that you need. 10:33:24

A. Yes, I've seen this. 10:33:42
Q. And when was the first time that you saw this, on or about? Do you have a memory of when you saw this for the first time? 10:33:45 10:33:48 10:33:52
A. It's been a couple months. I don't recall. It was before the holidays. 10:33:53 10:33:59
Q. Yeah. No problem. That -- that's perfectly -- 10:34:01
Okay. Wonderful. 10:34:05
And what did you do, if anything, to prepare for today's deposition? 10:34:06 10:34:11
A. Read through this information that was provided. That -- this complaint and this -- this information here. Talked to -- 10:34:12 10:34:19 10:34:23
Q. Okay. 10:34:24
When you say -- 10:34:25
A. I talked -- 10:34:25
Q. -- information, do you mean -- 10:34:25
A. Well, I did -- I'm sorry. I didn't mean to interrupt you. 10:34:25 10:34:28
I talked to people that were knowledgeable during the last several years to find out -- get information. 10:34:28 10:34:31
Q. Okay. Wonderful. 10:34:37
Which -- which people did you speak with? 10:34:38
A. I talked with policy. I've talked with a couple -- or at least one chief that was here during that 10:34:40 10:34:47

time period. I talked with technology. And visited with one of -- one of the individuals in -- on my direct team that was also involved with -- with this information. 10:34:50 10:34:58 10:35:02

Q. When you say you talked to policy, can you just expand on that? What -- I'm not sure what that means. 10:35:07 10:35:13

A. I -- I talked to one of the -- one of the people in policy to ask them about the policies that were in place about this particular topic. 10:35:15 10:35:19 10:35:23

Q. So the Sheriff's Office has a department that's referred to as "policy"? 10:35:25 10:35:30

A. Correct. 10:35:31

Q. Is that -- 10:35:31

A. Yes. 10:35:33

Q. Okay. Got it. Sorry. 10:35:34

And do you remember the name of the person in the policy department that you spoke with? 10:35:35 10:35:38

A. I believe that was Amy Grimm. 10:35:39

Q. Okay. 10:35:41

And did Ms. Grimm provide you with any documents or -- let me just stop there. 10:35:42 10:35:45

Did Ms. Grimm provide you with any documents? 10:35:50

A. No. 10:35:52

Q. And did Ms. Grimm provide you with any summary of -- of documents or -- or anything else? Did she provide you anything like that? 10:35:53 10:35:56 10:35:59

A. No. 10:36:00
Q. So it's just, if I'm understanding right, a verbal communication that you had with her about these issues. 10:36:01 10:36:06 10:36:08
A. Correct. 10:36:09
Q. Okay. 10:36:09
And you had mentioned in -- just in one of your previous answers that you spoke to some of these people about the -- I think what you said is the time frame. 10:36:11 10:36:15 10:36:19
MS. BARNES: Sorry about that. I was just telling him to leave the exhibit -- he's flipping the pages -- until you were done with your question. 10:36:23 10:36:25 10:36:26
MR. STRAUS: Oh, sure. Sure. Thank you. 10:36:29
BY MR. STRAUS: 10:36:31
Q. Yeah, you -- I think you had mentioned that you spoke with some of these folks about a particular time frame. Did I understand you right? 10:36:33 10:36:34 10:36:38
A. Yes. Yes. The time frame prior to while I was in -- not here, not with the Sheriff's Office at that time. 10:36:39 10:36:44 10:36:49
Q. I see. That makes sense. You talked to some of these people to fill in the gaps about what may or may not have happened during the interim when you were not employed by the Sheriff's Office, yeah? 10:36:49 10:36:52 10:36:55 10:36:58
A. Correct. 10:36:59

Q. Perfect. 10:37:00
And you mentioned that you spoke to at least one chief. Who was that? 10:37:01 10:37:04
A. Mike Dawson. 10:37:07
Q. And did Mr. Dawson provide you with any documents to review? 10:37:10 10:37:15
A. No. 10:37:15
Q. Did he provide you with any summary of information from his perspective or -- or any other information in -- in written form? 10:37:15 10:37:20 10:37:23
A. No. 10:37:25
Q. So is it correct to say that your conversations were just verbal oral communications with Mr. Dawson? 10:37:25 10:37:29
A. That's correct. 10:37:33
Q. In your conversations with Ms. Grimm, was there anyone else present either in person or on the phone while you guys were speaking? 10:37:35 10:37:40 10:37:44
A. Calbert Gillett was. 10:37:45
Q. Gillett. 10:37:49
And did Mr. Gillett participate in communication, or was he -- was he an observer? 10:37:53 10:37:57
A. He was observing. 10:37:59
Q. And same question for Mr. Dawson. When you were speaking with Chief Dawson, was there anyone else present? 10:38:00 10:38:04
A. There was not. 10:38:08

Q. Perfect. Okay. 10:38:09
If you could turn to page 7 of the notice of deposition which is Exhibit 1. 10:38:11 10:38:19
And just let me know when you're ready, but take your time. 10:38:22 10:38:36
A. Okay. I'm on page 7. 10:38:41
Q. Okay. Wonderful. 10:38:45
So starting, you know, maybe a quarter of the way down on -- on line 4 of page 7 is -- begins a list of documents requested either before production or at the deposition. 10:38:46 10:38:53 10:38:58 10:39:01
What efforts, if any, did you make to secure these documents and -- and produce them or bring them with you? 10:39:03 10:39:06 10:39:10
A. We searched hard drives for any type of policy, any communication. We searched emails, talked with technology, had them search their hard drives and anything that might have that information looking for policies and information regarding mugshots. 10:39:11 10:39:17 10:39:22 10:39:25 10:39:30
Q. Okay. Wonderful. 10:39:34
And which -- you listed a couple things that were searched. I think you said databases for starters; is that correct? 10:39:35 10:39:42 10:39:47
MS. BARNES: You can answer it, and then I have -- 10:39:47 10:39:49

THE WITNESS: Yes. We searched the databases. 10:39:49 10:39:51

MS. BARNES: I just want to interject just to be clear on something, Alex. 10:39:51 10:39:54

The -- what Mr. Hegstrom is talking about is the efforts to respond to requests for production and -- and proper requests for production, not this list of documents on a notice of deposition. That's not appropriate under the rule. 10:39:56 10:39:58 10:40:02 10:40:06 10:40:10

So these efforts happened before this notice of deposition. 10:40:11 10:40:14

MR. STRAUS: I see. So -- okay. That's helpful. Thank you. 10:40:16 10:40:20

BY MR. STRAUS: 10:40:21

Q. So let me just rephrase. 10:40:24

In -- after receiving this notice of deposition which is Exhibit 1, did you make any effort to identify and obtain any of the documents that are listed here on -- beginning on page 7? 10:40:26 10:40:32 10:40:37 10:40:42

A. May I have a moment with my counsel? 10:40:43

MS. BARNES: You gotta answer when the question's pending the best you can. 10:40:55 10:40:56

THE WITNESS: Okay. 10:40:56

MR. STRAUS: Yeah. 10:40:56

MS. BARNES: If you don't understand, you 10:40:59

can say that. 10:41:01
THE WITNESS: Yeah. I don't understand. 10:41:03
Can you rephrase the question, please? 10:41:05
BY MR. STRAUS: 10:41:07
Q. Of course. Of course. 10:41:08
So you've testified today you got this notice of 10:41:09
deposition, I think you said, a month or two ago, whatever 10:41:12
the case may be. At that time when you received this 10:41:15
notice of deposition, is it correct to say that you read 10:41:19
it? 10:41:23
A. Yes. 10:41:23
Q. Okay. Wonderful. 10:41:25
When you came up to -- to this portion which is 10:41:27
on page 7 starting on line 4 where there's documents 10:41:30
requested for production at or before the deposition, did 10:41:34
you make any effort to obtain or confirm that these 10:41:37
documents requested had been either produced to plaintiffs 10:41:42
or you would bring them to the deposition today? 10:41:47
MS. BARNES: So I am gonna object here and 10:41:52
note that this is an attorney-client privileged -- it's 10:41:56
going to elicit attorney-client privileged response. 10:42:03
And again, just to be clear, this notice of 10:42:04
deposition with a list of documents is not an appropriate 10:42:08
request for production, but Mr. -- 10:42:13
MR. STRAUS: Okay. So -- 10:42:13

MS. BARNES: -- but Mr. Hegstrom's participation in trying to find responsive documents pertain to your prior 34 RFPs, and so I'm just trying to explain to you that's why there's confusion. 10:42:14 10:42:18 10:42:22 10:42:29

MR. STRAUS: Yeah. And I appreciate that. Thank you very much. That was a very long speaking objection, and I'm gonna ask you moving forward -- you certainly have the right to object to form and to, you know, elicit a privilege objection, but short of that, you know, it's not proper to have speaking objections. That's considered coaching the witness. So please let's keep to the basic rules of civil procedure in federal court. 10:42:31 10:42:33 10:42:37 10:42:42 10:42:45 10:42:50 10:42:55 10:42:58

So okay. Let me ask you this. 10:43:03

You know what? Court Reporter, could you read back my last question. 10:43:09 10:43:15

THE COURT REPORTER: Sure. 10:43:15

(The requested portion of the record was read.) 10:43:15 10:43:47

MS. BARNES: And I'm gonna instruct the witness not to answer based on attorney-client privilege. 10:43:47 10:43:49

MR. STRAUS: Okay. Can we go off the record for a minute? 10:43:55 10:43:58

MS. BARNES: Sure. 10:43:59

THE VIDEOGRAPHER: We are going off the record at 10:44 a.m. 10:44:02 10:44:03

(A recess was taken from 10:44 a.m. to 10:50 a.m.) 10:44:07 10:50:28

THE VIDEOGRAPHER: We are back on the record at 10:50 a.m. 10:50:28 10:50:30

MR. STRAUS: Thank you. 10:50:33

BY MR. STRAUS: 10:50:34

Q. Okay. We're back on the record. 10:50:36

So off the record, Counsel just had a what I hope was a respectful debate about whether that was an appropriate privilege objection, and then Counsel for the witness and the witness had a private discussion out of earshot of the rest of us. 10:50:37 10:50:41 10:50:45 10:50:48 10:50:53

Okay. So we are back on the record. I'm gonna try to reiterate the question that was pending at the time. 10:50:55 10:51:00 10:51:04

After receiving Exhibit 1, which is your notice of deposition, and reading the document request for production at or before the deposition, did you make any effort to secure or produce the documents requested? 10:51:05 10:51:09 10:51:14 10:51:17

A. I had conversations with my -- my counsel, and that's the extent of that. 10:51:23 10:51:29

Q. It's correct to say that you had conversations with your counsel in lieu of searching for or identifying the documents requested; is that fair? 10:51:31 10:51:35 10:51:40

A. That's fair. 10:51:42

Q. Okay. 10:51:46
And when you say you had a conversation with your counsel, and I know you have a number of attorneys representing you, which counsel was that conversation with? 10:51:46 10:51:52 10:51:57 10:51:59
A. That would be with Ms. Barnes. 10:51:59
Q. Was it just Ms. Barnes alone? 10:52:03
A. I believe she had -- I believe Roshin was present for many of those. 10:52:05 10:52:09
Q. Anyone else involved? 10:52:10
A. I don't recall during those conversations there being more than just Roshin and -- and Sarah. 10:52:12 10:52:21
Q. And were those conversations in person, on the phone, via Zoom, some other manner? 10:52:24 10:52:27
A. All of the above. 10:52:32
Q. All the above. Okay. 10:52:32
And since receiving this notice of deposition, how many times approximately did you meet with -- and when I say meet with, I don't necessarily mean in person. But how many times did you meet with and -- and talk to your attorneys? 10:52:35 10:52:38 10:52:40 10:52:44 10:52:47
A. Multiple times. I don't -- I don't have a number. 10:52:48 10:52:51
Q. Do you think it would be more than ten? 10:52:51
A. Yes. 10:52:55

Q. More than 20? 10:52:57
A. I -- I don't know that it was that many. 10:53:00
Q. Somewhere -- fair to say somewhere between ten and 20? 10:53:04 10:53:09
A. Yes. That's fair. 10:53:10
Q. Okay. 10:53:13
And apart from Roshin and Ms. Barnes, I think you just testified and I just confirmed, there was no one else present on the phone, on the Zoom that you're aware of? No one else in the room where you were, no one else in the room where they were; is that fair? 10:53:14 10:53:22 10:53:27 10:53:29 10:53:31
A. That's correct. That's fair. 10:53:31
Q. And when was the most recent of these meetings? 10:53:33
A. This morning. 10:53:39
Q. And how long did that meeting last? 10:53:40
A. Maybe ten minutes. 10:53:44
Q. What was the longest of those meetings, if you could estimate? If you're not able to estimate and you have to guess, I don't want that, but. 10:53:47 10:53:53 10:53:56
A. I -- I -- I can't answer that question. I don't know. 10:53:57 10:54:01
Q. Okay. Okay. 10:54:01
Let's -- let's go back to what I think was your original answer, and maybe because my question wasn't great. 10:54:06 10:54:12 10:54:16

You had mentioned -- you testified to searching a number of databases and emails and -- and perhaps some other things in response to my question about this notice of deposition, but is it correct to say that your answer about those searches was really in search of documents responsive to discovery requests that had come in previously; is that fair? 10:54:16 10:54:19 10:54:23 10:54:27 10:54:31 10:54:38 10:54:41
A. That's fair. 10:54:42
Q. Okay. Wonderful. 10:54:44
And the databases that were searched, which -- which databases were searched? 10:54:45 10:54:48
A. The -- the hard drive we went on through the -- what's called the P drive, which is the -- got all our policies, and then technology did a search as well on their internal for -- for that -- that information. 10:54:52 10:54:55 10:54:59 10:55:02
Q. Okay. 10:55:06
And starting with the P drive, was that a search that you personally conducted or directed someone to conduct? How did that happen? 10:55:07 10:55:10 10:55:15
A. Both. Both. I searched it and then had somebody else search it with using the search topic of -- of mugshots and -- and whatnot. 10:55:16 10:55:21 10:55:24
Q. Okay. 10:55:26
And starting with the search that you did, what was the result of that search? 10:55:27 10:55:33

A. There were no policies that came back with that being the topic. 10:55:35 10:55:43
Q. Okay. 10:55:44
We're gonna get into a little bit of the discovery responses, so maybe we'll leave that for then. 10:55:46 10:55:51
But I think you mentioned that there was another person besides you that assisted or did a duplicate search. Who -- who was that person -- 10:55:55 10:55:57 10:56:02
A. That was Calbert Gillett. 10:56:04
Q. -- or persons? 10:56:06
It was Gillett. Got it. Okay. 10:56:08
And was there any difference in the result of his efforts to -- to conduct those searches as opposed to the efforts that you made personally? 10:56:10 10:56:14 10:56:18
A. No. 10:56:19
Q. So is it fair to say that -- I know you said that no policies came back but that requests for production were more extensive than just policies. 10:56:20 10:56:23 10:56:27
Did any results come back from the searches that you personally conducted? 10:56:30 10:56:33
A. I don't remember if it was two or three press releases from 2011. 10:56:34 10:56:39
Q. Okay. 10:56:43
Any difference between the results that you personally were able to gather which you've just described 10:56:43 10:56:47

and the results that Mr. Gillett performed? 10:56:53
A. I don't -- 10:56:58
Q. Sorry. Not the results. More about the -- the searches that he performed. 10:56:59 10:57:00
Did he -- was he able to find any documents that you were not able to find? 10:57:01 10:57:03
A. I don't believe so. 10:57:05
Q. And you mentioned searching emails. 10:57:06
Do you know whose emails were searched, or was it a global -- strike that. 10:57:11 10:57:14
Can you describe to me what emails were searched? 10:57:16
A. I -- I went through all of my previous emails as far back as they would go, and it went to -- there was nothing on mugshots in any of that as well just to make sure there was nothing new. 10:57:19 10:57:24 10:57:27 10:57:31
Q. And so is it correct to understand your testimony to say that by using the search term "mugshot" on your emails, nothing came back? 10:57:34 10:57:40 10:57:46
A. I don't recall anything coming back with that -- with that search topic on my emails. 10:57:47 10:57:54
Q. And is that the only -- I apologize for interrupting. 10:57:56 10:58:00
Was that the only search topic that was used? 10:58:00
A. I believe so, yes. 10:58:05
Q. Okay. 10:58:10

Was there any other emails searched besides yours? 10:58:14 10:58:19

MS. BARNES: Form and foundation. 10:58:19

THE WITNESS: Not aware of any. 10:58:20

BY MR. STRAUS: 10:58:24

Q. So it's your understanding that, in order to respond to the discovery requests in this action, that the only emails that were searched were your personal emails? Is that -- 10:58:27 10:58:33 10:58:35 10:58:39

And when I say personal emails, I don't mean your personal emails; I mean your email address at the Sheriff's Office. 10:58:39 10:58:43 10:58:45

MS. BARNES: Form and foundation. 10:58:46

MR. STRAUS: You can answer. 10:58:49

THE WITNESS: I -- I searched mine, and I don't know if the other people that were in discussion searched as well. 10:58:50 10:58:53 10:58:57

BY MR. STRAUS: 10:58:59

Q. Who were the other people in the discussion? 10:59:00

MS. BARNES: Form and foundation. 10:59:02

THE WITNESS: I -- I just know of Calbert Gillett -- I don't -- and I believe people from the legal liaison were gonna do some -- could do some searches as well. 10:59:03 10:59:07 10:59:11 10:59:14

BY MR. STRAUS: 10:59:14
Q. Of their own. Okay. 10:59:14
Do you know what search terms they used? 10:59:16
MS. BARNES: Form. Foundation. 10:59:17
THE WITNESS: I do not. 10:59:19
BY MR. STRAUS: 10:59:20
Q. And I'll represent that we've been -- hopefully 10:59:20
I'll summarize it properly. But we've been informed by 10:59:24
defendants that using the search term "mugshot" in some 10:59:27
instances in their searches, the -- was a too 10:59:32
general -- the term is too general to bring back search 10:59:37
results. 10:59:40
Do you think that that is the -- could have been 10:59:42
the situation with your email as well, that it's too 10:59:45
general a term to garner results? 10:59:50
MS. BARNES: Form. 10:59:53
THE WITNESS: I can't answer that question. 10:59:56
I don't know. 10:59:58
BY MR. STRAUS: 10:59:58
Q. Do you think sitting here today that you've ever 11:00:01
either sent or received an email with the word "mugshot"? 11:00:04
MS. BARNES: Form. 11:00:09
THE WITNESS: I'm -- I'm sure I have. 11:00:09
BY MR. STRAUS: 11:00:15
Q. What would be -- what do you think would be the 11:00:17

reason if you -- if you had sent or received an email with the word "mugshot" that that email or those emails would not have come back as a result of your search? 11:00:21 11:00:26 11:00:30

MS. BARNES: Form. Foundation. 11:00:33

THE WITNESS: So the answer to that is those would have been for current mugshots that went out. 11:00:34 11:00:47

And if we go back to the previous question, I mean, those came up, but nothing regarding policies or procedures with mugshots ever came up. 11:00:50 11:00:54 11:00:58

BY MR. STRAUS: 11:01:01

Q. Were you also searching for -- you know what? We'll -- we'll -- we'll leave that for just a little bit later. Okay. 11:01:05 11:01:09 11:01:12

So you did not bring any documents with you today; is that correct? 11:01:13 11:01:23

A. I did not. 11:01:24

Q. Okay. 11:01:25

And you did not identify any documents in response to this notice of deposition that had not been previously produced and did not identify any additional documents in conducting your search or your preparation today; is that fair? 11:01:26 11:01:32 11:01:35 11:01:42 11:01:46

A. That's correct. 11:01:48

Q. And does your email that you searched include both of your stints with the Sheriff's Office? In other 11:01:48 11:01:58

words -- let me just leave it there. 11:02:04
Do you know whether your email, current email, dates back to your original tenure with the Sheriff's Office, or is it just this most recent stint starting in January of 2025? 11:02:07 11:02:09 11:02:13 11:02:17
A. It's just my most recent stint at that email address. 11:02:18 11:02:22
Q. Do you have access to your previous email? 11:02:23
MS. BARNES: Form and foundation. 11:02:25
THE WITNESS: I don't know the answer to that. I've not -- that would be something that the legal team could do -- could -- could search. I cannot. I don't believe I can. 11:02:26 11:02:29 11:02:33 11:02:37
BY MR. STRAUS: 11:02:38
Q. Okay. 11:02:38
So it's fair to say -- or is it fair to say that there was no search done of any emails that you're aware of prior to January of 2025? 11:02:38 11:02:42 11:02:46
MS. BARNES: Form and foundation. 11:02:50
THE WITNESS: Not by me. 11:02:51
BY MR. STRAUS: 11:02:53
Q. Do you know whether Mr. Gillett conducted any email searches of emails prior to January 2025? 11:02:55 11:03:00
A. I do not know if he did. 11:03:06
Q. Okay. 11:03:08

Do you know if anyone else did any searches of emails prior to 2025? 11:03:09 11:03:11
MS. BARNES: Form and foundation. 11:03:13
THE WITNESS: I do not know if they did. 11:03:14
BY MR. STRAUS: 11:03:18
Q. Okay. 11:03:18
And generally how would you describe your role in responding to the discovery in this case? 11:03:18 11:03:25
A. I would -- 11:03:29
MS. BARNES: Form. 11:03:29
THE WITNESS: I would -- 11:03:29
MS. BARNES: Go ahead. 11:03:30
THE WITNESS: -- I would discuss with my -- my attorney. 11:03:30 11:03:33
BY MR. STRAUS: 11:03:34
Q. So I'm not sure if I understand that answer. 11:03:38
Is your answer that your role in this -- your role in the discovery for this case involves speaking with your attorney? Is that -- was that what -- 11:03:40 11:03:44 11:03:50
A. Being -- 11:03:50
Q. I just want to make sure I understand your answer. 11:03:51 11:03:54
A. Being responsive to Counsel and what they've asked. 11:03:54 11:03:58
Q. Okay. 11:03:58

So you didn't make any -- is it fair to say that you didn't make any independent decisions about what to search or not search in response to the discovery requests in this matter? Is that fair? 11:03:59 11:04:10 11:04:14 11:04:21

MS. BARNES: Form. 11:04:23

THE WITNESS: I responded to the request by Counsel. 11:04:23 11:04:26

BY MR. STRAUS: 11:04:26

Q. Okay. Fair. 11:04:28

Okay. You can put that notice of deposition aside. I don't think we're gonna need it. Certainly not right away. 11:04:28 11:04:37 11:04:42

How closely does the communications department work with the Sheriff's Office during your tenure with Sheriff Arpaio? 11:04:43 11:04:48 11:04:52

A. I don't know that I understand what you're asking. 11:04:54 11:04:57

Q. Yeah. 11:04:58

Let's say this: How often in the course of -- strike that. 11:04:59 11:05:04

When you were working in Sheriff Arpaio's administration, did you speak with him on a daily basis? 11:05:05 11:05:09

A. I did. 11:05:12

Q. And during your tenure with the current sheriff, do you speak with him on a daily basis? 11:05:13 11:05:21

MS. BARNES: Form. 11:05:24
THE WITNESS: When he come -- when he's in 11:05:24
the office, absolutely. 11:05:27
BY MR. STRAUS: 11:05:29
Q. Okay. 11:05:29
You don't speak to him if he's not physically in 11:05:29
the office? 11:05:36
A. Sometimes. Sometimes I do. 11:05:36
Q. And -- and how do you communicate when -- when 11:05:39
he's not in -- when it's not face to face, how -- what is 11:05:43
generally your mode of communication with the sheriff 11:05:48
currently? 11:05:51
A. Telephonic. 11:05:51
Q. Do you ever email him? 11:05:53
A. I do not email him. 11:05:55
Q. Did you ever email -- 11:05:56
Oh, I apologize. Continue. 11:05:58
A. I mean, I may have sent him an email of some sort 11:05:59
of communication, but generally it's -- it's telephone. 11:06:05
Q. Got it. 11:06:07
And yeah, I'm not trying to -- no gotcha 11:06:08
questions here. I'm not trying to hold you to that. 11:06:11
But so I understand your testimony, generally 11:06:15
your -- your -- your most common form of communication is 11:06:16
via telephone, and -- and emails are much less frequent; 11:06:19

is that fair? 11:06:23
A. That's correct. 11:06:23
Q. And during your tenure with Sheriff Arpaio's administration, was there any difference there in -- in your modes of communication with the sheriff? 11:06:24 11:06:30 11:06:32
MS. BARNES: Form. 11:06:34
THE WITNESS: It was all face-to-face or telephonic. 11:06:34 11:06:38
BY MR. STRAUS: 11:06:39
Q. Back in the Arpaio administration, was email a form of communication between folks in the Sheriff's Office? I understand not directly between you and -- and the sheriff, but other folks in the Sheriff's Office, is email -- was email a common form of communication? 11:06:42 11:06:47 11:06:51 11:06:53 11:06:56
MS. BARNES: Form. Foundation. 11:06:59
THE WITNESS: I don't know that his -- he had email. I'm sure he probably did, but it all went to his administrative assistant if it was email to him. 11:07:00 11:07:02 11:07:06
BY MR. STRAUS: 11:07:10
Q. Okay. 11:07:10
And when you're communicate -- when you were communicating with Sheriff Arpaio during that time via phone call, was that -- did that also include text messages? 11:07:12 11:07:19 11:07:23 11:07:26
A. No. He doesn't -- he doesn't text message. 11:07:26

Q. Okay. And man. I need that job too. 11:07:29
And the cell phone that you were personally communicating on, is that your personal cell phone, or was that a cell phone provided by the Sheriff's Office or someone else? 11:07:33 11:07:40 11:07:43 11:07:46
A. That was a work county phone. 11:07:46
Q. Okay. 11:07:49
So you did not pay that bill directly personally? 11:07:49
A. Correct. 11:07:53
Q. Is that the case now with -- under the current administration? 11:07:54 11:07:59
A. I do have a county phone. 11:08:00
Q. You have a county phone. Got it. 11:08:02
Do you also have a personal phone? 11:08:05
A. I do. 11:08:05
Q. Do you ever communicate work matters from your personal phone? 11:08:05 11:08:10
A. I -- I'm sure I have. 11:08:11
Q. Generally now, you know, in the current administration since you joined back in January 2025 -- again, I know you've testified that you don't email very often with the current sheriff, but in terms of the Sheriff's Office in general, is email a common form of communication amongst staff and other personnel? 11:08:16 11:08:22 11:08:27 11:08:31 11:08:35 11:08:38
MS. BARNES: Form and foundation. 11:08:43

THE WITNESS: It is. 11:08:44
BY MR. STRAUS: 11:08:45
Q. Just want to try to skip as much as possible here. 11:09:00 11:09:03
Was your email address in your -- during your time with Sheriff Arpaio the same email address? In other words, you know, probably your name @MCSO or whatever it is, is it the same email address as you currently use or was there a change in the -- the actual email address? 11:09:03 11:09:10 11:09:17 11:09:23 11:09:27
A. I believe it's changed. 11:09:30
In fact, yes, it has. 11:09:32
Q. Changed? 11:09:33
A. Yep. 11:09:33
Q. And what was your previous email address, if you remember? 11:09:33 11:09:36
A. I -- I don't remember if it was -- I don't remember. I don't recall. 11:09:36 11:09:39
Q. No problem. That's okay. 11:09:40
What's your current email address? 11:09:44
A. Christopher.hegstrom@mcso.maricopa.gov. 11:09:47
Q. Got it. 11:09:53
And is it the case that sort of the -- the general structure of email addresses for everyone back in the Arpaio administration changed as compared to now, or is it because you had a different stint that just your 11:09:53 11:09:55 11:10:00 11:10:06

email address changed, if you know? 11:10:10
MS. BARNES: Form and foundation. 11:10:12
THE WITNESS: All new employees have got 11:10:13
the -- the structure prior to the -- anybody that was here 11:10:16
before has the same structure as before. 11:10:20
BY MR. STRAUS: 11:10:24
Q. Got it. Yep. Okay. 11:10:25
Would you personally have a problem allowing a 11:10:27
search of your email using more targeted search terms? 11:10:39
MS. BARNES: Form. 11:10:43
THE WITNESS: Search my email? Absolutely. 11:10:43
No problem. 11:10:47
BY MR. STRAUS: 11:10:47
Q. Okay. 11:10:49
Has -- has anyone ever presented you with 11:10:49
alternative search terms different than the ones that you 11:10:55
searched on your own? 11:11:00
MS. BARNES: I'm gonna instruct the witness 11:11:02
not to answer. 11:11:05
BY MR. STRAUS: 11:11:05
Q. I don't want to hear anything that your attorney 11:11:06
said specifically. I just want to know if anyone 11:11:09
presented you with alternative search terms. 11:11:12
MS. BARNES: And again, I'm going to 11:11:12
instruct the witnesses not to answer on the 11:11:14

attorney-client privilege basis to the extent that anyone other than anyone related to your attorneys did or did not -- 11:11:17 11:11:20 11:11:25

MR. STRAUS: That's fair. 11:11:25

MS. BARNES: -- give you an answer to that. 11:11:26

MR. STRAUS: And I'll -- and I'll just state the question again. That's a fair objection. 11:11:28 11:11:30

BY MR. STRAUS: 11:11:32

Q. Did anyone other than your attorneys present you with any alternative search terms to search your email for responsive documents in this case? 11:11:32 11:11:36 11:11:42

A. No. 11:11:44

Q. Okay. So I'm gonna -- I'm gonna -- well, strike that. 11:11:45 11:12:12

Can you explain how the practice of publishing mugshots on the Sheriff's Office website first began? 11:12:12 11:12:20

MS. BARNES: So could I -- I just want to ask this and get this out of the way now. 11:12:25 11:12:25

Your notice of deposition discusses that the 30(b)(6) inquiry of this witness begins as of 2019. So I guess I'll allow a few of those questions, but I just want to remind you that that's where the notice of deposition sets the beginning of the inquiry for this deposition. Fair? 11:12:27 11:12:29 11:12:38 11:12:42 11:12:45 11:12:48

Do you want me to tell you where it is? 11:12:52

MR. STRAUS: No. I see it. 11:12:53
MS. BARNES: Okay. 11:12:55
I'm fine with a couple of those general 11:12:56
questions. I was just reminding you, Alex. 11:12:59
MR. STRAUS: No. No, I -- and I appreciate 11:13:03
that. So -- and -- and I don't mind having this brief 11:13:08
discussion on the record. 11:13:14
You're right. I do see that in the notice of 11:13:16
deposition. At the same time, Mr. Hegstrom was -- was 11:13:18
involved in the discovery process, as he's already 11:13:24
testified. And the time frame for the discovery 11:13:30
responses, you know, dates back to the -- the beginning of 11:13:35
this practice, which is why I'm asking about that. 11:13:38
MS. BARNES: We actually objected and had 11:13:40
the responses limited to 2019, as you and I have discussed 11:13:43
repeatedly. 11:13:43
So it's the same time frame, but like I said, you 11:13:46
know, he can answer a handful of questions, and 11:13:51
I'll -- I'll make objections as needed, but -- but our 11:13:51
position is this is limited to 2019 and forward. 11:13:55
MR. STRAUS: Yeah. And you've been very 11:13:59
clear with that position. We have all -- you know, we 11:14:02
have -- we're not in agreement on that position, but 11:14:05
that's, you know, that's common at this point -- 11:14:09
MS. BARNES: Sure. 11:14:10

MR. STRAUS: -- in litigation. So -- so I appreciate everything you've said and how you've said it. Thank you. 11:14:10 11:14:11 11:14:14

BY MR. STRAUS: 11:14:16

Q. So again, do you have a memory of how the -- strike that. 11:14:16 11:14:21

Do you know when the practice of publishing mugshots on the Sheriff's Office website began? 11:14:23 11:14:28

A. I -- 11:14:31

MS. BARNES: Form. 11:14:31

Go ahead. I'm just gonna make my objections. 11:14:33

Form. 11:14:33

Go ahead. 11:14:34

THE WITNESS: I believe it dates back to 2002. 11:14:34 11:14:36

BY MR. STRAUS: 11:14:39

Q. Okay. 11:14:39

And what is your understanding as a 30(b)(6) witness of how that practice came to -- came to fruition? In other words, do you know who made the decision to do that -- 11:14:40 11:14:48 11:14:54 11:14:57

MS. BARNES: Form. 11:14:57

BY MR. STRAUS: 11:14:58

Q. -- to start publishing these mugshots? 11:14:58

MS. BARNES: Sorry. Form. 11:15:02

Go ahead. 11:15:03

THE WITNESS: I don't know who was -- who made the decision. I believe Lisa Allen was the director at that time and Sheriff Joe Arpaio. 11:15:04 11:15:05 11:15:10

BY MR. STRAUS: 11:15:13

Q. What is your understanding of the reasons for beginning the publication of these -- of these mugshots on the website? 11:15:15 11:15:17 11:15:20

MS. BARNES: Form and foundation. 11:15:21

THE WITNESS: Transparency. Just general awareness of things that the Maricopa County Sheriff's Office is doing. 11:15:24 11:15:29 11:15:34

BY MR. STRAUS: 11:15:35

Q. Okay. 11:15:36

Was that the only purpose that -- that you're aware of, transparency? 11:15:36 11:15:43

MS. BARNES: Form and foundation. 11:15:46

THE WITNESS: I think it had many -- a multitude of things that it was able to do, and that is to alert the public to the transparency of what's going on in the office. It also assisted in finding fugitives, giving -- drawing people to the website. 11:15:48 11:15:50 11:15:55 11:15:58 11:16:06

So there were other things on the website that people might be able to get information from like crime-ridden neighborhoods that they might want to watch 11:16:07 11:16:10 11:16:14

out, which is also published on there. So the mugshot 11:16:16
page was just another way to draw people to the Maricopa 11:16:19
County's Sheriff's Office website. 11:16:24
BY MR. STRAUS: 11:16:27
Q. Okay. 11:16:27
And when you say draw people to the website, for 11:16:28
the purpose of traffic and things like that, or is that 11:16:32
still for the purpose of transparency? 11:16:36
A. It's both. It's the transparency so people can 11:16:40
see that's what's going on at the Sheriff's Office 11:16:45
apparently -- not apparently. 11:16:47
The Maricopa County Sheriff's Office, 75 percent 11:16:48
of our operation is the jail function. Again, it's to 11:16:51
show the public some of what we do. 11:16:54
Q. Okay. 11:16:56
And how does posting the mugshots educate people 11:16:57
about how the Sheriff's Office conducts itself? 11:17:07
A. It brings people to the website. Obviously 11:17:10
they're looking to see people that have been apprehended 11:17:13
by local law enforcement to see if that's something that 11:17:16
helps out something that happened in their neighborhood. 11:17:21
They're looking to see if that's a person that lives 11:17:24
in -- that's -- that could be potentially dangerous for 11:17:27
them. And it brings people to the website to look at 11:17:30
that, and then they transition to other places on the 11:17:32

website. 11:17:36

Q. Okay. 11:17:36

Is there anything on the mugshot lookup page that facilitates that transfer of people to other portions of -- of the website? 11:17:38 11:17:45 11:17:49

MS. BARNES: Form. 11:17:50

THE WITNESS: There are other tabs that you can see and start clicking on once you -- once -- on any page on the website. 11:17:51 11:17:53 11:17:58

BY MR. STRAUS: 11:17:59

Q. All right. 11:18:00

And what's your understanding of why the mugshots were -- and I understand right now, there's -- like, there's a different policy -- but your understanding of why the mugshots were only posted for three days? 11:18:00 11:18:07 11:18:10 11:18:12

A. Just -- 11:18:12

Q. Why is that? 11:18:12

A. My understanding is that's just the way it always was. They just posted them for three days, and then -- then they removed them at the time. 11:18:16 11:18:20 11:18:23

Q. Do you know why three days was chosen as opposed to one day or three weeks or a year or what have you? 11:18:25 11:18:29

MS. BARNES: Form and foundation. 11:18:33

THE WITNESS: I do not know the answer as to why only three days. 11:18:34 11:18:36

BY MR. STRAUS: 11:18:37
Q. In terms of catching a fugitive, for instance, as you've mentioned one of the purposes, is there an advantage to -- for that purpose to -- to removing the mugshot after three days? 11:18:39 11:18:43 11:18:47 11:18:51
MS. BARNES: Form. 11:18:55
THE WITNESS: I -- as people were populating that website, people would get -- start getting buried. Obviously that would -- with two to three hundred people being booked into the jail every day, pictures start getting buried, so there would probably be -- have been no purpose to have them left up much longer, because then you wouldn't have found them right away. You wouldn't have seen them. 11:18:55 11:19:01 11:19:04 11:19:08 11:19:11 11:19:14 11:19:18 11:19:19
BY MR. STRAUS: 11:19:19
Q. There was a mugshot lookup search feature, was there not? 11:19:20 11:19:23
A. I believe there was, yes. 11:19:24
Q. Wouldn't -- so if there had been a thousand, two thousand, a hundred thousand mugshots posted and -- and remained on there, wouldn't people be able to search for a particular mugshot through that feature? 11:19:25 11:19:30 11:19:35 11:19:38
MS. BARNES: Form. 11:19:41
THE WITNESS: I believe so. If they were there, yeah. 11:19:41 11:19:44

BY MR. STRAUS: 11:19:45

Q. If -- so if another law enforcement official or, you know, a neighbor or anyone was trying to identify a detainee or someone who had been arrested, after three days -- three days after they were arrested, would they have any ability to find that person's mugshot after that three-day period? 11:19:50 11:19:54 11:20:04 11:20:10 11:20:14 11:20:18

A. I believe they were still discoverable if they were in custody. 11:20:21 11:20:29

Q. And if they were no longer in custody, would -- would anyone be able to find them after that three-day period? 11:20:30 11:20:34 11:20:37

A. You would not -- I don't believe you were able to pull them up at that point. 11:20:38 11:20:42

Q. Would that hamper the ability of another law enforcement officer, for instance, to -- to locate or find this information about an arrestee after that three-day period? 11:20:43 11:20:47 11:20:51 11:20:55

A. No. Law enforcement has other avenues to get that information. 11:20:55 11:21:00

Q. So law enforcement was not one of the reasons that these mugshots were being published. 11:21:02 11:21:04

MS. BARNES: Form. 11:21:08

THE WITNESS: No. 11:21:08

BY MR. STRAUS: 11:21:09
Q. Is that right? 11:21:09
A. Correct. 11:21:10
Q. Okay. 11:21:11
So -- so what is the -- who would be looking for a fugitive other than law enforcement? 11:21:11 11:21:14
A. We're just, I mean, in general talking about people that in neighborhoods worried about -- maybe they saw something in their neighborhood and they look and see it. 11:21:17 11:21:20 11:21:24 11:21:27
Again, it was just another tool for law enforcement to use using their -- using the citizens to help them being the eyes and ears. 11:21:27 11:21:30 11:21:34
Q. And if that's the purpose, then why was it limited to three days of posting? 11:21:37 11:21:42
MS. BARNES: Form. 11:21:45
THE WITNESS: I don't know why they picked three days specifically. Again, photos with three hundred -- two to three hundred people being booked in every day, photos would have gotten buried, and nobody's even -- at some point, you gotta also with a database size, gotta -- gotta limit some of that. We can't -- I mean, putting it all up there would be -- would slow everything down on the website. 11:21:45 11:21:49 11:21:55 11:21:58 11:22:02 11:22:05 11:22:09 11:22:12

BY MR. STRAUS: 11:22:14
Q. Is -- is that what the Sheriff's Office was told, 11:22:14
that if these mugshots were not removed after three days 11:22:16
that it would slow down the system or -- or otherwise lose 11:22:20
capacity? 11:22:24
MS. BARNES: Form and foundation. 11:22:24
Go ahead. 11:22:26
THE WITNESS: I don't believe they were told 11:22:27
that. I don't know. Again, speaking out of -- of just 11:22:29
from my general knowledge of how technology works. 11:22:33
BY MR. STRAUS: 11:22:38
Q. Okay. 11:22:41
But you're not aware of any -- of any third-party 11:22:41
vendor or expert or anyone in the Sheriff's Office having 11:22:50
made that determination that the three-day posting was 11:22:56
somehow advantageous technologically; is that correct? 11:23:01
MS. BARNES: Form and foundation. 11:23:06
THE WITNESS: Correct. 11:23:07
BY MR. STRAUS: 11:23:08
Q. Do you see any advantage for the purpose of 11:23:11
identifying a fugitive or public safety to having the 11:23:16
mugshots posted for more than three days? 11:23:21
MS. BARNES: Form. 11:23:25
THE WITNESS: No. 11:23:26

BY MR. STRAUS: 11:23:26
Q. So you don't think it would be helpful if someone in the neighborhood was looking, you know, using the website in that way on day four after the person was arrested? It wouldn't have been advantageous to also have that mugshot posted on day four? 11:23:28 11:23:33 11:23:36 11:23:41 11:23:44
MS. BARNES: Form. 11:23:48
THE WITNESS: I don't -- I mean -- I mean, I can't say that it wouldn't be, but I can tell you that I -- after three days, you're gonna start looking through mugshots. You're talking almost 900 photos. You're probably going to not even make it that far. 11:23:48 11:23:54 11:23:58 11:24:01 11:24:03
BY MR. STRAUS: 11:24:06
Q. But if you're looking for a particular person, you could have searched for them, correct, by name? 11:24:07 11:24:10
MS. BARNES: Form. 11:24:12
THE WITNESS: I believe so, yes. 11:24:13
BY MR. STRAUS: 11:24:15
Q. But if that person was no longer a detainee on day four, if you searched for their name, you would not find any information that you would have found the day before; correct? 11:24:15 11:24:21 11:24:24 11:24:26
A. I believe that's correct. 11:24:27
Q. And you don't see any disadvantage for the purpose of public safety in having no information on day 11:24:28 11:24:31

four? 11:24:36
MS. BARNES: Form. 11:24:36
THE WITNESS: No. 11:24:37
BY MR. STRAUS: 11:24:38
Q. No. 11:24:39
Do -- do police departments continue looking for fugitives after the third day that they're on the run? 11:24:39 11:24:48
A. Absolutely. 11:24:51
Q. And why is that? Why don't they just only look for three days? 11:24:51 11:24:55
MS. BARNES: Form. Foundation. 11:24:57
THE WITNESS: That's -- that's their job. The public is -- assists when they can, but it's the -- it's law enforcement's job to go search for those people until they find them. 11:24:58 11:25:01 11:25:01 11:25:06
BY MR. STRAUS: 11:25:07
Q. Is there any -- is there anything -- strike that. 11:25:08
How does a search for a fugitive by law enforcement change on day three compared to day four? 11:25:17 11:25:23
MS. BARNES: Form and foundation. 11:25:27
THE WITNESS: I don't work on the sworn side. I can't answer your question on how their searches happen. 11:25:28 11:25:31 11:25:36
BY MR. STRAUS: 11:25:36
Q. But your testimony is that you don't know why the 11:25:36

three-day period was -- was chosen; correct? 11:25:39
MS. BARNES: Form. Foundation. 11:25:43
THE WITNESS: That's correct. I do not know 11:25:44
why three days was the specific number they went with. 11:25:45
BY MR. STRAUS: 11:25:48
Q. And apart from the -- sort of the -- the data 11:25:49
accumulation that you've testified about, are you aware of 11:25:54
any strategic reason in terms of transparency or public 11:25:56
safety as to why the postings would have been limited to 11:26:03
three days? 11:26:07
MS. BARNES: Form. Foundation. 11:26:08
THE WITNESS: No. 11:26:08
BY MR. STRAUS: 11:26:09
Q. Were there any alternatives to publishing 11:26:11
mugshots ever discussed? 11:26:16
MS. BARNES: Can you identify the time 11:26:18
frame? 11:26:21
MR. STRAUS: We can talk about from -- even 11:26:23
from 2019 and beyond. 11:26:26
BY MR. STRAUS: 11:26:30
Q. Was there any alternatives to posting mugshots -- 11:26:31
A. I don't believe -- 11:26:33
Q. -- discussed? 11:26:34
A. I don't believe so. 11:26:35
Q. And I know you mentioned another individual, but 11:26:36

is it your understanding that Sheriff Arpaio was the ultimate decisionmaker regarding the publication of website -- of mugshots? Pardon me. 11:26:49 11:26:55 11:27:00

MS. BARNES: Form and foundation. 11:27:02

THE WITNESS: Yes. 11:27:03

BY MR. STRAUS: 11:27:04

Q. Is there any discussion that you're aware of any time at any point that you're aware of discussions about how the public might interpret mugshots of individuals who had not been convicted? 11:27:21 11:27:23 11:27:27 11:27:32

MS. BARNES: Just to clarify, could you just say which time frame? Are you saying any time ever? 11:27:35 11:27:39

MR. STRAUS: Any time ever if -- if it's your preference. I know you've -- you know, I don't want -- I don't want to talk about stuff beyond the notice of deposition when it's not absolutely necessary, so we can start at, you know, 2019 and beyond if we need to. 11:27:42 11:27:44 11:27:47 11:27:50 11:27:55

BY MR. STRAUS: 11:27:58

Q. Was there ever any discussion about how -- and let me strike that. Let me just raise a foundation -- establish something first. 11:27:59 11:28:02 11:28:05

Mugshots were posted regardless of whether the arrestee was ultimately convicted or -- or pled guilty to the offense. Is that accurate? 11:28:07 11:28:12 11:28:16

A. That is correct. 11:28:19

Q. And, in fact, the mugshots -- how long after an arrestee was arrested were the mugshots posted? 11:28:20 11:28:26
MS. BARNES: Form. 11:28:32
Go ahead. 11:28:33
THE WITNESS: What -- what time frame -- I gotta know what time frame are you referring to? 11:28:33 11:28:35
BY MR. STRAUS: 11:28:37
Q. Sure. 11:28:39
We can start at -- at 2019 if you'd like. 11:28:39
A. I believe -- 11:28:45
Q. So from 2019 and beyond, how long after an arrestee was arrested were these mugshots -- was -- was the goal to -- to post the mugshot? 11:28:46 11:28:50 11:28:54
A. It varied depending on what they -- when they received that mugshot. 11:28:56 11:29:00
So they take the mugshot. It would be posted there. There was time frames that could change, but as far as changing, I mean, the start time for the three hours, 6:00 and 9:00 is something along that nature. So if it was within that first -- that first three hours, it might get posted then. 11:29:01 11:29:04 11:29:07 11:29:10 11:29:14 11:29:18
So again, it just all depended on when we did it. We did posts -- I can't remember. I want to say it was 3:00, 6:00 and 9:00 p.m. or some -- 3:00 a.m., 6:00. I don't remember the exact times, but that's when the 11:29:20 11:29:24 11:29:29 11:29:31

posting would have occurred. So -- 11:29:34

Q. That makes sense. So some -- 11:29:36

Sorry. 11:29:39

A. So if they came in at 2:00 a.m. and it was a 3:00 a.m. post, they would have gone up at 3:00. But if they came in at 3:01, it wouldn't have gone up until, like, 9:00 that morning or -- or whatever those time frames were. 11:29:39 11:29:43 11:29:44 11:29:47 11:29:49

Q. Got it. 11:29:49

So maybe if they came in at, you know, 9:20, they might not be posted until the next morning at 3:00 a.m. or what have you. I'm not holding you to that, but -- but I get what you're saying: They're -- they're posted at the first available opportunity, and there were sort of windows at which time postings went up; is that fair? 11:29:51 11:29:55 11:29:58 11:30:00 11:30:03 11:30:07

A. That's correct. 11:30:11

Q. Okay. 11:30:11

And so just in a practical sense, these postings almost -- frequently these mugshots were posted before there was any determination about the guilt or innocence of the arrestee; is that fair? 11:30:15 11:30:21 11:30:27 11:30:31

A. That's correct. 11:30:35

Q. Was there any ever -- that you're aware of, were there any -- were there any discussions about the impact of posting a mugshot of an arrestee that was ultimately 11:30:35 11:30:38 11:30:42

not found guilty of the crime that they were arrested for? 11:30:48
A. No discussions that I'm aware of. 11:30:54
MS. BARNES: And just a form and foundation to the last one just again regarding the time frame primarily. 11:30:56 11:30:58 11:31:02
MR. STRAUS: Yeah. 11:31:03
And that's absolutely fine. It's hard to jump in and -- and make objections right -- right on the spot, so doing it afterward's perfectly fine. 11:31:04 11:31:07 11:31:10
MS. BARNES: And I -- and I do ask about the time frame, Alex, really only because I'm gonna have less objections when you clarify that it's 2019 forward versus, you know, not clarifying. So you do that as you want to -- 11:31:10 11:31:12 11:31:16 11:31:19 11:31:21
MR. STRAUS: That's -- that's why I am trying to do it. 11:31:22 11:31:22
MS. BARNES: Right. 11:31:22
MR. STRAUS: Yeah. Yeah. That makes perfect sense. Yeah. 11:31:23 11:31:25
MS. BARNES: And I have to use the restroom, so I apologize. Whenever is a good -- 11:31:29 11:31:31
MR. STRAUS: Oh, absolutely. Yes, yes, yes. Let's take a break for sure. 11:31:31 11:31:31
MS. BARNES: Soon. It doesn't have to be immediately, but if you wanted to finish your train of 11:31:34 11:31:37

thought. 11:31:39

MR. STRAUS: No, no. This is fine. Yeah, yeah. Absolutely. Let's take a break. Sorry. 11:31:39 11:31:41

THE VIDEOGRAPHER: We are going off the record at 11:31 a.m. 11:31:41 11:31:44

(A recess was taken from 11:31 a.m. to 11:43 a.m.) 11:31:49 11:43:13

THE VIDEOGRAPHER: We are back on the record at 11:43 a.m. 11:43:13 11:43:18

BY MR. STRAUS: 11:43:19

Q. Wonderful. Okay. Thank you, sir. After a short break, we are back on the record. 11:43:19 11:43:22

You had mentioned shortly before we broke the name "Lisa Allen." Do you recall that testimony? 11:43:24 11:43:26

A. I do. 11:43:28

Q. And who is Lisa Allen? 11:43:29

A. Lisa Allen was the media director, prior -- Director of Communications prior to my taking over the role. 11:43:32 11:43:37 11:43:40

Q. So you took over the role twice actually. Was she prior to you during the Arpaio administration, or? 11:43:41 11:43:45

A. Yes. Sorry. Yes. 11:43:49

Q. Yes. 11:43:51

And that makes sense based on the way that you brought her up. I just wanted to make sure. 11:43:51 11:43:54

And regarding this, you know, this issue that we discussed at some length about the three-day posting and limiting that to three days, and correct me if I'm wrong, but your testimony was that you're not -- you don't know why three days was chosen as opposed to any other time frame; right? 11:43:57 11:44:02 11:44:07 11:44:11 11:44:14 11:44:18
MS. BARNES: Form. 11:44:19
THE WITNESS: That's correct. 11:44:20
BY MR. STRAUS: 11:44:21
Q. Do you know who might be the -- a person more knowledgeable or most knowledgeable about why that time frame was chosen? 11:44:22 11:44:25 11:44:28
A. I -- 11:44:29
MS. BARNES: Form. Foundation. 11:44:29
THE WITNESS: I do not. I would -- I would -- no, I don't. 11:44:30 11:44:32
BY MR. STRAUS: 11:44:34
Q. Okay. 11:44:34
Is there -- this is a strange question, but is there someone else that you know of that might know who would be most knowledgeable about, you know, how that decision and why that decision was made? 11:44:34 11:44:40 11:44:43 11:44:47
MS. BARNES: Form and foundation. 11:44:49
THE WITNESS: No. 11:44:50

BY MR. STRAUS: 11:44:52

Q. Okay. 11:44:52

So it's fair to say that at this point today, 11:44:52 that the Sheriff's Office and defendants do not know, and 11:44:56 at least right now there's no reasonable path to find out, 11:45:05 why that time period was selected as opposed to a 11:45:11 different time period for posting; is that fair? 11:45:15

MS. BARNES: Form and foundation. 11:45:18

THE WITNESS: That's correct. 11:45:19

BY MR. STRAUS: 11:45:20

Q. How was the -- what do you know about the 11:45:20 mechanics of how these mugshots were removed from the 11:45:24 website after three days? Like, how did that happen? Who 11:45:27 was responsible for that? What was the mechanism by which 11:45:31 that was accomplished? 11:45:35

MS. BARNES: Form. Foundation. 11:45:36

THE WITNESS: My understand -- 11:45:39

BY MR. STRAUS: 11:45:39

Q. We can split that up. I'll split it up. 11:45:40

Who -- what was the mechanism by which the 11:45:41 mugshots were removed from the website after the three-day 11:45:44 period? 11:45:47

MS. BARNES: Form. Foundation. 11:45:48

THE WITNESS: My understanding was this was 11:45:49 a technology default that was set in -- that was put in 11:45:51

place when they went up. After that certain amount of time, those 72 hours, those came -- those dropped off. 11:45:58 11:46:02

BY MR. STRAUS: 11:46:08

Q. And when you say a default, do you mean a default that was put in place by a third-party vendor, or is that a default that was put in place by someone at the Sheriff's Office? Can you elaborate on that? 11:46:08 11:46:11 11:46:16 11:46:21

MS. BARNES: Form. Foundation. 11:46:25

THE WITNESS: From my understanding from when they were initially set up, this was a three-day, 72 hours. It would automatically load them when they were -- when they -- when they were set to post, and they would come off 72 hours later. 11:46:25 11:46:27 11:46:33 11:46:36 11:46:40

BY MR. STRAUS: 11:46:42

Q. Okay. 11:46:42

And do you know if those mugshots that were removed from public view on the website were also somehow deleted permanently from the database of the Sheriff's Office or some other database wherever they lived? Do you know if that's what happened? 11:46:42 11:46:44 11:46:51 11:46:55 11:46:58

MS. BARNES: Form and foundation. 11:46:59

THE WITNESS: I don't believe they were deleted. I believe they were pulled off of the website. 11:47:00 11:47:02

BY MR. STRAUS: 11:47:05

Q. Okay. 11:47:05

The fact that they weren't deleted, does that speak at all to the -- your testimony about it perhaps slowing down the system or there not being enough memory, that sort of thing? If they're still in the system, would that have any impact, removing them from the website? 11:47:11 11:47:15 11:47:21 11:47:24 11:47:28

MS. BARNES: Form and foundation. 11:47:32

THE WITNESS: I can't answer that question. I'm not a technology specialist. 11:47:33 11:47:35

BY MR. STRAUS: 11:47:37

Q. That's fair. Okay. 11:47:39

How was it communicated to the -- strike that. 11:47:42

How did you first learn of this three-day posting period? 11:47:46 11:47:51

MS. BARNES: Form. 11:47:52

THE WITNESS: When I became a PIO in 2011, I was still a detention officer, became the PIO. I was told then that those -- that mugshots were posted for three days. I believe I may have had some knowledge prior to that as a detention officer, but it wasn't something that I was a daily or even a responsibility. So I may have known about it, but I don't recall. 11:47:53 11:48:00 11:48:04 11:48:07 11:48:11 11:48:15 11:48:21

BY MR. STRAUS: 11:48:23

Q. And how was the rest of the -- your team, the rest of the personnel, employees at the Sheriff's Office, how were they -- how were they informed of that policy 11:48:23 11:48:29 11:48:33

that -- that these mugshots would be removed after three days? 11:48:37 11:48:40

MS. BARNES: Form and foundation. 11:48:41

THE WITNESS: I don't know that there's a specific policy, so I don't know. It's just the way that it was implemented from the time -- from when it began at the time. 11:48:42 11:48:45 11:48:48 11:48:52

BY MR. STRAUS: 11:48:52

Q. Do you know -- do you know if there's any memo sort of explaining the -- the -- the sort of procedures that are used specifically regarding the mugshot postings? 11:48:54 11:48:58 11:49:01

MS. BARNES: Form and foundation. 11:49:07

THE WITNESS: No. 11:49:08

BY MR. STRAUS: 11:49:08

Q. And just to be clear, is it that you're not -- you don't know if there is a writing to that effect, or there is not a writing to that effect? Do you know one way or the other? 11:49:11 11:49:14 11:49:17 11:49:22

MS. BARNES: Form. Foundation. 11:49:22

Go ahead. 11:49:24

THE WITNESS: I'm not aware of any writings or policies about the three days. 11:49:24 11:49:26

BY MR. STRAUS: 11:49:28

Q. Is there anyone that you know that might be more knowledgeable about whether there is such a writing? 11:49:30 11:49:32

MS. BARNES: Form. Foundation. 11:49:35
THE WITNESS: I don't know. 11:49:36
BY MR. STRAUS: 11:49:37
Q. Okay. 11:49:37
You mentioned that one of the purposes was to drive traffic to the website; correct? 11:49:43 11:49:49
A. Yes. 11:49:51
Q. Do you know if there was ever any analysis done about the success of those efforts relative to these issues of transparency? 11:49:53 11:50:00 11:50:07
MS. BARNES: Form. 11:50:10
THE WITNESS: I don't know if there was any actual analysis done. 11:50:11 11:50:13
BY MR. STRAUS: 11:50:17
Q. Do you know if it worked, that the -- was transparency increased as the result of posting these mugshots? 11:50:17 11:50:21 11:50:25
MS. BARNES: Form and foundation. 11:50:25
THE WITNESS: I can't answer that question. I don't know. 11:50:26 11:50:33
BY MR. STRAUS: 11:50:33
Q. Is there anyone else that might know whether this was ever studied, evaluated, or any other means by which to determine the success of -- of this publication of the mugshots for the stated goal of transparency? 11:50:34 11:50:37 11:50:43 11:50:48

MS. BARNES: Form and foundation. 11:50:52
THE WITNESS: I believe our technology 11:50:53
department may be able to pull up some stats to see if 11:50:55
there was any more traffic. I -- that would be all I 11:51:00
could come up with for an answer. 11:51:04
BY MR. STRAUS: 11:51:05
Q. Do you know who's in charge of that technology 11:51:06
department? 11:51:10
MS. BARNES: Are you talking about 11:51:11
currently? 11:51:13
MR. STRAUS: Yes. 11:51:14
THE WITNESS: Yeah. Steve Loggins 11:51:15
(phonetic) is the oversight of technology. I don't -- he 11:51:19
probably isn't directly affected with that, but he 11:51:22
is -- it's under him. 11:51:26
BY MR. STRAUS: 11:51:27
Q. You say Loggins? Was that the last name? 11:51:28
A. Correct. 11:51:32
Q. Okay. 11:51:33
And the same question regarding what I think 11:51:34
you've referred to as public safety, right? 11:51:38
The -- the -- the fugitive issue and other sort of public 11:51:42
safety issues. 11:51:46
Do you know if there was ever any analysis done 11:51:48
regarding the effectiveness for that purpose? 11:51:51

MS. BARNES: Form and foundation. 11:51:54
THE WITNESS: I do not. 11:51:54
BY MR. STRAUS: 11:51:56
Q. Do you know if there were ever any disagreements internally about the purpose of the mugshot page postings? 11:51:58 11:52:02
MS. BARNES: And I'm continuing with the foundation objections because you keep not specifying the time frame. 11:52:06 11:52:10 11:52:15
THE WITNESS: Not that -- 11:52:16
MS. BARNES: Do you -- 11:52:16
THE WITNESS: -- I'm aware of. 11:52:16
MS. BARNES: Okay. Form and foundation. 11:52:17
Do you want to just keep not using the time frame? 11:52:19 11:52:22
MR. STRAUS: Yeah. I mean, I acknowledge your objections. I'll try to put a time frame in where -- when I can. 11:52:22 11:52:24 11:52:29
MS. BARNES: Okay. 11:52:30
MR. STRAUS: Okay. 11:52:31
BY MR. STRAUS: 11:52:32
Q. During your tenure in your current position, did your department ever respond to questions challenging whether the practice served the stated purposes? 11:52:41 11:52:46 11:52:49
A. Can you re -- repeat the question? I'm sorry. 11:52:54
Q. Were there any -- were there questions, you know, 11:52:58

or complaints about whether the policy of posting mugshots for three days, whether that practice actually served the purposes for which it was being done? Were there ever any questions challenging that, you know, the goals and the -- and the results? 11:53:01 11:53:09 11:53:13 11:53:17 11:53:21

MS. BARNES: Form. 11:53:22

THE WITNESS: Not to my knowledge. 11:53:22

BY MR. STRAUS: 11:53:25

Q. Okay. 11:53:27

And were the purposes, as you've stated, were those ever reduced to writing in the form of a memo or emails, a policy statement, anything like that, that what the purposes was for why this was -- this policy was enacted? 11:53:27 11:53:36 11:53:42 11:53:45 11:53:50

MS. BARNES: Form. Foundation. 11:53:51

Go ahead. 11:53:52

THE WITNESS: I believe in 2011, I -- the year is -- I -- it was '11 or '12. There was a press release done on it, but I don't know if there are any policies or procedure memos about it. 11:53:52 11:53:56 11:54:00 11:54:03

BY MR. STRAUS: 11:54:06

Q. But there might be; is that correct? 11:54:08

MS. BARNES: Form. Foundation. 11:54:11

THE WITNESS: Policies or procedures? 11:54:11

MR. STRAUS: Yeah. Just writings about the 11:54:15

stated purpose for this policy of posting mugshots for three days. 11:54:19 11:54:23

MS. BARNES: Form and foundation. 11:54:24

Go ahead. 11:54:25

THE WITNESS: Just a press release is all I've seen on that. 11:54:25 11:54:29

BY MR. STRAUS: 11:54:30

Q. Okay. And we'll talk about that press release shortly. Okay. 11:54:31 11:54:35

Okay. So is it fair to say that the Sheriff's Office did not evaluate whether publishing mugshots actually advanced public safety? Is that right? 11:54:36 11:54:47 11:54:53

MS. BARNES: Form. Foundation. 11:54:56

THE WITNESS: Not to my knowledge. 11:54:56

BY MR. STRAUS: 11:54:57

Q. And that means -- I'm sorry. Did I interrupt someone? Okay. 11:54:58 11:55:03

MS. BARNES: A computer made a noise. 11:55:03

BY MR. STRAUS: 11:55:06

Q. And in answering that way, does that an evaluation of that type was not done prior the policy starting, to your knowledge? 11:55:08 11:55:12 11:55:16

MS. BARNES: Form. Foundation. 11:55:17

THE WITNESS: I don't think I understand the question. 11:55:17 11:55:20

BY MR. STRAUS: 11:55:20
Q. No problem. 11:55:20
Prior to the mugshots being published on the website, do you know if any evaluation was done about whether doing so would advance public safety? 11:55:21 11:55:29 11:55:31
MS. BARNES: Form and foundation. 11:55:36
THE WITNESS: Prior to 2002, I have no idea. 11:55:37
BY MR. STRAUS: 11:55:41
Q. Okay. 11:55:41
Do you know if any evaluation prior to 2002 was done about whether publishing the mugshots would advance transparency? 11:55:42 11:55:46 11:55:54
MS. BARNES: Form and foundation. 11:55:54
THE WITNESS: Not that I'm aware of. 11:55:55
BY MR. STRAUS: 11:55:57
Q. Since that time all the way up until the present, do you know if there's ever been an evaluation done about whether publishing mugshots advances public safety? 11:55:58 11:56:01 11:56:03
MS. BARNES: Form and foundation. 11:56:05
THE WITNESS: I don't believe so. 11:56:07
BY MR. STRAUS: 11:56:08
Q. Do you know -- same question. 11:56:08
From the beginning until present, do you know if any evaluation was ever done about whether publishing mugshots advance transparency? 11:56:09 11:56:12 11:56:16

MS. BARNES: Same objections. 11:56:18
THE WITNESS: I don't believe so. 11:56:20
BY MR. STRAUS: 11:56:21
Q. What kind of information or data would you expect to see if that sort of evaluation had been done? 11:56:22 11:56:25
MS. BARNES: Form. Foundation. 11:56:28
Go ahead. 11:56:31
THE WITNESS: It wasn't done, so I'm not sure I understand. Maybe increased traffic to our website from the general public. I don't know that we've done anything specific just to do an analysis on that specific. 11:56:31 11:56:34 11:56:38 11:56:43
BY MR. STRAUS: 11:56:46
Q. And so that speaks to public safety, and I appreciate that answer. How about in terms of -- sorry. That speaks to transparency. 11:56:46 11:56:49 11:56:52
What about public safety then? What -- what kind of data or information would you expect to see to evaluate whether publishing mugshots advances public safety? 11:56:55 11:56:57 11:57:02
MS. BARNES: Form. Foundation. 11:57:05
Go ahead. 11:57:07
THE WITNESS: I think we would probably have to do some sort of survey amongst to -- to get that information. I don't know what I'd be looking for for a public safety. More calls from our -- from our constituents, complaints coming in from stuff they see on 11:57:07 11:57:09 11:57:13 11:57:16 11:57:20

the website. 11:57:25
BY MR. STRAUS: 11:57:26
Q. But that evaluation was not done; correct? 11:57:26
A. I don't -- 11:57:26
Q. To your knowledge. 11:57:29
MS. BARNES: Form and foundation. 11:57:30
THE WITNESS: I don't believe so. 11:57:31
BY MR. STRAUS: 11:57:32
Q. Is it fair to say that the practice of publishing 11:57:33 these mug -- mugshots on the website continued without 11:57:37 formal evaluation of its effectiveness? 11:57:41
MS. BARNES: Form and foundation. 11:57:45
BY MR. STRAUS: 11:57:46
Q. Is that fair? 11:57:47
A. I believe so. 11:57:47
Q. Was your office ever asked to assess the public 11:57:48 reaction or community impact of the publication of these 11:57:53 mugshots? 11:57:57
A. I don't believe so. 11:57:57
Q. Did your department -- did -- did you or anyone 11:57:59 at the Sheriff's Office track whether the posting of these 11:58:07 mugshots generated any confusion, complaints, negative 11:58:11 feedback? Was there any analysis of that done or tracking 11:58:14 of that sort of data? 11:58:17
MS. BARNES: Form. Foundation. 11:58:19

THE WITNESS: Not in my division, no. 11:58:20
BY MR. STRAUS: 11:58:22
Q. Is there any mechanism for reassessing this practice of publishing the mugshots if concerns did arise? 11:58:22 11:58:23
MS. BARNES: Form. 11:58:35
THE WITNESS: There's nothing in place currently. 11:58:36 11:58:38
BY MR. STRAUS: 11:58:39
Q. Did you ever speak with either Sheriff Arpaio or Sheriff Sheridan or quite frankly anyone else in the Sheriff's Office about any concerns that the public had or might have about this practice? 11:58:39 11:58:44 11:58:51 11:58:57
A. Not that I -- 11:58:59
MS. BARNES: Form. 11:59:02
THE WITNESS: Not that I recall. 11:59:03
BY MR. STRAUS: 11:59:03
Q. Did you ever have any communications with Sheriff Arpaio about this policy of posting mugshots? 11:59:04 11:59:08
MS. BARNES: Form. Foundation. 11:59:11
THE WITNESS: No. Not that I recall. 11:59:12
BY MR. STRAUS: 11:59:16
Q. Never once spoke to him about it? Okay. 11:59:17
Did -- okay. 11:59:19
How about before issuing a press release similar to the ones -- you know, there were press releases in 11:59:23 11:59:31

2011, for instance. Did you speak to the sheriff about that before issuing a press release? 11:59:34 11:59:38
MS. BARNES: Form. Foundation. 11:59:41
Go ahead. 11:59:42
THE WITNESS: Yeah. We -- we talked about the press release itself. 11:59:43 11:59:45
BY MR. STRAUS: 11:59:47
Q. Okay. 11:59:50
In terms of what to -- what would -- what kind of things did you talk about regarding the press release? 11:59:50 11:59:56
A. Just his -- generally just his approval of what was about to go out. 11:59:58 12:00:02
Q. In general, did Sheriff Arpaio generally approve communications from the Sheriff's Office to the public? 12:00:04 12:00:12
MS. BARNES: Form and foundation. 12:00:15
THE WITNESS: Yes. 12:00:16
BY MR. STRAUS: 12:00:18
Q. Is that any different with Sheriff Sheridan in that regard? 12:00:20 12:00:26
MS. BARNES: Form. 12:00:28
THE WITNESS: I -- I don't know that I understand the question. That he approves every bit of communications, or? 12:00:28 12:00:30 12:00:33
BY MR. STRAUS: 12:00:34
Q. Do -- yeah. 12:00:35

Are there instances in which you communicate policies to the public without consultation with the sheriff, Sheriff Sheridan? 12:00:37 12:00:42 12:00:52

A. No. 12:00:55

MS. BARNES: Form. 12:00:56

BY MR. STRAUS: 12:00:56

Q. Were there any mechanisms for removing a mugshot on the website prior to the three-day period in instances in which the arrestee was exonerated, in other words, charges were dropped, released without issuing charges, that sort of thing? Were there any policies for removing that website before the three-day period expired? 12:01:08 12:01:14 12:01:20 12:01:27 12:01:31 12:01:36

MS. BARNES: Same objections. 12:01:40

THE WITNESS: There was no policy regarding removal of them. 12:01:42 12:01:44

BY MR. STRAUS: 12:01:46

Q. Was there -- was there ever an instance that you're aware of when a mugshot was removed prior to the three-day period as a result of the arrestee having the charges dropped or no charges being brought, that sort of thing? Is that -- did that ever happen that you're aware of? 12:01:49 12:01:52 12:01:56 12:02:03 12:02:08 12:02:10

MS. BARNES: Form and foundation. 12:02:11

Go ahead. 12:02:12

THE WITNESS: Not to my knowledge. 12:02:12

BY MR. STRAUS: 12:02:16
Q. So in other words, regardless of what happens after the arrest and regardless of how quickly that might happen, the -- the mugshot, once posted, is gonna stay up until that three-day period expires; correct? 12:02:17 12:02:19 12:02:22 12:02:27
A. That -- that was correct. 12:02:31
Q. And am I right to use the past tense there because the current policy is slightly different? Now they're remove -- there's sort of 100 mugshots posted at any one time. Is that sort of the -- the reason I use the past tense in that question? 12:02:33 12:02:38 12:02:43 12:02:47 12:02:52
A. That's correct. 12:02:53
Q. Okay. 12:02:54
So during the period that mugshots were posted for three days, there was never an instance in which a mugshot was removed before that time period based on the lack of -- of charges or the exoneration of an arrestee; is that correct? 12:02:54 12:02:57 12:03:01 12:03:06 12:03:11
A. Not to my knowledge. 12:03:11
Q. Is that the same for now, and we can talk -- we'll talk about this later, but it's correct to say that now it's not a three-day period, that the policy now is that 100 mugshots are posted at any one time, and once they reach a hundred, the 101st mugshot is -- is removed; is that fair? 12:03:12 12:03:15 12:03:18 12:03:21 12:03:27 12:03:32

MS. BARNES: Form. 12:03:33
THE WITNESS: That's correct. 12:03:34
BY MR. STRAUS: 12:03:35
Q. And is it still the case that those -- a mugshots that posted of an arrestee is gonna stay on -- is gonna stay published until it's removed in its natural course by way of this policy we just discussed, and that is not gonna be altered? In other words, it's not gonna be removed before that time as a result of the exoneration or lack of charges of an arrestee; is that correct? 12:03:35 12:03:38 12:03:42 12:03:47 12:03:51 12:03:54 12:03:58
A. That's correct. 12:04:01
Q. And are you aware of any discussions in the Sheriff's Office or otherwise about the impact that that might have on someone who does not have charges -- no longer has charges pending and has not been convicted of anything, but yet their mugshot still remains online? Has there been any discussions about the impact that that would have on that individual? 12:04:02 12:04:05 12:04:10 12:04:15 12:04:20 12:04:26 12:04:28
MS. BARNES: Form. Foundation. 12:04:30
Go ahead. 12:04:31
THE WITNESS: No. 12:04:31
BY MR. STRAUS: 12:04:32
Q. And why do you think that is? Why wasn't that ever discussed? 12:04:33 12:04:35
MS. BARNES: Form. Foundation. 12:04:37

THE WITNESS: I can't answer that question. I don't know. 12:04:37 12:04:40
BY MR. STRAUS: 12:04:41
Q. Do you think that that's a reasonable topic to discuss internally at the Sheriff's Office? 12:04:43 12:04:47
MS. BARNES: Form. Foundation. 12:04:49
THE WITNESS: With the current policy, no. There -- 12:04:50 12:04:54
BY MR. STRAUS: 12:04:54
Q. We -- we can start -- we can start with the three-day policy. 12:04:54 12:04:57
The three-day policy, do you think it's a reasonable issue to discuss about whether a person has their charges dropped, you know, before that three-day period and whether their mugshot should remain online? 12:04:58 12:05:00 12:05:05 12:05:09
MS. BARNES: Form. Foundation. 12:05:12
THE WITNESS: It's not that way now, so I can't answer that question as to whether it's appropriate to have that discussion now. Currently I don't see it as an issue to discuss because with only a hundred mugshots going up there, and we bring in over -- usually around 300 a day, they're not even up there usually before their IA appearance now. 12:05:12 12:05:21 12:05:24 12:05:27 12:05:32 12:05:35 12:05:39
BY MR. STRAUS: 12:05:39
Q. So what would -- what do you think is sort of the 12:05:40



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

time period by which now under the current policy mugshots are -- and I know this is an estimation, but generally remain online on the -- on the Sheriff's Office website under the current policy of just 100 at a time? How long a time period are they up? 12:05:44 12:05:48 12:05:52 12:05:57 12:06:01

A. I can't answer that question. I don't know. It -- it all depends on the flow of traffic. 12:06:01 12:06:03

Q. Is it generally less than three days, or more than three days? 12:06:05 12:06:10

MS. BARNES: Form. Foundation. 12:06:10

THE WITNESS: It would be less than three days. 12:06:12 12:06:13

BY MR. STRAUS: 12:06:14

Q. Because you've said there's generally, if I'm right, 200 arrestees a day; is that right? 12:06:14 12:06:17

A. On the average. 12:06:20

Q. So is it the case in -- in some instances that a mugshot will now be posted for less than a day? 12:06:21 12:06:25

A. Yes. 12:06:28

Q. And how does that impact public safety purpose that you've discussed? 12:06:29 12:06:33

A. They're still visible to the public. They're still going to those. The media is able to get ahold of those photos and use them for their purposes of telling their stories. So those -- I mean, that's probably one of 12:06:34 12:06:38 12:06:43 12:06:45

the biggest things. The media is able to get ahold of those as well. 12:06:49 12:06:53
Q. Oh, is that one of the purposes of the -- of the policy, in order to inform the media? 12:06:53 12:06:56
MS. BARNES: Form. 12:06:59
THE WITNESS: I don't know if it's to inform the media, but it's for them to have access to it. 12:06:59 12:07:02
BY MR. STRAUS: 12:07:06
Q. Does the media have access to arrestee information through any other means? 12:07:07 12:07:11
A. They can get a Form 4 from the -- from the courts. 12:07:13 12:07:17
Q. What is a Form 4? 12:07:17
A. It's the form that talks about why somebody was arrested and charged. 12:07:20 12:07:25
Q. And what's the process by which a media member would obtain arrestee information through a Form 4? What's the actual process? 12:07:27 12:07:32 12:07:37
A. I -- they go -- 12:07:39
MS. BARNES: Form. Foundation. 12:07:39
Go ahead. 12:07:40
THE WITNESS: They go through the court system. I don't -- I can't -- they get the information from the courts, and then they come to us for the mugshot. 12:07:40 12:07:43 12:07:47

BY MR. STRAUS: 12:07:51

Q. Got it. 12:07:52

And then when they do that, is there any information that's redacted? 12:07:53 12:07:57

MS. BARNES: Form. Foundation. 12:07:59

THE WITNESS: Redacted from what? 12:08:00

BY MR. STRAUS: 12:08:03

Q. Well, for instance, when a -- when a media member requests that mugshot, is the birthday of the arrestee included in that information? 12:08:04 12:08:08 12:08:13

A. It is not. 12:08:14

Q. And why is that? 12:08:16

A. It's just one of the things that we redact when they get those to -- for identifiers, I guess, is a -- I -- I don't know the reason why. I can tell you that we -- it's redacted for identification purposes with the court records. 12:08:18 12:08:25 12:08:33 12:08:36 12:08:40

Q. And when you say for identification purposes, what do you mean by that? 12:08:41 12:08:44

A. That's -- 12:08:46

MS. BARNES: Form. 12:08:46

THE WITNESS: Sorry. That's probably the wrong term. It's -- 12:08:47 12:08:49

I -- I can't tell you why it's redetected. I can tell you it's redacted. 12:08:55 12:08:58

BY MR. STRAUS: 12:08:59
Q. And do you know why -- why the decision -- how the decision was made to redact that information when the media requests it through the form you identified but not to remove that information when posting it to the public on the Sheriff's website? 12:09:00 12:09:04 12:09:08 12:09:12 12:09:17
MS. BARNES: Form and foundation. 12:09:20
THE WITNESS: The legal liaisons made that determination. Legal team made that decision at some point. I don't know when that occurred. 12:09:22 12:09:28 12:09:30
BY MR. STRAUS: 12:09:32
Q. Who would be the best person to talk about to about that? 12:09:34 12:09:37
MS. BARNES: Form and foundation. 12:09:37
THE WITNESS: I believe that's gonna be Kimberly Thompson. 12:09:38 12:09:41
BY MR. STRAUS: 12:09:42
Q. All right. 12:09:44
Is every arrestee's mugshot posted? Let's talk about during the three-day period, you know, the time when they were posted for three days. Was every arrestee have their mugshot posted? 12:09:44 12:09:54 12:09:57 12:10:02
MS. BARNES: Form. Foundation. 12:10:05
THE WITNESS: There may have been some exceptions, but yes. 12:10:06 12:10:07

BY MR. STRAUS: 12:10:08

Q. What were -- what are the nature of those exceptions? 12:10:08 12:10:11

A. Inmate was -- went straight to the hospital and didn't come straight to the jail facility, so they couldn't take the mugshot -- couldn't take the photo. The inmate was being combative, so it -- for officer safety they may not have done the mugshot. 12:10:12 12:10:15 12:10:18 12:10:21 12:10:28

Q. Explain to me. So -- so how would it increase officer safety for that mugshot not to be posted? 12:10:30 12:10:34

A. I'm not saying it would be anything to do with officer safety. What I'm telling you is in the jail, it was something for the safety within the -- the jail for them to get the photo from the inmate if they're being combative in the jail itself. 12:10:39 12:10:41 12:10:44 12:10:46 12:10:50

Q. I see. 12:10:52

If a -- if a arrestee had a mugshot taken, was that mugshot then posted, or were there exceptions? Were there any people that had mugshots taken but did not have those mugshots posted? 12:10:53 12:10:58 12:11:02 12:11:05

MS. BARNES: Form and foundation. 12:11:07

THE WITNESS: Yes. 12:11:08

BY MR. STRAUS: 12:11:09

Q. And why would that be? 12:11:10

MS. BARNES: Same objections. 12:11:12

THE WITNESS: A request from the arresting agency. They may be using that person for further information, using them for furthering another case. They may not have wanted that to be released, and they would ask. 12:11:13 12:11:17 12:11:21 12:11:25 12:11:29

BY MR. STRAUS: 12:11:29

Q. I see. 12:11:30

Any other reasons why someone's mugshot would not have be posted after having been taken? 12:11:31 12:11:34

A. It would just been a request by the agency that made the arrest. Otherwise, it would have been posted if there was no request. 12:11:38 12:11:43 12:11:46

Q. So it's accurate to say that mugshots were posted automatically as opposed to individual review apart from the exception that you've just described; is that fair? 12:11:46 12:11:50 12:11:56

A. That's correct. 12:12:00

MS. BARNES: Form. 12:12:01

THE WITNESS: Sorry. 12:12:04

MS. BARNES: You're fine. 12:12:05

BY MR. STRAUS: 12:12:06

Q. And -- and is it fair to say there's no discretion once the automated process begins? And I -- I -- let me -- strike that. Let me back up. 12:12:07 12:12:10 12:12:15

Would you describe the process of posting the mugshots as an automated process? In other words, it's 12:12:17 12:12:20

happening via technology as opposed to a human being making determinations? 12:12:23 12:12:26

A. That's correct. 12:12:28

Q. Okay. 12:12:29

And is it fair to say that once that automated process begins, there's no discretion on -- on the part of the Sheriff's Office about posting that; correct? 12:12:31 12:12:35 12:12:38

MS. BARNES: Form. Foundation. 12:12:42

THE WITNESS: That's correct. 12:12:43

BY MR. STRAUS: 12:12:44

Q. And just want to go back to -- now we're talking about the current policy where a hundred mugshots are -- are up on the website at any one time. And you've testified that that could result in a mugshot being posted for less than one day. 12:13:05 12:13:10 12:13:13 12:13:18 12:13:23

Is that a fair summary of your testimony? 12:13:25

A. That's correct. 12:13:28

Q. And could it be even less than that? Could it be that a mugshot is posted for only 12 hours or so? 12:13:28 12:13:33

A. Could be. 12:13:37

Q. Okay. 12:13:38

And, in fact, is it accurate to say that there's really no minimum time period for which a mugshot could be posted under the current policy; it's really dependent on how many people are arrested behind that person? Is that 12:13:38 12:13:42 12:13:48 12:13:53

fair? 12:13:56
A. That's fair. 12:13:57
Q. And do you see any impact of that change going from three days of posting to less than that, as you've described sometimes significantly less, do you see any impact that that would have on the public safety purpose that you've described? 12:13:58 12:14:02 12:14:10 12:14:14 12:14:17
MS. BARNES: Form. 12:14:18
THE WITNESS: No. 12:14:19
BY MR. STRAUS: 12:14:21
Q. And was that ever discussed, whether that new policy would have some impact on the stated goals? 12:14:24 12:14:27
MS. BARNES: Form. 12:14:31
THE WITNESS: No. 12:14:32
BY MR. STRAUS: 12:14:33
Q. Any analysis done about whether that change in policy would impact the stated goals? 12:14:34 12:14:37
MS. BARNES: Form. 12:14:40
THE WITNESS: No. 12:14:40
BY MR. STRAUS: 12:14:41
Q. After the fact, now that that policy is in place, has there been any analysis about whether it had an impact on any of the stated goals of the policy of posting mugshots? 12:14:45 12:14:48 12:14:53 12:14:57
MS. BARNES: Form. Foundation. 12:14:57

THE WITNESS: No. 12:14:58
BY MR. STRAUS: 12:14:59
Q. During the three-day period when -- when the 12:15:02 posting was up for three days, was there any discussion of 12:15:07 shorter -- shortening the duration of the posting to 12:15:11 reduce any negative impacts it might have on the arrestee? 12:15:15
MS. BARNES: I'm sorry. Can I ask either 12:15:20 for you to repeat it -- 12:15:23
MR. STRAUS: Of course. 12:15:23
MS. BARNES: -- or for it to be read back? 12:15:23 I missed it. 12:15:26
MR. STRAUS: Oh, no problem. Yeah. 12:15:26
BY MR. STRAUS: 12:15:26
Q. During the period when the mugshots were being 12:15:26 posted for three days, was there any discussion of 12:15:28 shortening that time period to reduce any negative impact 12:15:31 it might have on -- on an arrestee? 12:15:36
MS. BARNES: Form. Foundation. 12:15:39
Go ahead. 12:15:41
THE WITNESS: Not to my knowledge. 12:15:41
BY MR. STRAUS: 12:15:45
Q. What is your understanding about why that policy 12:15:45 was changed from posting for three days to then change to 12:15:48 this sort of max one hundred at a time being posted? 12:15:52
MS. BARNES: And I'm going to instruct the 12:15:57

witness to answer only to the extent he can answer outside of any attorney-client discussions. 12:15:59 12:16:03

MR. STRAUS: Sure. Yes. Please do. 12:16:10

THE WITNESS: Can you repeat the question? 12:16:13

MR. STRAUS: Yes. 12:16:25

Actually I'm sorry. Madam Court Reporter, could you read back the last question? 12:16:25 12:16:25

(The requested portion of the record was read.) 12:16:25 12:16:50

MS. BARNES: And I apologize. I'm actually gonna instruct the witness not to answer altogether based on attorney-client and work product privilege. 12:16:50 12:16:53 12:16:53

If you want to clarify when the date was that the change happened. 12:17:06 12:17:11

MR. STRAUS: Okay. Sure. 12:17:13

BY MR. STRAUS: 12:17:13

Q. When was the policy changed from three days of posting to maximum 100 mugshots posted at a time? 12:17:14 12:17:18

MS. BARNES: Form. 12:17:22

THE WITNESS: Sorry for the delay. I'm trying to remember if it was August or September this year. 12:17:39 12:17:41 12:17:44

BY MR. STRAUS: 12:17:45

Q. Oh, it's not a race. Yeah, take your time. 12:17:46

And -- and that's okay if you want to estimate 12:17:48

it, you know, sometime around -- you know, between August and September is fine. I don't want to put words in your mouth, but -- but that's okay if -- if that's the best of your knowledge. 12:17:51 12:17:52 12:17:53 12:17:56

A. That -- yeah. Be something -- either August or September of this year, that policy was changed. 12:17:57 12:18:01

Q. And why was that policy changed? 12:18:03

MS. BARNES: Okay. And I'm gonna instruct the witness not to answer on the basis of attorney-client and work product privilege. 12:18:06 12:18:07 12:18:12

MR. STRAUS: So pardon me, Mr. Hegstrom. I'm just gonna get a clarification from Ms. Barnes. 12:18:17 12:18:21

Meaning that the answer to why the policy was changed -- 12:18:27 12:18:31

MS. BARNES: It happened during the course of this litigation. 12:18:34 12:18:36

MR. STRAUS: -- would invoke attorney -- 12:18:37

MS. BARNES: Oh, sorry. 12:18:38

MR. STRAUS: What's that? 12:18:38

MS. BARNES: That obviously happened during the course of this ligation and the other pending litigations on this same topic, so we are going to instruct the witness not to answer based on attorney-client and work product privilege. 12:18:39 12:18:41 12:18:43 12:18:47 12:18:50

MR. STRAUS: Okay. I'm not -- yeah, I don't 12:18:56

agree that that answer could possibly be privileged, but with that said, I will move on because I have to. 12:19:07 12:19:10

BY MR. STRAUS: 12:19:15

Q. Do you see any advantage from a public safety standpoint to having changed the policy from three days to maximum a hundred postings at a time? 12:19:16 12:19:20 12:19:26

MS. BARNES: Same instruction. We're -- we're gonna instruct the witness not to answer on attorney-client and work product privilege. 12:19:31 12:19:36 12:19:41

MR. STRAUS: But this is asking for his analysis of the change. 12:19:45 12:19:47

MS. BARNES: This is during the course of -- 12:19:51

MR. STRAUS: Like, what's happening in his -- in his brain. How could that be privileged? 12:19:55 12:19:55

MS. BARNES: Because it's in the course of this litigation, and that is work product privilege. He is the representative of the county who is represented by counsel in an ongoing, active litigation, and the questions that you are now asking are protected by both of those privileges. That's our position. 12:19:56 12:19:58 12:20:01 12:20:05 12:20:08 12:20:12

MR. STRAUS: Okay. And that's fair. You're -- obviously I'm not interfering with your right to assert the privilege, but I am gonna ask a couple more questions. They may come with the same answer. 12:20:15 12:20:16 12:20:20 12:20:25

BY MR. STRAUS: 12:20:28
Q. Do you see any disadvantage to posting mugshots for a shorter period of time than the three days that the policy used to -- used to be? 12:20:28 12:20:32 12:20:37
MS. BARNES: Give me a second. 12:20:40
Same -- same instruction. 12:20:47
BY MR. STRAUS: 12:20:49
Q. Okay. 12:20:52
How was it communicated -- how did -- strike that. 12:20:52 12:20:57
How did you learn that the policy was going to be changed from posting for three days to maximum a hundred mugshots posted at any one time? 12:20:57 12:21:01 12:21:06
MS. BARNES: Go ahead. 12:21:11
THE WITNESS: I'm working with the technology department to have developed that. 12:21:13 12:21:15
BY MR. STRAUS: 12:21:18
Q. You worked with the technology department to develop that. Is that what you're saying? 12:21:20 12:21:23
A. Yeah. They -- they -- well, they developed it, and we talked about the final product, and this is going forward. 12:21:25 12:21:28 12:21:32
Q. I see. 12:21:33
And what kind of -- in what form were those communications? 12:21:34 12:21:38

A. Those were face-to-face conversations. 12:21:39
Q. No email ever exchanged about that policy change? 12:21:46
A. No. 12:21:50
MS. BARNES: Form. 12:21:52
THE WITNESS: No. No policy changes. 12:21:53
BY MR. STRAUS: 12:21:55
Q. Well, no, that is a policy -- I guess maybe I'm not clear. 12:21:57 12:22:00
The policy change I'm -- I'm referring to is: Policy used to be that mugshots were posted for three days and then removed. The policy now is that there's a maximum 100 mugshots posted at any one time, so that's a change in policy that I -- that I was referring to. 12:22:00 12:22:03 12:22:07 12:22:10 12:22:16
So were there any emails about that change in policy? 12:22:20 12:22:23
MS. BARNES: Form. 12:22:23
THE WITNESS: Not to my knowledge. I believe everything was done face to face with these discussions. 12:22:24 12:22:26 12:22:30
Sorry. Chair just fell. 12:22:33
MR. STRAUS: No problem. I saw that. 12:22:37
BY MR. STRAUS: 12:22:38
Q. And how did you communicate that to your staff, the rest of the Sheriff's Office, and -- and anyone outside of the Sheriff's Office? How did you communicate 12:22:39 12:22:42 12:22:45

that new, what I'll call, the policy? 12:22:48

MS. BARNES: I need to -- 12:22:52

MR. STRAUS: Policy being the duration of time that a mugshot is posted. 12:22:54 12:22:56

MS. BARNES: When you mean how, are you just talking about in what form the communique occurred? 12:22:59 12:23:02

MR. STRAUS: Yeah, and that's a -- that's a very good point. I appreciate that. Thank you. Let me -- let me strike that. 12:23:05 12:23:07 12:23:10

BY MR. STRAUS: 12:23:10

Q. Did you communicate that change in policy to anyone after it was communicated to you? 12:23:10 12:23:13

MS. BARNES: Form. 12:23:16

THE WITNESS: Probably talked with my -- and I don't recall all the steps, but probably talked with my supervisor, the sheriff, the undersheriff, let them know what we were doing, but I don't know that we put anything out as a broadcast agency wide to let everybody know we did that, because the mugshot page just happens to most people there. 12:23:16 12:23:22 12:23:26 12:23:28 12:23:33 12:23:36 12:23:40

BY MR. STRAUS: 12:23:40

Q. Sorry. What do you mean just happens? 12:23:41

Oh, meaning it's outside of their -- 12:23:42

A. Yes. 12:23:45

Q. -- responsibilities or purview. Got it. 12:23:45

So Sheriff Sheridan found out about this change in policy from you? 12:23:48 12:23:52
MS. BARNES: Form and foundation. 12:23:53
THE WITNESS: I believe it was probably me that had told him. 12:23:54 12:23:56
BY MR. STRAUS: 12:23:58
Q. And in all the -- all the people -- strike that. 12:23:59
To your knowledge, were you the first person outside of the technology department that folks employed by -- pardon me -- by the Sheriff's Office, were you the first person told of this change in policy? 12:24:04 12:24:08 12:24:13 12:24:18
MS. BARNES: Form. Foundation. 12:24:22
THE WITNESS: I can't answer. I don't know. I don't know if I was first. 12:24:23 12:24:24
BY MR. STRAUS: 12:24:26
Q. All right. That's fair. 12:24:26
And in terms of all the -- you mentioned a -- you know, a list of people or positions that you communicated, you passed on that information about this change in policy, were any of those communications other than face to face? 12:24:28 12:24:32 12:24:37 12:24:39 12:24:43
A. I don't know how everybody communicated to each other. I'm -- all of my stuff was -- most of my stuff was face to face. I use email occasionally, but I don't believe for that topic, I don't know that I have. I don't 12:24:43 12:24:47 12:24:52 12:24:57

recall any. 12:24:57

Q. But if there had been such communications, do you think that would have come -- revealed itself in your search that you conducted of your email? 12:24:58 12:25:06 12:25:09

MS. BARNES: Form. Foundation. 12:25:11

THE WITNESS: Yes. 12:25:12

BY MR. STRAUS: 12:25:12

Q. But I think we established that you just search of your email for the word "mugshot," and zero results came back; is that right? 12:25:15 12:25:18 12:25:23

A. Yes. 12:25:24

Q. Do you know who instructed the technology department to make this change? 12:25:24 12:25:51

MS. BARNES: I'm gonna have to instruct the witness not to answer in the way you formed -- the way you have asked the question. 12:25:56 12:26:01 12:26:07

If you want to re-ask it. 12:26:11

MR. STRAUS: Well, so far I have not asked who told the technology department to make this change. I'm just asking if you -- 12:26:14 12:26:17 12:26:21

Well, I -- I take that back. 12:26:24

MS. BARNES: You did, so. 12:26:27

BY MR. STRAUS: 12:26:28

Q. Did the technology department make this decision on their own -- 12:26:31 12:26:34

MS. BARNES: Same -- same instruction. 12:26:36
BY MR. STRAUS: 12:26:36
Q. -- to your knowledge? 12:26:41
MS. BARNES: Same instruction. 12:26:42
It's still -- you're still getting at the same 12:26:45 potential response, so I've got to make the instruction. 12:26:48
MR. STRAUS: I hear you. I mean, I disagree 12:26:53 that if he was to say -- and I'm not saying that he did. 12:26:55
MS. BARNES: Uh-huh. 12:26:58
MR. STRAUS: If he was to say that they did 12:27:00 not make their decision on their own, that doesn't destroy 12:27:02 any privilege until there's a follow-up question. 12:27:06
MS. BARNES: It does -- 12:27:08
MR. STRAUS: But -- 12:27:08
MS. BARNES: -- because you're forgetting 12:27:10 your work -- 12:27:10
MR. STRAUS: -- you know, I -- I respect the 12:27:12 fact that you've asserted the privilege, and I just have 12:27:13 to -- to go with that for now, so. 12:27:15
MS. BARNES: But I just want to clarify. 12:27:15
Sorry, Alex. It's -- I thought you were done. 12:27:17
MR. STRAUS: Oh, no, no, no. I'm done. 12:27:20 Yeah, please. 12:27:21
MS. BARNES: I just want to make sure that 12:27:22 it's clear the objection is not just attorney-client 12:27:24

privilege. It's also work product privilege. 12:27:29
MR. STRAUS: Uh-huh. 12:27:32
MS. BARNES: So that creates a different shield. 12:27:33 12:27:35
MR. KLOBERDANZ: Alex, I don't know if we're at a natural break right now, but we -- we do have sandwiches that arrived. 12:27:37 12:27:37 12:27:40
MS. BARNES: And are we close -- 12:27:41
MR. STRAUS: Yeah, that's do it. 12:27:41
MS. BARNES: -- about video? 12:27:43
MR. STRAUS: That is a good breaking point actually. Enjoy. If you want to just -- yeah, I mean, I'm -- I'm here, so it doesn't matter. Whenever you guys are done, I'll be ready, so take your time. 12:27:43 12:27:43 12:27:51 12:27:53
MS. BARNES: Okay. It's 12:27. If we could just go off until 12:45, see if that's enough time, or maybe 12:50. That gives us 20 minutes. 12:27:55 12:27:58 12:27:59
THE VIDEOGRAPHER: Okay. Let me -- let me get -- 12:28:01 12:28:01
We're going off the record at 12:28 p.m. 12:28:02
(A recess was taken from 12:28 p.m. to 1:03 p.m.) 12:28:11 13:03:22
THE VIDEOGRAPHER: We are back on the record at 1:03 p.m. 13:03:22 13:03:24
Alex, you're -- Alex, you're muted. 13:03:24

MR. STRAUS: Pardon me. 13:03:26

BY MR. STRAUS: 13:03:26

Q. Thank you, Mr. Hegstrom. We're back after a short lunch break. And the problem is breaks is then you -- you realize what you forgot to ask. So I'm gonna back up just for a quick second. 13:03:35 13:03:39 13:03:42 13:03:47

We were talking about transparency a bit as one of the stated purposes of -- of the policy of posting these mugshots, and I'm curious if there are any other or what other tools the Sheriff Office uses to drive traffic to the website that you're aware of. 13:03:50 13:03:54 13:03:58 13:04:03 13:04:08

MS. BARNES: Form. Foundation. 13:04:10

Go ahead. 13:04:12

THE WITNESS: We've -- we've done media releases to talk -- talk about things on the website. We've draw -- we push them that way. We talk about it. It's on most of our communications, our forms that we hand out to the public to the website. 13:04:13 13:04:17 13:04:21 13:04:23 13:04:28

BY MR. STRAUS: 13:04:30

Q. Is there any other sort of ongoing campaign, for lack of a better word, that -- with the sort of stated goal of increasing transparency in addition to this mugshot-posting policy? 13:04:31 13:04:40 13:04:43 13:04:48

MS. BARNES: Form. Foundation. 13:04:51

THE WITNESS: Can you -- 13:04:52

MR. STRAUS: Yeah. 13:04:56
THE WITNESS: -- help me with the question a little bit? 13:04:57 13:04:58
BY MR. STRAUS: 13:04:58
Q. Of course. 13:04:59
In addition to posting these mugshots on the Sheriff's Office web page, are there any other -- or -- or tell me what the other sort of ongoing efforts that the Sheriff's Department uses to drive traffic to the website. 13:04:59 13:05:02 13:05:07 13:05:16
MS. BARNES: Form. 13:05:19
BY MR. STRAUS: 13:05:20
Q. Or maybe you've -- you've listed them already. 13:05:20
A. I think -- I think most of it I have, and that is we -- in most of our communications, if it's an email, if it's a social media, the website is usually attached to all of that to drive people to that website. 13:05:25 13:05:28 13:05:31 13:05:33
Q. Okay. 13:05:36
Would the transparency objectives that you -- purposes, the transparency purposes that you've talked about, to what -- what effect would those be achieved, without including the birthday, for instance, of an arrestee? 13:05:40 13:05:43 13:05:47 13:05:53 13:05:58
MS. BARNES: Form. Foundation. 13:06:00
BY MR. STRAUS: 13:06:02
Q. And maybe I'll -- let me -- let me restate that 13:06:03

because that was a little rambling. 13:06:06
How does posting an arrestee's birthday advance the transparency objective? 13:06:08 13:06:15
MS. BARNES: Same objections. 13:06:19
Go ahead. 13:06:20
THE WITNESS: It assists our -- the media partners who are looking up individuals and going -- finding out information through the Form 4. It helps them to connect the photo and the -- and the information to that same person. 13:06:20 13:06:23 13:06:27 13:06:27 13:06:32
BY MR. STRAUS: 13:06:34
Q. But when they're using Form 4, the birthday is redacted; correct? 13:06:36 13:06:39
MS. BARNES: Form and foundation. 13:06:40
THE WITNESS: I don't believe the -- Form 4, that the birthday is redacted. I think the redaction is when it comes as a public records request to the agents to the Sheriff's Office. I don't believe the courts redact that. 13:06:41 13:06:43 13:06:48 13:06:52 13:06:55
BY MR. STRAUS: 13:06:56
Q. Oh, okay. I thought that -- that you had testified in the other direction. And -- and maybe let me just understand what the Form 4 is. 13:06:57 13:06:58 13:07:03
So Form 4 gets filed with the court, and then the court then instructs the Sheriff's Office to release the 13:07:05 13:07:09

information pursuant to that request. Is that accurate? 13:07:14
MS. BARNES: Form. 13:07:17
THE WITNESS: No. The arresting agency 13:07:18
fills out all of the information. That's called the Form 13:07:22
4. That is submitted to the courts. And so then the 13:07:26
media outlet get that from the courts directly. 13:07:30
BY MR. STRAUS: 13:07:33
Q. And that will have the birthday included in it. 13:07:33
A. Yes. 13:07:33
Q. Is that what you're saying? 13:07:38
A. Yes. 13:07:40
Q. Okay. 13:07:41
And so that's transparency. 13:07:44
In terms of the public safety, are you aware if 13:07:47
anyone's ever been or how many people, I should probably 13:07:50
say, how many people have been arrested as a result of 13:07:53
these mugshot postings on the website? 13:08:00
MS. BARNES: Form and foundation. 13:08:02
Go ahead. 13:08:04
THE WITNESS: Not -- not aware of any 13:08:04
specific individual that has been due to the posting on 13:08:07
the Facebook -- or on the MCSO website. 13:08:11
BY MR. STRAUS: 13:08:16
Q. Yeah. Okay. 13:08:17
So the sheriff -- so just to reiterate and just 13:08:20

to make sure I have it right, the -- the Sheriff's Office is not aware of any -- of any person that's ever been arrested as a result of the policy of posting mugshots on the Sheriff's Office website. Is that your testimony? 13:08:28 13:08:31 13:08:35 13:08:38

MS. BARNES: Form and foundation. 13:08:41

THE WITNESS: It's not -- I think the policy you're talking about, you're talking about just the practice, and I can't -- I don't believe we can quantify whether any of those arrests or anything came from the posting on there, whether it came from a complaint that came in because somebody saw that. I can't tell you if they saw that person or that individual on the mugshot page to make them make the call to us. 13:08:42 13:08:45 13:08:47 13:08:53 13:08:56 13:08:59 13:09:02 13:09:04

BY MR. STRAUS: 13:09:06

Q. Do you know if any analysis has been done to find out if that's ever had that positive effect that -- that you were seeking? 13:09:07 13:09:11 13:09:14

A. Not to my knowledge has any analysis been done on that. 13:09:15 13:09:18

Q. And -- okay. 13:09:18

So we're gonna -- I'm gonna change topics a bit, and we're gonna talk a little bit about some of these third-party websites that -- that I think you're aware of, but -- but we'll find out. 13:09:22 13:09:26 13:09:30 13:09:35

Are you familiar and are you aware that there are 13:09:37

third-party websites that post the mugshots and the information that was originally posted by the Sheriff's Office on their own websites beyond that three day -- we'll talk about the three-day period. 13:09:46 13:09:51 13:09:57 13:10:01

Are you aware that that happens? 13:10:04

A. Yes. 13:10:05

Q. And that the -- at the time that the Sheriff's Office started publishing mugshots online, was it understood that that content could be posted on -- on public websites and captured by others? 13:10:06 13:10:15 13:10:20 13:10:25

MS. BARNES: Form. Foundation. 13:10:27

THE WITNESS: Was the Sheriff's Office aware? Is -- was that the question? 13:10:28 13:10:35

MR. STRAUS: Yes. 13:10:37

MS. BARNES: Same objections. 13:10:38

THE WITNESS: I -- I think there was a general knowledge that that could happen. 13:10:39 13:10:41

BY MR. STRAUS: 13:10:44

Q. And was there any discussion about the impact that that could have, either positive or negative? 13:10:44 13:10:47

A. I don't recall any discussion back then. 13:10:50

MS. BARNES: Same objections. 13:10:52

BY MR. STRAUS: 13:10:53

Q. Do you view that as a positive or a negative -- well, strike that. 13:10:55 13:10:59

Do you see any positive impact potentially from this continued availability of these mugshots and the -- the other information beyond that three-day period? 13:11:00 13:11:07 13:11:10

MS. BARNES: Form. Foundation. 13:11:14

THE WITNESS: I don't know that I understand the question as you -- as you asked. 13:11:15 13:11:17

BY MR. STRAUS: 13:11:20

Q. So -- so -- so these third-party websites are posting the mugshots and the information that the Sheriff's Office is removing, and we'll talk about the three-day period for now. 13:11:20 13:11:25 13:11:30 13:11:33

So when there was a policy for -- to post it for three days, these third-party websites were posting that same information really in perpetuity after that three-day period, right? After the Sheriff's Office removes it, these third parties are continuing to display that information and images. 13:11:35 13:11:37 13:11:40 13:11:47 13:11:50 13:11:54

Is there any positive impact that -- that you see or that the Sheriff Office sees from -- from that occurrence? 13:11:55 13:11:58 13:12:01

MS. BARNES: Form. Foundation. 13:12:02

THE WITNESS: I don't know what the impact is from that. 13:12:03 13:12:05

BY MR. STRAUS: 13:12:06

Q. Do you -- can -- has it ever been discussed, or 13:12:08

do you -- are you aware or have an opinion about any negative impact that that additional posting could have on -- on individuals? 13:12:12 13:12:16 13:12:22

MS. BARNES: Form. Foundation. 13:12:23
Go ahead. 13:12:25

THE WITNESS: I don't know that I recall any conversations about that specific topic. 13:12:25 13:12:27

BY MR. STRAUS: 13:12:30

Q. Sitting here today, do you think that there's any potential negative impact on an arrestee who was ultimately exonerated, either charges dropped or found innocent, that their mugshot and identifying information would be posted internationally for all times on a public website? Do you see any negative impact that that potentially could have? 13:12:31 13:12:36 13:12:40 13:12:45 13:12:49 13:12:55 13:12:58

MS. BARNES: Form and foundation. 13:12:59

THE WITNESS: It's -- it's an impact I'm not aware of and have not done any research on that. 13:13:00 13:13:02

BY MR. STRAUS: 13:13:06

Q. But can you see any potential negative impact that that could have on someone? 13:13:08 13:13:10

MS. BARNES: Same objections. 13:13:12
Go ahead. 13:13:13

THE WITNESS: Can I see any negative impact from that? I think you can see both sides of this issue 13:13:13 13:13:22

either way. 13:13:28
BY MR. STRAUS: 13:13:28
Q. Meaning there could be positive, and there could be negative? 13:13:28 13:13:33
MS. BARNES: Same objections. 13:13:34
THE WITNESS: Yes. 13:13:35
BY MR. STRAUS: 13:13:36
Q. Okay. So -- so let's -- let's take one and then the other. 13:13:37 13:13:40
What are the potential negative impacts it could have? Understanding what you're saying, I think, is that it could be balanced by the positive impacts, but what are the negative impacts you could anticipate potentially happening from this continued publication of these images and information? 13:13:40 13:13:45 13:13:47 13:13:47 13:13:52 13:13:59
MS. BARNES: Form and foundation. 13:14:01
THE WITNESS: I don't know that I can give you an answer on that today. I would have to research it before I had -- to know both sides of that issue. 13:14:02 13:14:04 13:14:08
BY MR. STRAUS: 13:14:10
Q. Well, let's take Mr. -- Mr. Houston. 13:14:11
So he was -- are you aware that he was arrested and not ultimately convicted of the crime? 13:14:13 13:14:16
A. Yes. 13:14:18
Q. Are you aware that his mugshot and his personal 13:14:18

identifying information remains on multiple websites that are published, you know, internationally? Are you aware that that's happened? 13:14:23 13:14:27 13:14:33

MS. BARNES: Form and foundation. 13:14:34

THE WITNESS: I -- I believe I was informed of that information. 13:14:36 13:14:38

BY MR. STRAUS: 13:14:39

Q. Could -- do you -- what impact do you think that that would have, for instance, you know, during a job-interview process that his mugshot is online for all to see forever? 13:14:40 13:14:42 13:14:47 13:14:52

MS. BARNES: Form and foundation. 13:14:53

THE WITNESS: I -- I'm -- I don't know what that impact is. I would assume that that would have some negative impact on that -- that individual, but we don't know without a study to determine whether what that impact is gonna be and how long it goes and how -- how deep it goes, that impact. 13:14:54 13:14:57 13:15:01 13:15:03 13:15:07 13:15:11

BY MR. STRAUS: 13:15:12

Q. But that sort of study was never conducted; correct? 13:15:13 13:15:13

A. Not to my knowledge. 13:15:16

Q. It's not -- and it wasn't -- that sort of study was not conducted before the practice -- I think -- I think you prefer to call it a practice of posting his 13:15:17 13:15:20 13:15:25

mugshot. That sort of analysis was not done before the practice began; correct? To your knowledge? 13:15:28 13:15:32

MS. BARNES: Form and foundation. 13:15:34

THE WITNESS: That's correct. 13:15:35

BY MR. STRAUS: 13:15:35

Q. And that sort of analysis was never done during the course of -- I don't know. What it is? -- 20 plus years that -- that this practice has been going on, no one's engaged in that sort of analysis for the negative impacts; is that right? 13:15:36 13:15:39 13:15:43 13:15:46 13:15:50

MS. BARNES: Same objections. 13:15:51

Go ahead. 13:15:53

THE WITNESS: That's correct. 13:15:53

BY MR. STRAUS: 13:15:53

Q. And was that analysis done before -- and we haven't talked about it yet, but you're aware that the Sheriff's Office has reengaged and is now again posting mugshots online. 13:15:54 13:16:01 13:16:05 13:16:11

Before that practice was reinstated recently, was there any analysis done of these potential negative impacts? 13:16:12 13:16:17 13:16:20

MS. BARNES: I'm gonna have to interject. If you can clarify from a time frame. If you want to say before this lawsuit was initiated, then my objection would possibly be negated. 13:16:21 13:16:24 13:16:27 13:16:33

MR. STRAUS: Yeah. I'm gonna -- I understand, and I'm not just doing it as a -- as a futile exercise, but -- but I'm gonna have to let you get to the point of objecting. 13:16:34 13:16:37 13:16:42 13:16:45

So I am going to ask -- 13:16:45

BY MR. STRAUS: 13:16:45

Q. So, you know, earlier in 2025 -- please correct me -- or -- or strike that. 13:16:46 13:16:51

Is it correct that the Sheriff's Office began publishing website -- mugshots on its website again in late 2025? Is that correct? 13:16:52 13:16:56 13:17:01

A. Yes. 13:17:03

Q. Before the decision was made to -- to continue that practice to reengage in that practice, was there any analysis done on the potential negative impacts that we just discussed? 13:17:04 13:17:10 13:17:14 13:17:18

MS. BARNES: And I'm gonna instruct the witness not to answer on the attorney-client and work product privilege insofar as that goes back to the date that this notice of claim was served. And I don't have that date. 13:17:18 13:17:20 13:17:24 13:17:27 13:17:33

So if -- I can instruct him that he can only answer the question based on his understanding of anything prior to summer of 2022 or before the notice of claim was served. 13:17:34 13:17:37 13:17:40 13:17:45

MR. STRAUS: So -- 13:17:47
MS. BARNES: Does that make sense? 13:17:49
MR. STRAUS: Yes, I think so, but I just 13:17:50
want to clarify. 13:17:53
MS. BARNES: Okay. 13:17:53
MR. STRAUS: Is it gonna -- are you going to 13:17:54
object -- object on privilege grounds to any question 13:17:56
about anything related to the mugshot publication that 13:17:59
happened after the first lawsuit was filed? Is that gonna 13:18:04
be your position? Because that might save us some time if 13:18:10
I just know. 13:18:14
MR. KLOBERDANZ: If my -- if I may help just 13:18:15
so the record's clear, the -- the notice of claim by 13:18:19
Houston was submitted on March 22nd, 2022. 13:18:20
MS. BARNES: Okay. 13:18:20
MR. KLOBERDANZ: Obviously a lawsuit was 13:18:24
filed later. 13:18:25
MS. BARNES: After that. Okay. 13:18:26
MR. KLOBERDANZ: That was filed on May 23, 13:18:28
2022. 13:18:30
MS. BARNES: So yes. I'm going to object to 13:18:31
it on attorney-client and work product privilege to what 13:18:33
it sounds like a bulk of the questions you might be 13:18:36
asking, but maybe not on all of them, because there's been 13:18:39
a handful that you did ask him that I did not -- 13:18:43

MR. STRAUS: Yeah. 13:18:47
MS. BARNES: -- make that objection. 13:18:48
MR. STRAUS: That's true. 13:18:49
MS. BARNES: So -- so yes, in general anything about the whys and, you know, yes. 13:18:49 13:18:53
MR. STRAUS: I'm so sorry. You said anything about the -- 13:18:55 13:18:57
MS. BARNES: You know, the whys and the whos. 13:18:58 13:19:00
MR. STRAUS: Oh, the whys. 13:19:00
MS. BARNES: Right. So he can answer the question you just asked as long as he's talking about anything before March of 2022. 13:19:02 13:19:03 13:19:04
So if you can -- 13:19:06
MR. STRAUS: Okay. 13:19:07
MS. BARNES: Do I -- 13:19:09
MR. STRAUS: I'll say this. 13:19:10
MS. BARNES: Okay. 13:19:14
So let me see. Will he be able to answer this? 13:19:17
BY MR. STRAUS: 13:19:17
Q. Has there ever been done from the beginning of time until to date -- to date any analysis of the potential negative impacts that this practice of posting mugshots might have on arrestees? 13:19:19 13:19:22 13:19:27 13:19:30
MS. BARNES: And so I'm gonna instruct the 13:19:35

witness to only answer that question based on the attorney-client and the work product privilege -- privilege up until March of 2022. So anything -- 13:19:37 13:19:41 13:19:42 13:19:42

MR. STRAUS: Okay. 13:19:42

MS. BARNES: -- up until March 2022 you can say yes or no whether that happened. 13:19:46 13:19:49

THE WITNESS: No. 13:19:51

BY MR. STRAUS: 13:19:51

Q. Okay. 13:19:51

And has the Sheriff's Office ever been made aware directly from citizens or otherwise about specific negative impacts that this has had on people's lives? 13:19:53 13:20:00 13:20:06

MS. BARNES: Form. Foundation. 13:20:12

Go ahead. 13:20:13

THE WITNESS: The Maricopa County Sheriff's Office has a complaint division. Kimberly Thompson would have those answers for you. I'm -- it's -- it's very few apparently, because I have not had a whole lot of conversations about -- in fact, I've had no conversations about any of them, but if they did, they came through that division, the legal liaison. 13:20:13 13:20:16 13:20:21 13:20:25 13:20:29 13:20:31 13:20:37

BY MR. STRAUS: 13:20:39

Q. Okay. 13:20:39

And I'm gonna -- I won't burden you or Counsel or 13:20:40

anyone else with those questions if they're better directed at the legal liaison. So we can -- we can agree to -- to move on from that. Okay. 13:20:42 13:20:47 13:20:51

But it sounds like -- are you familiar with the term "scraping" as it relates to website content when I uses the word "scrape"? 13:20:55 13:21:00 13:21:07

A. Yes. 13:21:09

Q. Okay. 13:21:09

And you've testified that -- I -- am I right that your testimony was that the Sheriff's Office was generally aware that, you know, the practice of scraping websites was possible and could have -- you know, could be instituted in regards to these publication of website -- of mugshots; is that -- is that right? That was your testimony earlier? 13:21:10 13:21:15 13:21:17 13:21:25 13:21:29 13:21:33 13:21:36

MS. BARNES: Form. Foundation. 13:21:37

Go ahead. 13:21:38

THE WITNESS: Yes. 13:21:38

BY MR. STRAUS: 13:21:39

Q. Okay. 13:21:40

And was that understanding sort of common in the communications department? In other words, was a general understanding of the communications department that that was something that could happen? 13:21:40 13:21:46 13:21:49 13:21:52

A. Yes. 13:21:53

Q. So it was understood that if the Sheriff's Office -- even if the Sheriff's Office removed the mugshot from its own website after a few days, it was understood that third parties could continue to display that -- those images and that information. 13:21:54 13:22:00 13:22:03 13:22:07 13:22:11

A. Yes. 13:22:15

Q. Okay. 13:22:15

Was there any expectation that the Sheriff's Office could control how long a mugshot remained available on the internet once it was initially published? 13:22:15 13:22:19 13:22:22

MS. BARNES: Form. Foundation. 13:22:26

THE WITNESS: I'm not sure I understand the question. 13:22:27 13:22:30

BY MR. STRAUS: 13:22:30

Q. Did the -- yeah. That was a little rambling. 13:22:31

Did the Sheriff's Office think they could control how long a mugshot remained available on the internet once it was originally published by the Sheriff's Office? 13:22:35 13:22:40 13:22:44

MS. BARNES: Form. Foundation. 13:22:48

Go ahead if you can. 13:22:51

THE WITNESS: I think we could only control what we could control within the Maricopa County Sheriff's Office and our website. 13:22:52 13:22:54 13:22:57

BY MR. STRAUS: 13:22:58

Q. So the Sheriff's Office recognized that removal 13:22:59

from its own website would not necessarily mean that the mugshot disappeared from public view; is that fair? 13:23:02 13:23:05

A. Yeah. That's -- I -- I think we were aware that other third-party vendors were scraping. 13:23:10 13:23:12

Q. And were there ever any discussions about that reality that these mugshots, once the County -- once the Sheriff's Office posts them, that there's a possibility that they could remain online, you know, in excess of -- of the three days or the hundred -- you know, not -- under either policy, was there ever any discussion about that? 13:23:15 13:23:22 13:23:27 13:23:29 13:23:33 13:23:39 13:23:41

A. I -- 13:23:42

MS. BARNES: Form. Foundation. 13:23:42

THE WITNESS: I don't believe there was any discussion about that that I recall. 13:23:43 13:23:46

BY MR. STRAUS: 13:23:47

Q. Anyone raise, that you're aware of, any concerns about the sort of reputational harm, employment consequences, or any embarrassment that might result from this indefinite online availability of these mugshots? 13:23:48 13:23:51 13:23:55 13:23:58

MS. BARNES: Form and foundation. 13:24:02

And again, I'm going to have to instruct the witness to only answer that question up until March of 2022 based on the attorney-client and work product privilege. 13:24:03 13:24:05 13:24:09 13:24:13

THE WITNESS: I don't believe there was any discussion about that. 13:24:13 13:24:15
BY MR. STRAUS: 13:24:15
Q. Did the communications department ever evaluate how, you know, members of the public might use or misuse mugshots once they were copied off the Sheriff's Office website? 13:24:20 13:24:24 13:24:29 13:24:33
A. I don't believe there was any evaluation as to the mugshot page. 13:24:33 13:24:37
Q. Okay. So -- so there's really -- if I'm -- if I'm understanding that answer right and -- and your previous answer, and since we're -- yeah. I'll just say before this practice started of publishing mugshots and then for the entirety of the time that it remained, and I think your attorney will restrict us to -- to that 2022 date, but the entirety of that time, there was no evaluation about the impact on citizens by this practice of publishing mugshots; is that right? 13:24:38 13:24:45 13:24:47 13:24:53 13:24:58 13:25:03 13:25:07 13:25:10 13:25:14
MS. BARNES: Counsel is correct. Objection and instruct the witness on attorney-client and work product privilege only to answer that question up until March of 2022. 13:25:18 13:25:18 13:25:22 13:25:25
THE WITNESS: That's correct. 13:25:27
MR. STRAUS: And just in the interest of -- of saving Ms. Barnes unnecessary effort, I'm 13:25:28 13:25:31

perfectly fine and -- and putting on the record that I 13:25:38
understand your objection. I know it's not -- I would 13:25:42
just give it a blanket statement that everything that I 13:25:45
ask is only up to that 2022 date, but I know that you've 13:25:48
allowed some. 13:25:48
So if -- if you wanted to, you know, sort of 13:25:51
abbreviate your objection because I know it's a long one 13:25:55
and it's appropriate -- appropriate for you to give that 13:25:58
long one, it's fine with me, and I'm certainly never gonna 13:26:01
raise anything. I -- I understand the full breadth of 13:26:05
your objection if you wanted to -- to abbreviate it, 13:26:07
but -- but I'll leave that up to you. 13:26:10
MS. BARNES: Okay. I'll -- just to be clear 13:26:10
for the record, I'll abbreviate it to "instruction based 13:26:12
on March 2022 as previously stated." 13:26:16
But I also do want to add a form and foundation 13:26:18
objection to the last question as well, which I did not 13:26:19
get in. 13:26:22
MR. STRAUS: Okay. Good. So I fully 13:26:22
acknowledge that abbreviation stands for the full breadth 13:26:26
of your objection as previously stated. 13:26:27
MS. BARNES: Great. 13:26:30
MR. STRAUS: Okay. 13:26:31
BY MR. STRAUS: 13:26:32
Q. Okay. Did the Sheriff's Office ever take any 13:26:44

steps to discourage third-party scraping or reuse of the mugshots? 13:26:47 13:26:52

MS. BARNES: Form and foundation. 13:26:53

THE WITNESS: There was no attempt that I'm aware of. 13:26:53 13:26:56

BY MR. STRAUS: 13:26:57

Q. So nothing like technical measures such as, you know, like blocking, indexing, or adding usage restrictions, watermarking, which I know is done now, but -- but prior to, none of those were ever considered; correct? 13:26:58 13:27:01 13:27:05 13:27:08 13:27:08

A. I'm not aware of any. Technology may have put -- implemented something that I'm not aware of at the time, but I was -- I'm not aware of that. 13:27:13 13:27:17 13:27:20

Q. Okay. 13:27:22

And -- and I think you testified already, but -- but you made an effort, every reasonable effort that you could to educate yourself about some of the relevant issues that happened during the time period by which you are not working for the County; correct? 13:27:22 13:27:25 13:27:29 13:27:32 13:27:36

A. Correct. 13:27:39

Q. For -- for the Sheriff's Office. 13:27:39

A. Yes. 13:27:42

Q. Okay. 13:27:42

And -- and sorry to stray, but who was in your 13:27:44

role, if it was one person or more people, as many as you know, in the period that you were not employed by the Sheriff's Office? Who -- who was in your current role during those periods? 13:27:49 13:27:53 13:27:56 13:27:59
A. Are you referring to that eight-year period of time from 2017 until '25? 13:28:01 13:28:05
Q. Yeah. To -- to your knowledge, who was in -- serving in that role? 13:28:09 13:28:11
A. I believe Norma was the -- one of the directors during that. 13:28:12 13:28:17
Q. Okay. 13:28:19
A. And there was a -- Mark Casey, I believe, was a -- the Director of Communications at some point. And I believe Donna Rossi may have been a -- in this role. 13:28:20 13:28:26 13:28:30
Q. Are those the -- the -- you made efforts to speak with those people to -- to educate yourself on that -- that period? 13:28:34 13:28:39 13:28:41
MS. BARNES: Form. 13:28:43
BY MR. STRAUS: 13:28:46
Q. Sorry. I don't know if any of those are attorneys, so. 13:28:46 13:28:49
A. I have not been able to reach out to any of those people with -- 13:28:50 13:28:53
We've tried to -- I think we tried to get -- I tried to get ahold of Norma -- did -- and was not able to 13:28:55 13:28:56

reach her. 13:29:00
Q. I see. Okay. 13:29:01
But you didn't make an attempt to -- to reach 13:29:02
Mark Casey or Donna Rossi? 13:29:05
A. No. 13:29:08
Q. And none of those three people currently work at 13:29:09
the Sheriff's Office; is that right? 13:29:12
A. That's correct. 13:29:14
Q. Okay. 13:29:14
Was any communication -- were the arrestees ever 13:29:21
told during their detainment or otherwise that their 13:29:27
mugshot would be posted online? 13:29:31
MS. BARNES: Form. Foundation. 13:29:34
THE WITNESS: I -- I don't know that -- if 13:29:35
they were told or not by the arresting officer or the 13:29:39
detention staff that was at the jail at the time. 13:29:44
BY MR. STRAUS: 13:29:47
Q. Is it the policy now of -- of the Sheriff's 13:29:48
Office to inform arrestees of that? 13:29:49
MS. BARNES: Form and foundation. 13:29:53
THE WITNESS: There's no policy on the 13:29:54
mugshot, informing the inmates of the mugshots. 13:29:57
BY MR. STRAUS: 13:30:00
Q. Do you know if there was ever any sort of 13:30:08
analysis? I know there wasn't a study and that sort of 13:30:11

thing, but any sort of analysis of -- to assess sort of the benefits of this practice of posting mugshots weighed against any potential harm to the arrestees? Was that ever discussed, analyzed, considered? 13:30:15 13:30:19 13:30:25 13:30:30

MS. BARNES: Same instruction, March of 2022. 13:30:33 13:30:36

Go ahead. 13:30:36

THE WITNESS: I'm not aware of -- 13:30:36

MR. STRAUS: Yes. 13:30:38

THE WITNESS: I'm not aware of any analysis that were done regarding the mugshot page and its effectiveness either way. 13:30:40 13:30:41 13:30:44

BY MR. STRAUS: 13:30:45

Q. And casting no aspersions, you know, on -- on you, of course, but seems from your testimony that the Sheriff's Office was not concerned about the potential harms that could come to arrestee from having their mugshot posted; is that fair? 13:30:47 13:30:51 13:30:57 13:31:01 13:31:06

MS. BARNES: Form. Foundation. Same instruction, March of 2022. 13:31:08 13:31:10

Go ahead. 13:31:12

THE WITNESS: Standard practice from early 2002 was to post everybody's mugshot that came through our facilities. 13:31:12 13:31:15 13:31:20

BY MR. STRAUS: 13:31:20
Q. Okay. 13:31:20
Without any considering that you know of of any 13:31:21 potential harm that might come to -- to anyone, including 13:31:24 people ultimately exonerated from the charges that they 13:31:28 were arrested; is that fair? 13:31:35
MS. BARNES: Same objections and 13:31:35 instruction. 13:31:37
THE WITNESS: Correct. 13:31:37
MR. STRAUS: I'm not doing this, Ms. Barnes, 13:31:46 to -- to test your patience by any means. I think this is 13:31:49 a non-privileged -- could -- could result in a 13:31:53 non-privileged question even though it's after that date. 13:31:56
BY MR. STRAUS: 13:31:56
Q. What is your understanding of why the Sheriff's 13:32:00 Office decided in summer of 2025 to again begin posting 13:32:04 mugshots on the website? 13:32:14
MS. BARNES: Nope. Instructing the witness 13:32:16 not to answer for attorney-client and work product 13:32:19 privilege. 13:32:25
MR. STRAUS: Just to save some time. Is 13:32:31 there any -- this is a question for Ms. Barnes. 13:32:33
Is there anything I can ask about the -- the 13:32:37 reactivation, for lack of a better term, of the mugshot 13:32:39 publication practice that is -- you will allow him to 13:32:44

answer? 13:32:51

MS. BARNES: I mean this respectfully and not flippantly. I really can't give you those questions. Most of them, I believe, are covered under the attorney-client and/or work product privilege; however, as I said earlier, there were a couple that you asked that were fine, but I'm not gonna sit here and profess to -- 13:32:51 13:32:53 13:32:57 13:33:01 13:33:04 13:33:07

MR. STRAUS: Yeah. 13:33:07

MS. BARNES: -- know what all the possible questions you might ask. I might come up with different ones, and I'm not gonna give you my different ones. 13:33:07 13:33:12 13:33:14

MR. STRAUS: I was about to say, are you gonna craft some questions -- 13:33:16 13:33:17

MS. BARNES: I am not. 13:33:17

MR. STRAUS: -- and you can text them to me. 13:33:19

MS. BARNES: Just shoot you off -- I can text them to you right now. 13:33:21 13:33:22

MR. STRAUS: Okay. All right. Well, hopefully it won't -- yeah. So I have to ask some, but I'll try not to -- to waste too much of our time, understanding what you just -- 13:33:25 13:33:28 13:33:29 13:33:34

Maybe I'll just make this my last one. 13:33:51

MS. BARNES: Okay. 13:33:51

BY MR. STRAUS: 13:33:51

Q. I think that -- I think you can answer this. 13:33:54

Did the possibility of harm resulting from these third-party publications of mugshots factor in at all to the decision to reinstate that practice in 2025? 13:33:57 13:34:05 13:34:11

MS. BARNES: Same -- same instruction. 13:34:18

MR. STRAUS: Okay. That was about the best of what I could do. So okay. Got it. 13:34:21 13:34:22

MS. BARNES: I mean, I was just gonna offer that obviously, and I think this is in the discovery responses, but, I mean, we -- we don't dispute that the website went back up, that page went back up when it did and it looks like it does and contains or doesn't contain -- 13:34:25 13:34:27 13:34:30 13:34:32 13:34:37 13:34:40

MR. STRAUS: Yeah. 13:34:40

MS. BARNES: -- all that it does or doesn't contain. I mean, that's about as far as we're gonna get. 13:34:40 13:34:42

MR. STRAUS: That -- yeah. So that's what I was gonna ask. So that's as far -- in terms of the, like you said, the whys or -- 13:34:46 13:34:47 13:34:48

MS. BARNES: Right. 13:34:49

MR. STRAUS: -- even the hows or all that stuff is not -- you're not gonna let him answer any of that. Okay. 13:34:51 13:34:53 13:34:57

MS. BARNES: And just to be clear, I've also added a form objection to those -- 13:35:04 13:35:07

MR. STRAUS: Yes. 13:35:07

MS. BARNES: -- and I didn't want that to be lost as well, but yes. 13:35:09 13:35:11

MR. STRAUS: Okay. 13:35:14

MS. BARNES: Okay. 13:35:15

BY MR. STRAUS: 13:35:16

Q. Okay. Is it correct to say that at one point -- strike that. 13:35:18 13:35:21

I'm gonna use the term with your permission if you understand it properly, the term "disclaimer" for the practice of publishing a, you know, "innocent until proven guilty," that sort of -- you know, something to that effect along with the mugshots. So that's what I'm gonna call a disclaimer; is that fair? 13:35:21 13:35:26 13:35:31 13:35:37 13:35:39 13:35:42

A. That's fair. 13:35:44

Q. Is it accurate to say that at some time prior to -- let's just say that 2022 date. At some time prior to, the Sheriff's Office publication of mugshots included a disclaimer; is that accurate? 13:35:45 13:35:49 13:35:53 13:36:00

A. That is. 13:36:03

Q. And is it accurate to say that at some time, that disclaimer was removed, and the mugshots were posted without any such disclaimer; is that fair? 13:36:04 13:36:11 13:36:15

A. That's fair. 13:36:17

Q. Do you know when that was? 13:36:18

A. I believe -- 13:36:20

Q. When that change happened? 13:36:21
A. I believe late September, October. I don't know exact -- 2016, I believe, is when they came down. 13:36:23 13:36:27
Q. And why did that come down? 13:36:30
MS. BARNES: Form. Foundation. 13:36:33
THE WITNESS: I believe it was during a redesign, and it was probably something that was overlooked at that time. 13:36:34 13:36:37 13:36:41
BY MR. STRAUS: 13:36:42
Q. Do you know -- well, it sounds like a silly question, but at some point after what you -- what I think you just referred to as a "mistake," after that was made, was the Sheriff's Office aware that that disclaimer was no longer being included in the publication of the mugshots? 13:36:44 13:36:49 13:36:53 13:36:57 13:37:04
MS. BARNES: Form and foundation. 13:37:06
THE WITNESS: Yes, at some point. 13:37:07
BY MR. STRAUS: 13:37:10
Q. Do you have any idea about when the Sheriff's Office became aware of that mistake? 13:37:12 13:37:16
MS. BARNES: Form and foundation and same instruction, limiting to before March of 2022. 13:37:17 13:37:21
MR. STRAUS: Yes. 13:37:26
THE WITNESS: I don't have that -- I don't recall exactly when they may have been aware of that. 13:37:26 13:37:31

BY MR. STRAUS: 13:37:34
Q. Was there any discussion in the Sheriff's Office about the fact that this mistake, as you described it, had been made, and now the mugshots were being published without that disclaimer? 13:37:34 13:37:39 13:37:44 13:37:48
MS. BARNES: Same objections and instruction. 13:37:49 13:37:51
Go ahead. 13:37:51
THE WITNESS: To my knowledge, there was none. 13:37:52 13:37:55
BY MR. STRAUS: 13:37:55
Q. No discussion at all about that disclaimer having been removed? 13:37:55 13:37:58
MS. BARNES: Same objections and instruction. 13:37:59 13:38:02
Go ahead. 13:38:02
THE WITNESS: Correct. 13:38:02
BY MR. STRAUS: 13:38:03
Q. All right. Okay. 13:38:04
Do you know if it would have been technically feasible to reinsert that disclaimer once the Sheriff's Office became aware that it had been removed by mistake? Was it -- was it technologically possible to have it put back on moving forward? 13:38:04 13:38:08 13:38:14 13:38:18 13:38:21
MS. BARNES: Form and foundation. 13:38:23

THE WITNESS: Yes. 13:38:24

BY MR. STRAUS: 13:38:24

Q. Do you know why no efforts were made to -- to correct that mistake? 13:38:28 13:38:33

MS. BARNES: Form. Foundation. Same instruction. 13:38:34 13:38:36

Go ahead. 13:38:37

THE WITNESS: Not aware of why. 13:38:37

BY MR. STRAUS: 13:38:39

Q. Do you see any potential reputational or other harm to an arrestee having their mugshot posted without that disclaimer as opposed to a posting that included that disclaimer? 13:38:47 13:38:57 13:39:01 13:39:09

MS. BARNES: Form. 13:39:09

BY MR. STRAUS: 13:39:09

Q. Do you see any difference in the potential harm? 13:39:11

MS. BARNES: Form and foundation. 13:39:11

THE WITNESS: I believe they're different, and people will -- but I believe most people that saw the mugshots on the page, I don't know that they believed anybody -- I think they believed the disclaimer was just under -- there was a -- there was a -- an automatic belief of people that look at that, that these people weren't guilty; these were people that were just arrested by the way it's posted on there with charges. 13:39:12 13:39:13 13:39:16 13:39:19 13:39:24 13:39:29 13:39:33 13:39:33

BY MR. STRAUS: 13:39:37

Q. So do you mean -- so I think I understand what you're saying. 13:39:38 13:39:39

Are you saying that even without the disclaimer, you think that -- I think you said most -- most people understood that these were arrestees and were not having been convicted of a crime? Is that what you're saying? 13:39:40 13:39:42 13:39:45 13:39:49

A. That's what I'm saying. 13:39:52

Q. So why was the disclaimer originally included on those photos? 13:39:53 13:39:57

MS. BARNES: Form and foundation. 13:39:57

BY MR. STRAUS: 13:39:58

Q. Or alongside those mugshot photos. 13:39:59

MS. BARNES: Form and foundation. 13:40:01

THE WITNESS: Those were posted in 2002, and I'm not aware of the discussions that went on when they -- when they posted that at the time, when they put that up. 13:40:02 13:40:05 13:40:07 13:40:11

BY MR. STRAUS: 13:40:11

Q. But a disclaimer, you know, similar in -- in substance is currently associated with -- and in close proximity to the -- the mugshots that are posted currently; correct? 13:40:12 13:40:17 13:40:23 13:40:27

A. Yes. 13:40:28

Q. So in other words, the correct chronology is that 13:40:29

there was a disclaimer published with the -- with the mugshots that were published for a period of time, and I think what we estimated was from the inception until 2016. Then there was a period that it was mistakenly removed for a period of, I guess we'd have to say, from '16 to 2025. So another nine years, it was removed. And then after which it was then put back on. 13:40:38 13:40:42 13:40:45 13:40:51 13:41:00 13:41:06 13:41:10

Is that -- that's accurate; right? 13:41:13

MS. BARNES: Form. Foundation. 13:41:15

Go ahead. 13:41:16

THE WITNESS: Yes. 13:41:17

BY MR. STRAUS: 13:41:17

Q. Okay. 13:41:19

And it's your testimony as a representative of the Sheriff's Office that there's no conceivable negative impact of having that mistake and having that disclaimer removed. Is that accurate? 13:41:19 13:41:28 13:41:34 13:41:43

MS. BARNES: Form and foundation. 13:41:44

Go ahead. 13:41:46

THE WITNESS: It is my testimony that that -- that there was none due to that. 13:41:47 13:41:48

BY MR. STRAUS: 13:41:51

Q. And would it then be correct to say that there's no positive impact that you can -- that you or the Sheriff's Office can see from having put it back on 13:41:51 13:41:56 13:41:59

currently? 13:42:03

MS. BARNES: I'm gonna object and in -- form and foundation and instruct the witness not to answer based on attorney-client and work product privilege. 13:42:03 13:42:06 13:42:09

MR. STRAUS: Okay. It's a challenge. 13:42:14

So I just put on the record. I think it's clear, but I do not -- Plaintiffs does not agree with the assertion of the privilege, and I'm just putting that, you know, on the record. I obviously have no power to -- to impact your -- your authority to -- to lodge that objection, so. Okay. 13:42:24 13:42:29 13:42:34 13:42:35 13:42:37 13:42:42

BY MR. STRAUS: 13:42:42

Q. Was adding -- I think you've answered this, but was adding that disclaimer ever considered by the Sheriff's Office or any of the defendants before this 2002 litigation began? 13:43:00 13:43:03 13:43:08 13:43:13

MS. BARNES: Do you mean 2022? 13:43:15

MR. STRAUS: Yes. Yes. The 2022 litigation. Yeah. 13:43:18 13:43:21

BY MR. STRAUS: 13:43:22

Q. So prior to 2022, you know, between -- and I guess the -- the cleaner way to say it is: Between approximately September 2016 and 2022, was it ever considered? Was that -- was reinstating that disclaimer ever considered? 13:43:22 13:43:25 13:43:28 13:43:36 13:43:42

MS. BARNES: And I'm only gonna -- I instruct the witness to answer to the extent you're -- you're -- to the extent you're aware of any attorney conversation in that regard, do not answer as to that, but if there's anything else during that time frame that you're aware of, you can answer. 13:43:43 13:43:46 13:43:49 13:43:52 13:43:55 13:43:58

THE WITNESS: My understanding is there was no discussions about the mugshot web page and -- and that page being -- whether there was a post on there or a disclaimer or not prior to that date. 13:44:00 13:44:01 13:44:05 13:44:10

BY MR. STRAUS: 13:44:12

Q. So -- not trying to be snarky. I'm just trying to make a clean record. 13:44:21 13:44:24

So with that -- from -- from your testimony, it would seem that any member of the, you know, Sheriff's Office or otherwise, you know, any of the defendants, anyone employed by the Sheriff's Office, let's say, just would have independently noticed that the disclaimer was removed, but to your knowledge, no one ever talked about it. It was never discussed. Just each independent person may have noticed that it was removed, but there was never any discussion about it; is that accurate? 13:44:25 13:44:30 13:44:34 13:44:38 13:44:46 13:44:53 13:44:57 13:45:01 13:45:06

MS. BARNES: So same objections. Same instruction. 13:45:06 13:45:10

MR. STRAUS: And I apologize. You know, 13:45:10

still during this period, 2016 to 2022. 13:45:12

MS. BARNES: Right. So I'm just doing my same objections and instruction from that last question. 13:45:16 13:45:17

MR. STRAUS: Yeah. 13:45:17

MS. BARNES: Answer if you can. 13:45:19

THE WITNESS: Yeah, to my knowledge, there was no discussions about it. The website went under a reconstruction, and at that time, I don't know that there was any level discussions specific to that. It was -- it was going through its -- its readjustment phase. 13:45:21 13:45:23 13:45:27 13:45:30 13:45:35

BY MR. STRAUS: 13:45:38

Q. No one to your knowledge ever reached out to the third-party vendor who helped with the website and sounds like maybe made that mistake? No one ever reached out to them that you're aware of? 13:45:40 13:45:42 13:45:46 13:45:49

MS. BARNES: Form and foundation. 13:45:50

THE WITNESS: I've had no discussions with anybody that has given me that -- any indication that they did at the time. 13:45:51 13:45:54 13:45:58

BY MR. STRAUS: 13:45:58

Q. Do you know whether any of the sheriffs who were in office during that period, 2016 to 2022, whether they were aware that this mistake had happened? 13:45:58 13:46:03 13:46:10

MS. BARNES: Form. Foundation. 13:46:12

THE WITNESS: Are you referring to the 13:46:13

sheriff themselves, or just employees -- 13:46:15
MR. STRAUS: Yeah. 13:46:15
THE WITNESS: -- of the Sheriff's Office at the time? 13:46:18 13:46:20
MR. STRAUS: No. No, the sheriffs themselves. 13:46:20 13:46:22
MS. BARNES: Same objections. 13:46:22
MR. STRAUS: To your knowledge. 13:46:22
MS. BARNES: Form and foundation. 13:46:25
THE WITNESS: I -- I have -- I have no knowledge whether they were aware or not at that time. 13:46:27 13:46:28
BY MR. STRAUS: 13:46:32
Q. Okay. 13:46:37
Part of your role at the Sheriff's Office includes speaking to the media on behalf of the -- the agency; is that correct? 13:46:37 13:46:43 13:46:46
A. Yes. 13:46:47
Q. Does that include explaining website changes and the public-facing features at times? 13:46:48 13:46:54
A. Yes. 13:46:57
Q. When you speak to the media in that capacity, do you do so accurately and to convey the Sheriff's Office positions and actions? 13:46:58 13:47:08 13:47:11
A. That's the intended goal, yes. 13:47:12
Q. And you understand the members of the public and 13:47:17

media rely on your statements as being accurate? 13:47:20
MS. BARNES: Form. 13:47:22
THE WITNESS: Yes. 13:47:23
MS. BARNES: Foundation. Sorry. 13:47:25
BY MR. STRAUS: 13:47:26
Q. And there was a redesign of the website in 2016; 13:47:28 correct? 13:47:32
A. I believe so. Yes, there was. 13:47:32
Q. What is your knowledge about the reasons for that 13:47:35 redesign at the time? 13:47:42
MS. BARNES: So form and foundation. And 13:47:45 again, this is a time frame prior to the scope of this 13:47:50 notice for this deposition, but let's see how far it goes 13:47:55 before I make an issue. 13:48:00
THE WITNESS: It was just cleaning up the 13:48:03 website trying to make it a little more easy for everybody 13:48:07 to manage for the technology get Granicus involved. It 13:48:11 was -- again, it was updating from what was once a 2002 13:48:14 look to a -- to a newer model basically is what the 13:48:18 redesign was for. 13:48:22
BY MR. STRAUS: 13:48:23
Q. Were any of the mugshot-related features 13:48:23 discussed as part of that process? 13:48:27
MS. BARNES: Form and foundation. 13:48:28
THE WITNESS: I think as a -- just as 13:48:29

a -- it going up and being put in place, I think they probably mentioned it, but again, it was part of the website itself. 13:48:33 13:48:36 13:48:40

MR. STRAUS: Okay. 13:48:45

And I am going to -- so I'm gonna hand you -- 13:48:45

And I think we're only on Exhibit 2, if I'm not mistaken; is that right? 13:49:24 13:49:29

MS. BARNES: Yep. 13:49:31

MR. STRAUS: Okay. 13:49:31

So a news article from the Phoenix News Times titled "Sheriff Joe Arpaio Holds Public Voting For Jail Mugshot of the Day After Website Redesign." 13:49:34 13:49:40 13:49:40

One of my colleagues will hand that to you or the court reporter. 13:49:43 13:49:46

MS. BARNES: And are these things that have all been disclosed? 13:49:47 13:49:49

MR. STRAUS: Say it again. 13:49:50

MS. BARNES: Are -- is this exhibit and anything like this things that have been disclosed? 13:49:51 13:49:53

MR. STRAUS: I mean, it's a public newspaper -- news article. 13:49:56 13:49:58

MS. BARNES: I understand that, but that wasn't my question. I'm asking: Have you disclosed any of the things that you're about to ask questions about to a witness so that I would have been able to be aware of 13:50:00 13:50:01 13:50:04 13:50:05

them and potentially prepare this witness. 13:50:09

MR. STRAUS: I don't know what you mean by disclose. Like, produce it to you? 13:50:11 13:50:14

MS. BARNES: Disclose in a disclosure statement in this case as a potential exhibit in this case. 13:50:16 13:50:18 13:50:22

MR. STRAUS: It's an -- it's not an exhibit in the case. It's an exhibit into his deposition, and no, I haven't disclosed it to you previously. 13:50:24 13:50:25 13:50:29

MS. BARNES: So I'm just making an objection on the record that I do not think that it is fair or reasonable to expect that we have a 30(b)(6) witness here to answer questions on 30(b)(6) topics, and you're about to show him documents that have never been disclosed by Plaintiff in this case such that that puts me at a disadvantage in being able to have had those and known of them in order to decide whether I was going to prepare him referring to any of those things because you haven't disclosed them. 13:50:32 13:50:33 13:50:36 13:50:39 13:50:44 13:50:47 13:50:51 13:50:54 13:51:00 13:51:03

MR. STRAUS: Okay. So noted. I can ask you without showing you the document if that somehow helps. 13:51:04 13:51:09

BY MR. STRAUS: 13:51:09

Q. Okay. So there is a 2016 article in the Phoenix New Times in which you're quoted. 13:51:13 13:51:22

It says, "Chris Hegstrom, an MCSO spokesman, says 13:51:24

the agency is assessing whether it will bring back the mugshot voting system when it puts," quote, "phase 2," unquote, "of the website changes into place, but he could offer no information or estimate on when the second phase might happen." 13:51:28 13:51:32 13:51:35 13:51:38 13:51:41

Do you remember making that statement or seeing that in a news article? 13:51:42 13:51:45

MS. BARNES: Form. Foundation. 13:51:47

THE WITNESS: I don't recall that. I'm -- again, that happened -- what year was it? I don't even remember what -- when that happened, that occurred. 13:51:47 13:51:53 13:51:57

BY MR. STRAUS: 13:51:59

Q. Do you have a memory of the -- are you familiar with what's referred to as the Mugshot of the Day feature? 13:51:59 13:52:03

A. Yes. Yes. 13:52:07

Q. Do you remember or -- sorry. 13:52:08

Are you aware that at some point, that feature was removed from the website? 13:52:12 13:52:15

A. Yes. 13:52:17

Q. Is it consistent with your knowledge or memory that that happened, at least timing-wise, in conjunction with this 2016 redesign? 13:52:18 13:52:24 13:52:31

MS. BARNES: Form. Foundation. 13:52:33

THE WITNESS: Vaguely rings a bell. I couldn't tell you when that occurred. I remember the 13:52:34 13:52:40

redesign that was happening in 2016. As far as the Mugshot of the Day, I don't recall exactly why -- when that was pulled down, and -- 13:52:43 13:52:47 13:52:51

BY MR. STRAUS: 13:52:56

Q. I think -- I think you -- sorry, sir. Were you -- were you done? 13:52:57 13:52:58

A. Yeah. 13:52:59

Q. Yeah. 13:52:59

A. Sorry. 13:53:00

Q. And I think -- I think what you just said, and I just want to make sure, that you don't have any knowledge or -- at this time about why that change was made, why the Mugshot of the Day feature was removed; is that accurate? 13:53:00 13:53:03 13:53:05 13:53:11

MS. BARNES: Form and foundation. 13:53:15

THE WITNESS: I don't -- I don't recall the -- the time or the reasoning at that moment when that was removed. 13:53:16 13:53:21 13:53:24

BY MR. STRAUS: 13:53:25

Q. Do you know why that feature, Mugshot of the Day, was -- was launched to begin with? Like, why that was part of the website that -- I'll call it a contest? 13:53:27 13:53:30 13:53:37

MS. BARNES: Form and foundation. 13:53:41

THE WITNESS: I believe it was to assist in drawing more traffic to our website as well as getting the public involved with what the Maricopa County Sheriff's 13:53:42 13:53:45 13:53:48

Office was doing so they could be more aware of everything 13:53:50
going on, providing that transparency, and drawing people 13:53:53
to it. 13:53:58
BY MR. STRAUS: 13:53:59
Q. Okay. 13:53:59
And so how did that transparency goal, how was 13:53:59
that goal impacted by its removal? 13:54:08
MS. BARNES: Form and foundation. 13:54:11
THE WITNESS: Removing the Mugshot of the 13:54:12
Day? Is that the question? 13:54:17
MS. BARNES: Same objections. 13:54:19
BY MR. STRAUS: 13:54:20
Q. Yeah. So in other words, if the mugshot -- not 13:54:20
if. 13:54:23
The Mugshot of the Day contest was included to 13:54:24
advance the transparency goals, and then it was removed. 13:54:28
How did that impact the -- the transparency, accomplishing 13:54:34
the goals of transparency when that was removed? 13:54:42
MS. BARNES: Form and foundation. 13:54:46
THE WITNESS: I don't know that there's 13:54:46
an -- an exact science to that. We're still having people 13:54:49
come to the website for the mugshots. Whether the Mugshot 13:54:53
of the Day -- at some point, we -- you know, you -- you 13:54:57
try new ways of drawing people to the website more and 13:54:59
more. That ran its course, and as they were doing the 13:55:02

redesign, that was one of the things that they didn't go with. They just went with the mugshot itself. 13:55:07 13:55:12

BY MR. STRAUS: 13:55:16

Q. That was an -- am I right to say that that was a very popular feature on the website, the contest? 13:55:16 13:55:19

MS. BARNES: Form and foundation. 13:55:24

THE WITNESS: I -- I believed it was. The -- I -- I don't know that I can answer whether that's a popular feature, considering the -- the web has changed over the years, and many people come for many different reasons. But it was what we believed to be a popular draw. 13:55:24 13:55:26 13:55:28 13:55:32 13:55:36 13:55:39

BY MR. STRAUS: 13:55:39

Q. If it was a popular draw, wouldn't that negatively impact the transparency goal when it was removed? 13:55:40 13:55:42 13:55:46

MS. BARNES: Form. Foundation. 13:55:46

THE WITNESS: I don't know that that's an accurate depiction. I think people were still coming to the website for the mugshots or for the other purposes of coming to the website. They were already accustomed to coming, so they were coming after that was gone too. 13:55:47 13:55:55 13:55:59 13:56:02 13:56:03

MR. STRAUS: Okay. 13:56:03

I'm gonna have the court reporter hand you -- I guess we're still on Exhibit 2 because I retracted the 13:56:08 13:56:12

one -- which is Defendant's third supplemental answers to Plaintiff's first set of interrogatories. 13:56:15 13:56:20

MR. KLOBERDANZ: Alex, did you say third supplemental? 13:56:25 13:56:28

MR. STRAUS: Yeah. 13:56:29

(Deposition Exhibit No. 2 was marked for identification.) 13:56:57 13:56:57

BY MR. STRAUS: 13:56:57

Q. Did they hand you that? I'm sorry. I looked away. 13:57:12 13:57:15

A. Yes, sir. Yes. 13:57:16

Q. Okay. 13:57:16

Have you ever -- are you familiar with this document? Have you seen that before? 13:57:18 13:57:19

A. Yes. 13:57:21

Q. And what role, if any, did you have in creating this document? 13:57:27 13:57:33

MS. BARNES: Form. 13:57:35

THE WITNESS: I -- I was part of answering the questions as they were asked of me, answering questions for this. 13:57:38 13:57:48 13:57:51

BY MR. STRAUS: 13:57:51

Q. And who was asking those questions? 13:57:52

MS. BARNES: Form. That's an attorney-client privileged question, so I'm gonna instruct 13:57:53 13:57:58

him not to answer. 13:58:01
If you want to reword it. 13:58:02
BY MR. STRAUS: 13:58:04
Q. Without telling me what was communicated back and 13:58:09
forth, were your instructions regarding your role in 13:58:13
creating this document, were those instruction -- did 13:58:18
those instructions come from Counsel? 13:58:22
MS. BARNES: So, again -- 13:58:24
MR. STRAUS: Don't tell me what the 13:58:26
instructions are. 13:58:27
MS. BARNES: You're still asking that in a 13:58:28
way that's -- that is implying conversations with Counsel 13:58:30
and what -- you're talking about what Counsel may have 13:58:35
instructed him to do, and that's protected. Just -- you 13:58:38
gotta word it a different way. 13:58:43
If you want to just ask him -- I'm not gonna tell 13:58:45
him how to ask him, but. 13:58:49
MR. STRAUS: I mean, I've already asked it. 13:58:51
BY MR. STRAUS: 13:58:51
Q. How -- how was this document created, to your 13:58:52
knowledge? 13:58:55
MS. BARNES: Form and foundation. 13:58:55
THE WITNESS: It appears it was my counsel 13:58:56
put it together. 13:59:04

BY MR. STRAUS: 13:59:04
Q. Okay. Let -- let me do this. 13:59:07
Plaintiff's Exhibit 3 will be the verification 13:59:07
page, undated verification of the deponent. 13:59:13
MS. BARNES: You want them to hand it to us? 13:59:24
MR. STRAUS: Yes. 13:59:28
MR. KLOBERDANZ: What are you asking for? 13:59:28
MS. BARNES: He didn't hear you. 13:59:30
MR. KLOBERDANZ: Yeah. 13:59:35
MR. STRAUS: Oh, sorry. The verification 13:59:35
page -- 13:59:35
MR. KLOBERDANZ: The one verification? 13:59:35
MR. STRAUS: -- for the interrogatories. 13:59:36
MR. KLOBERDANZ: Yes. This is for the first 13:59:38
set of interrogatories, though. 13:59:40
MR. STRAUS: There's only one
verification --
MR. KLOBERDANZ: -- and the third
supplement.
MR. STRAUS: -- for that.
MR. KLOBERDANZ: Yeah. It doesn't have a
date on it, to be --
MR. STRAUS: No, it doesn't. 13:59:54
(Deposition Exhibit No. 3 was marked for 13:59:54
identification.) 13:59:55

BY MR. STRAUS: 13:59:55
Q. Have you seen that document before? 14:00:00
A. Yes. 14:00:01
Q. Is it -- is that -- the statements there true and accurate? 14:00:02 14:00:08
A. Yes. 14:00:08
Q. Do you know on or about what date you signed this? 14:00:09 14:00:14
A. I don't recall. It was, I believe, before the holidays. 14:00:14 14:00:20
MS. BARNES: We're happy to provide you an amended version of the verification or the date when it was signed. That was just an oversight that the date's not on there. 14:00:21 14:00:25 14:00:27 14:00:31
MR. STRAUS: Okay. Yeah. No problem. I -- there's -- I wasn't insinuating anything nefarious. I just wanted to give some -- get some details. But yes, that would be great. Thank you so much. 14:00:32 14:00:33 14:00:37 14:00:40
BY MR. STRAUS: 14:00:43
Q. Okay. Let's turn to the answers, which was the previous exhibit, and let's turn to Interrogatory 7, which is on page 4. 14:00:45 14:00:49 14:00:55
When you get there, let me know, and I'll -- 14:00:58
A. I'm on -- 14:01:02
Q. And sometimes people -- 14:01:03

A. I'm on page 4. 14:01:03
Q. Witnesses read things -- 14:01:03
A. I'm on page 4. 14:01:03
Q. If you're okay -- 14:01:05
A. I'm on page 4. 14:01:06
Q. Okay. Perfect. 14:01:06
I'm not gonna ask you to read it. I'm gonna read 14:01:09 it myself unless you or your counsel object. 14:01:11
So the interrogatory is number 7, "Describe all 14:01:13 changes made to the MCSO website, including mugshot 14:01:17 publication policies and practices or advertising policies 14:01:21 and practices during the relevant time frame." 14:01:24
And there's a long answer here, which I'll give 14:01:28 you all the time you need to -- to review. The -- and 14:01:32 just tell me when you're ready. 14:01:39
A. Okay. 14:01:51
Q. Okay. 14:01:51
So the original answer, which is in bold, not 14:01:53 italicized, which is from line number 1 to line number 9, 14:02:02 is essentially just refusing to answer. Is that -- is 14:02:08 that accurate? 14:02:13
MS. BARNES: Objection. Form and 14:02:14 foundation. 14:02:15
BY MR. STRAUS: 14:02:16
Q. It's -- it's some number of objections without 14:02:17

any substantive response; is that fair? 14:02:20
MS. BARNES: Form and foundation. 14:02:22
THE WITNESS: That's correct. 14:02:23
BY MR. STRAUS: 14:02:24
Q. And then starting on line 10, there's two lines of italicized type here which indicates that's the -- the amended answer, okay, which is again not providing any substance. 14:02:24 14:02:28 14:02:36 14:02:44
And then on -- starting on line 12, we get back to some of the original answer. And on line 14, there's this supplemental response which is italicized. And it says -- and I will summarize here -- but -- but Counsel will -- or you can correct me if I'm wrong, but. 14:02:45 14:02:50 14:02:54 14:03:01 14:03:03
So it's just saying that -- of course, without waiving other objections and information and belief, it lists a number of changes that were made. One is the addition of a disclaimer "all individuals are innocent until proven guilty." 14:03:06 14:03:10 14:03:14 14:03:19 14:03:23
Is it your understanding that that is referring to the change that was made in late 2025? 14:03:26 14:03:29
A. Yes. 14:03:34
Q. So that's one of the changes that I can't ask you anything about pursuant to your counsel's objection. 14:03:40 14:03:47
And then number two is the inclusion of identifiers, booking number, first and last name, charges, 14:03:53 14:03:56



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

and arresting agency. 14:03:59
Do you know when that change was made? 14:04:01
A. That would have been at the same time. 14:04:03
Q. Same time, that 2025? 14:04:10
A. Correct. 14:04:15
Q. Okay. 14:04:15
And then with the inclusion -- 14:04:17
Do you know what that means that -- after the comma. So it's line 17. After that first comma, it says capital W, capital I, lower case T, lower case H. So with the exclusion of dates of birth. 14:04:23 14:04:27 14:04:35 14:04:39
What -- what does that part mean? So in 2025, there were identifiers -- there was a change in the identifiers? So there was -- is this -- just so I'm asking if I'm getting this right. Previous to 2025, there was book -- no booking numbers on there, but -- but there were first and last name, charges, and -- so I'm not understanding number 2, if you can help me understand that. 14:04:42 14:04:47 14:04:51 14:04:53 14:04:57 14:05:00 14:05:04 14:05:07
So there was a change in 2025. If you can help me understand what was on -- what was included before that change and then what ultimately was included after that change. 14:05:08 14:05:11 14:05:16 14:05:19
A. I believe prior to, there was the booking number, the first and last name, the charges, and the arresting 14:05:19 14:05:22

agency, and the date of birth. I believe -- but that all changed. So the date of birth was left off. Also the type of the charges was added from crime type. Also watermarks were added. 14:05:25 14:05:33 14:05:37 14:05:43

Q. Okay. So hold on. So just one sec, because you're getting ahead of me. So that's number 3 and 4. 14:05:44 14:05:47

But number 2, prior to 2025, there were first and last names included; correct? 14:05:51 14:05:56

A. Prior to? 14:05:58

Q. Yeah. Prior to that 2025 change, there were previous -- in previous postings of mugshots, the -- the first and last name of the arrestee was included. Or is that -- or am I wrong about that? 14:05:59 14:06:05 14:06:09 14:06:13

A. That's correct. 14:06:15

Q. Okay. 14:06:15

So that's not actually a change, because that happened -- that's been -- let me put it this way. 14:06:16 14:06:19

Is it correct to say that the first and last name of arrestees have been included in the postings throughout the time that this -- this practice has been happening with the -- with the Sheriff's Department? Am I right about that? It's always had the names of the arrestees -- 14:06:21 14:06:25 14:06:29 14:06:33 14:06:35

A. Yes. 14:06:40

Q. -- correct? 14:06:40

And is the arresting agency something that is new 14:06:41

for 2025, or was the arresting agency also information that was previously posted prior to 2025? 14:06:47 14:06:51

A. I believe the arresting agency has been a part of it -- 14:06:54 14:06:58

Q. Okay. 14:07:01

A. -- since beginning. 14:07:01

Q. And the booking number, was that something that was new in 2025? 14:07:03 14:07:05

A. No. 14:07:07

Q. Okay. Okay. 14:07:08

So this -- this subpart 2, not entirely accurate; is that fair? 14:07:14 14:07:21

MS. BARNES: Form. 14:07:22

BY MR. STRAUS: 14:07:22

Q. Something -- this -- this question was asking for changes, and this listing -- number 1 lists some changes. Number 2 lists a whole bunch of things that weren't changed, and then -- but -- but what it's really saying is that the date of birth was excluded; is that fair? 14:07:23 14:07:26 14:07:30 14:07:35 14:07:38

I just want to -- I'm not trying to, like, gotcha on this. I'm just -- that's what this is saying; right? The -- the thing that was changed in subpart 2 is that the date of birth was excluded. 14:07:41 14:07:45 14:07:47 14:07:52

MS. BARNES: Form. 14:07:53

BY MR. STRAUS: 14:07:54

Q. Everything else listed there in subpart 2 was already -- is not a change; it's just a continuation of the same practice; correct? 14:07:55 14:07:57 14:08:00

MS. BARNES: Same objection. 14:08:02

Go ahead. 14:08:04

THE WITNESS: Yeah. Number two is basically saying all of those things were present with the exclusion of date of birth -- 14:08:05 14:08:12 14:08:15

MR. STRAUS: Okay. 14:08:19

THE WITNESS: -- basically. 14:08:21

BY MR. STRAUS: 14:08:21

Q. And number 3, the change -- the change of column heading from crime type to charges. 14:08:21 14:08:25

What's the difference between crime type and charges? 14:08:27 14:08:30

MS. BARNES: Form. 14:08:30

THE WITNESS: Charges is a more direct to what actually happened as opposed to the type of crime. It's a -- it's the actual charge itself. 14:08:30 14:08:33 14:08:36

MS. BARNES: Oh, chair went again. 14:08:39

MR. STRAUS: That chair is a problem. 14:08:42

THE WITNESS: I love this chair. I love this chair. 14:08:46 14:08:47

BY MR. STRAUS: 14:08:47
Q. Okay. All right. 14:08:47
So 3, I think, is -- okay. I'm gonna get -- just 14:08:47
give it one shot. 14:08:56
MS. BARNES: You already know. 14:08:57
BY MR. STRAUS: 14:08:59
Q. Why was -- why was -- why did that change happen 14:09:00
from crime type to charges in 2025? 14:09:01
MS. BARNES: Instruct the witness not to 14:09:05
answer on attorney-client and work product privilege. 14:09:09
BY MR. STRAUS: 14:09:09
Q. Got it. 14:09:09
Okay. Number 4, the inclusion of watermarks to 14:09:10
booking photographs, okay? 14:09:13
Why was that change made? 14:09:21
MS. BARNES: Same instruction. 14:09:24
MR. STRAUS: Okay. Got it. 14:09:26
BY MR. STRAUS: 14:09:27
Q. Okay. 14:09:27
And then we've discussed this, "mugshot will be 14:09:29
posted and remain on the mugshot page for 100 new mugshots 14:09:32
have been posted instead of remaining for three days' 14:09:33
time." I've already asked you that, and you've been 14:09:37
instructed not to -- to answer. 14:09:40
"An inmate can be searched on the mugshot page 14:09:42

only if they are in custody." Is that a change? Was that not the case previously, or is that the same as it was before? 14:09:43 14:09:47 14:09:52

A. I -- I believe that was the same before. 14:09:54

Q. Okay. 14:09:56

And then there's a reference to answer 4 above, and that speaks to the disclaimer. Okay. Got it. 14:09:59 14:10:06

MS. BARNES: The prior disclaimer. 14:10:16

BY MR. STRAUS: 14:10:19

Q. Is it -- sitting here today reading this, does this seem like a full and complete answer to the interrogatory seeking all changes made to the website during the relevant time period? And I'll just say that for these interrogatory responses, the relevant time period goes back -- and I understand it's objected to, but is -- goes back to the initial publishing of mugshots by the -- by the Sheriff's Office. 14:10:20 14:10:23 14:10:27 14:10:32 14:10:36 14:10:40 14:10:44 14:10:48

So sitting here today, does this seem like a complete answer to the -- the question of what changes were made? 14:10:50 14:10:53 14:10:55

MS. BARNES: Form and foundation. 14:10:56

THE WITNESS: Are you referring to the interrogatory for that number 7? 14:10:57 14:11:01

MR. STRAUS: 7. Yes. 14:11:07

THE WITNESS: Yes. 14:11:11

BY MR. STRAUS: 14:11:12
Q. But I'm not seeing any reference in those 14:11:13
responses to the removal of the Mugshot of the Day feature 14:11:16
in the 2016 redesign. Did I miss that? 14:11:19
MS. BARNES: Form and foundation, but you 14:11:43
can answer if you know. 14:11:46
THE WITNESS: I don't -- can you restate the 14:11:46
question? Because I'm not sure I'm clear on what -- where 14:11:50
you're referring to. 14:11:52
MR. STRAUS: Of course. Yes. Yes. Yes. 14:11:53
Yes. 14:11:55
BY MR. STRAUS: 14:11:55
Q. So in the list of changes that were requested in 14:11:55
Interrogatory No. 7, I don't see any mention of the 14:11:58
removal of the Mugshot of the Day feature. 14:12:04
A. That's correct. I don't see them there. 14:12:11
MS. BARNES: Same objections to the last 14:12:15
question, but yes. 14:12:17
BY MR. STRAUS: 14:12:18
Q. So is it fair to say that the interrogatory 14:12:18
response is incomplete in that respect? 14:12:20
MS. BARNES: Form. Foundation. 14:12:22
Go ahead if you can answer. 14:12:29
THE WITNESS: Are you referring to the 14:12:30
Mugshot of the Day portion of it? 14:12:36

BY MR. STRAUS: 14:12:39
Q. I'm saying that the -- yes. I am -- 14:12:40
A. And you're -- 14:12:40
Q. I'm saying that the question was -- you know, the interrogatory was requesting information about all the changes that were made to the mugshot publication by the Sheriff's Office, and it has a list of some changes that were made, but it does not list the removal of the Mugshot of the Day feature. 14:12:43 14:12:47 14:12:52 14:12:56 14:13:01 14:13:06
A. For the 2016, '17 changes that occurred is what we're referring to; correct? 14:13:06 14:13:11
Q. Correct. Yes. You testified that the Mugshot of the Day feature was removed in -- on or about, you know, in 2016, but that's not one of the changes that are listed here; correct? 14:13:13 14:13:16 14:13:19 14:13:24
A. That's correct. 14:13:25
Q. So the interrogatory response is incomplete in that respect; correct? 14:13:25 14:13:29
MS. BARNES: Form and foundation. 14:13:30
Alex, he's already answered the question repeatedly, and whether or not from a legal standpoint there's completeness here -- 14:13:32 14:13:35 14:13:38
MR. STRAUS: That's a -- 14:13:41
MS. BARNES: No -- 14:13:41
MR. STRAUS: That is a speaking objection. 14:13:42

MS. BARNES: I don't care. 14:13:42
MR. STRAUS: You cannot give speaking objections. 14:13:43
MS. BARNES: I don't -- 14:13:43
MR. STRAUS: You can't give a long recitation about what this objection is. 14:13:44
MS. BARNES: So once again -- 14:13:48
MR. STRAUS: Just state your objection and -- 14:13:49
MS. BARNES: You don't -- if you'd like to get the judge up -- 14:13:49
MR. STRAUS: You're not -- you're not testifying today. 14:13:50
MS. BARNES: So Alex, you're not gonna dictate what my objections are gonna be or they're not gonna be. If you want to take issue with my objections -- 14:13:53
MR. STRAUS: Well, I'm not. The Federal Rules of Civil Procedure will dictate that. 14:13:59
MS. BARNES: And that's perfectly fine, but you're not the arbiter. 14:14:01
MR. STRAUS: I'm not gonna allow you to have a speaking objection. 14:14:02
MS. BARNES: You don't get to allow me -- 14:14:04
MR. STRAUS: You just can't -- 14:14:04
MS. BARNES: -- or not allow me. You are 14:14:04

not the arbiter. If you'd like to get the judge on the phone about me trying to make a complete record right now, then you can do that. I'm simply trying to make a record that this has been asked and answered, and I believe that you're asking an -- the -- the question is directed to the inappropriate person, because you're taking issue with the -- from a legal standpoint what we've provided you. 14:14:07 14:14:09 14:14:12 14:14:15 14:14:16 14:14:20 14:14:23

If you'd -- 14:14:29

MR. STRAUS: Okay. 14:14:29

MS. BARNES: -- like to get the judge on the phone, but you're not gonna -- you're not gonna be the arbiter of when I get to make the objection or how I'm gonna make it. You can take issue with it, but you -- you're not gonna tell me I'm not gonna speak, so let's get that very clear. 14:14:29 14:14:31 14:14:31 14:14:36 14:14:38 14:14:38

He can answer it right now, once again, if he's able to, and I've made my objections for the record. 14:14:41 14:14:44

Can you answer it further? 14:14:47

THE WITNESS: Can we restate the question? 14:14:52

BY MR. STRAUS: 14:14:54

Q. Is this -- his interrogatory -- 14:14:54

Are these interrogatory responses complete? 14:14:54

MS. BARNES: Form and foundation. 14:14:57

Go ahead. 14:14:59

THE WITNESS: It does not mention the 14:14:59

Mugshot of the Day feature on the -- in this interrogatory. 14:15:04 14:15:08

BY MR. STRAUS: 14:15:09

Q. So is to your -- is the answer provided complete? 14:15:09

MS. BARNES: Form and foundation. 14:15:14

Go ahead. 14:15:16

THE WITNESS: It is -- the Mugshot of the Day feature is not here. If that's what we're looking for, it's not here. So that would be correct, your question. 14:15:16 14:15:18 14:15:21 14:15:25

BY MR. STRAUS: 14:15:25

Q. Okay. 14:15:25

How was the decision made about which changes to include and which to omit in response to Interrogatory No. 7? 14:15:27 14:15:30 14:15:35

MS. BARNES: And I'm gonna instruct the witness not to answer. That's an attorney-client and work product privileged question. 14:15:35 14:15:37 14:15:43

BY MR. STRAUS: 14:15:43

Q. Is there other information that you're aware of in response to that interrogatory for now that is not included and should have been? 14:15:44 14:15:46 14:15:52

MS. BARNES: Form and foundation. 14:15:55

You can answer it if you can. 14:15:56

THE WITNESS: Not that I'm aware of. 14:15:58

MR. STRAUS: So the only change -- 14:15:58
THE WITNESS: Not as I look at it today. 14:16:01
BY MR. STRAUS: 14:16:04
Q. But today's not the first time you've seen this; 14:16:04 right? You verified that these were accurate to the best 14:16:07 of your knowledge -- 14:16:10
A. Correct. 14:16:10
Q. -- when you signed the verification; correct? 14:16:11
A. Correct. 14:16:12
Q. And you thoroughly reviewed -- you thoroughly 14:16:13 reviewed the interrogatory responses at that time? 14:16:15
A. Yes. 14:16:17
Q. And you had enough time? You were provided 14:16:17 enough time to give a thorough review of the responses? 14:16:22
A. Yes. 14:16:26
Q. And is it your testimony now that that's the only 14:16:26 omission that was made? 14:16:30
MS. BARNES: Form and foundation. 14:16:31
Go ahead. 14:16:33
THE WITNESS: It appears that that would be 14:16:33 correct. 14:16:37
BY MR. STRAUS: 14:16:37
Q. That that's the only omission that's -- that's 14:16:40 made? 14:16:44
MS. BARNES: Form and foundation. 14:16:44

THE WITNESS: Correct. 14:16:45
MS. BARNES: Go ahead -- 14:16:45
MR. STRAUS: Did you make -- 14:16:45
MS. BARNES: -- once again. 14:16:46
BY MR. STRAUS: 14:16:46
Q. Did you make the decision to omit that information from this response? 14:16:46 14:16:50
MS. BARNES: I'm gonna instruct the witness not to answer the question. It's attorney-client and work product privilege. 14:16:51 14:16:54 14:16:57
MR. STRAUS: Well, no. But I'm asking if -- if he made that decision. If he didn't make it, he doesn't have to tell me who made it. 14:16:58 14:17:00 14:17:00
BY MR. STRAUS: 14:17:00
Q. Did you make the decision not to omit -- to omit that information? 14:17:01 14:17:04
MS. BARNES: Alex, I feel like you're forgetting the fact that there is a work product privilege also, not just attorney-client, and whoever made the decision while we were conferring and preparing the responses is governed by the work product privilege or protected by it, I should say, and so I have instructed the witness not to answer that last question that you just asked in the manner in which you asked it. 14:17:06 14:17:08 14:17:10 14:17:14 14:17:17 14:17:21 14:17:23 14:17:27

BY MR. STRAUS: 14:17:29
Q. Was the decision made to omit that information from this interrogatory response? 14:17:30 14:17:33
MS. BARNES: Same instruction unless you ask it differently. 14:17:36 14:17:39
BY MR. STRAUS: 14:17:41
Q. So you're -- you're not allowing him to answer that question? 14:17:46 14:17:48
MS. BARNES: If you want to ask him if he intended to omit that piece of information, you can ask him that. That's not what you've asked. 14:17:49 14:17:51 14:17:53
MR. STRAUS: I did. I said, "Did you make the decision to omit that information?" That's the question I asked. So I'll ask it again. 14:17:57 14:18:00 14:18:02
BY MR. STRAUS: 14:18:04
Q. Did you make the decision to omit that information from this interrogatory response? 14:18:04 14:18:07
MS. BARNES: Form and foundation. 14:18:09
Go ahead. 14:18:12
THE WITNESS: I don't -- I -- I did not make that decision based on reading this. I -- I did -- I left it out possibly, but not intentionally that being a portion of it. 14:18:12 14:18:16 14:18:22 14:18:28
BY MR. STRAUS: 14:18:29
Q. So we've been going for another hour. I just 14:18:42

want to be cognizant of court reporter and others, so it would be appropriate to take a short break. 14:18:46 14:18:49

THE VIDEOGRAPHER: We are going off the record at 2:18 p.m. 14:18:53 14:18:55

(A recess was taken from 2:18 p.m. to 2:32 p.m.) 14:18:58 14:32:06

THE VIDEOGRAPHER: We are back on the record at 2:32 a.m. 14:32:06 14:32:08

BY MR. STRAUS: 14:32:11

Q. Okay. Thank you, Mr. Hegstrom. We're back on the record. 14:32:12 14:32:16

Was the date of birth information included since the inception of this practice by the Sheriff's Office of publishing mugshots? 14:32:17 14:32:23 14:32:28

A. It appears -- 14:32:30

MS. BARNES: Form and foundation. 14:32:30

THE WITNESS: It appears that it was. 14:32:31

BY MR. STRAUS: 14:32:33

Q. Okay. Okay. 14:32:42

So I'm gonna have you -- have the -- my colleagues give to the court reporter and then give to -- to you and counsel the Granicus production, which starts at -- it's GRAN and then five zeros and a one. 14:32:42 14:32:49 14:32:52 14:32:57

And let's turn -- when you get it. 14:33:20

MS. BARNES: It's Exhibit 4. 14:33:21

(Deposition Exhibit No. 4 was marked for identification.) 14:33:21 14:33:23

BY MR. STRAUS: 14:33:23

Q. And I'm not gonna have you, unless you want to, but you absolutely can, review everything. I'm happy to bring you to -- to a certain page. 14:33:23 14:33:24 14:33:27

So why don't we go to what's Granicus document 20. And that's the -- the Bates stamps are the ones on the lower right. So GRAN, four zeros, two zero. And that just brings you to where the exhibit starts. 14:33:29 14:33:33 14:33:38 14:33:50

This is -- and again, take all the time that -- that you want to familiarize yourself with this, but this is a contract specific to the 2021 redesign. 14:33:54 14:33:56 14:34:00

And so are you familiar with this document? Have you ever seen it before? 14:34:09 14:34:12

A. I don't recall seeing this specific document. 14:34:14

Q. Yeah. And this one was not produced by -- by -- by your office or, you know, or by the Sheriff's Office or the defendants. It was a third-party disclosure. 14:34:18 14:34:24 14:34:28 14:34:31

And I'm gonna have you turn to what's GRAN, four zeros, 42, which is Exhibit B-1. 14:34:32 14:34:39

MS. BARNES: What page? 14:34:46

THE WITNESS: It's 42. 14:34:50

MR. STRAUS: 42. Bates number 42. GRAN, 14:34:50

four zero, 42. Four zeros, 42. 14:34:58
BY MR. STRAUS: 14:35:05
Q. And so -- and I'm sorry. You just tell me when 14:35:05
you're ready, and -- and take your time. 14:35:09
A. I'm prepared. 14:35:11
Q. Okay. 14:35:12
What's described here at the, you know, at the 14:35:18
top is an inmate lookup and mugshot lookup integration, 14:35:19
and it's, you know, referred to in other places as a 14:35:29
widget, but. 14:35:33
Is it your understanding that this inmate lookup 14:35:34
mugshot lookup were a feature that were added during this 14:35:39
redesign? 14:35:42
MS. BARNES: Form and foundation. 14:35:43
THE WITNESS: Was it created new, or was it 14:35:44
just created? I'm not sure I understand the question. 14:35:49
BY MR. STRAUS: 14:35:52
Q. Is it -- was this a -- was this a change, 14:35:53
anything associated with this inmate lookup and mugshot 14:35:57
lookup, was there any changes that happened during this 14:36:03
2021 redesign? 14:36:05
MS. BARNES: Form and foundation. 14:36:06
BY MR. STRAUS: 14:36:08
Q. It appears that way to me, but I, you know, could 14:36:08
be wrong. You're more knowledgeable. 14:36:12

Because it seems like from the description, it says, "The inmate information widget will enable website visitors to look up inmates based on booking number or first name, last name, date of birth." 14:36:14 14:36:17 14:36:22 14:36:27

MS. BARNES: Is there a question? 14:36:34

BY MR. STRAUS: 14:36:36

Q. Yeah. The question was already stated, and it's that: Is this a new either feature or subpart of a feature? Is there something new here that's being described in this scope of work? 14:36:37 14:36:41 14:36:49 14:36:52

MS. BARNES: Same objections. 14:36:55

Go ahead if you know. 14:36:56

THE WITNESS: I believe that this was just taking from what was already currently on the -- on the original website, and Granicus was taking and moving that into their format. 14:36:56 14:36:58 14:37:03 14:37:07

BY MR. STRAUS: 14:37:12

Q. Is that because the third-party vendor that originally had designed the website was not Granicus and was somebody else, some other entity? Is that what you -- is that what you mean? 14:37:12 14:37:16 14:37:19 14:37:21

A. I -- I believe that it was being done -- initially they were doing the work in house before they moved it over to Granicus. 14:37:22 14:37:25 14:37:26

Q. I see. 14:37:28



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

And is that -- is it your understanding that it was 2021 when Granicus became involved? 14:37:29 14:37:32

MS. BARNES: Form and foundation. 14:37:35

THE WITNESS: I believe it was '21, yes. 14:37:36

BY MR. STRAUS: 14:37:45

Q. And so I guess, you know, my understanding from reading this was that, you know, when it -- in that first -- first row in the right-hand column under where it -- the bolded public mugshots seems to say "Granicus will build the widget that displays a list of public mugshots along with specific information for each booking. The list will be in a table format and can be sorted by columns as well as by keyword search." 14:37:48 14:37:53 14:37:57 14:38:02 14:38:06 14:38:10 14:38:14 14:38:15

That -- that seems to indicate to me that that's a new element, new feature, that Granicus is building. And, in fact, Granicus says they will build it, you know, in the future tense. Is that -- is that not your understanding? Is everything that's described in that -- in that column of that first row are just features that were there already? 14:38:19 14:38:23 14:38:29 14:38:33 14:38:36 14:38:41 14:38:45

A. I -- I believe that Granicus built what was -- so that their platform -- this would work with their platform, not that -- I don't know that they necessarily created anything new or a new appearance, but what they did on the back end on -- for their -- on the technology 14:38:47 14:38:56 14:38:59 14:39:01 14:39:05

side, I believe this would been -- would have been their version of building it so that it looked similar or was fixed to be what they -- what was needed at the time. 14:39:08 14:39:10 14:39:15

Q. Okay. I see. 14:39:19

And so things like date of birth -- from your testimony, I'm understanding that things like date of birth, for instance, were included in mugshot publications from the outset. That's not anything new that happened in 2021; correct? 14:39:20 14:39:23 14:39:26 14:39:30 14:39:34

MS. BARNES: Form. Foundation. 14:39:35

THE WITNESS: I -- I don't believe so. 14:39:35

BY MR. STRAUS: 14:39:38

Q. Okay. 14:39:40

Pardon me one second while I just ask my colleague. Okay. 14:39:40 14:39:50

I'm gonna have folks hand you -- 14:39:57

And I think we're up to Exhibit 5. Am I right about that? 14:40:01 14:40:05

A. Correct. 14:40:06

Q. Yeah. Okay. 14:40:07

Two pages that are from the MCSO.org website, and my colleagues will tell me if they know what I'm talking about. 14:40:08 14:40:21 14:40:26

MR. KLOBERDANZ: It's about the screenshots, Alex? 14:40:26 14:40:29

MR. STRAUS: Yeah. Yep. 14:40:29
MR. KLOBERDANZ: The Google AdSense ads? 14:40:31
MR. STRAUS: Yep. 14:40:31
MR. KLOBERDANZ: Okay. 14:40:31
MS. BARNES: And again, is this something that's been disclosed? 14:40:31 14:40:33
MR. KLOBERDANZ: I believe -- I believe so. 14:40:34
MR. STRAUS: It is straight from your website, your client's website. 14:40:36 14:40:38
MS. BARNES: I -- I understand that, but that's not what I asked. 14:40:38 14:40:40
Has this been disclosed, this particular document that we're marking as Exhibit 5? 14:40:42 14:40:44
MR. KLOBERDANZ: It's been used in pleadings, so that -- that much I'm aware of. 14:40:47 14:40:49
MS. BARNES: Okay. 14:40:52
MR. KLOBERDANZ: Alex, do you want to do separate exhibits, 5 and 6? 14:41:10 14:41:14
MR. STRAUS: Sure. Yeah. 14:41:14
MR. KLOBERDANZ: Okay. I handed -- 14:41:14
MR. STRAUS: You can do the one -- 14:41:14
MR. KLOBERDANZ: I handed the one with Levitch first. 14:41:16 14:41:18
MR. STRAUS: Okay. Got it. 14:41:21
MR. KLOBERDANZ: Earlier in time. 14:41:22



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

MS. BARNES: So Mark Kelly is 6? 14:41:24
MR. KLOBERDANZ: Yes. 14:41:26
(Deposition Exhibit No. 5 was marked for 14:41:37
identification.) 14:41:40
(Deposition Exhibit No. 6 was marked for 14:41:40
identification.) 14:41:42
BY MR. STRAUS: 14:41:42
Q. Okay. 14:41:42
Sir, are you familiar with this feature, the 14:41:47
search feature of the Sheriff's Office website? 14:41:50
MS. BARNES: Form. Foundation. 14:41:54
THE WITNESS: I'm familiar with the search, 14:41:55
yes. 14:41:59
BY MR. STRAUS: 14:42:00
Q. Okay. If you look down, you know, I'd say about 14:42:02
one-third of the way down, there's the blue hyperlinked. 14:42:06
It says "Warrants," comma, "Arrests & Mugshots." 14:42:12
Do you see that? 14:42:15
A. I do. 14:42:16
Q. Dash, "Just Enter a Name Just Name & State"? 14:42:17
A. Yes. 14:42:21
Q. And then under that, there's little -- it's 14:42:21
small -- I'm sorry -- it's small type. I mean, I'm -- I 14:42:26
have glasses, and it's hard for me to see it, but it's 14:42:28
green. There's a little -- the letters AD in the green 14:42:32

box, and then it has another hyperlink to spyfly.com. 14:42:35
Do you see that? 14:42:40
A. Yep. 14:42:41
Q. And then there's another one under the next blue; right? There's -- there's -- there's four boxes on the page that have this ad in the box and then with a hyperlink to a website. 14:42:41 14:42:46 14:42:48 14:42:52
Do you see those? 14:42:54
A. Yes. 14:42:55
Q. What's your understanding about what those are? 14:42:55
MS. BARNES: Form and foundation. 14:42:58
THE WITNESS: Those are gonna take you to a third party off of that website to some sort of advertising, some sort of pay-for product. 14:42:59 14:43:03 14:43:10
BY MR. STRAUS: 14:43:15
Q. And what's your understanding about how those -- would you consider that -- that's an advertisement; right? That's why it says AD in the -- in the box? Would you agree with that? 14:43:17 14:43:21 14:43:23 14:43:27
MS. BARNES: Form and foundation. 14:43:28
THE WITNESS: Yes. 14:43:29
BY MR. STRAUS: 14:43:29
Q. And what's your understanding about how those advertisers got their ads onto the Maricopa County Sheriff's Office website? 14:43:29 14:43:32 14:43:39

MS. BARNES: Form and foundation. 14:43:39
THE WITNESS: So the search feature on here at the time appears to have been linked to. If it wasn't within the website, went to the World Wide Web and went outside of just the Sheriff's Office for searching. 14:43:40 14:43:46 14:43:50 14:43:54
BY MR. STRAUS: 14:43:57
Q. Okay. But does -- pardon me. 14:44:01
Does that answer address how these advertisements got onto the Sheriff's Office website? In other words, they -- yeah, how did those ads get onto your website? 14:44:03 14:44:10 14:44:14
MS. BARNES: Form and foundation. 14:44:19
THE WITNESS: There was -- again, it's -- it's the -- it's the search feature provided by the third-party vendor. When you search the name, if you couldn't find it on the home page the -- at the time, the one MCSO website, then when it didn't reach somebody on the -- on -- within the website, the home site, it would search outside of that until it came up with a -- with a -- something that it matched. And that's where that all came from. 14:44:19 14:44:28 14:44:30 14:44:36 14:44:41 14:44:47 14:44:51 14:44:54 14:44:59
BY MR. STRAUS: 14:44:59
Q. And there is a monetary element to advertising on a -- someone -- an entity or a person's website; is that fair? Is that your understanding? 14:45:01 14:45:12 14:45:18
MS. BARNES: Form and foundation. 14:45:19

BY MR. STRAUS: 14:45:20

Q. You have to pay to advertise on people's websites; correct? 14:45:20 14:45:22

MS. BARNES: Sorry. Form and foundation. 14:45:23

THE WITNESS: Ask the question again so I'm understanding, because I think you're asking if somebody gets paid for that advertising on that website; is that correct? 14:45:25 14:45:28 14:45:31 14:45:31

MR. STRAUS: On the -- on the Sheriff's Office website, yes. 14:45:36 14:45:38

MS. BARNES: Form and foundation. 14:45:40

Go ahead. 14:45:41

THE WITNESS: The Sheriff's Office -- the Sheriff's Office does -- does not have any advertising on there. Again, this is going outside. Granicus put a search function that if it wasn't found in the local, it went to a grander scale, if you will, outside of the Sheriff's Office to search for this information, and that's where those are found. It wasn't on the home page itself of the Maricopa County Sheriff's Office. 14:45:42 14:45:46 14:45:48 14:45:52 14:45:55 14:45:58 14:46:01 14:46:06

BY MR. STRAUS: 14:46:09

Q. Right. 14:46:09

But is it your testimony that neither Granicus nor the Sheriff's Office had any role in providing the logistics for an ad such as these four to appear on the 14:46:12 14:46:16 14:46:24

Sheriff's Office website? 14:46:30

MS. BARNES: Form and foundation. 14:46:31

THE WITNESS: I'm telling you whoever put 14:46:31
the search function had made it so if you didn't search 14:46:34
local, you went national. It did not -- there was no 14:46:39
financial gain by either our third-party vendor or the 14:46:42
Maricopa County Sheriff's Office from that. 14:46:47

BY MR. STRAUS: 14:46:49

Q. How do you know that? 14:46:49

A. Well, we're -- the Maricopa County Sheriff's 14:46:50
Office has to produce all receipts when it comes to monies 14:46:55
that we earn or spend for transparency for the government 14:46:59
as a -- as a member of the government. 14:47:05

Q. And have you done the investigation to determine 14:47:06
that there was no revenue created for the Sheriff's Office 14:47:09
or the County based on these advertisements? 14:47:14

A. The Maricopa County Sheriff's Office, our 14:47:17
financial department has gone through all of this. They 14:47:19
would -- that would have been flagged right away, and it 14:47:23
was not. 14:47:24

Q. They went through all of this, meaning what? 14:47:25
What's "this"? 14:47:28

A. The -- the Maricopa County Sheriff's Office has a 14:47:28
financial department that they go though all of our 14:47:30
receipts, everything that's spent, and everything that 14:47:33

comes in. Has gone through it all, and this would have been something, these ads, if we were making money off of, that would have been flagged, and it was not because the -- the -- we don't make money off of ads from the website. 14:47:34 14:47:37 14:47:41 14:47:44 14:47:49

Q. During what process would that have been flagged? 14:47:50

A. During the -- 14:47:56

MS. BARNES: Form. 14:47:56

THE WITNESS: -- regular audits. We -- the -- we're government -- as a government entity, we are audited about everything, any money that comes in or goes out. 14:47:57 14:48:00 14:48:03 14:48:07

BY MR. STRAUS: 14:48:07

Q. But sitting here today, how do you know that that was not flag -- using your term, "flagged," how do you know that that -- they're not receiving revenue from them? 14:48:08 14:48:10 14:48:14 14:48:17

MS. BARNES: Form. 14:48:18

THE WITNESS: Well, I would have been notified about that if we were making -- if we were taking in money that we weren't supposed to. 14:48:18 14:48:19 14:48:22

BY MR. STRAUS: 14:48:25

Q. The communications department -- well, I don't know why I wouldn't say -- you're supposed to -- 14:48:26 14:48:29

The communications department would have -- you 14:48:30

mean separate and apart from -- from these discovery responses, they would have notified you? Or do you mean in coordination with the production of -- of these responses they would have notified you? I'm just not understanding what you mean. 14:48:33 14:48:36 14:48:39 14:48:43 14:48:45

They -- does -- does the finance department alert you to every bit of revenue that the Sheriff's Office and the County obtain? 14:48:46 14:48:50 14:48:53

MS. BARNES: Form. 14:48:56

THE WITNESS: Any money that is spent out of my division in my area, I would know about it as well as any revenue that I gained that, if it's under my purview, I would have been alerted to. 14:48:57 14:49:00 14:49:03 14:49:06

BY MR. STRAUS: 14:49:08

Q. And this is under your purview because it's a public-facing communication because it's the website? Why -- how does this fall under your purview? 14:49:08 14:49:12 14:49:15

A. It's the communication aspect of it would be from me. 14:49:18 14:49:23

Q. Meaning the entire website is under your purview? Is that what you mean? 14:49:23 14:49:27

A. Yes. 14:49:28

Q. Okay. 14:49:29

Is it your understanding that -- that just by way of a default, so to speak, setting that when your website 14:49:29 14:49:46

was designed by Granicus that it allowed for these sorts 14:49:51
of ads to -- to pop up? Is that what you mean? 14:49:55

MS. BARNES: Form. Foundation. 14:50:00

THE WITNESS: I'm saying when they created 14:50:00
it, that website, that search engine, the search engine 14:50:03
searches locally first and then would expand out to 14:50:09
outside of the office and the office's website. 14:50:13

BY MR. STRAUS: 14:50:16

Q. And why is that? Why -- why do you allow that 14:50:17
search to happen outside of, you know, to -- to the 14:50:20
outside world beyond what's available on the Sheriff's 14:50:24
Office website? 14:50:29

MS. BARNES: Form and foundation. 14:50:29

THE WITNESS: I -- I believe that was 14:50:30
probably an oversight at the time that was later 14:50:31
corrected, that that search had allowed more than just 14:50:34
right there. 14:50:40

BY MR. STRAUS: 14:50:40

Q. Do you know when that error was identified? 14:50:42

MS. BARNES: Form and foundation. 14:50:45

THE WITNESS: I do not have the answer to 14:50:46
when exactly that -- that occurred. 14:50:49

BY MR. STRAUS: 14:50:51

Q. Do you have any estimation without guessing? 14:50:52
Year? Decade? Anything? 14:50:55

MS. BARNES: Same objections. 14:50:57
THE WITNESS: I'm not prepared to guess on when it -- when that took place, the correction. 14:50:59 14:51:03
BY MR. STRAUS: 14:51:05
Q. Yeah, no, I don't want you to guess. 14:51:06
Do you know who identified this error? 14:51:07
MS. BARNES: Form and foundation. 14:51:10
THE WITNESS: I -- I can't answer the question as to who was the one that -- that found it, just that it was -- that it was discovered and fixed. 14:51:11 14:51:15 14:51:18
BY MR. STRAUS: 14:51:21
Q. And -- but you don't know when it was discovered; is that right? 14:51:23 14:51:27
A. That is correct. 14:51:27
Q. Do you know when it was fixed? 14:51:28
MS. BARNES: Form and foundation. 14:51:31
THE WITNESS: No. I -- I don't know the exact date of when that was fixed. 14:51:32 14:51:34
BY MR. STRAUS: 14:51:36
Q. Do you have any estimation of the date when it was fixed? 14:51:36 14:51:41
MS. BARNES: Same objection. 14:51:42
THE WITNESS: I would not want to put a false date on that for you. 14:51:43 14:51:45

BY MR. STRAUS: 14:51:46
Q. Okay. 14:51:46
And why -- why was it fixed? 14:51:47
MS. BARNES: Same objection. 14:51:49
THE WITNESS: The search engine was supposed 14:51:50 to be designed to search just within the Maricopa County 14:51:54 Sheriff's Office and the website itself, the home website 14:51:58 itself, not outside it to the World Wide Web. 14:52:01
BY MR. STRAUS: 14:52:04
Q. Okay. 14:52:05
And what -- what's the -- like, what -- what -- 14:52:05 what's the problem with it having a broader search 14:52:09 function? 14:52:13
MS. BARNES: Form and foundation. 14:52:13
THE WITNESS: Our goal was to drive people 14:52:14 to the website, the local website, and to go through what 14:52:17 we have at the Sheriff's Office. Adding that search 14:52:20 function and going outside of there kind of takes away 14:52:23 from what we wanted, which was to see what was on the 14:52:27 website. 14:52:30
BY MR. STRAUS: 14:52:31
Q. So there was -- so the procedures in place that 14:52:31 if -- strike that. 14:52:35
Do you think this mistake that was made was made 14:52:36 by Granicus? 14:52:39

MS. BARNES: Form. Foundation. 14:52:41
Go ahead. 14:52:43
THE WITNESS: I believe that our third-party 14:52:43
vendor is the one that created that, that search engine. 14:52:48
BY MR. STRAUS: 14:52:52
Q. And so there were policies or -- or at least 14:52:54
procedures to correct a mistake that's made by a 14:52:59
third-party vendor; correct? 14:53:04
MS. BARNES: Form. 14:53:05
THE WITNESS: Yes. 14:53:06
BY MR. STRAUS: 14:53:07
Q. And so -- so what's the procedure for correcting 14:53:10
a mistake like that? 14:53:17
MS. BARNES: Form. 14:53:19
THE WITNESS: That would have been a phone 14:53:19
call to our technology department and to Granicus 14:53:22
themselves and ask them to make the -- make the correction 14:53:26
and have them send that correction on back to us and 14:53:29
through our technology to upload. 14:53:34
BY MR. STRAUS: 14:53:35
Q. And how difficult was that to accomplish the 14:53:36
correction of that mistake? 14:53:41
MS. BARNES: Form. Foundation. 14:53:42
THE WITNESS: It was something that if we 14:53:43
made the phone call and made the -- and made the request, 14:53:47

they would get right on it and taken -- get it taken care of as -- depending on the correction that needed to be made, whether it be a -- 14:53:51 14:53:55 14:53:59

MR. STRAUS: So -- 14:53:59

THE WITNESS: -- button or whether it be a change of code or whatever they need to do. 14:54:01 14:54:01

BY MR. STRAUS: 14:54:03

Q. So -- so your testimony isn't -- and I'm not holding you to one, but it sounds like what you testified to is you make a phone call, tell them what needs to be fixed, and -- and they're pretty diligent and efficient with making that change for you. Is that right? 14:54:04 14:54:07 14:54:10 14:54:14 14:54:17

MS. BARNES: Form and foundation. 14:54:19

THE WITNESS: I think that's probably fair to say. 14:54:20 14:54:22

BY MR. STRAUS: 14:54:22

Q. Okay. 14:54:24

So why is it that you went from 2016 onward all the way until 2025 without ever getting the mistake of the lack of a disclaimer fixed? 14:54:24 14:54:33 14:54:38

MS. BARNES: Hold -- I don't hear a question. 14:54:44 14:54:48

MR. STRAUS: I'm sorry. Say it again. 14:54:49

MS. BARNES: I didn't hear a question. 14:54:52

MR. STRAUS: Okay. Can --

MS. BARNES: Sorry. I thought you cut off mid-sentence.

MR. STRAUS: -- I have that question read.

THE COURT REPORTER: Did you ask for it to be read back?

MR. STRAUS: Yes, please.

(The requested portion of the record was read.) 14:55:14

MS. BARNES: Okay. So form. Foundation. 14:55:14 Same prior instruction regarding anything outside the 14:55:16 scope of attorney-client discussions to include up 14:55:18 to -- or after March 1st, 2022. 14:55:23

You can answer if you can. 14:55:27

THE WITNESS: The Maricopa County Sheriff's 14:55:31 Office when they made the update in the program or the 14:55:35 website, they were doing the changes in 2016. Again, that 14:55:39 appears to have been an oversight, and again the website 14:55:44 went back into use as it had prior with the changes made, 14:55:49 which was a -- this is -- just happened. 14:55:53

So I don't know that a whole lot of eyes inside 14:55:56 the Maricopa County Sheriff's Office were taking a look at 14:56:00 it as far as in the communication area. 14:56:04

BY MR. STRAUS: 14:56:08

Q. I'm not sure if I understood that answer. 14:56:12

A. Okay. 14:56:15

Q. So I'm just gonna -- with your indulgence, I'm just gonna ask it again and see if I can understand your answer better. 14:56:16 14:56:20 14:56:24

If it only takes a phone call and Granicus is gonna be very diligent and efficient with making changes that are requested, why did -- why was the mistake of removing the disclaimer never corrected after 2016? 14:56:25 14:56:28 14:56:32 14:56:38

MS. BARNES: Form. Foundation. 14:56:45

MR. STRAUS: You can answer. 14:56:50

MS. BARNES: Same instruction from March '22 forward. 14:56:52 14:56:55

You can answer other than that. 14:56:58

THE WITNESS: Again, I think it was an oversight by the office, and I don't think anybody had seen it at that -- at that time when the redesign was taking place, and the -- and it went back to being the website being used by the public, but I think internally it was just happening because, again, going back to photos just appearing, I don't think anybody -- I think it was just an oversight. 14:57:00 14:57:03 14:57:06 14:57:10 14:57:12 14:57:18 14:57:21 14:57:25

BY MR. STRAUS: 14:57:26

Q. I know it was an oversight, but I'm asking is -- as was this -- these ad -- this enhanced search function was an oversight; right? I mean, there were 12 mistakes by Granicus, according to your testimony. One of 14:57:26 14:57:29 14:57:34 14:57:35

them was corrected, you know, seems rather diligently. 14:57:37
Do you know how long this -- this error of -- of 14:57:42
having this outside search feature, do you know how long 14:57:45
that was on the website before it was fixed? 14:57:48
MS. BARNES: Form. Foundation. 14:57:52
THE WITNESS: I don't -- I do not know the 14:57:54
time frame exactly. 14:57:55
BY MR. STRAUS: 14:57:56
Q. Do you have any estimate of how long these ads 14:57:59
were up there? 14:58:01
MS. BARNES: Same objection. 14:58:03
THE WITNESS: I would rather not make a 14:58:04
guess at the time frame. 14:58:06
BY MR. STRAUS: 14:58:08
Q. Okay. 14:58:08
But at some point, you know -- you've testified 14:58:09
at some point it was identified as an error, phone call 14:58:12
was made, and it was fixed; correct? 14:58:14
MS. BARNES: Form. Foundation. 14:58:17
THE WITNESS: Correct. 14:58:18
BY MR. STRAUS: 14:58:19
Q. But at some time, the lack of a disclaimer was 14:58:20
identified as a mistake, and no effort was made to fix 14:58:24
that; correct? 14:58:28
MS. BARNES: Form and foundation. 14:58:29

THE WITNESS: I don't believe I said that. I don't believe I -- I don't believe I told you when the -- when it was discovered as being an oversight. I don't know when the oversight occurred and to when it got fixed. 14:58:30 14:58:32 14:58:33 14:58:38 14:58:42

BY MR. STRAUS: 14:58:42

Q. Oh, which one, the -- the ads, or the disclaimer? 14:58:44

A. The disclaimer. 14:58:47

Q. Okay. 14:58:48

But at some point after 2016, it was identified that the disclaimer was not on there; correct? Or are you saying that no one ever noticed it? 14:58:49 14:58:56 14:59:00

MS. BARNES: Form. Foundation. 14:59:03

BY MR. STRAUS: 14:59:04

Q. At some point, did -- did anyone, yourself or anyone else, notice that the disclaimer "innocent until proven guilty" was no longer on the -- on the mugshot -- website? 14:59:04 14:59:07 14:59:11 14:59:14

MS. BARNES: And again, form and foundation and with the instruction to only answer prior to March 2022. 14:59:14 14:59:16 14:59:20

THE WITNESS: I don't know when that was discovered. The actual oversight when that was -- when somebody recognized it before '22 if it was even recognized before then -- 14:59:20 14:59:32 14:59:39 14:59:45

MR. STRAUS: So is it your testimony -- 14:59:47
THE WITNESS: -- that the disclaimer was -- 14:59:47
MR. STRAUS: Sorry. I apologize. I interrupted. 14:59:48 14:59:50
THE WITNESS: You're fine. 14:59:51
BY MR. STRAUS: 14:59:52
Q. So it's your testimony that between 2016 and 2022, it's possible that nobody noticed that there -- there was not a disclaimer on the -- on the mugshot website anymore? Is that what you're saying? It's possible that no one noticed that -- 14:59:52 14:59:55 14:59:59 15:00:02 15:00:06
MS. BARNES: Form and -- 15:00:11
BY MR. STRAUS: 15:00:11
Q. -- for those six years? 15:00:11
MS. BARNES: Form and foundation. 15:00:11
Go ahead. 15:00:11
THE WITNESS: Yes. 15:00:11
BY MR. STRAUS: 15:00:13
Q. Did you ever notice it during those -- during that time? 15:00:14 15:00:17
MS. BARNES: Form -- form and foundation. 15:00:18
THE WITNESS: I did not. 15:00:18
BY MR. STRAUS: 15:00:20
Q. Whose responsibility is it -- strike that. 15:00:20
Whose -- under whose purview is the website, 15:00:25

the -- the Sheriff's Office website? 15:00:30
MS. BARNES: Form. 15:00:35
THE WITNESS: The website is under the 15:00:36
Director of Communications. 15:00:41
BY MR. STRAUS: 15:00:42
Q. And that includes the -- the mugshot publication 15:00:43
feature? 15:00:47
A. Yes. 15:00:48
Q. How often do you look at that page or those 15:00:48
pages? 15:00:54
MS. BARNES: When are you talking about? 15:00:56
We need a time frame; otherwise, I don't know how 15:01:05
to object or not. I've said this multiple times. It's 15:01:08
that much harder for me to know whether to object or not 15:01:10
if you don't give a time frame. How often does he look at 15:01:11
it this week? How often does he look at it in 2016 to 15:01:15
2022? 15:01:19
MR. STRAUS: The disclaimer is back on this 15:01:21
week, so that wouldn't be -- that wouldn't be relevant; 15:01:21
right? 15:01:21
BY MR. STRAUS: 15:01:21
Q. Since 2016 when the mistake was made, I'm -- let 15:01:24
me strike that. 15:01:28
So you're responsible for the website; correct? 15:01:32
A. It does fall under me, yes. 15:01:34

Q. And the -- and the mugshot feature of the website is also under your responsibilities; correct? 15:01:37 15:01:44
A. Yes. 15:01:47
Q. And so are you the one that noticed that the search feature was mistakenly broad? 15:01:48 15:01:56
MS. BARNES: Okay. I'm going to interject and instruct the witness at this point not to answer based on attorney-client privilege and work product privilege because I don't know the timing that we're talking about, and so that is why I have asked you to clarify whether or not I need to instruct him not to answer based on those privileges. 15:02:00 15:02:03 15:02:07 15:02:12 15:02:13 15:02:19 15:02:22
MR. STRAUS: I don't need to clarify. I cannot clarify because he doesn't know when it happened, so -- so I can't clarify a time. 15:02:23 15:02:25 15:02:29
I'll try. Okay. 15:02:31
MS. BARNES: Well, let me -- let -- 15:02:32
BY MR. STRAUS: 15:02:32
Q. Do you know when -- 15:02:32
MS. BARNES: Okay. Go ahead. 15:02:33
BY MR. STRAUS: 15:02:33
Q. -- the mistake was made that -- 15:02:33
Okay. 15:02:35
MS. BARNES: Go ahead. 15:02:35

BY MR. STRAUS: 15:02:36
Q. Do you know when the mistake was made that resulted in this enhanced search feature that we've been discussing? Do you know when that mistake was made, when that started, when that was added to the website? 15:02:37 15:02:41 15:02:48 15:02:51
MS. BARNES: Form and foundation. 15:02:54
THE WITNESS: That would have been after Granicus took control of creating the website. So after -- what is that? -- 2020. 15:02:55 15:02:57 15:03:01
BY MR. STRAUS: 15:03:03
Q. Yeah. I think it's 2021, but -- 15:03:05
A. Yeah. 15:03:07
Q. -- I could be wrong, so let's say 2020. 15:03:08
At what point did you notice that this enhanced search feature was part of the Sheriff's Office website? 15:03:11 15:03:16
MS. BARNES: Go ahead. 15:03:23
Form. Foundation. 15:03:25
You can answer. 15:03:26
THE WITNESS: That would have been my predecessor that would have been -- would have had to have caught that, as I wasn't at the Sheriff's Office when that was caught as an error. 15:03:26 15:03:28 15:03:32 15:03:35
BY MR. STRAUS: 15:03:36
Q. Okay. 15:03:37
And which predecessor was that? 15:03:37

MS. BARNES: Form and foundation. 15:03:40
THE WITNESS: I believe Norma. 15:03:41
BY MR. STRAUS: 15:03:43
Q. And -- and how do you know that it -- that she 15:03:45
was the one who caught that? 15:03:47
MS. BARNES: Form and foundation. 15:03:49
I -- go ahead. 15:03:51
THE WITNESS: I'm just giving a general 15:03:54
because she was a supervisor -- she was over the -- she 15:03:57
was the communications director. I'm -- I'm just putting 15:03:59
her in that should have been something she was notified of 15:04:04
by her staff. 15:04:06
BY MR. STRAUS: 15:04:07
Q. And what is the process by which the Sheriff's 15:04:07
Office reviews or otherwise identifies errors with its 15:04:13
website? 15:04:18
A. Early on, that would have been when the -- a lot 15:04:22
of times when staff was reviewing finding something. 15:04:27
Something new was posted; we would see it; we would see 15:04:32
stuff. 15:04:36
I don't know that there was any policy or 15:04:36
procedure in -- in fact, I know there wasn't any specific 15:04:38
that we had to go check the website at certain times, 15:04:41
intervals. It was just if somebody caught something, saw 15:04:45
something, they would say something to us. 15:04:48

BY MR. STRAUS: 15:04:50
Q. But is it your testimony that no one caught 15:04:50
anything or said anything or saw anything regarding the 15:04:52
lack of a disclaimer associated with the mugshot page? 15:04:56
MS. BARNES: Form and foundation. 15:05:01
Again, same instruction, prior to March of 2022. 15:05:02
You can answer if you know. 15:05:07
THE WITNESS: I'm not aware of any response 15:05:08
to that from anybody. 15:05:14
BY MR. STRAUS: 15:05:17
Q. When was the first time you found out or were 15:05:18
put -- made aware of the fact that this disclaimer was no 15:05:21
longer on the website after that mistake happened in 2016? 15:05:26
MS. BARNES: So I'm gonna have to instruct 15:05:31
the witness not to answer for the attorney-client work 15:05:33
product privilege since he did not come back to the 15:05:36
Sheriff's Office until 2025, which falls in the time frame 15:05:39
that we have been indicating we object on those two bases. 15:05:44
MR. STRAUS: Yeah, but he's obligated to 15:05:46
have -- to have educated himself on these issues. 15:05:48
MS. BARNES: You didn't ask him that 15:05:52
question. You asked him a different question. 15:05:54
MR. STRAUS: Okay. 15:05:57
MS. BARNES: I'd like to -- I'd like 15:05:59
to -- I'd like to take a five-minute break. 15:06:01

THE VIDEOGRAPHER: We're going off the record -- 15:06:01 15:06:07
MR. STRAUS: We have a pending question. We have a pending question, so after the question is answered, you can take a break. 15:06:07 15:06:08 15:06:09
MS. BARNES: I already instructed him not to answer the question, so we don't. Okay? 15:06:09 15:06:12
MR. STRAUS: Sure. Have your break. 15:06:18
MS. BARNES: All right. 15:06:21
THE VIDEOGRAPHER: We are going off the record at 3:06 p.m. 15:06:23 15:06:26
(A recess was taken from 3:06 p.m. to 3:16 p.m.) 15:06:31 15:16:54
THE VIDEOGRAPHER: We are back on the record at 3:16 p.m. 15:16:54 15:16:58
BY MR. STRAUS: 15:17:00
Q. Okay. Wonderful. Thank you, Mr. Hegstrom. It's kind of an abrupt break, but are you are -- you're ready to continue testifying? 15:17:01 15:17:02 15:17:08
A. Yes, sir. 15:17:09
Q. Wonderful. 15:17:10
Okay. I think we've established what we don't know so far about these ads. So to -- to summarize your testimony so far, is it correct to say that this search feature that went outside of the Sheriff's Office website 15:17:12 15:17:16 15:17:21 15:17:29

was an inadvertent feature on the Sheriff's Office website? 15:17:33 15:17:40

Is that fair? 15:17:40

MS. BARNES: Form and foundation. 15:17:42

Go ahead. 15:17:43

THE WITNESS: I'm surmising that it's accurate. 15:17:43 15:17:46

BY MR. STRAUS: 15:17:47

Q. Okay. 15:17:47

And sitting here today, in your personal knowledge and also in your efforts to educate yourself as a 30(b)(6) witness, you do not know when this error was identified. Is that accurate? 15:17:47 15:17:50 15:17:54 15:18:01

MS. BARNES: Form. 15:18:03

THE WITNESS: What error are you referring to? 15:18:05 15:18:07

BY MR. STRAUS: 15:18:08

Q. The fact that this search feature provided search results outside of the Sheriff's Office website, which in this case resulted in some ads coming back as search results. We don't know when that -- when that error was made; is that correct? 15:18:08 15:18:13 15:18:18 15:18:22 15:18:27

MS. BARNES: Form. 15:18:27

THE WITNESS: I don't know when that search feature was put on there or when it was taken away from 15:18:28 15:18:30



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

there. 15:18:34
BY MR. STRAUS: 15:18:36
Q. Okay. So we don't know when it was put on there. 15:18:36 We don't know when it was taken off. 15:18:39
You are aware of certain discovery requests 15:18:41 that -- relevant to ads on the Sheriff's Office website; 15:18:54 is that right? Do you remember that Plaintiff asked some 15:19:02 discovery questions about that? 15:19:06
A. Can you refresh my memory? 15:19:07
Q. Sure. 15:19:11
So Interrogatory No. 3 -- 15:19:12
MS. BARNES: Exhibit 2. 15:19:24
He's getting in front of him. 15:19:26
MR. STRAUS: Yeah. No problem. Thank you 15:19:31 for assisting. 15:19:33
MS. BARNES: 3. 15:19:48
THE WITNESS: Number 3? 15:19:50
MR. STRAUS: Okay. Yeah. 15:19:57
THE WITNESS: Okay. 15:19:58
BY MR. STRAUS: 15:19:58
Q. Sorry. Tell me if you're -- okay. 15:19:58
So number 3 says, "Identify the time periods 15:20:01 during which the MCSO website included any Google AdSense 15:20:05 or monetized third-party advertising platforms. For each 15:20:09 period, state the revenue generated and the identity of 15:20:12

any person, government agency, or entity received such funds." 15:20:15 15:20:19

So do you agree that this -- the time period by -- for which this enhanced search feature which you've indicate was a mistake, the time period that that was up and active on the Sheriff's Office website is the time period for which Interrogatory 3 is inquiring; is that fair? 15:20:19 15:20:27 15:20:31 15:20:37 15:20:45 15:20:54

MS. BARNES: Form. 15:20:54

THE WITNESS: Can you repeat the question? 15:20:55

BY MR. STRAUS: 15:20:57

Q. Yeah. 15:20:58

So Interrogatory No. 3 is asking for the time periods during which the -- your web -- your Sheriff's Office website included any AdSense or monetized third-party advertising. Whatever time period it is that this mistakes was made that included search features that would result in advertisements on the Sheriff's Office website, that's the time period that Interrogatory No. 3 is inquiring about; correct? 15:20:59 15:21:04 15:21:07 15:21:11 15:21:15 15:21:20 15:21:23 15:21:29

MS. BARNES: Form. 15:21:33

BY MR. STRAUS: 15:21:36

Q. Is that -- is that your understanding? 15:21:36

MS. BARNES: Form. 15:21:37

THE WITNESS: I believe so, yeah. 15:21:37

MR. STRAUS: Okay. 15:21:41
THE WITNESS: Yes. 15:21:41
BY MR. STRAUS: 15:21:42
Q. And what efforts did you make to identify that time period? 15:21:42 15:21:47
MS. BARNES: Form. 15:21:48
THE WITNESS: I'm gonna need you to repeat -- re-ask the question. I'm not sure I understand what you're asking here. You're asking me about this time period from 2017? What -- I don't know what you're asking here. 15:21:49 15:22:32 15:22:34 15:22:38 15:22:46
BY MR. STRAUS: 15:22:47
Q. Yeah. 15:22:47
So I -- I -- I think based on your testimony right now sitting here today, we don't know what the time period is. The time period is from whenever the search -- the search feature was part of the Sheriff's Office website until whenever that phone call was made and -- and it was removed and no longer a part of the website. So that's the time period we're looking for, because that appears, based on your testimony, is the time period which there was Google AdSense or other third-party advertising -- 15:22:47 15:22:49 15:22:52 15:22:58 15:23:06 15:23:10 15:23:13 15:23:16 15:23:19 15:23:24
MS. BARNES: Form. 15:23:25

BY MR. STRAUS: 15:23:26
Q. -- on the website. So that's the time period we're trying to inquire about, and we're ask -- I don't know the time period. That's why Interrogatory 3 asks to identify the time period. 15:23:26 15:23:29 15:23:32 15:23:36
And I think from what your testimony you're saying right now, we don't know the time period. Is that accurate? 15:23:38 15:23:41 15:23:45
MS. BARNES: Form. 15:23:46
THE WITNESS: You're saying the Google AdSense was on our page, and I'm saying that it was not. We did not include AdSense, Google AdSense, or monetize the advertising platforms on the website, so I'm not sure I understand what you're asking. 15:23:47 15:23:49 15:23:55 15:24:00 15:24:03
I'm kind of -- sorry. It's getting late, so I'm sorry. 15:24:04 15:24:07
MR. STRAUS: No. No. Absolutely. And -- and -- and you're right. 15:24:09 15:24:11
BY MR. STRAUS: 15:24:12
Q. So whether -- so the first part of this interrogatory, the first sentence, doesn't -- doesn't require the monetization to be the Sheriff's Office receiving that money, okay? Later it asks for who's receiving the money, but this first sentence is just "Identify the time period in which the website included 15:24:12 15:24:15 15:24:18 15:24:23 15:24:29 15:24:29

any Google AdSense or other monetized third-party advertising." 15:24:32 15:24:38

These -- you know, we're looking at an exhibit, and there's another exhibit coming next with another four, these are four ads; right? These are four ads that are clearly on these Sheriff's Office website. Those are monetized that. Someone's getting money from that. I'm not -- I understand that you're saying that -- that the Sheriff's Office to your knowledge didn't get the -- the money, but that is a monetized advertising. So we're trying to figure out what's the time period. 15:24:38 15:24:40 15:24:44 15:24:48 15:24:53 15:24:56 15:24:59 15:25:01 15:25:07

Really the -- the -- the cleanest way to put it after your testimony is: Do we know when this mistake first happened, and do we know when it was corrected? And I know that you've testified and said we don't know either of those. We don't know when it started, and we don't know when it ended. And okay. That -- that's fair enough. 15:25:10 15:25:12 15:25:17 15:25:23 15:25:26 15:25:28 15:25:31

What I'm asking now is: What did you do to try to find the answer those two questions? 15:25:31 15:25:35

MS. BARNES: Form. 15:25:37

BY MR. STRAUS: 15:25:39

Q. That's what this interrogatory is asking. 15:25:39

MS. BARNES: Same objection. 15:25:41

THE WITNESS: I've talked with people that 15:25:43

are -- that were with the agency at the time, and -- in the communications as well as the leadership to ask and see if they've -- if they know anything about this stuff. And the technology department. I went to the technology department and asked them about it as well. 15:25:57 15:26:00 15:26:08 15:26:12 15:26:15

BY MR. STRAUS: 15:26:17

Q. What response did you get back from any of those people and departments? 15:26:21 15:26:24

A. I've wrote -- 15:26:25

MS. BARNES: You don't need to -- I'm just directing -- 15:26:29 15:26:33

THE WITNESS: I know. I'm getting -- 15:26:33

MS. BARNES: -- you not to flip to other pages -- 15:26:33 15:26:33

THE WITNESS: I know. 15:26:33

MS. BARNES: -- because you're doing that nervously. 15:26:34 15:26:35

THE WITNESS: I am. 15:26:35

MS. BARNES: So just please focus on the question to the extent you answer it. 15:26:36 15:26:39

THE WITNESS: I don't recall my conversation with the technology bureau about this, just that they had -- it was identified and corrected as far as the search was not going to be a broad search outside of the home page. 15:26:41 15:26:44 15:26:47 15:26:52 15:26:56

BY MR. STRAUS: 15:26:57
Q. Okay. 15:26:57
So it sounds to me like you said that you may 15:26:58 have received the information about what this time period 15:27:02 was, but -- but you're not remembering what it is now; is 15:27:05 that fair? 15:27:11
MS. BARNES: Form. 15:27:11
THE WITNESS: I'm telling you I talked to 15:27:12 the technology and a few others to try to get those dates, 15:27:13 and discussion was had. But as far as specifics, I -- I 15:27:17 don't think I have that answer of when. 15:27:21
BY MR. STRAUS: 15:27:24
Q. Do you know -- sounds like that's a little bit of 15:27:26 a different answer than the -- nobody knows what that 15:27:31 answer is. 15:27:35
Do you -- do you think that there are people you 15:27:36 have either -- either already talked to or someone else, 15:27:41 or other people that would be able to give you that 15:27:44 answer? 15:27:45
MS. BARNES: Form. Foundation. 15:27:46
BY MR. STRAUS: 15:27:50
Q. Including perhaps Granicus. 15:27:51
MS. BARNES: Same objections. 15:27:52
THE WITNESS: I believe we could probably 15:27:53 narrow down the exact or a fairly close time frame on the 15:27:57

when it started and when it ended talking with Granicus. 15:28:04
BY MR. STRAUS: 15:28:07
Q. And how long do you think it would -- how long do you think it would take to -- to -- to achieve that goal? 15:28:08 15:28:11
MS. BARNES: Form and foundation. 15:28:14
THE WITNESS: I don't -- I don't know the answer to your question as far as how long it would take somebody to research that and figure that information out. 15:28:15 15:28:17 15:28:22
BY MR. STRAUS: 15:28:25
Q. Okay. 15:28:25
Are you, as a representative of the defendants, prepared to obtain that information and supplement these responses so that they can be accurate? 15:28:26 15:28:31 15:28:36
MS. BARNES: He's not gonna answer that. That's a decision for Counsel to make. It'll be discussed, but that's not a question that he's gonna answer. 15:28:39 15:28:42 15:28:43 15:28:45
BY MR. STRAUS: 15:28:46
Q. Okay. 15:28:46
So this Interrogatory No. 3 is not accurate, the answer to that interrogatory; is that correct? 15:28:47 15:28:51
MS. BARNES: Form and foundation. 15:28:54
THE WITNESS: You think in -- you're saying this Interrogatory No. 3 is incorrect? Is inaccurate? 15:28:55 15:29:40
MR. STRAUS: Sorry for that. 15:30:03

BY MR. STRAUS: 15:30:03

Q. What I'm saying is that the interrogatory asks for the time period, and the answer does not provide the time period, although you've testified that that time period is capable of being determined; it just hasn't been determined yet. So this -- so maybe I -- I -- I retract my previous statement. 15:30:05 15:30:07 15:30:12 15:30:15 15:30:22 15:30:26

The interrogatory -- my question is not whether it's inaccurate. This interrogatory answer is incomplete; is that fair? 15:30:27 15:30:30 15:30:37

MS. BARNES: Form and foundation. 15:30:37

THE WITNESS: I don't know that I can answer that as far as the time periods. I mean, we might -- we can try -- try again. I -- I don't -- I don't recall if we've given -- I don't know. 15:30:38 15:30:45 15:30:50 15:30:52

I will have to see if we can find that. I believe we tried, but I will -- 15:30:55 15:31:00

MS. BARNES: I don't want you making any -- 15:31:01

THE WITNESS: Okay. 15:31:01

MS. BARNES: -- avowals on the record about what you are gonna -- not gonna do after this. That'll be for discussion -- 15:31:01 15:31:04 15:31:06

MR. STRAUS: Okay. You're coaching -- 15:31:06

MS. BARNES: -- with Counsel. 15:31:06

MR. STRAUS: -- the witness. You're 15:31:07

coaching the witness. 15:31:07

MS. BARNES: I am not. I just instructed him not to complete his answer for the reason I already identified which is that's not something that he's going to address, that that is a decision for Counsel to make, not for him to make an affirmative representation about something that is pertaining to a strategy decision in this case. So that is why I interjected. 15:31:08 15:31:10 15:31:12 15:31:15 15:31:16 15:31:18 15:31:21

And I hope you understand that, by the way, under the federal rules, you actually are supposed to, not just allowed to, but are supposed to give the basis of your objections at risk of not preserving them at trial. And you can look at the case law on that, number one. 15:31:27 15:31:29 15:31:32 15:31:35 15:31:39

Number two, I am allowed to stop him from testifying to something that's not something that he is allowed to speak to that is attorney-client work product discussion that needs to take place, which is what I did. 15:31:42 15:31:45 15:31:49 15:31:53

MR. STRAUS: Are you done? 15:31:56

MS. BARNES: For now. 15:31:57

MR. STRAUS: I don't want to interrupt you. 15:31:58

You're done. Okay. 15:32:00

BY MR. STRAUS: 15:32:02

Q. So is it correct to say that as of today, this interrogatory response is incomplete? 15:32:03 15:32:09

MS. BARNES: Form and foundation. 15:32:13

Go ahead. 15:32:15

THE WITNESS: I don't know that that's accurate. 15:32:16 15:32:24

BY MR. STRAUS: 15:32:25

Q. Okay. 15:32:25

Can you point me to any answer where you have identified the time period that was requested? 15:32:27 15:32:31

MS. BARNES: Form. 15:32:34

Go ahead. 15:32:36

THE WITNESS: There is no time frame mentioned in that answer. 15:32:36 15:33:04

BY MR. STRAUS: 15:33:05

Q. So is that a complete answer to the Interrogatory No. 3? 15:33:06 15:33:10

MS. BARNES: Form and foundation. 15:33:10

THE WITNESS: I don't know if that is, because I don't know if we can identify time periods. I don't know that we can. 15:33:11 15:33:17 15:33:20

BY MR. STRAUS: 15:33:21

Q. Have you -- it's your testimony that Granicus made the mistake, and Granicus fixed the mistake; correct? 15:33:23 15:33:27

MS. BARNES: Form. Go ahead. 15:33:32

THE WITNESS: I -- after discussion with other people in the office with my team and technology, I believe it was a Granicus production that created that 15:33:34 15:33:40 15:33:46

search engine. 15:33:53
BY MR. STRAUS: 15:33:54
Q. Did you contact anyone at Granicus to find out when -- the time period that's being requested here? 15:33:56 15:34:01
MS. BARNES: Form. 15:34:04
THE WITNESS: I personally did not make any contact with Granicus. 15:34:05 15:34:08
BY MR. STRAUS: 15:34:09
Q. Did you instruct anyone else to contact Granicus to get an answer to this interrogatory? 15:34:10 15:34:13
MS. BARNES: Form. 15:34:15
THE WITNESS: My team was in contact with Granicus over this, over whatever -- 15:34:15 15:34:22
BY MR. STRAUS: 15:34:26
Q. And did they -- 15:34:26
A. Go ahead. 15:34:26
Q. I apologize. 15:34:27
A. No, go ahead. 15:34:29
Q. And did your team inquire about the time period being requested here? 15:34:30 15:34:34
MS. BARNES: Form. 15:34:37
THE WITNESS: I didn't see the list of questions. They saw the -- they saw what we provided, and -- and concurred that this was accurate. 15:34:37 15:34:42 15:34:47

BY MR. STRAUS: 15:34:52
Q. Okay. 15:34:53
Who -- who concurred that -- the answer to 15:34:53
Interrogatory No. 3 was accurate? 15:34:58
MS. BARNES: Form. 15:35:00
THE WITNESS: I believe after discussion 15:35:00
with Calbert Gillett that he was -- he and one of our 15:35:03
technology bureau people were all in agreement with that. 15:35:08
BY MR. STRAUS: 15:35:11
Q. Oh, in agreement that this was accurate? 15:35:13
A. Correct. 15:35:16
Q. This answer -- and so can you just point me to 15:35:16
where the accurate identification of the time period 15:35:21
requested is? 15:35:23
MS. BARNES: Form. Asked and answered. 15:35:24
You can answer one more time if you can. 15:35:28
THE WITNESS: The time frame isn't listed on 15:35:32
here. 15:35:36
BY MR. STRAUS: 15:35:36
Q. So is the answer to Interrogatory No. 3 complete? 15:35:36
MS. BARNES: Form. Foundation. Asked and 15:35:41
answered. 15:35:43
Go ahead. 15:35:45
THE WITNESS: Again, I think that it's not 15:35:46
on here, and -- and I don't have the answer -- I -- I 15:35:49

don't -- to my recollection can't tell you if there was a 15:36:15
time frame available to -- to answer that question. 15:36:19
BY MR. STRAUS: 15:36:22
Q. Don't know whether there was a time period 15:36:26
available to answer that question. 15:36:30
A. No. It -- 15:36:30
Q. Okay. 15:36:31
A. Let me -- 15:36:31
To identify the time period. I don't know if 15:36:32
there is an -- if there is the ability to identify that 15:36:35
time period. 15:36:37
Q. Okay. 15:36:38
Do you know if your team that contacted Granicus 15:36:42
inquired about the answer to Interrogatory No. 3? 15:36:51
MS. BARNES: Form. Asked and answered. 15:36:55
One more time if you'd like to answer, please. 15:36:57
THE WITNESS: My team read the response, 15:37:00
and -- and that was the answer that they gave 15:37:04
after -- after reading the interrogatories, so. 15:37:08
BY MR. STRAUS: 15:37:14
Q. Okay. 15:37:15
But you've verified these interrogatory answers; 15:37:15
right? Correct? 15:37:18
A. I talked with my team who verified they're -- I 15:37:19
verified the portion, and whether it be with my team or 15:37:23

personal searches myself. 15:37:28
Q. Okay. 15:37:30
So which portion of these interrogatory answers are you verifying to be accurate and complete? 15:37:31 15:37:35
MS. BARNES: Form. 15:37:39
BY MR. STRAUS: 15:37:42
Q. Are there particular interrogatories that were your purview and other ones that were someone else's? 15:37:43 15:37:45
A. Ultimately it all came back to me, and I was responsible for them ultimately. 15:37:47 15:37:50
Q. Okay. 15:37:51
And now sitting here today, do you think that Interrogatory No. 3 that the answer you provided was complete? 15:37:52 15:37:54 15:37:57
MS. BARNES: We are gonna move on. You have -- this has now gone into the area that Rule 30 and Rule 26 both preclude which is you're badgering and being argumentative with this witness. He had asked and answered -- you have asked, and he has answered multiple times. I understand that you don't think that his answer is -- 15:37:57 15:38:00 15:38:05 15:38:09 15:38:10 15:38:13 15:38:16
MR. STRAUS: And what has he -- 15:38:17
MS. BARNES: Let me finish.
MR. STRAUS: And what has he --
MS. BARNES: Let me finish.

MR. STRAUS: -- answered? Is it --
MS. BARNES: No, I'm going to --
MR. STRAUS: -- complete or is it --
MS. BARNES: I'm going to finish making my objection because then we're moving on. 15:38:19 15:38:23
You are now badgering him. I understand that you don't think that the answer is sufficient, but he has given it multiple times. So can you move on, please? 15:38:27 15:38:29 15:38:32
MR. STRAUS: He has not given an answer. I will move on. He has not answered the question whether it's complete or not, and you know that he hasn't. So that's okay. We'll move on. The answer is -- is there, and its silence is -- is deafening. 15:38:40 15:38:42 15:38:46 15:38:49 15:38:50
MS. BARNES: It's not. 15:38:53
MR. STRAUS: So okay. 15:38:53
MS. BARNES: He's answered, and we don't need your commentary. You know there's no jury here; right? 15:38:53 15:38:55 15:38:55
MR. STRAUS: I'm not asking -- you're not testifying -- 15:38:55 15:38:58
MS. BARNES: There is no jury here. 15:38:58
MR. STRAUS: You're not testifying. You're not testifying. You're not testifying. 15:38:58 15:39:00
MS. BARNES: Don't tell me what I'm going to say or not say. My objections are not testimony. They 15:39:00 15:39:03

are valid objections that I am allowed to make. 15:39:07
MR. STRAUS: You already objected. We're moving on -- 15:39:08 15:39:09
MS. BARNES: As I'm talking, I'm just going to keep repeating it because you keep interrupting. 15:39:09 15:39:10
There are parameters within which you can operate as the questioner in this deposition, and those are governed by both Rule 26 and Rule 30, and I am allowed to stop you when you have continued to ask this witness a question over and over and over. He's answered it the way he can answer it. And if you don't like it, you don't like it. I understand, but we're going to move along. 15:39:13 15:39:17 15:39:21 15:39:26 15:39:30 15:39:34 15:39:38
BY MR. STRAUS: 15:39:47
Q. What's the name of the people on your team that contacted Granicus? 15:39:48 15:39:51
MS. BARNES: Form. 15:39:51
Go ahead. 15:39:53
THE WITNESS: Calbert Gillett and Eric. He's one of our technology guys. Those would be the two that would have made that contact. 15:39:53 15:40:01 15:40:06
BY MR. STRAUS: 15:40:07
Q. Okay. 15:40:07
Can I get a last name for Eric? 15:40:08
A. I would love to give that to you. I can't pronounce it. I would have to -- we'll -- I'll have to 15:40:08 15:40:12

get that to you. I don't have it in front of me. 15:40:14

MS. BARNES: I don't have it, or I'd spell it. 15:40:15 15:40:17

BY MR. STRAUS: 15:40:17

Q. I'd ask -- I'd ask your counsel's permission before you offer to do anything, but that would be lovely if you could get us his last name. 15:40:18 15:40:18 15:40:22

MS. BARNES: Hilarious. 15:40:25

MR. STRAUS: Wonderful. 15:40:26

BY MR. STRAUS: 15:40:27

Q. Okay. 15:40:27

Do you know whether -- whether or not Google received ad revenue from the clicks that came off of these advertisements on the Sheriff's Office website? 15:40:28 15:40:31 15:40:36

MS. BARNES: Form and foundation. 15:40:39

THE WITNESS: I have no idea if Google made any money off of those. 15:40:40 15:40:42

BY MR. STRAUS: 15:40:43

Q. Have you inquired about that with Granicus or has anyone from your team inquired with Granicus? 15:40:44 15:40:47

MS. BARNES: Form. Foundation. 15:40:51

THE WITNESS: To my knowledge, no. Nobody has asked about those questions regarding the Google revenue. 15:40:52 15:40:54 15:41:00

BY MR. STRAUS: 15:41:00
Q. Yeah, but you just -- that the second -- 15:41:02
Oh, I apologize. 15:41:04
A. You're fine. 15:41:05
Q. Do you see the second sentence in Interrogatory no. 3, "For each period, state the revenue generated and the identify of any persons, government agency, or entity who receives such funds"? 15:41:06 15:41:09 15:41:11 15:41:14
A. I see that. 15:41:17
Q. Did I read that properly? Okay. 15:41:17
Is it your understanding that someone other than Granicus would know that information? 15:41:22 15:41:28
MS. BARNES: Form and foundation. 15:41:32
Do you need his question read back? 15:41:50
THE WITNESS: Yes, please.
MS. BARNES: Try not to look at this --
MR. STRAUS: Can you think of any --
MS. BARNES: -- when you're --
THE WITNESS: I'm trying to -- well, I was trying to --
THE COURT REPORTER: Are you gonna re-ask, or do you want me to read it?
MR. STRAUS: Oh, no, no. Yes. No, They -- they -- they requested you read -- read it, so thank you.

THE COURT REPORTER: Okay.

(The requested portion of the record was read.) 15:42:12

MS. BARNES: Form and foundation. 15:42:12

THE WITNESS: Somebody has to know, but it 15:42:15
wouldn't -- I -- I -- it wouldn't be the Maricopa County 15:42:17
Sheriff's Office. 15:42:22

BY MR. STRAUS: 15:42:23

Q. Is there any possibility that Granicus would know 15:42:23
that information? 15:42:27

MS. BARNES: Form and foundation. 15:42:28

THE WITNESS: I can't begin to speculate 15:42:29
what Granicus knows or doesn't know. 15:42:31

BY MR. STRAUS: 15:42:34

Q. Did anyone on your team inquire with Granicus for 15:42:35
the answer to that interrogatory? 15:42:40

MS. BARNES: Form and foundation. 15:42:42

THE WITNESS: My team talked about to 15:42:43
Granicus about the search engine. As far as all the 15:42:46
specific questions on that particular, I don't -- I -- I 15:42:53
don't believe so. 15:42:58

BY MR. STRAUS: 15:42:58

Q. Okay. 15:42:58

And why -- why didn't they? 15:43:01

MS. BARNES: I'm going to instruct the 15:43:05

witness not to answer for attorney-client and work product privilege. To the extent there's some other outside reason of which you're aware that they didn't ask any particular question, you can answer that. If -- if it's anything other than that, you could -- have to just say "I can't answer that." 15:43:07 15:43:12 15:43:16 15:43:20 15:43:23 15:43:26

THE WITNESS: I can't answer that. 15:43:27

BY MR. STRAUS: 15:43:29

Q. Are there members of your team who are attorneys? 15:43:36

A. No. 15:43:40

Q. Okay. 15:43:44

And what's your understanding of the privilege associated what they did or didn't ask a third party in response to an interrogatory request? 15:43:50 15:43:53 15:44:00

MS. BARNES: First of all, I don't -- I can't even understand why it is you think that it is appropriate to ask that question. They're obviously responding to the -- 15:44:03 15:44:06 15:44:07 15:44:11

MR. STRAUS: You're testifying. 15:44:11

MS. BARNES: Let me finish. 15:44:12

They're responding to -- 15:44:14

MR. STRAUS: I don't want you to finish. 15:44:15

MS. BARNES: I don't -- I don't -- I don't really care if you'd like me to finish or not. I'm going to finish. 15:44:17 15:44:17 15:44:17

I'm inserting the objection and instructing the witness not to answer on attorney-client and work product privilege. To the -- 15:44:19 15:44:22 15:44:25

MR. STRAUS: About a question about a non-attorney speaking to a third party? How could that possibly be privileged? 15:44:27 15:44:29 15:44:34

MS. BARNES: Because who do you -- who do you think they're discussing these discovery requests and responses with in order to determine what information they need to provide? 15:44:34 15:44:38 15:44:41 15:44:44

You understand that there are objections to these interrogatories; right? 15:44:45 15:44:47

MR. STRAUS: Not valid ones. 15:44:49

MS. BARNES: That -- that's neither here nor there for right now. 15:44:51 15:44:54

MR. STRAUS: Okay. I don't need to -- I don't want to get involved in a discussion -- 15:44:54 15:44:55

MS. BARNES: So in other words -- 15:44:57

MR. STRAUS: I don't even want you talking. 15:44:57

MS. BARNES: I'm -- 15:44:57

MR. STRAUS: I don't -- 15:44:57

MS. BARNES: I don't care. 15:44:57

MR. STRAUS: For the record -- 15:44:59

MS. BARNES: Stop saying I don't want you to talk. 15:44:59 15:44:59

MR. STRAUS: Can we go off the record, please? 15:45:01 15:45:03

MS. BARNES: No. I want -- no. I will not go off the record. I don't agree to go off the record. I'm making this for the record for important reasons. 15:45:03 15:45:04 15:45:06

I am instructing the witness not to answer the last question on attorney-client and work product privilege bases very justifiably so because you are asking for questions that invade those privileges. 15:45:09 15:45:12 15:45:15 15:45:19

If you want to go off the record, we can go off now. 15:45:23 15:45:26

MR. STRAUS: Go ahead.

THE COURT REPORTER: Jim.

THE WITNESS: Are we going off the record?

MS. BARNES: You're on -- yes.

THE VIDEOGRAPHER: You want to go off?

MS. BARNES: We agreed now, yes. 15:45:38

THE VIDEOGRAPHER: We're going off the record at 3:45 p.m. 15:45:38 15:45:44

(A recess was taken from 3:45 p.m. to 3:51 p.m.) 15:45:48 15:51:32

THE VIDEOGRAPHER: We are back on the record at 3:51 p.m. 15:51:32 15:51:34

MS. BARNES: I made some objections on the record that I believed were appropriate insofar as the 15:51:36 15:51:41

attorney-client and work product privilege. It appears -- it appears I may have overstated as to one question about what was asked of Granicus, and so I am withdrawing the instruction as to that question. 15:51:45 15:51:49 15:51:53 15:51:57

I'm maintaining the form and foundation objections -- I take that back. I'm maintaining the form objection, but I am no longer instructing the witness not to answer what was asked of Granicus. 15:52:01 15:52:04 15:52:08 15:52:10

MR. STRAUS: Okay. Sorry. 15:52:14

BY MR. STRAUS: 15:52:15

Q. So what questions and what information did your team seek from Granicus to respond to these interrogatories and discovery requests? 15:52:16 15:52:20 15:52:24

MS. BARNES: Form. 15:52:26

Go ahead. 15:52:27

THE WITNESS: I don't recall the specific questions that were asked of them at this time. 15:52:27 15:52:35

BY MR. STRAUS: 15:52:37

Q. In prep -- in preparing for today's deposition and -- and in verifying these discovery responses, did you ask your team what questions were asked of Granicus? 15:52:40 15:52:45 15:52:48

A. We -- we have had discussions about their conversations with Granicus. 15:52:51 15:52:57

Q. And in what form were those discussions? 15:52:57

A. In person, face-to-face discussions. 15:53:02

Q. You never sent an email about any of this? 15:53:06
A. No emails were sent that I'm aware of that I 15:53:09
recall on this topic. 15:53:13
Q. Okay. 15:53:14
So you, right now, you don't know what questions 15:53:25
were asked of Granicus; correct? 15:53:30
A. That is correct. 15:53:33
Q. So is it correct to say that you don't know 15:53:34
whether this answer or any of the answers to these 15:53:46
interrogatories are accurate and complete? 15:53:50
MS. BARNES: Form. Foundation. 15:53:52
THE WITNESS: All of these interrogatories 15:53:55
were reviewed by me or the team and me again, and 15:53:59
everybody was in agreement that everything on these was 15:54:06
accurate at the time they were presented. 15:54:10
BY MR. STRAUS: 15:54:15
Q. And complete as well? 15:54:15
MS. BARNES: Form. Foundation. 15:54:17
BY MR. STRAUS: 15:54:17
Q. Is that right? 15:54:18
A. To the best of our ability and knowledge, yes. 15:54:18
Q. Which third-party websites are you aware of 15:54:21
having scraped mugshots and identifying information from 15:54:58
the Sheriff's Office website? 15:55:02
A. I don't know that I know the exact websites. I 15:55:06

think I've seen websites that have got photos from mugshots, and whether they came from the Maricopa County Sheriff's Office website or some other website or some other County agency that put them up, but I don't recall the exact names of those at this time. 15:55:14 15:55:20 15:55:24 15:55:29 15:55:32

Q. What other County websites posts mugshots that we're talking about? 15:55:36 15:55:44

MS. BARNES: Form and foundation. 15:55:44

THE WITNESS: I -- I don't know that I have that answer of which counties. I believe that there was a time when -- or I -- I believed -- whether, again, I would be surmising -- that there are other websites that are doing the same thing as us. Maricopa County Sheriff's Office's wasn't the only one putting mugshots out there. 15:55:45 15:55:49 15:55:53 15:55:57 15:56:01 15:56:04

BY MR. STRAUS: 15:56:08

Q. Of Maricopa County arrestees? Is that what you mean? 15:56:08 15:56:11

A. No. No. I'm just saying that there's photos out there that were scraped from other counties as well. I don't know what the website -- I -- I would only be surmising what the websites were that were posting those, whether it be Maricopa County or some other county outside of Maricopa -- 15:56:12 15:56:15 15:56:21 15:56:23 15:56:28 15:56:31

Q. Okay. 15:56:31

A. -- that would be doing similar. 15:56:36

Q. Let's look at Interrogatory No. 5. It says identify -- and that's on page 3 starting on line 19. "Identify all third parties known or reasonably believed to have scraped, copied, or otherwise republished mugshots or other data from the MCSO website during the relevant time frame." 15:56:37 15:56:41 15:56:41 15:56:45 15:56:49 15:56:53
Did I read that accurately? 15:56:54
MS. BARNES: Form. 15:56:56
THE WITNESS: That's correctly read, yes. 15:56:57
BY MR. STRAUS: 15:56:59
Q. And what did you do to identify all third parties known to have scraped these mugshots from MCSO? 15:56:59 15:57:03
MS. BARNES: Form. 15:57:09
THE WITNESS: I don't -- I think there was a general awareness. I don't know that there was any specific third-party websites that were identified. That would -- I -- I don't know that -- today, I couldn't -- I couldn't go back and find those websites and find the Maricopa County that I -- to my -- to my knowledge, I don't know that I can -- I would only be surmising that I couldn't go back and find what was posted during that time frame. 15:57:09 15:58:01 15:58:05 15:58:14 15:58:19 15:58:23 15:58:25 15:58:30 15:58:34
BY MR. STRAUS: 15:58:34
Q. But are you -- are you intent -- are you aware of any third-party websites that scraped, copied, or 15:58:34 15:58:35

otherwise republished mugshots or data from the MCSO website? 15:58:40 15:58:44

A. I -- I am not aware of the identities of those specific. 15:58:44 15:58:58

Q. Okay. 15:58:58

A. Those specific websites. 15:58:59

Q. What efforts did you make to identify those websites in response to this interrogatory? 15:59:00 15:59:06

MS. BARNES: Form. 15:59:12

THE WITNESS: With respect to that, we talked with the technology department to see if we could identify some sites. 15:59:13 15:59:21 15:59:24

BY MR. STRAUS: 15:59:27

Q. And what was the result of that inquiry? 15:59:29

A. I think we were -- we were able to determine a -- I -- I think we were able to determine that there was a -- that those were out there, but as to identify specific to Maricopa County and them taking from Maricopa County website, I don't think we did -- we were able to identify the -- the websites doing that. 15:59:36 15:59:44 15:59:56 16:00:02 16:00:07 16:00:11

Q. What efforts did you make to try to identify those websites? 16:00:13 16:00:17

MS. BARNES: Form. 16:00:18

THE WITNESS: We would have to -- that would be one of those that the -- that I talked with our 16:00:18 16:00:26

technology department. That's what I did to see if they could determine. 16:00:30 16:00:34

BY MR. STRAUS: 16:00:34

Q. And what did they do to determine -- to answer your question? Do you know? 16:00:35 16:00:38

MS. BARNES: Form and foundation. 16:00:40

THE WITNESS: I -- I don't know what they did to find out the answer. 16:00:40 16:00:44

BY MR. STRAUS: 16:00:46

Q. And what's your understanding of -- of your response -- I'm gonna read from page 4 starting at line 1 now. It says, "Without waiving foregoing objections, Defendants are unaware of third-party identities responsive to this request other than there being a general awareness of those already indicated by Plaintiff." 16:00:47 16:00:51 16:00:58 16:01:02 16:01:05 16:01:08 16:01:09

Did I read that correctly? 16:01:10

A. You did. 16:01:12

Q. And what is your understanding of the websites that were already indicated by Plaintiff? 16:01:13 16:01:17

A. I don't understand your question as far as those indicated by the plaintiff. 16:01:19 16:01:24

Q. I don't know. That's your -- that -- that's your response. You say, "other than there being a general awareness of those already indicated by Plaintiff." 16:01:25 16:01:29 16:01:33

What does that mean, "those already indicated by plaintiff"? 16:01:35 16:01:39
A. I believe we're talking about the third party, the ones that had scraped mugshots from the Maricopa County Sheriff's Office website. 16:01:39 16:01:49 16:01:55
Q. Correct. 16:01:55
So this interrogatory asks you to identify those entities that have scraped, and I'm trying to ask you about what your response to that are. I don't see any websites named here. Zero. 16:01:57 16:02:03 16:02:07 16:02:11
So is that a complete -- full, complete, and accurate response to this interrogatory? 16:02:13 16:02:20
MS. BARNES: Form and foundation. 16:02:23
THE WITNESS: That answer answers your Interrogatory No. 5 accurately. 16:02:23 16:03:00
BY MR. STRAUS: 16:03:04
Q. Okay. 16:03:04
So where is the identity of the -- where is the identity of those? It says identify -- sorry. 16:03:05 16:03:12
It says, "Identify all third parties known or reasonably believed to have scraped, copied, or otherwise republished." What are the identities of those third parties in your answer? 16:03:16 16:03:20 16:03:23 16:03:25
A. Again, we -- there is -- it is a general awareness that we have except for those that you 16:03:26 16:03:29



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

guys -- that the plaintiffs have provided. 16:03:34
Q. Which are those? And where were those provided? 16:03:37
MS. BARNES: Form. 16:03:44
THE WITNESS: I say provided. I -- I 16:03:44
have -- that -- I did not speak -- it's just the ones that 16:03:46
you -- that are publicly available that are known by the 16:03:50
plaintiff is what I'm -- 16:03:54
"Indicated by the plaintiff." 16:03:57
We're aware of the third parties, of course. 16:03:59
There's a general awareness. 16:04:02
MS. BARNES: Are you done with your answer? 16:04:28
THE WITNESS: Yeah. I'm done with my 16:04:31
answer. 16:04:34
MS. BARNES: All right. It's 4:04. What 16:04:34
did we say we were gonna do, 4:15, or 4:00? 16:04:39
MR. STRAUS: Okay. Yeah. We had -- we have 16:04:47
that agreement, so.
Okay. Thank you --
MS. BARNES: Can I get an idea --
MR. STRAUS: -- very much.
MS. BARNES: Wait. Wait.
MR. STRAUS: Oh, sorry. I didn't realize -- 16:04:49
MS. BARNES: Just trying to get an idea of 16:04:50
how much longer you think you have to reconvene. 16:04:52
MR. STRAUS: Well, how much -- how -- how 16:04:56

long have we been on the record? 16:04:58

THE VIDEOGRAPHER: We've been on the record 4 hours and 29 -- 4 hours and 30 minutes. 16:05:01 16:05:03

MR. STRAUS: Well, I'll try my best to keep it to 2 hours and 30 minutes more. 16:05:10 16:05:12

MS. BARNES: All right. Thanks. 16:05:16

Are we -- we're off the record. 16:05:16

THE VIDEOGRAPHER: We are -- I'm sorry. 16:05:20

MR. STRAUS: Thank you, Mr. Hegstrom. I know it's not an enjoyable process. I appreciate all your efforts and politeness. Thank you very much. 16:05:20 16:05:23 16:05:23

THE WITNESS: Thank you. 16:05:23

THE VIDEOGRAPHER: We are off the record at 4:05 p.m., and this concludes today's testimony given by Chris Hegstrom. 16:05:27 16:05:29 16:05:29

The total number of media used is seven and will be retained by Veritext. 16:05:35 16:05:40

STATE OF ARIZONA )
) Ss
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing deposition was taken by me, Ashley Stahl, CR No. 51001, a Certified Reporter for the State of Arizona; that prior to being examined, the witness named was duly sworn to testify to the whole truth; that the questions propounded and the answers of the witness thereto were taken down by me and thereafter reduced to computerized transcription under my direction and supervision; that the foregoing is a true and correct transcript of all proceedings had upon the taking of said deposition, all done to the best of my skill and ability.

I further certify that I am in no way related to any party to said action nor in any way interested in the outcome thereof.

DATED at Phoenix, Arizona, this 12th of January, 2026.

Ashley Stahl

ASHLEY STAHL
CR No. 51001

Alex R. Straus, Esq.
Astraus@milberg.com

January 12, 2026

RE: Houston, Brian v. Maricopa County, Arizona, Et Al.

1/8/2026, Chris Hegstrom , 30(B)(6) , (#7819282).

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure. Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

**&**

**&** 4:1 6:11 175:17,20 232:24 233:9

**0**

**00875** 1:6 5:15

**1**

**1** 2:16 5:10 22:17,18 27:3 28:17 31:16 152:19 156:16 169:22 227:11 233:1
**1-226** 3:16
**1/8/2026** 232:5
**1/8/26** 5:2
**10** 153:5
**100** 82:9,23 85:4 94:18 98:12 158:21
**101st** 82:24
**10:13** 1:17 3:3 5:2
**10:44** 30:25 31:1
**10:50** 31:2,4
**11** 74:18
**11:31** 65:5,6
**11:43** 65:7,9
**12** 74:18 91:19 153:9 188:24 232:3
**12:27** 103:15
**12:28** 103:20 103:21
**12:45** 103:16
**12:50** 103:17
**12th** 231:20
**14** 153:10
**148** 2:17
**150** 2:18
**16** 136:5
**1600** 4:3
**169** 2:20
**17** 154:9 161:10
**175** 2:21,22
**19** 225:2
**1:03** 103:22,24
**1st** 187:12

**2**

**2** 2:17 142:6 144:2 147:25 148:6 154:18 155:7 156:11 156:17,22 157:2 199:12 230:5
**20** 33:1,4 103:17 114:7 169:8
**200** 85:15
**2000** 13:20
**2002** 50:15 76:7,10 127:23 135:15 137:15 141:18
**2009** 13:19,24
**2011** 35:22 69:15 74:17 80:1
**2015** 14:5
**2016** 13:20 14:14,18 15:5 132:3 136:3 137:23 139:1 139:22 141:6 143:23 144:22 145:1 160:4 161:10,14 186:18 187:16 188:7 190:10 191:7 192:16 192:22 196:13
**2017** 15:18 125:6 201:10
**2018** 17:1
**2019** 48:20 49:15,20 60:19 61:17 62:9,11 64:12
**2020** 194:9,13
**2021** 169:13 170:21 172:2 173:9 194:11
**2022** 115:24 116:14,20 117:13 118:3,6 121:24 122:15 122:22 123:4 123:15 127:6 127:20 131:16 132:21 137:17 137:18,21,23 139:1,22 187:12 190:21 191:8 192:17 196:6
**2025** 13:21 18:2,24 40:5 40:18,23 41:2 45:21 115:7,11 128:16 130:3 136:5 153:20 154:4,12,15,20 155:7,10 156:1 156:2,8 158:8 186:19 196:17
**2025.520** 232:9 232:12
**2026** 1:16 3:3 231:21 232:3
**21** 172:4
**22** 2:16 188:10 190:24
**22nd** 116:14
**23** 116:19
**25** 17:2,3 125:6
**26** 213:17 215:8
**280** 3:22
**2800** 4:3
**29** 230:3
**2:00** 63:4
**2:18** 168:4,5
**2:22** 1:6 5:15

**2:32** 168:6,8

**3**

**3** 2:18 150:3,24 155:6 157:13 158:3 199:11 199:16,17,22 200:7,13,19 202:4 206:20 206:24 209:14 211:4,20 212:14 213:13 217:6 225:2
**30** 1:13 2:3 3:2 7:3 8:10,19 48:20 50:18 143:12,13 198:12 213:16 215:8 230:3,5 232:5 233:1
**300** 84:21
**34** 30:3
**34345** 231:23
**36** 8:10
**3:00** 62:24,24 63:5,5,11
**3:01** 63:6
**3:06** 197:11,12
**3:16** 197:13,15
**3:45** 221:19,20
**3:51** 221:21,23

**4**

**4** 2:19 27:9 29:14 86:11,13 86:17 106:8,12 106:15,23,24 107:5 151:22 152:1,3,5 155:6 158:13 159:6 168:25 169:1 227:11 230:3,3
**42** 169:22,24,25 169:25 170:1,1
**480-250-4514** 3:17
**480-624-2700** 3:13
**4960** 3:16
**4:00** 229:15
**4:04** 229:14
**4:05** 230:14
**4:15** 229:15

**5**

**5** 2:21 173:17 174:13,18 175:3 225:1 228:15
**51001** 1:25 231:6,25

**6**

**6** 1:13 2:3,22 3:2 7:3 8:10,19 48:20 50:18 143:12,13 174:18 175:1,5 198:12 232:5
**602-271-7700** 4:4
**6:00** 62:19,24 62:24

**7**

**7** 2:6 27:2,6,9 28:19 29:14 151:21 152:9 159:23,24 160:14 164:15
**72** 68:2,10,13
**75** 52:12
**7537** 3:4,12 5:16
**7819282** 232:5

**8**

**8** 1:16 3:3
**85004** 4:3
**85249** 3:17
**85250** 3:13
**866-252-0878** 3:23

**9**

**9** 152:19
**900** 58:11
**90212** 3:22
**9:00** 62:19,24 63:7
**9:20** 63:10

**a**

**a.m.** 1:17 3:3 5:2 30:25 31:1 31:2,4 62:24 63:4,5,11 65:5 65:6,7,9 168:8
**abbreviate** 123:7,11,14
**abbreviation** 123:20
**ability** 13:11 55:6,15 212:10 223:21 231:15
**able** 10:8,11,13 33:18 35:25 36:5,6 51:19 51:24 54:21 55:11,13 72:3 85:23 86:1 117:19 125:22 125:25 142:25 143:16 163:17 205:18 226:15 226:16,19
**above** 32:15,16 159:6 232:6
**abrupt** 197:18
**absolutely** 9:12 12:6 19:10 20:6 43:3 47:11 59:8 61:16 64:7,22 65:3 169:5 202:17
**accept** 9:10
**access** 40:8 86:7,9
**accomplish** 185:21
**accomplished** 67:15

**accomplishing** 146:17
**accumulation** 60:7
**accurate** 61:24 90:13 91:22 107:1 131:15 131:18,20 136:8,17 138:22 141:1 145:13 147:19 151:5 152:21 156:11 165:5 198:7,13 202:8 206:13,20 209:3 210:24 211:4,10,13 213:4 223:10 223:15 228:12
**accurately** 140:22 225:7 228:15
**accustomed** 147:21
**acevedo** 3:21 6:15,16
**achieve** 206:4
**achieved** 105:21
**acknowledge** 7:12 73:15 123:20
**action** 5:22 37:7 231:18
**actions** 140:23
**active** 96:18 200:6
**activities** 19:2
**actual** 46:9 71:13 86:18 157:20 190:23
**actually** 14:2 49:14 65:20 74:2 75:12 94:6,10 103:12 155:16 157:19 208:10
**ad** 175:25 176:6,18 178:25 188:23 216:13
**add** 123:16
**added** 130:24 155:3,4 170:12 194:5
**adding** 124:8 137:13,14 184:17
**addition** 104:22 105:6 153:17
**additional** 39:20 111:2
**address** 37:11 40:7 46:5,6,8,9 46:14,19 47:1 177:8 208:5
**addresses** 46:23
**administer** 5:21
**administration** 15:6 18:17 42:22 44:4,10 45:11,20 46:24 65:21
**administrations** 21:17,22
**administrative** 44:18
**ads** 174:2 176:24 177:10 180:2,4 182:2 189:9 190:7 197:23 198:20 199:6 203:5,5
**adsense** 174:2 199:23 200:15 201:22 202:11 202:12,12 203:1
**advance** 76:5 76:11,25 106:2 146:16
**advanced** 75:12
**advances** 76:18 77:18
**advantage** 54:4 57:20 96:4
**advantageous** 57:16 58:5
**advertise** 178:2
**advertisement** 176:18
**advertisements** 177:8 179:16 200:18 216:14
**advertisers** 176:24
**advertising** 152:11 176:14 177:22 178:7 178:14 199:24 200:16 201:23 202:13 203:2 203:10
**advise** 19:21
**affected** 72:14
**affiliations** 6:2
**affirmative** 208:6
**agency** 90:2,10 99:18 107:3 140:16 144:1 154:1 155:1,25 156:1,3 200:1 204:1 217:7 224:4
**agents** 106:17
**ago** 7:23 29:7
**agree** 5:9 96:1 119:2 137:7 176:19 200:3 221:4
**agreed** 221:17
**agreement** 49:23 211:8,10

223:14 229:17
**ahead** 41:12 50:11,13 51:1 57:7 62:4 70:20 74:16 75:4 77:7,20 80:4 81:24 83:20 86:21 93:19 97:14 104:13 106:5 107:19 111:5 111:23 114:12 118:15 119:17 120:20 127:7 127:21 133:8 133:16 134:7 136:10,19 155:6 157:6 160:23 163:24 164:6 165:19 166:2 167:19 171:12 178:12 185:2 191:16 193:20,24 194:16 195:7 198:5 209:1,9 209:22 210:16 210:18 211:23 215:17 221:12 222:15
**ahold** 85:23 86:1 125:25
**airline** 16:25 17:4,14
**airlines** 17:8,9
**aivchenkopllc** 3:18
**al** 5:12,13 232:4
**alert** 51:20 181:6
**alerted** 181:13
**alex** 3:20 6:4 28:4 49:4 64:11 102:21 103:5,25,25 148:3 161:20 162:14 166:17 173:25 174:17 232:1
**allen** 51:3 65:14,16,17
**allow** 48:21 128:25 162:21 162:23,25 182:9
**allowed** 123:5 182:1,16 208:11,14,16 215:1,8
**allowing** 47:8 167:7
**alongside** 135:13
**altered** 83:8
**alternative** 47:16,23 48:10
**alternatives** 60:14,21
**altogether** 94:11
**amber** 4:7 6:22
**amended** 151:12 153:7
**american** 17:6
**amount** 68:1
**amy** 24:17
**analysis** 71:8 71:13 72:24 77:11 78:23 92:16,22 96:11 108:15,18 114:1,6,9,15,20 115:15 117:22 126:25 127:1 127:10
**analyzed** 127:4
**andrew** 3:15,16 6:8
**answer** 9:12,20 10:1,7,21,21,24 11:17 13:11 27:24 28:21 30:20 33:20,24 34:4 37:14 38:17 39:5 40:10 41:16,17 41:22 47:19,25 48:5 49:18 53:24 59:22 69:7 71:19 72:5 77:14 84:1,18 85:6 94:1,1,11 95:9 95:13,23 96:1 96:8,24 100:13 101:15 112:18 115:18,23 117:11,19 118:1 121:23 122:11,12,21 128:19 129:1 129:25 130:21 137:3 138:2,4 138:6 139:5 143:13 147:8 149:1 152:13 152:18,20 153:7,10 158:10,24 159:6,11,19 160:6,23 163:16,18 164:4,17,24 166:9,23 167:7 177:8 182:21 183:8 187:13 187:24 188:3,9 188:12 190:20 193:7,11 194:18 196:7 196:15 197:7 203:20 204:20 205:11,14,15 205:19 206:7 206:14,17,21 207:3,9,12 208:3 209:6,11 209:13 210:10

211:3,12,16,20 211:25 212:2,5 212:14,16,18 213:13,20 214:7,9,12 215:11 218:16 219:1,4,6,7 220:2 221:6 222:8 223:9 224:10 227:4,8 228:14,23 229:11,13
**answered** 137:13 161:20 163:4 197:5 211:15,22 212:15 213:19 213:19 214:1 214:10,16 215:10
**answering** 75:20 148:19 148:20
**answers** 2:17 9:6 25:8 118:18 148:1 151:20 212:22 213:3 223:9 228:14 231:10
**anticipate** 112:13
**anybody** 47:4 134:21 139:18 188:14,19 196:9
**anymore** 191:10
**anyone's** 107:15
**apart** 33:7 60:6 90:14 181:1
**apologize** 36:21 43:17 64:21 94:10 138:25 191:3 210:17 217:3
**apparently** 52:11,11 118:19
**appear** 6:12 178:25
**appearance** 5:25 84:23 172:24
**appearances** 3:10 6:2
**appearing** 6:14 8:9 188:19 232:18 233:7
**appears** 149:23 165:20 168:15 168:17 170:24 177:3 187:17 201:21 222:2,2
**appreciate** 7:11 7:14 30:5 49:5 50:2 77:14 99:8 230:10
**apprehended** 52:19
**appropriate** 9:8,18 10:23 11:24 28:8 29:23 31:10 84:18 123:8,8 168:2 219:17 221:25
**approval** 80:11
**approve** 80:13
**approves** 80:22
**approximately** 7:22 32:18 137:23
**arbiter** 162:20 163:1,12
**area** 181:11 187:22 213:16
**argumentative** 213:18
**arizona** 1:2,7,8 1:15 3:5,6,13 3:17 4:3 5:15 5:17 14:21 17:11 231:1,7 231:20 232:4
**arpaio** 16:1 20:23 21:7,9 42:15 44:10,22 46:6,24 51:4 61:1 65:21 79:9,18 80:13 142:11
**arpaio's** 42:21 44:3
**arrest** 82:3 90:11
**arrested** 55:4,5 58:5 62:2,12 64:1 86:15 91:25 107:16 108:3 112:22 128:6 134:24
**arrestee** 55:17 61:23 62:2,12 63:21,25 81:9 81:19 82:17 83:5,10 86:9 86:17 87:9 88:21 89:17 93:6,17 105:22 111:10 127:17 134:11 155:12
**arrestee's** 88:19 106:2
**arrestees** 85:15 117:24 126:10 126:19 127:3 135:6 155:19 155:22 224:16
**arresting** 90:1 107:3 126:15 154:1,25 155:25 156:1,3
**arrests** 108:9 175:17
**arrived** 103:7
**article** 142:10 142:21 143:23 144:7

**ashley** 1:23 3:5 5:19 231:6,24
**aside** 16:4 42:11
**asked** 17:16 41:24 78:16 101:16,18 110:6 117:12 129:6 148:20 149:18 158:23 163:4 166:24 166:24 167:11 167:14 174:11 193:10 196:22 199:7 204:5 211:15,21 212:15 213:18 213:19 216:23 222:3,8,17,21 223:6
**asking** 9:16 15:2 42:17 49:13 96:10,19 101:20 116:24 142:23 148:23 149:11 150:7 154:15 156:15 163:5 166:11 178:6 188:22 200:13 201:9,9 201:10 202:14 203:19,23 214:19 221:8
**asks** 202:4,23 207:2 228:7
**aspect** 181:18
**aspersions** 127:14
**assert** 96:23
**asserted** 102:18
**assertion** 137:8
**assess** 78:16 127:1
**assessing** 144:1
**assist** 145:23
**assistant** 44:18
**assisted** 35:7 51:21
**assisting** 199:15
**assists** 59:13 106:6
**associated** 135:21 170:19 196:4 219:13
**assume** 10:3 113:14
**astraus** 3:23 232:2
**attached** 105:15
**attachment** 2:19
**attempt** 124:4 126:3
**attendance** 6:6
**attorney** 6:3,23 10:20 29:20,21 30:20 41:14,19 47:21 48:1 94:2,12 95:9 95:17,24 96:9 102:25 115:18 116:22 118:2 121:24 122:15 122:20 128:19 129:5 137:4 138:4 148:25 158:10 164:17 166:9,19 187:11 193:8 196:15 208:16 219:1 220:2,5 221:7 222:1
**attorneys** 32:3 32:21 48:2,9 125:21 219:9
**audio** 5:7
**audited** 180:11
**audits** 180:9
**august** 94:21 95:1,5
**authority** 137:10
**authorized** 5:21
**automated** 90:22,25 91:5
**automatic** 134:22
**automatically** 68:11 90:14
**availability** 110:2 121:20
**available** 63:14 120:9,17 182:11 212:2,5 229:6
**avenue** 4:3
**avenues** 55:19
**average** 85:16
**avowals** 207:20
**aware** 14:2 33:9 37:4 40:17 51:16 57:13 60:7 61:7,8 63:23 64:2 70:21 73:11 76:14 81:18,21 83:12 104:11 107:14 107:20 108:2 108:23,25 109:5,13 111:1 111:18 112:22 112:25 113:2 114:16 118:11 119:11 121:3 121:17 124:5 124:12,13,14 127:8,10 132:13,19,24 133:22 134:8 135:16 138:3,6 139:15,23 140:11 142:25 144:17 146:1 164:20,25 174:15 196:8

196:12 199:5 219:3 223:2,22 225:24 226:3 229:9
**awareness** 51:11 225:15 227:15,25 228:25 229:10
**az** 3:14

**b**

**b** 1:13 2:3 3:2 7:3 8:10,19 48:20 50:18 143:12,13 169:22 198:12 232:5 233:1
**back** 13:20 16:15,17,22 17:15,17 30:15 31:3,7,13 33:23 35:1,17 35:19 36:13,18 36:19 38:11 39:3,7 40:3 44:10 45:20 46:23 49:12 50:14 65:8,12 90:23 91:11 93:10 94:7 101:10,21 103:23 104:3,6 109:21 115:19 130:10,10 133:24 136:7 136:25 144:1 149:4 153:9 159:15,16 168:7,10 172:25 185:18 187:5,18 188:16,18 192:18 196:16 197:14 198:20 204:7 213:9 217:14 221:22 222:6 225:18 225:21
**background** 13:16
**badgering** 213:17 214:6
**baggage** 17:5
**balanced** 112:12
**barnes** 4:2 6:10 6:10 12:13,15 12:18 19:7 20:4 21:23 25:10 27:24 28:3,21,25 29:19 30:1,19 30:23 32:6,7 33:7 37:3,13 37:20 38:4,16 38:22 39:4 40:9,19 41:3 41:10,12 42:5 43:1 44:6,15 45:25 47:2,10 47:18,24 48:5 48:17 49:2,14 49:25 50:10,22 50:25 51:9,17 53:6,23 54:6 54:23 55:23 56:16 57:6,17 57:23 58:7,16 59:2,11,20 60:2,11,16 61:4,11 62:3 64:3,10,17,20 64:24 66:7,14 66:23 67:8,16 67:23 68:8,21 69:6,14 70:3 70:12,19 71:1 71:11,18 72:1 72:9 73:1,6,10 73:12,18 74:6 74:15,23 75:3 75:13,18,23 76:6,13,19 77:1,6,19 78:6 78:12,25 79:5 79:14,19 80:3 80:15,20 81:5 81:13,23 83:1 83:19,25 84:6 84:16 85:10 86:5,20 87:5 87:21 88:7,14 88:23 89:21,25 90:17,19 91:8 92:8,13,18,25 93:7,10,18,25 94:10,19 95:8 95:12,15,18,20 96:7,12,15 97:5,14 98:4 98:16 99:2,5 99:13 100:3,12 101:5,14,22 102:1,4,9,13,15 102:20,24 103:3,8,10,15 104:12,24 105:10,23 106:4,14 107:2 107:18 108:5 109:11,15,22 110:4,21 111:4 111:16,22 112:5,16 113:4 113:12 114:3 114:11,22 115:17 116:2,5 116:15,18,21 117:2,4,8,11,16 117:18,25 118:6,14 119:16 120:11 120:19 121:13 121:21 122:19 122:25 123:13 123:22 124:3 125:18 126:13 126:20 127:5 127:19 128:7 128:10,18,22 129:2,9,14,16

129:23 130:4,7 130:14,19,23 131:1,4 132:5 132:15,20 133:6,14,25 134:5,14,17 135:11,14 136:9,18 137:2 137:17 138:1 138:23 139:2,5 139:16,24 140:7,9 141:2 141:4,11,24 142:8,15,18,22 143:4,10 144:8 144:23 145:14 145:22 146:8 146:11,19 147:6,17 148:18,24 149:8,11,22 150:5,8 151:11 152:22 153:2 156:13,24 157:5,17,21 158:5,9,16 159:8,21 160:5 160:17,22 161:19,24 162:1,4,7,10,14 162:19,23,25 163:10,23 164:5,16,23 165:18,25 166:2,4,8,17 167:4,9,18 168:16,25 169:23 170:14 170:22 171:5 171:11 172:3 173:10 174:5 174:10,16 175:1,11 176:11,20 177:1,11,25 178:4,11 179:2 180:8,18 181:9 182:3,13,20 183:1,7,16,22 184:4,14 185:1 185:9,14,23 186:13,21,24 187:1,9 188:8 188:10 189:5 189:11,19,25 190:13,19 191:12,15,21 192:2,11 193:6 193:17,20,24 194:6,16 195:1 195:6 196:5,14 196:21,24 197:6,9 198:4 198:14,23 199:12,16 200:9,21,24 201:6,24 202:9 203:21,24 204:10,13,16 204:19 205:7 205:20,23 206:5,14,22 207:11,18,20 207:24 208:2 208:19,25 209:8,15,22 210:5,11,21 211:5,15,21 212:15 213:5 213:15,23,25 214:2,4,14,16 214:21,24 215:4,16 216:2 216:8,15,21 217:13,16,18 218:4,11,17,25 219:15,20,23 220:7,14,18,20 220:22,24 221:3,15,17,24 222:14 223:11 223:18 224:8 225:8,13 226:9 226:23 227:6 228:13 229:3 229:11,14,19 229:21,23 230:6

**based** 8:12 30:20 65:24 82:16 94:11 95:23 115:23 118:1 121:24 123:14 137:4 167:21 171:3 179:16 193:7 193:11 201:14 201:21

**bases** 196:18 221:8

**basic** 30:12

**basically** 21:25 141:19 157:7 157:11

**basis** 42:22,25 48:1 95:9 208:11

**bates** 2:19 169:8,25

**began** 13:19 48:16 50:8 70:6 114:2 115:9 137:16

**beginning** 6:3 28:19 48:23 49:12 51:7 76:23 117:21 156:6

**begins** 27:9 48:20 90:22 91:6

**behalf** 6:5 8:11 140:15

**belief** 134:22 153:15

**believe** 17:1 24:17 32:8,8 36:7,24 37:22 40:13 46:10 50:14 51:3

54:18,24 55:8 55:13 57:8 58:17,23 60:22 60:24 62:10 68:22,23 69:18 72:2 74:17 76:20 77:2 78:7,15,19 88:15 98:18 100:4,25 106:15,18 108:8 113:5 121:14 122:1,8 125:9,12,14 129:4 131:25 132:2,3,6 134:18,19 141:8 145:23 151:9 154:24 155:1 156:3 159:4 163:4 171:13,22 172:4,21 173:1 173:11 174:7,7 182:14 185:3 190:1,2,2 195:2 200:25 205:24 207:17 209:25 211:6 218:21 224:10 228:3
**believed** 134:20 134:21 147:7 147:11 221:25 224:11 225:3
228:21
**bell** 144:24
**benefits** 127:2
**best** 9:7 28:22 88:12 95:3 130:5 165:5 223:21 230:4 231:14
**better** 10:16 104:21 119:1 128:24 188:3
**beverly** 3:22,22
**beyond** 60:19 61:15,17 62:11 109:3 110:3 182:11
**bhangoo** 4:2 6:11
**big** 10:10,12
**biggest** 86:1
**bill** 45:8
**birth** 154:11 155:1,2 156:19 156:23 157:9 168:12 171:4 173:5,7
**birthday** 87:9 105:21 106:2 106:12,16 107:8
**bit** 35:4 39:12 80:22 104:7 105:3 108:21 108:22 181:7 205:13
**bkl** 3:14
**blanket** 123:3
**blocking** 124:8
**blue** 175:16 176:4
**board** 15:6
**bold** 152:18
**bolded** 172:9
**book** 154:16
**booked** 54:10 56:19
**booking** 153:25 154:16,24 156:7 158:14 171:3 172:11
**bowwlaw.com** 4:4,5
**box** 176:1,6,19
**boxes** 176:5
**brain** 96:14
**brashear** 4:7 6:22,22
**breadth** 123:10 123:20
**break** 11:10,11 11:13,23 64:23 65:3,12 103:6 104:4 168:2 196:25 197:5,8 197:18
**breaking** 103:11
**breaks** 11:16 104:4
**brian** 1:3 5:12 232:4
**brief** 49:6
**bring** 27:13 29:18 38:11 39:14 84:21 144:1 169:6
**brings** 52:18,24 169:10
**broad** 193:5 204:24
**broadcast** 99:18
**broader** 184:12
**broening** 4:1 6:10
**broke** 65:13
**brought** 65:25 81:20
**bryson** 3:19
**build** 172:10,16
**building** 172:15 173:2
**built** 172:21
**bulk** 116:23
**bunch** 156:17
**burden** 118:25
**bureau** 204:22 211:8
**buried** 54:8,11 56:20
**button** 186:5

**[ca - christopher.hegstrom]**


**c**

**ca** 232:9,12,21
**calbert** 26:18 35:9 37:21 211:7 215:18
**california** 3:22
**call** 22:16 44:23 99:1 108:13 113:25 131:13 145:21 185:16,25 186:10 188:4 189:17 201:18
**called** 34:13 107:4
**calls** 77:24
**camera** 5:5
**campaign** 15:23,23,25 16:16,21 104:20
**campaigns** 16:5
**capable** 207:5
**capacity** 14:20 15:22 57:5 140:21
**capital** 154:10 154:10
**captured** 109:10
**care** 162:1 186:1 219:24 220:22
**carry** 10:4 22:4
**case** 1:6 11:2 29:8 41:8,18 45:10 46:22 48:11 83:4 85:17 90:3 143:5,6,8,15 154:10,10 159:2 198:20 208:8,13
**casey** 125:12 126:4
**casting** 127:14
**catching** 54:2
**caught** 194:21 194:22 195:5 195:24 196:2
**cause** 5:15
**ccp** 232:9,12
**cell** 45:2,3,4
**center** 15:10,11 15:15
**central** 4:3
**certain** 68:1 169:6 195:23 199:5
**certainly** 7:12 7:14,18 30:8 42:11 123:9
**certification** 1:25
**certified** 1:24 3:6 7:5 231:6
**certify** 231:17
**chad** 18:21
**chair** 98:20 157:21,22,23 157:24
**challenge** 137:5
**challenging** 73:22 74:4
**chandler** 3:17
**change** 21:6 46:9 59:19 62:17 92:3,16 93:23 94:14 96:11 98:2,9 98:13,14 99:11 100:1,11,19 101:13,19 108:21 132:1 145:12 153:20 154:2,13,20,22 154:23 155:10 155:16 157:3 157:13,13 158:7,15 159:1 165:1 170:18 186:6,12
**changed** 46:10 46:12,24 47:1 93:23 94:17 95:6,7,14 96:5 97:12 147:9 155:2 156:18 156:22
**changes** 15:7 21:25 22:1 98:5 140:18
144:3 152:10 153:16,22 156:16,16 159:12,19 160:13 161:6,7 161:10,14 164:13 170:20 187:16,18 188:5
**changing** 62:18
**charge** 72:7 157:20
**charged** 86:15
**charges** 81:10 81:10,20,20 82:17 83:10,14 83:15 84:14 111:11 128:5 134:25 153:25 154:17,25 155:3 157:14 157:16,18 158:8
**check** 195:23
**chief** 18:21 23:25 26:3,24
**chosen** 53:21 60:1 66:5,12
**chris** 1:13 2:2 3:1 5:11 7:3 143:25 230:15 232:5
**christopher.h...** 46:20

**chronology** 135:25
**citizens** 56:12 118:12 122:17
**civil** 30:12 162:18 232:19 232:21
**claim** 115:20 115:24 116:13
**clarification** 95:12
**clarify** 19:8 61:11 64:12 94:13 102:20 114:23 116:4 193:10,13,14 193:15
**clarifying** 64:13
**class** 1:4
**clean** 9:3,19 138:13
**cleaner** 137:22
**cleanest** 203:12
**cleaning** 141:15
**clear** 10:6 28:4 29:22 49:22 70:15 98:8 102:25 116:13 123:13 130:23 137:6 160:8 163:15
**clearly** 203:6
**clicking** 53:8
**clicks** 216:13
**client** 29:20,21 30:20 48:1 94:2,12 95:9 95:24 96:9 102:25 115:18 116:22 118:2 121:24 122:20 128:19 129:5 137:4 148:25 158:10 164:17 166:9,19 187:11 193:8 196:15 208:16 219:1 220:2 221:7 222:1
**client's** 174:9
**close** 103:8 135:21 205:25
**closely** 42:13
**coaching** 30:11 207:23 208:1
**code** 186:6 232:9,12,19,21
**cognizant** 168:1
**coleman** 3:19
**colleague** 173:15
**colleagues** 22:9 142:13 168:21 173:22
**column** 157:13 172:8,19
**columns** 172:13
**com** 3:14
**combative** 89:7 89:15
**come** 10:22 17:15,17 18:17 34:6 35:19 39:3 43:2 68:13 72:5 86:24 89:5 96:24 101:3 127:17 128:4 129:10 132:4 146:22 147:10 149:7 196:16
**comes** 19:14 106:17 179:11 180:1,11
**coming** 8:23 15:6 36:19 77:25 147:19 147:21,22,22 198:20 203:4
**comma** 154:9,9 175:17
**commencing** 3:3
**commentary** 214:17
**common** 43:24 44:14 45:23 49:24 119:21
**communicate** 43:9 44:21 45:16 81:1 98:23,25 99:11
**communicated** 19:23 69:11 97:9 99:12 100:18,22 149:4
**communicating** 44:22 45:3
**communication** 18:17 21:21 25:3 26:20 27:16 43:11,19 43:24 44:5,11 44:14 45:24 126:10 181:16 181:18 187:22
**communicati...** 18:3,11,14 26:13 42:13 65:18 79:17 80:14,23 97:25 100:20 101:2 104:17 105:14 119:22,23 122:4 125:13 180:23,25 192:4 195:10 204:2
**communique** 99:6
**community** 78:17
**comparatively** 12:18

**compared** 46:24 59:19
**complaint** 23:12 108:10 118:17
**complaints** 74:1 77:25 78:22
**complete** 16:10 159:11,19 163:2,22 164:4 208:3 209:13 211:20 213:4 213:14 214:3 214:11 223:10 223:17 228:11 228:11
**completed** 232:7,17 233:6
**completeness** 161:22
**completion** 233:10
**computer** 75:18
**computerized** 231:11
**conceivable** 136:15
**concerned** 127:16
**concerns** 79:4 79:11 121:17
**concludes** 230:14
**concurred** 210:24 211:3
**condition** 13:11
**conduct** 34:19 35:13
**conducted** 5:4 34:18 35:20 40:22 101:4 113:20,24
**conducting** 39:21
**conducts** 52:17
**conferring** 166:20
**confirm** 29:16
**confirmed** 33:8
**confusion** 30:4 78:22
**conjunction** 144:21
**connect** 106:9
**connection** 5:5
**consequences** 121:19
**consider** 176:17
**considered** 30:11 124:10 127:4 137:14 137:24,25
**considering** 128:3 147:9
**consistent** 144:20
**constituents** 77:25
**consultation** 81:2
**contact** 210:3,7 210:9,12 215:20 232:9 232:20
**contacted** 212:13 215:15
**contain** 130:12 130:15
**contains** 130:11
**content** 20:10 109:9 119:5
**contest** 145:21 146:15 147:5
**continuation** 157:3
**continue** 5:8 43:17 59:6 115:13 120:4 197:19
**continued** 78:10 110:2 112:14 215:9
**continuing** 73:6 110:16
**continuity** 21:21
**contract** 169:13
**control** 120:9 120:16,22,22 194:8
**conversation** 9:17 32:2,4 138:4 204:21
**conversations** 26:12,15 31:20 31:22 32:11,13 98:1 111:7 118:20,20 149:12 222:23
**convey** 140:22
**convicted** 61:10,23 83:15 112:23 135:7
**coordination** 181:3
**copied** 122:6 225:4,25 228:21
**copies** 22:20
**correct** 11:21 11:24 14:12,16 14:17 16:16,21 17:19 20:21,25 21:3,4,10,11 24:11 25:5,25 26:12,14 27:23 29:9 31:22 33:12 34:4 36:16 39:15,23 44:2 45:9 56:3 57:16,18 58:15 58:22,23 60:1 60:3 61:25 63:16,22 66:3

66:8 67:9 71:6 72:18 74:22 78:3 82:5,6,12 82:18,21 83:2 83:10,11 90:16 91:3,7,9,17 106:13 113:21 114:2,4,13 115:7,9,11 122:19,23 124:11,20,21 126:8 128:9 131:6 133:17 134:4 135:23 135:25 136:23 140:16 141:7 153:3,13 154:5 155:8,14,18,24 157:4 160:16 161:11,12,15 161:16,18 164:9 165:7,8 165:9,21 166:1 173:9,19 178:3 178:8 183:14 185:7,8 189:18 189:20,24 190:11 192:24 193:2 197:24 198:22 200:20 206:21 208:23 209:21 211:11 212:23 223:6,7 223:8 228:6 231:13

**corrected** 182:16 188:7 189:1 203:14 204:23

**correcting** 185:12

**correction** 183:3 185:17 185:18,22 186:2

**corrections** 14:22 15:12 232:14,15 233:3,4

**correctly** 225:9 227:17

**counsel** 5:11 6:1,25 10:19 28:20 31:8,10 31:20,23 32:3 32:4 41:23 42:7 96:18 118:25 122:19 149:7,12,13,23 152:8 153:12 168:22 206:15 207:24 208:5 232:18,22 233:7

**counsel's** 153:23 216:5

**counties** 224:10 224:19

**county** 1:7,8,13 2:3 3:2 5:13 7:3 8:11 13:18 15:13 20:10,14 20:19 45:6,12 45:13 51:11 52:12 96:17 118:16 120:22 121:6 124:20 145:25 176:24 178:20 179:7 179:10,16,17 179:23 181:8 184:6 187:14 187:21 218:6 224:2,4,6,13,16 224:22,22 225:19 226:18 226:19 228:5 231:2 232:4

**county's** 52:3

**couple** 9:4 23:5 23:25 27:21 49:3 96:23 129:6

**course** 10:21 29:5,5 42:19 83:6 93:9 95:15,21 96:12 96:15 105:5 114:7 127:15 146:25 153:14 160:10 229:9

**court** 1:1 5:14 5:19 6:24 8:5 11:13,14 12:5 22:11,14 30:12 30:14,16 86:22 87:17 94:6 106:24,25 142:14 147:24 168:1,21 187:4 217:21 218:1 221:13

**courts** 86:12,24 106:18 107:5,6

**cover** 7:19

**covered** 129:4

**cr** 231:6,25

**craft** 129:13

**created** 149:20 170:15,16 172:24 179:15 182:4 185:4 209:25

**creates** 103:3

**creating** 148:16 149:6 194:8

**crime** 51:25 64:1 112:23 135:7 155:3 157:14,15,19 158:8

**critical** 12:7

**crossed** 16:7

**curious** 104:9

**current** 18:9 20:24 21:14 22:6 39:6 40:2 42:24 45:10,19 45:22 46:19 73:21 82:8

84:7 85:1,4 91:12,24 125:3
**currently** 13:9 18:5 43:12 46:8 72:10 79:7 84:19 126:6 135:21 135:23 137:1 171:14
**custody** 55:9 55:10 159:1
**cut** 187:1
**cv** 1:6 5:15

**d**

**d** 2:1
**daily** 42:22,25 69:20
**dangerous** 52:23
**daniel** 3:12 6:7
**dash** 175:20
**data** 60:6 77:4 77:17 78:24 225:5 226:1
**database** 56:21 68:18,19
**databases** 27:22 28:2 34:2,10,11
**date** 94:13 115:19,21 117:22,22 122:16 123:4 128:13 131:16 138:10 150:22 151:7,12 155:1 155:2 156:19 156:23 157:9 168:12 171:4 173:5,6 183:18 183:20,24 232:16 233:5
**date's** 151:13
**dated** 231:20
**dates** 40:3 49:12 50:14 154:11 205:9
**dawson** 26:4,5 26:13,23,24
**day** 7:13,13 53:22 54:10 55:7,12,17 56:20 57:15 58:4,6,20,21,25 59:7,19,19 60:1 66:2 67:21 68:10 69:12 81:8,12 81:19 82:5,22 84:11,12,14,22 85:15,18 88:20 91:15 93:3 109:4,4 110:3 110:11,14 142:12 144:14 145:2,13,19 146:10,15,23 160:3,15,25 161:9,13 164:1 164:8
**days** 53:15,19 53:21,25 54:5 55:5,5 56:15 56:18 57:3,22 58:10 59:10 60:4,10 66:3,5 67:13 69:18 70:2,22 74:2 75:2 82:15 85:8,9,12 88:21 92:4 93:4,15,23 94:17 96:5 97:3,12 98:10 110:13 120:3 121:9 158:22
**deafening** 214:13
**debate** 31:9
**decade** 182:25
**decide** 17:14 143:17
**decided** 128:16
**decision** 19:18 50:20 51:3 66:22,22 88:2 88:3,9 101:24 102:11 115:13 130:3 164:13 166:6,12,15,20 167:2,13,16,21 206:15 208:5,7
**decisionmaker** 61:2
**decisions** 19:2 19:4,16,24 20:1 42:2
**deep** 113:17
**default** 67:25 68:4,4,6 181:25
**defendant** 8:10
**defendant's** 148:1
**defendants** 1:10 4:1 5:13 6:11 8:14 38:9 67:4 137:15 138:16 169:19 206:11 227:13
**delay** 94:20
**deleted** 68:18 68:23 69:1
**delivered** 18:18
**department** 14:21 24:9,16 42:13 72:3,8 73:22 78:20 97:16,18 100:9 101:13,19,24 105:9 119:22 119:23 122:4 155:21 179:18 179:24 180:23 180:25 181:6 185:16 204:4,5 226:11 227:1
**departments** 59:6 204:8

**depended** 62:22
**dependent** 91:24
**depending** 19:18 62:14 186:2
**depends** 5:4 85:7
**depiction** 147:19
**deponent** 9:2 150:4
**deposed** 7:17
**deposition** 1:13 2:16 3:1 5:3,11 5:16 7:23 11:18 20:13 22:9,18 23:10 27:3,11 28:8 28:11,16 29:7 29:9,15,18,23 31:17,18 32:17 34:4 39:19 42:10 48:19,22 48:23 49:9 61:16 141:13 143:8 148:6 150:24 169:1 175:3,5 215:7 222:19 231:5 231:14 232:19 232:23,25 233:8,10
**describe** 18:8 36:11 41:7 90:24 152:9
**described** 35:25 90:15 92:5,7 133:3 170:7 171:10 172:18
**description** 2:15 171:1
**designed** 171:19 182:1 184:6
**designee** 8:10
**desk** 10:10
**destroy** 102:11
**details** 151:17
**detainee** 55:4 58:19
**detainment** 126:11
**detention** 13:25 14:1,3 15:9,11 15:13 16:12 69:16,19 126:16
**determination** 57:15 63:20 88:9
**determinations** 91:2
**determine** 71:24 113:16 179:14 220:9 226:15,16 227:2,4
**determined** 207:5,6 232:18 232:23 233:7
**develop** 97:19
**developed** 97:16,20
**dictate** 162:15 162:18
**difference** 35:12,24 44:4 134:16 157:15
**different** 46:25 47:16 53:14 67:7 80:18 82:8 103:3 129:10,11 134:18 147:10 149:15 196:22 205:14
**differently** 167:5
**difficult** 185:21
**diligent** 186:11 188:5
**diligently** 189:1
**direct** 18:19 24:2 157:18
**directed** 34:18 119:2 163:5
**directing** 204:11
**direction** 106:22 231:12
**directive** 19:14
**directly** 44:12 45:8 72:14 107:6 118:12
**director** 14:10 14:13 16:18 18:3 51:3 65:17,18 125:13 192:4 195:10
**directors** 125:9
**disadvantage** 58:24 97:2 143:16
**disagree** 102:7
**disagreements** 73:4
**disappeared** 121:2
**disclaimer** 131:9,13,18,21 131:22 132:13 133:5,12,21 134:12,13,21 135:4,9,20 136:1,16 137:14,24 138:10,18 153:17 159:7,8 186:20 188:7 189:22 190:7,8 190:11,16 191:2,9 192:18 196:4,12

**disclose** 143:3,4
**disclosed** 142:16,19,23 143:9,14,19 174:6,12
**disclosure** 143:4 169:20
**discourage** 124:1
**discoverable** 55:8
**discovered** 183:10,12 190:3,23
**discovery** 34:6 35:5 37:7 41:8 41:18 42:3 49:10,11 130:8 181:1 199:5,8 220:8 222:13 222:20
**discretion** 90:22 91:6
**discuss** 15:3 41:13 84:5,13 84:20
**discussed** 49:15 60:15,23 66:2 83:7,24 85:21 92:11 110:25 115:16 127:4 138:20 141:23 158:20 206:16
**discusses** 48:19
**discussing** 194:4 220:8
**discussion** 31:11 37:16,19 49:7 61:7,19 84:19 93:4,15 109:19,21 121:10,15 122:2 133:2,12 138:22 205:10 207:22 208:17 209:23 211:6 220:17
**discussions** 61:8 63:24 64:2 83:12,17 94:2 98:19 121:5 135:16 138:8 139:7,9 139:17 187:11 222:22,24,25
**display** 110:16 120:4
**displays** 172:10
**dispute** 130:9
**district** 1:1,2 5:14,14
**division** 79:1 118:17,22 181:11
**dkloberdanz** 3:14
**document** 11:3 22:24 31:17 143:21 148:14 148:17 149:6 149:20 151:2 169:7,14,16 174:12
**documents** 8:21 24:19,21 24:24 26:5 27:10,13 28:7 28:18 29:14,17 29:23 30:2 31:19,24 34:5 36:5 39:14,18 39:21 48:11 143:14
**doe** 1:8
**doing** 11:12 16:15 51:12 64:9 76:5 99:17 115:2 128:10 139:2 146:1,25 171:23 187:16 204:16 224:13 224:25 226:20
**donna** 125:14 126:4
**draw** 52:2,6 104:16 147:12 147:14
**drawing** 51:22 145:24 146:2 146:24
**drive** 3:5,12,22 5:16 34:12,13 34:17 71:6 104:10 105:9 105:16 184:15
**drives** 27:15,17
**dropped** 68:2 81:10,20 84:14 111:11
**due** 107:21 136:21
**duly** 7:4 231:8
**duplicate** 35:7
**duration** 93:5 99:3

**e**

**e** 2:1 232:9,12 233:1
**earlier** 115:7 119:15 129:6 174:25
**early** 127:22 195:17
**earn** 179:12
**ears** 56:13
**earshot** 31:12
**east** 3:4,12 5:16
**easy** 141:16
**educate** 8:20 52:16 124:18 125:16 198:11
**educated** 196:20
**education** 16:9
**effect** 8:4 70:17 70:17 105:20 108:16 131:12

**[effectiveness - everybody's]**


**effectiveness** 72:25 78:11 127:12
**efficient** 11:3 186:11 188:5
**effort** 8:20 28:17 29:16 31:19 122:25 124:17,17 189:23
**efforts** 27:12 28:6,10 35:13 35:14 71:9 105:8 125:15 134:3 198:11 201:4 226:7,21 230:11
**eight** 125:5
**either** 19:15 26:16 27:10 29:17 38:21 79:9 93:7 95:5 109:20 111:11 112:1 121:10 127:12 171:8 179:6 203:15 205:17,17
**elaborate** 68:7
**element** 172:15 177:22
**elicit** 29:21 30:9
**else's** 213:8
**email** 2:19 37:11 38:14,21 39:1,2,24 40:2 40:2,6,8,23 43:14,15,16,18 44:10,14,14,17 44:18 45:22,23 46:5,6,8,9,14 46:19,23 47:1 47:9,11 48:10 98:2 100:24 101:4,9 105:14 223:1
**emails** 27:16 34:2 36:8,9,11 36:12,18,20 37:1,8,8,10,11 39:2 40:17,23 41:2 43:25 74:12 98:14 223:2
**embarrassment** 121:19
**employ** 14:18
**employed** 25:24 100:9 125:2 138:17
**employees** 47:3 69:24 140:1
**employment** 14:14 21:20 121:18
**enable** 171:2
**enacted** 74:14
**ended** 14:15 16:22 203:17 206:1
**enforcement** 16:9,11 52:20 55:2,16,19,21 56:6,12 59:19
**enforcement's** 59:14
**engaged** 114:9
**engine** 182:5,5 184:5 185:4 210:1 218:19
**enhanced** 188:23 194:3 194:14 200:4
**enjoy** 103:12
**enjoyable** 230:10
**enter** 175:20
**entire** 181:20
**entirely** 156:11
**entirety** 122:14 122:16
**entities** 228:8
**entity** 171:20 177:23 180:10 200:1 217:7
**erase** 11:21
**eric** 215:18,23
**errata** 232:14 232:16 233:3,5
**error** 182:19 183:6 189:2,17 194:22 198:12 198:15,21
**errors** 195:15
**esq** 3:12,16,20 3:20,21,21 4:2 4:2 232:1
**essentially** 152:20
**establish** 9:3 61:21
**established** 101:8 197:22
**estimate** 10:8 10:11,14 33:18 33:18 94:25 144:4 189:9
**estimated** 136:3
**estimation** 85:2 182:24 183:20
**et** 5:12,13 232:4
**evaluate** 75:11 77:17 122:4
**evaluated** 71:23
**evaluation** 75:21 76:4,10 76:17,24 77:5 78:3,11 122:8 122:17
**everybody** 12:8 18:18 99:18 100:22 141:16 223:14
**everybody's** 127:23

**evolve** 14:8
**exact** 62:25 132:3 146:21 183:18 205:25 223:25 224:5
**exactly** 132:24 145:2 182:22 189:7
**examination** 2:6 7:7
**examined** 7:5 231:8
**example** 10:9
**except** 228:25
**exception** 90:15
**exceptions** 88:25 89:3,18
**excess** 121:8
**exchanged** 98:2
**excluded** 156:19,23
**exclusion** 154:11 157:8
**exercise** 115:3
**exhibit** 2:16,17 2:18,19,21,22 11:4 22:10,17 22:18 25:11 27:3 28:17 31:16 142:6,18 143:5,7,8 147:25 148:6 150:3,24 151:21 168:25 169:1,10,22 173:17 174:13 175:3,5 199:12 203:3,4
**exhibits** 2:12 2:15 11:1 174:18
**exonerated** 81:9 111:11 128:5
**exoneration** 82:17 83:9
**expand** 24:5 182:6
**expect** 21:19 77:4,17 143:12
**expectation** 120:8
**expected** 21:20
**expert** 57:14
**expired** 81:12
**expires** 82:5
**explain** 18:15 30:4 48:15 89:9
**explaining** 70:10 140:18
**extensive** 35:18
**extent** 31:21 48:1 94:1 138:2,3 204:20 219:2
**external** 18:11
**eyes** 56:13 187:20

**f**

**face** 43:10,10 44:7,7 98:1,1 98:18,18 100:20,21,24 100:24 222:25 222:25
**facebook** 107:22
**facilitates** 53:4
**facilities** 127:24
**facility** 89:5
**facing** 140:19 181:16
**fact** 46:11 62:1 69:1 91:22 92:21 102:18 118:20 133:3 166:18 172:16 195:22 196:12 198:18
**factor** 130:2
**fair** 15:19,20 31:24,25 33:3 33:5,11,12 34:7,8 35:16 39:22 40:16,16 42:1,4,9 44:1 48:4,7,24 63:15,21 67:3 67:7 69:10 75:10 78:9,14 82:25 90:15,21 91:5,16 92:1,2 96:21 100:16 121:2 127:18 128:6 131:13 131:14,22,23 143:11 153:1 156:12,19 160:20 177:24 186:14 198:3 200:8 203:17 205:6 207:10
**fairly** 205:25
**faith** 8:20
**fall** 181:17 192:25
**falls** 196:17
**false** 183:24
**familiar** 108:25 119:4 144:13 148:13 169:14 175:9,12
**familiarize** 169:12
**far** 7:13 16:12 36:13 58:12 62:18 101:18 130:15,17 141:13 145:1 187:22 197:23 197:24 204:23 205:10 206:7 207:13 218:19 227:21
**feasible** 133:21
**feature** 54:16 54:22 144:14

144:17 145:13 145:19 147:5,9 160:3,15 161:9 161:13 164:1,8 170:12 171:8,9 172:15 175:9 175:10 177:2 177:13 189:3 192:7 193:1,5 194:3,15 197:25 198:1 198:18,25 200:4 201:17
**features** 140:19 141:22 172:19 200:17
**federal** 30:12 162:17 208:10 233:1,8,9
**feedback** 78:23
**feel** 166:17
**fell** 98:20
**figure** 203:11 206:8
**filed** 5:14 106:24 116:9 116:17,19
**fill** 25:22
**fills** 107:4
**final** 97:21
**finance** 181:6
**financial** 179:6 179:18,24
**financially** 5:23
**find** 23:21 30:2 36:5,6 55:6,11 55:16 58:21 59:15 67:5 108:15,24 177:15 203:20 207:16 210:3 225:18,18,21 227:8
**finding** 51:21 106:8 195:18
**fine** 12:5,25 49:3 64:7,9 65:2 90:19 95:2 123:1,9 129:7 162:19 191:5 217:4
**finish** 9:19 64:25 213:23 213:25 214:4 219:20,22,24 219:25
**finished** 9:11
**firm** 5:20 6:5
**first** 7:4 13:17 13:19 22:5,23 23:2,4 48:16 61:21 62:20,20 63:14 69:12 100:8,11,14 116:9 148:2 150:14 153:25 154:9,17,25 155:7,12,18 165:4 171:4
172:8,8,19 174:23 182:6 196:11 202:20 202:21,24 203:14 219:15
**five** 168:23 196:25
**fix** 189:23
**fixed** 173:3 183:10,15,18 183:21 184:3 186:11,20 189:4,18 190:5 209:21
**flag** 180:15
**flagged** 179:19 180:3,6,15
**flip** 204:13
**flippantly** 129:3
**flipping** 25:11
**flow** 85:7
**focus** 204:19
**folks** 25:16 44:11,13 100:9 173:16
**follow** 102:12
**follows** 7:5 232:8
**force** 8:4
**foregoing** 227:12 231:5 231:12
**forever** 113:11
**forgetting** 102:15 166:18
**forgot** 104:5
**form** 17:22 19:7 20:4 21:23 26:10 30:8 37:3,13 37:20 38:4,16 38:22 39:4 40:9,19 41:3 41:10 42:5 43:1,24 44:6 44:11,14,15 45:23,25 47:2 47:10 50:10,12 50:22,25 51:9 51:17 53:6,23 54:6,23 55:23 56:16 57:6,17 57:23 58:7,16 59:2,11,20 60:2,11 61:4 62:3 64:3 66:7 66:14,23 67:8 67:16,23 68:8 68:21 69:6,14 70:3,12,19 71:1,11,18 72:1 73:1,12 74:6,11,15,23 75:3,13,23 76:6,13,19 77:6,19 78:6 78:12,25 79:5 79:14,19 80:3

**[form - foundation]**


80:15,20 81:5 81:23 83:1,19 83:25 84:6,16 85:10 86:5,11 86:13,14,17,20 87:5,21 88:4,7 88:14,23 89:21 90:17 91:8 92:8,13,18,25 93:18 94:19 97:24 98:4,16 99:6,13 100:3 100:12 101:5 104:12,24 105:10,23 106:8,12,14,15 106:23,24 107:2,4,18 108:5 109:11 110:4,21 111:4 111:16 112:16 113:4,12 114:3 118:14 119:16 120:11,19 121:13,21 123:16 124:3 125:18 126:13 126:20 127:19 130:24 132:5 132:15,20 133:25 134:5 134:14,17 135:11,14 136:9,18 137:2 139:16,24 140:9 141:2,11 141:24 144:8 144:23 145:14 145:22 146:8 146:19 147:6 147:17 148:18 148:24 149:22 152:22 153:2 156:13,24 157:17 159:21 160:5,22 161:19 163:23 164:5,23 165:18,25 167:18 168:16 170:14,22 172:3 173:10 175:11 176:11 176:20 177:1 177:11,25 178:4,11 179:2 180:8,18 181:9 182:3,13,20 183:7,16 184:14 185:1,9 185:14,23 186:13 187:9 188:8 189:5,19 189:25 190:13 190:19 191:12 191:15,21,21 192:2 194:6,17 195:1,6 196:5 198:4,14,23 200:9,21,24 201:6,24 202:9 203:21 205:7 205:20 206:5 206:22 207:11 208:25 209:8 209:15,22 210:5,11,21 211:5,15,21 212:15 213:5 215:16 216:15 216:21 217:13 218:4,11,17 222:5,6,14,24 223:11,18 224:8 225:8,13 226:9,23 227:6 228:13 229:3

**formal** 78:11

**format** 171:16 172:12

**formed** 101:15

**former** 15:25

**forms** 104:17

**forth** 149:5

**forward** 30:7 49:20 64:12 97:22 133:24 188:11

**found** 54:13 58:21 64:1 100:1 111:11 178:16,19 183:9 196:11

**foundation** 37:3,13,20 38:4 39:4 40:9 40:19 41:3 44:15 45:25 47:2 51:9,17 53:23 57:6,17 59:11,20 60:2 60:11 61:4,21 64:3 66:14,23 67:8,16,23 68:8,21 69:6 70:3,12,19 71:1,18 72:1 73:1,7,12 74:15,23 75:3 75:13,23 76:6 76:13,19 77:6 77:19 78:6,12 78:25 79:19 80:3,15 81:23 83:19,25 84:6 84:16 85:10 86:20 87:5 88:7,14,23 89:21 91:8 92:25 93:18 100:3,12 101:5 104:12,24 105:23 106:14 107:18 108:5 109:11 110:4 110:21 111:4 111:16 112:16 113:4,12 114:3 118:14 119:16 120:11,19

121:13,21 123:16 124:3 126:13,20 127:19 132:5 132:15,20 133:25 134:5 134:17 135:11 135:14 136:9 136:18 137:3 139:16,24 140:9 141:4,11 141:24 144:8 144:23 145:14 145:22 146:8 146:19 147:6 147:17 149:22 152:23 153:2 159:21 160:5 160:22 161:19 163:23 164:5 164:23 165:18 165:25 167:18 168:16 170:14 170:22 172:3 173:10 175:11 176:11,20 177:1,11,25 178:4,11 179:2 182:3,13,20 183:7,16 184:14 185:1 185:23 186:13 187:9 188:8 189:5,19,25 190:13,19 191:15,21 194:6,17 195:1 195:6 196:5 198:4 205:20 206:5,22 207:11 208:25 209:15 211:21 216:15,21 217:13 218:4 218:11,17 222:5 223:11 223:18 224:8 227:6 228:13

**four** 58:4,6,20 59:1,19 169:9 169:21 170:1,1 176:5 178:25 203:4,5,5

**frame** 25:9,17 25:18 49:11,17 60:17 61:12 62:5,6 64:4,11 66:6,12 73:8 73:14,16 114:23 138:5 141:12 152:12 189:7,13 192:12,15 196:17 205:25 209:10 211:17 212:2 225:6,22

**frames** 62:17 63:8

**frankly** 79:10

**frcp** 233:1

**frequent** 43:25

**frequently** 63:19

**friend** 10:5

**front** 199:13 216:1

**fruition** 50:19

**fugitive** 54:2 56:6 57:21 59:18 72:22

**fugitives** 51:21 59:7

**full** 123:10,20 159:11 228:11

**fully** 123:19

**function** 52:13 178:16 179:4 184:13,18 188:24

**funds** 200:2 217:8

**further** 90:2 163:18 231:17

**furthering** 90:3

**futile** 115:2

**future** 172:17

**g**

**gain** 179:6

**gained** 181:12

**gap** 21:19

**gaps** 25:22

**garner** 38:15

**gather** 35:25

**general** 38:11 38:11,15 45:23 46:23 49:3 51:10 56:7 57:10 77:10 80:13 109:17 117:4 119:22 195:8 225:15 227:15,24 228:24 229:10

**generally** 41:7 43:11,19,23 45:19 80:11,13 85:2,8,14 119:10

**generated** 78:22 199:25 217:6

**getting** 54:8,11 102:5 145:24 154:15 155:6 186:19 199:13 202:15 203:7 204:12

**gilbert** 3:16

**gillett** 26:18,19 26:20 35:9,11 36:1 37:22 40:22 211:7 215:18

**give** 9:22 10:9 10:11,13 11:18 48:5 97:5 112:17 123:3,8 129:3,11

**[give - gotta]**

151:17 152:13 158:4 162:2,5 165:14 168:21 168:21 192:15 205:18 208:11 215:24
**given** 8:5 139:18 207:15 214:8,9 230:14
**gives** 103:17
**giving** 51:22 195:8
**glasses** 175:24
**global** 36:10
**gmail.com** 3:18
**go** 5:9 7:25 9:1 18:16 30:21 33:23 36:13 39:7 41:12 50:11,13 51:1 57:7 59:14 62:4 70:20 74:16 75:4 77:7,20 80:4 80:12 81:24 83:20 86:19,21 86:22 91:11 93:19 97:14 102:19 103:16 104:13 106:5 107:19 111:5 111:23 114:12 118:15 119:17 120:20 127:7 127:21 133:8 133:16 134:7 136:10,19 147:1 157:6 160:23 163:24 164:6 165:19 166:2 167:19 169:7 171:12 178:12 179:24 184:16 185:2 191:16 193:20 193:24 194:16 195:7,23 198:5 209:1,9,22 210:16,18 211:23 215:17 221:1,4,4,10,10 221:12,16 222:15 225:18 225:21
**goal** 62:13 71:25 104:22 140:24 146:6,7 147:15 184:15 206:4
**goals** 74:4 92:12,17,23 146:16,18
**goes** 113:17,18 115:19 141:13 159:15,16 180:11
**going** 5:2 29:21 30:24 47:24 51:20 52:10 58:12 65:4 84:21 85:23 92:3 93:25 95:22 97:11,21 103:20 106:8 114:8 115:5 116:6,21 121:22 139:10 142:1,5 143:17 146:2 167:25 168:3 178:15 184:18 188:18 193:6 197:1,10 204:24 208:4 214:2,4,24 215:4,12 218:25 219:24 221:14,18
**gonna** 9:7,14 9:16 10:11,25 15:6 22:8,23 29:19 30:7,19 31:13 35:4 37:23 42:11 47:18 48:13,13 50:11 58:10 64:11 82:4 83:5,5,8,8 88:15 94:11 95:8,12 96:8 96:23 101:14 104:5 108:21 108:21,22 113:17 114:22 115:1,3,17 116:6,9 117:25 118:25 123:9 129:7,11,13 130:7,15,17,21 131:8,12 137:2 138:1 142:5 147:24 148:25 149:16 152:7,7 158:3 162:14 162:15,16,21 163:11,11,13 163:14,14 164:16 166:8 168:20 169:4 169:21 173:16 176:12 188:1,2 188:5 196:14 201:7 206:14 206:16 207:21 207:21 213:15 217:21 227:11 229:15
**good** 5:1 6:15 8:20 9:22 11:1 64:21 99:8 103:11 123:19
**google** 174:2 199:23 201:22 202:10,12 203:1 216:12 216:16,23
**gotcha** 43:21 156:20
**gotta** 28:21 56:21,22,22 62:6 149:15

**gotten** 56:20
**governed** 166:21 215:8
**government** 179:12,13 180:10,10 200:1 217:7
**gran** 168:23 169:9,21,25
**gran000001-...** 2:20
**grander** 178:17
**granicus** 141:17 168:22 169:7 171:15 171:19,24 172:2,9,15,16 172:21 178:15 178:23 182:1 184:25 185:16 188:4,25 194:8 205:22 206:1 209:20,21,25 210:3,7,9,13 212:13 215:15 216:19,20 217:12 218:9 218:13,15,19 222:3,8,12,21 222:23 223:6
**great** 8:8 12:3 13:22 14:1 33:25 123:22 151:18
**green** 175:25 175:25
**grimm** 24:17 24:19,21,23 26:15
**grossman** 3:19
**grounds** 116:7
**guess** 10:7,15 10:17 33:19 48:21 87:14 98:7 136:5 137:22 147:25 172:6 183:2,5 189:13
**guessing** 182:24
**guilt** 63:20
**guilty** 61:23 64:1 131:11 134:24 153:18 190:17
**guys** 26:17 103:13 215:19 229:1

**h**

**h** 154:10
**halfway** 9:15
**hamper** 55:15
**hand** 22:9 104:17 142:5 142:13 147:24 148:9 150:5 172:8 173:16
**handed** 11:3 174:20,22
**handful** 49:18 116:25
**handled** 232:8
**handling** 17:5
**happen** 9:13 34:19 59:23 67:13 81:21 82:4 109:17 119:24 144:5 158:7 182:10
**happened** 14:8 16:24 25:23 28:10 52:21 68:20 94:14 95:15,20 113:3 116:9 118:7 124:19 132:1 139:23 144:10 144:11,21 155:17 157:19 170:20 173:8 187:19 193:14 196:13 203:14
**happening** 91:1 96:13 112:14 145:1 155:20 188:18
**happens** 82:2 99:19,22 109:5
**happy** 151:11 169:5
**hard** 27:15,17 34:12 64:7 175:24
**harder** 192:14
**harm** 121:18 127:3 128:4 130:1 134:11 134:16
**harms** 127:17
**head** 9:5,5
**heading** 157:14
**hear** 12:5,8 47:21 102:7 150:8 186:21 186:24
**heard** 5:6 12:25
**hearing** 12:17
**hegstrom** 1:13 2:2 3:1 5:11 7:3,10 12:13 28:5 49:9 95:11 104:3 143:25 168:10 197:17 230:9 230:15 232:5
**hegstrom's** 30:1
**held** 11:15
**help** 9:4 56:13 105:2 116:12 154:18,20
**helped** 139:13
**helpful** 28:13 58:2
**helps** 52:21 106:9 143:21
**hilarious** 216:8

**hills** 3:22
**hired** 13:24
**hold** 13:23 14:24 43:22 155:5 186:21
**holding** 63:12 186:9
**holds** 142:11
**holidays** 23:6 151:10
**home** 177:15 177:17 178:19 184:7 204:25
**hope** 11:2 31:8 208:9
**hopefully** 9:13 38:7 129:19
**hospital** 89:4
**hour** 11:14 167:25
**hours** 62:19,20 68:2,11,13 91:19 230:3,3 230:5
**house** 171:23
**houston** 1:3 5:12 112:21 116:14 232:4
**hows** 130:20
**huh** 102:9 103:2
**human** 91:1
**hundred** 54:9 54:20 56:19,19 82:24 84:20 91:12 93:24 96:6 97:12 121:9
**hyperlink** 176:1,7
**hyperlinked** 175:16

**i**

**ia** 84:22
**idea** 76:7 132:18 216:16 229:19,23
**identification** 22:19 87:16,18 148:7 150:25 169:2 175:4,6 211:13
**identified** 88:4 182:19 183:6 189:17,23 190:10 198:13 204:23 208:4 209:7 225:16
**identifiers** 87:14 153:25 154:13,14
**identifies** 195:15
**identify** 6:14 28:17 39:18,20 55:3 60:16 199:22 201:4 202:5,25 209:17 212:9 212:10 217:7 225:2,3,11 226:7,12,17,20 226:21 228:7 228:19,20
**identifying** 31:23 57:21 111:12 113:1 223:23
**identities** 226:3 227:13 228:22
**identity** 199:25 228:18,19
**images** 110:17 112:14 120:5
**immediately** 64:25
**impact** 63:24 69:5 78:17 83:13,17 85:20 92:3,6,12,17,22 93:16 109:19 110:1,18,22 111:2,10,14,17 111:20,24 113:8,14,15,16 113:18 122:17 136:16,24 137:10 146:17 147:15
**impacted** 146:7
**impacts** 93:6 112:10,12,13 114:10,21 115:15 117:23 118:13
**impede** 13:11
**implemented** 70:6 124:13
**implying** 149:12
**important** 7:12 7:14 221:5
**inaccurate** 11:19 206:24 207:9
**inadvertent** 9:13 198:1
**inappropriate** 163:6
**inception** 136:3 168:13
**include** 39:24 44:23 140:18 164:14 187:11 202:12
**included** 87:10 107:8 131:17 132:14 134:12 135:9 146:15 154:21,22 155:8,12,19 164:22 168:12 173:7 199:23 200:15,17 202:25 232:14 233:3
**includes** 140:15 192:6
**including** 6:1 8:21 105:21

128:4 152:10 205:22
**inclusion** 153:24 154:7 158:13
**incomplete** 11:19 160:21 161:17 207:9 208:24
**incorrect** 206:24
**increase** 89:9
**increased** 71:16 77:9
**increasing** 104:22
**indefinite** 121:20
**independent** 42:2 138:20
**independently** 19:5,17 20:2 138:18
**indexing** 124:8
**indicate** 172:14 200:5
**indicated** 227:15,20,22 227:25 228:1 229:8
**indicates** 153:6
**indicating** 196:18
**indication** 139:18
**individual** 60:25 83:18 90:14 107:21 108:12 113:15
**individuals** 24:2 61:9 106:7 111:3 153:17
**indulgence** 188:1
**industry** 16:25 17:4,15
**influence** 13:9
**inform** 86:4,6 126:19
**information** 8:14 19:6,13 23:11,12,17,21 24:3 26:9,10 27:18,19 34:15 51:24 55:17,20 58:21,25 77:4 77:17,23 86:10 86:17,23 87:4 87:10 88:3,5 90:3 100:19 106:8,10 107:1 107:4 109:2 110:3,9,14,17 111:12 112:15 113:1,6 120:5 144:4 153:15 156:1 161:5 164:20 166:7 166:16 167:2 167:10,13,17 168:12 171:2 172:11 178:18 205:4 206:8,12 217:12 218:10 220:9 222:11 223:23
**informed** 20:2 38:8 69:25 113:5
**informing** 126:22
**initial** 159:16
**initially** 13:23 68:10 120:10 171:23
**initiated** 114:24
**inmate** 89:4,7 89:14 158:25 170:8,11,19 171:2
**inmates** 126:22 171:3
**innocence** 63:20
**innocent** 111:12 131:10 153:17 190:16
**inquire** 202:3 210:19 218:15
**inquired** 212:14 216:19 216:20
**inquiring** 200:7 200:20
**inquiry** 48:20 48:23 226:14
**inserting** 220:1
**inside** 187:20
**insinuating** 151:16
**insofar** 115:19 221:25
**instance** 54:2 55:16 80:1 81:17 82:15 87:8 105:21 113:9 173:7
**instances** 38:10 81:1,8 85:17
**instituted** 119:13
**institutional** 22:4
**instruct** 30:19 47:18,25 93:25 94:11 95:8,23 96:8 101:14 115:17,22 117:25 121:22 122:20 137:3 138:2 148:25 158:9 164:16 166:8 193:7,11 196:14 210:9 218:25
**instructed** 101:12 149:14

**[instructed - judge]**


158:24 166:22 197:6 208:2
**instructing** 128:18 220:1 221:6 222:7
**instruction** 96:7 97:6 102:1,4,6 123:14 127:5 127:20 128:8 130:4 132:21 133:7,15 134:6 138:24 139:3 149:6 158:16 167:4 187:10 188:10 190:20 196:6 222:4
**instructions** 8:2 12:1 149:5 149:7,10
**instructs** 10:20 106:25
**integration** 170:8
**intended** 140:24 167:10
**intent** 225:24
**intentionally** 167:22
**interest** 122:24
**interested** 5:23 7:18 231:18
**interfering** 96:22
**interim** 25:23
**interject** 28:3 114:22 193:6
**interjected** 208:8
**internal** 18:11 18:11,14 34:15
**internally** 18:16 73:5 84:5 188:17
**internationally** 111:13 113:2
**internet** 5:5 120:10,17
**interpret** 61:9
**interrogatories** 148:2 150:13 150:15 212:19 213:7 220:12 222:13 223:10 223:12
**interrogatory** 2:17 151:21 152:9 159:12 159:14,23 160:14,20 161:5,17 163:21,22 164:2,14,21 165:11 167:3 167:17 199:11 200:7,13,19 202:4,21 203:23 206:20 206:21,24 207:2,8,9 208:24 209:13 210:10 211:4 211:20 212:14 212:22 213:3 213:13 217:5 218:16 219:14 225:1 226:8 228:7,12,15
**interrupt** 9:7,9 9:17 23:19 75:16 208:20
**interrupted** 191:4
**interrupting** 36:22 215:5
**intervals** 195:24
**interview** 113:10
**invade** 221:9
**investigation** 179:14
**invoke** 95:17
**involve** 20:9
**involved** 24:3 32:10 49:10 141:17 145:25 172:2 220:17
**involves** 41:18
**issue** 66:1 72:22 84:13,20 111:25 112:19 141:14 162:16 163:6,13
**issues** 25:4 71:10 72:23 124:19 196:20
**issuing** 79:24 80:2 81:10
**it'll** 206:15
**italicized** 152:19 153:6 153:11
**ivchenko** 3:15 3:16 6:8,8

**j**

**jail** 52:13 54:10 89:5,12,13,15 126:16 142:11
**jane** 1:8
**january** 1:16 3:3 17:1,3 18:2 18:24 40:5,18 40:23 45:20 231:21 232:3
**jerry** 17:16
**jim** 4:6 5:18 221:13
**job** 45:1 59:12 59:14 113:10
**joe** 16:1 20:23 21:7,9 51:4 142:11
**joined** 45:20
**juan** 3:21 6:16
**judge** 8:5 162:11 163:1 163:10

**jump** 64:7
**jury** 214:17,21
**justifiably** 221:8
**juvenile** 14:22 15:12,15

**k**

**keep** 30:11 73:7 73:13 215:5,5 230:4
**kelly** 175:1
**keyword** 172:13
**kimberly** 88:16 118:17
**kind** 77:4,16 80:9 97:24 184:18 197:18 202:15
**kloberdanz** 3:4 3:11,12 6:6,7 12:8,14,16 22:20 103:5 116:12,16,19 148:3 150:7,9 150:12,14,18 150:21 173:24 174:2,4,7,14,17 174:20,22,25 175:2
**know** 7:16,19 8:1,2,3,4 9:1,2 9:2,5,12,16,16 9:23 10:2,5,8,9 10:10,16,16 11:11,15,17,20 11:20 12:22 15:2 16:8,8 20:22 21:19 22:11 27:4,8 30:9,10,14 32:3 33:2,21 35:16 36:9 37:16,21 38:3 38:18 39:11 40:2,10,22,24 41:1,4 42:16 44:16 45:19,21 46:7 47:1,22 49:12,18,22,24 50:7,20 51:2 53:21,24 55:3 56:17 57:9 58:3 59:25 60:3,25 61:14 61:14,17 62:6 63:10 64:13 66:1,4,10,20,20 66:21 67:4,11 68:16,20 70:4 70:5,9,9,16,18 70:24 71:2,8 71:12,15,20,22 72:7,24 73:4 73:25 74:4,19 76:4,10,17,22 76:23 77:10,23 79:25 80:21 84:2,14 85:2,6 86:6 87:15 88:2,10,20 95:1,1 99:16 99:17,18 100:13,14,18 100:22,25 101:12 102:17 103:5 108:15 110:5,22 111:6 112:17,19 113:2,9,13,16 114:7 115:7 116:11 117:5,8 119:11,12 121:8,9 122:5 123:2,4,6,7 124:8,9 125:2 125:20 126:14 126:24,25 127:14 128:3 129:9 131:10 131:11,24 132:2,10 133:20 134:3 134:20 135:20 137:9,21 138:15,16,25 139:8,21 143:2 145:19 146:20 146:23 147:8 147:18 151:7 151:23 154:2,8 158:5 160:6 161:4,13 169:18 170:7,9 170:24 171:12 172:6,7,16,23 173:22 175:15 179:9 180:14 180:16,24 181:11 182:10 182:19 183:6 183:12,15,17 187:20 188:22 189:1,2,3,6,16 190:4,22 192:12,14 193:9,14,19 194:2,4 195:4 195:21,22 196:7 197:23 198:12,21,24 199:3,4 201:10 201:15 202:4,7 203:3,13,14,15 203:15,16,17 204:3,12,15 205:13 206:6 207:12,15 209:2,16,17,18 212:4,9,13 214:11,17 216:12 217:12 218:5,9,13 223:5,8,25,25 224:9,20 225:15,17,20 227:5,7,23 230:10
**knowledge** 8:13,13,22

**[knowledge - long]**


22:4 57:10 69:18 74:7 75:14,22 78:5 81:25 82:19 93:20 95:4 98:17 100:8 102:3 108:18 109:17 113:22 114:2 125:7 133:9 138:19 139:6,12 140:8 140:11 141:9 144:20 145:11 149:21 165:6 198:11 203:9 216:22 223:21 225:19
**knowledgeable** 23:20 66:11,11 66:21 70:25 170:25
**known** 69:21 143:16 225:3 225:12 228:20 229:6 231:5
**knows** 205:14 218:13
**kozub** 3:4,11

**l**

**l** 3:12 4:2
**lack** 82:17 83:10 104:21 128:24 186:20 189:22 196:4
**largely** 11:11
**late** 115:11 132:2 153:20 202:15
**launched** 145:20
**law** 3:4 4:6 5:18 6:5 16:9 16:11 52:20 55:2,15,19,21 56:6,11 59:14 59:18 208:13
**lawsuit** 114:24 116:9,16
**leadership** 19:21 204:2
**learn** 69:12 97:11
**leave** 17:14 25:11 35:5 39:12 40:1 123:12
**left** 14:18 15:4 54:12 155:2 167:21
**legal** 37:22 40:11 88:8,9 118:22 119:2 161:21 163:7 232:7
**length** 66:2
**letters** 22:13 175:25
**level** 139:9
**levitch** 174:23
**lia** 3:21 6:18
**liaison** 37:23 118:22 119:2
**liaisons** 88:8
**lieu** 31:23
**ligation** 95:21
**limit** 56:22
**limited** 49:15 49:20 56:15 60:9
**limiting** 66:3 132:21
**line** 27:9 29:14 152:19,19 153:5,9,10 154:9 225:2 227:11 232:15 233:4
**lines** 153:5
**linked** 177:3
**lisa** 51:3 65:14 65:16,17
**list** 27:9 28:7 29:23 100:18 160:13 161:7,8 172:10,12 210:22
**listed** 27:21 28:18 105:12 157:2 161:14 211:17
**listing** 156:16
**lists** 153:16 156:16,17
**litigation** 50:1 95:16 96:16,18 137:16,19
**litigations** 95:22
**little** 13:15 15:16 35:4 39:12 105:3 106:1 108:22 120:15 141:16 175:22,25 205:13
**lived** 68:19
**lives** 16:7 52:22 118:13
**load** 68:11
**local** 52:20 178:16 179:5 184:16
**locally** 182:6
**locate** 55:16
**location** 5:15
**locked** 232:12 233:1
**lodge** 137:10
**loggins** 72:12 72:17
**logistics** 178:25
**long** 7:23 11:7 14:3,24 15:11 30:6 33:15 62:1,11 85:4 113:17 117:12 120:9,17 123:7 123:9 152:13

**[long - maricopa]**

162:5 189:2,3 189:9 206:3,3 206:7 230:1
**longer** 54:12 55:10 58:19 83:15 132:14 190:17 196:13 201:19 222:7 229:24
**longest** 33:17
**look** 52:24 56:9 59:9 134:23 141:19 165:2 171:3 175:15 187:21 192:9 192:15,16 208:13 217:16 225:1
**looked** 148:9 173:2
**looking** 22:22 27:18 52:19,22 56:5 58:3,10 58:14 59:6 77:23 106:7 164:8 201:20 203:3
**looks** 130:11
**lookup** 53:3 54:16 170:8,8 170:11,12,19 170:20
**lose** 57:4
**lost** 131:2
**lot** 9:15 118:19 187:20 195:17
**love** 157:23,23 215:24
**lovely** 216:6
**lower** 154:10 154:10 169:9
**lunch** 104:4

**m**

**madam** 94:6
**made** 17:14 35:14 50:20 51:3 57:15 66:22 75:18 88:3,8,9 90:11 115:13 118:11 124:17 125:15 132:12 133:4 134:3 139:14 145:12 152:10 153:16,20 154:2 158:15 159:12,20 161:6,8 163:17 164:13 165:17 165:24 166:12 166:13,19 167:2 179:4 184:24,24 185:7,25,25,25 186:3 187:15 187:18 189:18 189:23 192:22 193:22 194:2,4 196:12 198:22 200:17 201:18 209:21 215:20 216:16 221:24
**main** 21:20
**maintaining** 222:5,6
**make** 8:20 9:6 10:1,8 12:4 15:7 20:1 27:12 28:17 29:16 31:18 36:14 41:21 42:1,2 49:19 50:11 58:12 64:8 65:25 101:13,19,24 102:6,11,24 108:1,13,13 116:2 117:2 126:3 129:22 138:13 141:14 141:16 145:11 163:2,3,12,13 166:3,6,12,15 167:12,16,20 180:4 185:17 185:17 186:10 189:12 201:4 206:15 208:5,6 210:6 215:1 226:7,21 232:14 233:3
**makes** 25:21 63:2 64:18 65:24
**making** 19:5,16 91:2 143:10 144:6 180:2,20 186:12 188:5 207:18 214:4 221:5
**man** 1:3 45:1
**manage** 141:17
**manager** 15:23
**managing** 20:9
**manner** 32:14 166:24
**march** 116:14 117:13 118:3,6 121:23 122:22 123:15 127:5 127:20 132:21 187:12 188:10 190:20 196:6
**maricopa** 1:7,8 1:13 2:3 3:2 5:13 7:3 13:17 15:13 20:10,14 20:19 51:11 52:2,12 118:16 120:22 145:25 176:24 178:20 179:7,10,17,23 184:6 187:14 187:21 218:6 224:2,13,16,22 224:23 225:19 226:18,18 228:4 231:2 232:4

**mark** 22:10 125:12 126:4 175:1
**marked** 2:12 22:14,18 148:6 150:24 169:1 175:3,5
**marking** 174:13
**married** 1:3
**matched** 177:19
**matter** 5:12 7:12 19:25 42:4 103:13
**matters** 15:3 45:16
**max** 93:24
**maximum** 94:18 96:6 97:12 98:12
**mcdonald** 3:4 3:12 5:16
**mcso** 46:7 107:22 143:25 152:10 177:16 199:23 225:5 225:12 226:1
**mcso.marico...** 46:20
**mcso.org** 173:21
**mdm** 5:15
**mean** 19:8 20:19 23:17,18 32:19 37:10,11 39:8 43:18 56:7,23 58:8,8 62:18 68:4 73:15 85:25 87:19 99:5,22 102:7 103:12 121:1 129:2 130:7,9,15 135:2 137:17 142:20 143:2 149:18 154:12 171:21 175:23 181:1,2,5,21 182:2 188:24 207:13 224:17 228:1
**meaning** 95:13 99:23 112:3 179:21 181:20
**means** 8:11 9:22 18:15 24:5 71:23 75:16 86:10 128:11 154:8
**measures** 124:7
**mechanics** 67:12
**mechanism** 67:14,20 79:3
**mechanisms** 81:7
**media** 5:10 14:10,13 16:19 18:3,10,10 65:17 85:23 86:1,4,7,9,16 87:8 88:4 104:14 105:15 106:6 107:6 140:15,21 141:1 230:16
**medical** 13:10
**medication** 13:10
**meet** 32:18,19 32:20
**meeting** 33:15
**meetings** 33:13 33:17
**member** 86:16 87:8 138:15 179:13
**members** 122:5 140:25 219:9
**memo** 70:9 74:11
**memory** 23:3 50:5 69:3 144:13,20 199:9
**memos** 74:20
**mention** 160:14 163:25
**mentioned** 11:9 25:7,15 26:2 34:1 35:6 36:8 54:3 60:25 65:13 71:5 100:17 142:2 209:11
**message** 44:25
**messages** 44:24
**mic** 12:19,21
**mid** 187:2
**mike** 26:4
**milberg** 3:19 6:5,16,18,20,22
**milberg.com** 3:23 232:2
**mind** 49:6
**mine** 37:15
**minimum** 91:23
**minute** 30:22 196:25
**minutes** 33:16 103:17 230:3,5
**missed** 93:11
**mistake** 132:12 132:19 133:3 133:22 134:4 136:16 139:14 139:23 184:24 185:7,13,22 186:19 188:6 189:23 192:22 193:22 194:2,4 196:13 200:5 203:13 209:21 209:21
**mistaken** 142:7
**mistakenly** 136:4 193:5



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**mistakes** 188:25 200:17
**misuse** 122:5
**mode** 43:11
**model** 141:19
**modes** 44:5
**moment** 28:20 145:16
**monetary** 177:22
**monetization** 202:22
**monetize** 202:12
**monetized** 199:24 200:15 203:1,7,10
**money** 180:2,4 180:11,21 181:10 202:23 202:24 203:7 203:10 216:17
**monies** 179:11
**month** 29:7
**months** 23:5
**morning** 5:1 6:15 33:14 63:7,11
**moscone** 3:20 6:20,20
**mouth** 95:3
**move** 96:2 119:3 213:15 214:8,10,12 215:12
**moved** 16:22 16:22 171:24
**moving** 16:15 30:7 133:24 171:15 214:5 215:3
**mtm** 1:7
**mug** 78:10
**mugshot** 36:17 38:9,21 39:2 52:1 53:3 54:5 54:16,22 55:6 58:6 62:13,15 62:16 63:25 70:11 73:5 81:7,18 82:4 82:16,24 83:16 84:15 85:18 86:24 87:9 88:19,22 89:6 89:8,10,17,18 90:8 91:14,19 91:23 99:4,19 101:9 104:23 107:17 108:12 111:12 112:25 113:10 114:1 116:8 120:2,9 120:17 121:2 122:9 126:12 126:22 127:11 127:18,23 128:24 134:11 135:13 138:8 141:22 142:12 144:2,14 145:2 145:13,19 146:9,13,15,22 147:2 152:10 158:20,21,25 160:3,15,25 161:6,8,12 164:1,7 170:8 170:12,19 173:7 190:18 191:10 192:6 193:1 196:4
**mugshots** 27:19 34:22 36:14 39:6,9 48:16 50:8,24 51:7 52:16 53:12,15 54:20 55:22 57:3,22 58:11 60:15,21 61:3,9,22 62:1 62:2,12 63:19 67:12,21 68:16 69:17 70:1 71:17,25 74:1 75:1,11 76:3 76:11,18,25 77:18 78:10,18 78:22 79:4,18 82:9,14,23 83:4 84:20 85:1 89:19,20 90:13,25 91:12 92:24 93:14 94:18 97:2,13 98:10,12 104:9 105:6 108:3 109:1,8 110:2 110:9 114:18 115:10 117:24 119:14 121:6 121:20 122:6 122:13,18 124:2 126:22 127:2 128:17 130:2 131:12 131:17,21 132:14 133:4 134:20 135:22 136:2 146:22 147:20 155:11 158:21 159:16 168:14 172:9 172:11 175:17 223:23 224:2,6 224:14 225:4 225:12 226:1 228:4
**multiple** 32:22 113:1 192:13 213:19 214:8
**multitude** 51:19
**muted** 103:25

**n**

**n** 2:1
**name** 5:18 6:4 6:15 24:15 46:7 58:15,20 65:14 72:17

153:25 154:17 154:25 155:12 155:18 171:4,4 175:20,20 177:14 215:14 215:23 216:7
**named** 228:10 231:8
**names** 155:8,22 224:5
**narrow** 205:25
**national** 179:5
**natural** 83:6 103:6
**nature** 62:19 89:2
**necessarily** 32:19 121:1 172:23
**necessary** 61:16 232:14 233:3
**need** 10:15,17 11:4,8 16:8 22:25 42:11 45:1 61:17 99:2 152:14 186:6 192:12 193:11,13 201:7 204:10 214:17 217:14 220:10,16
**needed** 12:23 49:19 173:3 186:2
**needs** 18:18 186:10 208:17
**nefarious** 151:16
**negated** 114:25
**negative** 78:22 93:6,16 109:20 109:25 111:2 111:10,14,20 111:24 112:4 112:10,13 113:15 114:9 114:20 115:15 117:23 118:13 136:15
**negatively** 147:15
**neighbor** 55:3
**neighborhood** 52:21 56:9 58:3
**neighborhoods** 51:25 56:8
**neither** 178:23 220:14
**nervously** 204:17
**never** 16:15 21:1 79:22 82:15 113:20 114:6 123:9 138:20,21 143:14 188:7 223:1
**new** 15:6 17:16 36:15 47:3 92:11 99:1 143:24 146:24 155:25 156:8 158:21 170:15 171:8,9 172:15 172:15,24,24 173:8 195:19
**newer** 141:19
**news** 142:10,10 142:21 144:7
**newsletters** 18:16
**newspaper** 142:21
**nine** 136:6
**nobody's** 56:20
**nod** 9:5
**noise** 75:18
**non** 128:12,13 220:5
**nope** 128:18
**norma** 125:9 125:25 195:2
**north** 4:3
**notating** 232:15 233:4
**note** 5:3 29:20
**noted** 143:20
**notice** 2:16 22:9 27:2 28:8 28:10,16 29:6 29:9,22 31:16 32:17 34:3 39:19 42:10 48:19,22 49:8 61:15 115:20 115:24 116:13 141:13 190:16 191:19 194:14
**noticed** 8:15,21 138:18,21 190:12 191:8 191:11 193:4
**noticing** 6:3
**notified** 180:20 181:2,4 195:11
**number** 5:15 7:19 10:18 16:5 32:3,23 34:2 60:4 152:9,19,19,25 153:16,24,25 154:18,24 155:6,7 156:7 156:16,17 157:7,13 158:13 159:23 169:25 171:3 199:17,22 208:13,14 230:16 232:15 233:4
**numbers** 22:12 22:14 154:16

**o**

**oath** 5:21 8:3
**oberg** 4:1 6:10

**object** 29:19 30:8 116:7,7 116:21 137:2 152:8 192:13 192:14 196:18
**objected** 49:14 159:15 215:2
**objecting** 115:4
**objection** 10:19 30:7,9 31:10 48:7 102:25 114:24 117:2 122:19 123:2,7 123:11,17,21 130:24 137:11 143:10 152:22 153:23 157:5 161:25 162:6,8 162:22 163:12 183:22 184:4 189:11 203:24 214:5 220:1 222:7
**objections** 5:24 10:18,22 30:10 49:19 50:11 64:8,12 73:7 73:16 77:1 81:13 89:25 106:4 109:15 109:22 111:22 112:5 114:11 128:7 133:6,14 138:23 139:3 140:7 146:11 152:25 153:15 160:17 162:3 162:15,16 163:17 171:11 183:1 205:23 208:12 214:25 215:1 220:11 221:24 222:6 227:12
**objective** 106:3
**objectives** 105:18
**obligated** 10:24 196:19
**obligation** 9:25
**observer** 26:21
**observing** 26:22
**obtain** 28:18 29:16 86:17 181:8 206:12
**obviously** 7:11 10:5 21:25 52:18 54:9 95:20 96:22 116:16 130:8 137:9 219:17
**occasionally** 20:5 100:24
**occurred** 63:1 88:10 99:6 144:11,25 161:10 182:22 190:4
**occurrence** 110:20
**october** 132:2
**offense** 13:7 61:24
**offer** 11:11,13 130:7 144:4 216:6
**office** 1:13 2:3 3:2 7:3 8:12 13:18 14:19 15:4,14 16:18 16:23 17:15,21 17:24 18:1,12 18:18 19:22 20:11,14,15,19 20:19,22 22:5 22:6 24:9 25:19,24 37:12 39:25 40:4 42:14 43:3,7 44:12,13 45:4 45:23 48:16 50:8 51:12,21 52:3,10,12,17 57:2,14 67:4 68:7,19 69:24 75:11 78:16,21 79:11 80:14 83:13 84:5 85:3 91:7 98:24,25 100:10 104:10 105:7 106:18 106:25 108:1,4 109:3,8,12 110:10,15,19 114:17 115:9 118:11,17 119:10 120:2,2 120:9,16,18,23 120:25 121:7 122:6 123:25 124:22 125:3 126:7,19 127:16 128:16 131:17 132:13 132:19 133:2 133:22 136:15 136:25 137:15 138:16,17 139:22 140:3 140:14,22 146:1 159:17 161:7 168:13 169:18,19 175:10 176:25 177:5,9 178:10 178:13,14,18 178:20,24 179:1,7,11,15 179:17,23 181:7 182:7,12 184:7,17 187:15,21 188:14 192:1 194:15,21 195:15 196:17 197:25 198:1 198:19 199:6

200:6,15,18 201:18 202:22 203:6,9 209:24 216:14 218:7 223:24 224:3 228:5 232:11
**office's** 182:7 224:14
**officer** 13:25 14:1,4 15:13 16:12 55:16 69:16,19 89:7 89:10,12 126:15
**offices** 3:4
**official** 55:2
**oh** 25:13 43:17 64:22 86:3 93:12 94:24 95:18 99:23 102:22 106:21 117:10 150:10 157:21 190:7 211:10 217:3 217:23 229:22
**okay** 7:10,25 10:14,25 11:25 12:6,9,12,22,25 13:3,6,14,15,22 14:1,2,6,11,17 14:23 15:1,8,8 15:17,24 16:3 16:20 17:7,10 17:13,13,18 18:4,7,8,13,22 19:20 20:8,13 20:17,20 21:5 22:3,16 23:8 23:14,22 24:14 24:18 25:6 27:1,6,7,20 28:12,23 29:12 29:25 30:13,21 31:7,13 32:1 32:16 33:6,22 33:22 34:9,16 34:23 35:3,11 35:23 36:25 38:2 39:13,17 40:15,25 41:6 41:25 42:9,10 43:5 44:20 45:1,7 46:18 47:7,14 48:13 49:2 50:17 51:14 52:5,15 53:2 56:4 57:12 63:17 65:11 66:18 67:2 68:15,25 69:10 71:4 72:19 73:12,18 73:19 74:9 75:8,9,10,17 76:9 79:22,23 80:8 82:13 91:4,21 94:15 94:25 95:3,8 95:25 96:21 97:8 103:15,18 105:17 106:21 107:12,24 108:20 112:8 116:5,15,18 117:15,18 118:5,10,24 119:3,8,20 120:7 122:10 123:13,19,23 123:25 124:15 124:24 125:11 126:2,9 128:2 129:18,23 130:5,6,22 131:3,4,6 133:19 136:13 137:5,11 140:13 142:4,9 143:20,23 146:5 147:23 148:12 150:2 151:15,20 152:4,6,16,17 153:7 154:6 155:5,15 156:5 156:10,10 157:10 158:2,3 158:13,14,17 158:19 159:5,7 163:9 164:12 168:10,19,19 170:6 173:4,13 173:15,20 174:4,16,20,24 175:8,15 177:7 181:23 184:2 184:10 186:17 186:25 187:9 187:25 189:15 190:9 193:6,16 193:20,23 194:24 196:23 197:7,17,22 198:9 199:3,18 199:19,21 201:1 202:23 203:17 205:2 206:10,19 207:19,23 208:21 209:5 211:2 212:7,12 212:21 213:2 213:11 214:12 214:15 215:22 216:11 217:10 218:1,23 219:11 220:16 222:9 223:4 224:24 226:5 228:17 229:16 229:18
**omission** 165:17,23
**omit** 164:14 166:6,15,15 167:2,10,13,16
**once** 11:14 53:8 53:8 79:22 82:4,24 90:22 91:5 120:10,17

**[once - party]**


121:6,6 122:6 133:21 141:18 162:7 163:16 166:4
**one's** 114:9
**ones** 47:16 79:25 129:11 129:11 169:8 213:8 220:13 228:4 229:5
**ongoing** 96:18 104:20 105:8
**online** 12:16 83:16 84:15 85:3 109:8 113:10 114:18 121:8,20 126:12
**onward** 186:18
**operate** 215:6
**operation** 52:13
**opinion** 19:24 111:1
**opportunity** 63:14
**opposed** 35:13 53:21 66:5 67:6 90:14 91:1 134:12 157:19
**oral** 26:13
**order** 37:6 86:4 143:17 220:9
**original** 33:24 40:3 152:18 153:10 171:15 232:10,20,22
**originally** 109:2 120:18 135:9 171:19
**outcome** 5:23 231:19
**outlet** 107:6
**outset** 173:8
**outside** 94:1 98:25 99:23 100:9 177:5,18 178:15,17 182:7,10,11 184:8,18 187:10 189:3 197:25 198:19 204:24 219:2 224:22
**overlap** 16:6
**overlooked** 132:8
**oversee** 18:10
**overseeing** 20:9
**oversight** 72:13 151:13 182:15 187:17 188:14 188:20,22,24 190:3,4,23
**overstated** 222:2
**own** 8:12 38:2 47:17 101:25 102:11 109:3 120:3 121:1

**p**

**p** 34:13,17
**p.m.** 62:24 103:20,21,22 103:24 168:4,5 168:6 197:11 197:12,13,15 221:19,20,21 221:23 230:14
**page** 2:5,15 27:2,6,9 28:19 29:14 52:2 53:3,9 73:5 99:19 105:7 108:13 122:9 127:11 130:10 134:20 138:8,9 150:4,11 151:22 152:1,3 152:5 158:21 158:25 169:6 169:23 176:6 177:15 178:19 192:9 196:4 202:11 204:25 225:2 227:11 232:15 233:4
**pages** 25:12 173:21 192:10 204:14 232:14 232:17,17 233:3,6,6
**paid** 178:7
**paralegal** 4:7 6:23
**parameters** 215:6
**pardon** 15:15 61:3 95:11 100:10 104:1 173:14 177:7
**part** 91:6 140:14 141:23 142:2 145:21 148:19 154:12 156:3 194:15 201:17,19 202:20
**participants** 5:6
**participate** 26:20
**participation** 30:2
**particular** 24:8 25:16 54:22 58:14 174:12 213:7 218:20 219:4
**parties** 5:8 6:13 110:16 120:4 225:3,11 228:20,23 229:9
**partners** 106:7
**party** 5:22 57:13 68:5

108:23 109:1 110:8,13 121:4 124:1 130:2 139:13 169:19 171:18 176:13 177:14 179:6 185:3,8 199:24 200:16 201:22 203:1 219:13 220:5 223:22 225:16,25 227:13 228:3 231:18
**passed** 100:19
**past** 82:7,11
**path** 67:5
**patience** 128:11
**paul** 1:7
**pay** 45:8 176:14 178:2
**pdf** 232:12 233:1
**penalty** 232:16 233:5
**pending** 28:22 31:14 83:15 95:21 197:3,4
**penzone** 1:8,9 21:2
**people** 11:12 12:16 23:20,23 24:6 25:8,22 37:16,19,22 51:22,24 52:2 52:6,9,16,18,19 52:24 53:4 54:7,8,9,21 56:8,19 59:15 89:19 91:25 99:20 100:7,18 105:16 107:15 107:16 125:1 125:16,23 126:6 128:5 134:19,19,23 134:23,24 135:5 146:2,21 146:24 147:10 147:19 151:25 184:15 203:25 204:8 205:16 205:18 209:24 211:8 215:14
**people's** 118:13 178:2
**perceive** 20:3,6
**percent** 52:12
**perfect** 8:18 16:20 21:12 22:16 26:1 27:1 64:19 152:6
**perfectly** 9:18 10:23 11:24 23:7 64:9 123:1 162:19
**performed** 36:1 36:4
**period** 24:1 55:7,12,18 60:1 67:6,7,22 69:13 81:8,12 81:19 82:5,14 82:16,22 84:15 85:1,5 88:20 91:23 93:3,14 93:16 97:3 109:4 110:3,11 110:15 124:19 125:2,5,17 136:2,4,5 139:1,22 159:13,15 199:25 200:3,5 200:7,16,19 201:5,10,16,16 201:20,22 202:2,4,5,7,25 203:11 205:4 207:3,4,5 209:7 210:4,19 211:13 212:4,9 212:11 217:6 232:18 233:7
**periods** 125:4 199:22 200:14 207:13 209:17
**perjury** 232:17 233:6
**permanently** 68:18
**permission** 131:8 216:5
**perpetuity** 110:14
**person** 6:7 24:15 26:16 32:13,19 35:7 35:8 52:22 58:4,14,19 66:10 84:13 88:12 90:2 91:25 100:8,11 106:10 108:2 108:12 125:1 138:20 163:6 200:1 222:25
**person's** 55:6 177:23
**personal** 8:12 15:2 37:8,10 37:11 45:3,14 45:17 112:25 198:10 213:1
**personally** 34:18 35:14,20 35:25 45:2,8 47:8 210:6
**personnel** 45:24 69:24
**persons** 1:4 35:10 217:7
**perspective** 26:9
**pertain** 30:3
**pertaining** 208:7

[ph - positive]


**ph** 3:22
**phase** 139:10 144:2,4
**phillips** 3:19
**phoenix** 4:3 142:10 143:23 231:20
**phone** 26:16 32:14 33:9 44:23 45:2,3,4 45:6,12,13,14 45:17 163:2,11 185:15,25 186:10 188:4 189:17 201:18
**phonetic** 72:13
**photo** 89:6,14 106:9
**photographs** 158:14
**photos** 56:18 56:20 58:11 85:24 135:10 135:13 188:18 224:1,18
**physically** 43:6
**picked** 56:17
**pictures** 54:10
**piece** 167:10
**piedmont** 17:8
**pio** 69:15,16
**place** 5:8 24:8 68:1,5,6 79:6 92:21 142:1 144:3 183:3 184:22 188:16 208:17
**places** 52:25 170:9
**plaintiff** 1:5 6:5 6:9,17,19,21,23 143:15 199:7 227:16,20,22 227:25 228:2 229:7,8
**plaintiff's** 22:10 148:2 150:3
**plaintiffs** 3:11 3:15,19 5:12 5:13 6:7 29:17 137:7 229:1
**platform** 172:22,23
**platforms** 199:24 202:13
**pleadings** 174:15
**please** 5:3,24 6:14,25 10:7 11:7 13:7 18:8 29:3 30:11 94:3 102:23 115:7 187:6 204:19 212:16 214:8 217:15 221:2
**pled** 61:23
**pllc** 3:15,19
**plus** 114:7
**point** 16:1 49:24 55:14 56:21 61:8 67:3 88:10 99:8 103:11 115:4 125:13 131:7 132:11 132:16 144:17 146:23 189:16 189:17 190:10 190:15 193:7 194:14 209:6 211:12
**police** 59:6
**policies** 19:22 20:3 24:7 27:18 34:14 35:1,17,18 39:8 70:22 74:20,24 81:2 81:11 152:11 152:11 185:6
**policy** 23:24 24:4,7,10,16 27:15 53:14 69:25 70:5 74:1,12,13 75:1,21 79:18 81:14 82:8,22 83:7 84:7,11 84:12 85:1,4 86:4 91:12,24 92:12,17,21,23 93:22 94:17 95:6,7,13 96:5 97:4,11 98:2,5 98:7,9,10,11,13 98:15 99:1,3 99:11 100:2,11 100:20 104:8 104:23 108:3,6 110:12 121:10 126:18,21 195:21
**politeness** 230:11
**political** 16:5
**pop** 182:2
**popular** 147:5 147:9,11,14
**populating** 54:7
**portion** 29:13 30:17 94:8 160:25 167:23 187:7 212:25 213:3 218:2
**portions** 53:4
**position** 13:23 14:9,13,24 49:20,22,23 73:21 96:20 116:10
**positions** 8:14 100:18 140:23
**positive** 108:16 109:20,24 110:1,18 112:3 112:12 136:24

**possibility** 121:7 130:1 218:9
**possible** 7:21 10:6 46:3 119:12 129:9 133:23 191:8 191:11
**possibly** 10:18 96:1 114:25 167:22 220:6
**post** 62:13 63:5 68:12 109:1 110:12 127:23 138:9
**posted** 53:15 53:19 54:20 57:22 58:6 61:22 62:2,16 62:21 63:11,13 63:19 69:17 82:4,9,14,23 83:5 85:18 88:19,21,22 89:10,18,20 90:9,11,13 91:14,19,24 93:15,24 94:18 97:13 98:10,12 99:4 109:2,9 111:13 126:12 127:18 131:21 134:11,25 135:15,17,22 156:2 158:21 158:22 195:19 225:21
**posting** 52:16 56:15 57:15 60:21 63:1,25 66:2 67:7 69:12 71:16 74:1 75:1 78:21 79:18 88:5 90:24 91:7 92:4,23 93:4,5,23 94:18 97:2,12 104:8,23 105:6 106:2 107:21 108:3,10 110:9 110:13 111:2 113:25 114:17 117:23 127:2 128:16 134:12 224:21
**postings** 60:9 63:15,18 70:11 73:5 96:6 107:17 155:11 155:19
**posts** 62:23 121:7 224:6
**potential** 102:6 111:10,20 112:10 114:20 115:15 117:23 127:3,16 128:4 134:10,16 143:5
**potentially** 52:23 110:1 111:15 112:13 143:1
**power** 137:9
**practical** 63:18
**practice** 48:15 49:13 50:7,19 73:23 74:2 78:9 79:4,12 108:8 113:24 113:25 114:2,8 114:19 115:14 115:14 117:23 119:11 122:13 122:17 127:2 127:22 128:25 130:3 131:10 155:20 157:4 168:13
**practices** 19:22 21:21 152:11 152:12
**preclude** 213:17
**predecessor** 194:20,25
**prefer** 113:25
**preference** 22:12 61:14
**prep** 222:19
**preparation** 39:21
**prepare** 23:9 143:1,17
**prepared** 170:5 183:2 206:12
**preparing** 166:20 222:19
**present** 4:6 6:1 26:16,24 32:8 33:9 48:9 76:16,23 157:8
**presented** 47:15,23 223:15
**preserving** 208:12
**press** 16:4 35:21 74:18 75:5,8 79:24 79:25 80:2,6 80:10
**pretty** 8:2 10:25 186:11
**previous** 17:20 25:8 36:12 39:7 40:8 46:14 122:12 151:21 154:15 155:11,11 207:7
**previously** 34:7 39:20 123:15 123:21 143:9 156:2 159:2
**primarily** 64:5
**prior** 17:23 25:18 30:3 40:18,23 41:2

47:4 65:18,18 65:21 69:18 75:21 76:3,7 76:10 81:8,18 115:24 124:10 131:15,16 137:21 138:10 141:12 154:24 155:7,9,10 156:2 159:8 187:10,18 190:20 196:6 231:7
**private** 31:11
**privilege** 10:20 30:9,20 31:10 48:1 94:12 95:10,24 96:9 96:16,23 102:12,18 103:1,1 115:19 116:7,22 118:3 118:3 121:25 122:21 128:20 129:5 137:4,8 158:10 166:10 166:18,21 193:8,8 196:16 219:2,12 220:3 221:8 222:1
**privileged** 29:20,21 96:1 96:14 128:12 128:13 148:25 164:18 220:6
**privileges** 96:20 193:12 221:9
**probably** 7:13 9:22 44:17 46:7 54:11 58:12 72:14 77:21 85:25 87:22 99:14,15 100:4 107:15 132:7 142:2 182:15 186:14 205:24
**problem** 11:19 23:7 46:18 47:8,12 76:2 93:12 98:21 104:4 151:15 157:22 184:12 199:14
**procedure** 30:12 74:20 162:18 185:12 195:22 232:19 232:21
**procedures** 39:9 70:10 74:24 184:22 185:7
**proceed** 7:1
**proceeding** 5:24
**proceedings** 231:13
**process** 49:10 86:16,18 90:22 90:24,25 91:6 113:10 141:23 180:6 195:14 230:10
**produce** 27:13 31:19 143:3 179:11
**produced** 29:17 39:20 169:17
**product** 94:12 95:10,24 96:9 96:16 97:21 103:1 115:19 116:22 118:2 121:24 122:21 128:19 129:5 137:4 158:10 164:18 166:10 166:18,21 176:14 193:8 196:16 208:16 219:1 220:2 221:7 222:1
**production** 27:10 28:6,7 29:15,24 31:18 35:17 168:22 181:3 209:25
**profess** 129:7
**professional** 14:20 15:21 16:7
**program** 187:15
**promoted** 14:8 14:10
**pronounce** 215:25
**proper** 28:7 30:10
**properly** 38:8 131:9 217:10
**propounded** 231:9
**protected** 96:19 149:14 166:22
**proven** 131:10 153:18 190:17
**proves** 11:2
**provide** 24:19 24:21,23,25 26:5,8 151:11 207:3 220:10
**provided** 23:11 45:4 163:7 164:4 165:13 177:13 198:18 210:23 213:13 229:1,2,4 232:19 233:8
**providing** 146:2 153:7 178:24
**proximity** 135:22

**public** 19:6,13 19:23 20:3 51:20 52:14 57:21 58:25 59:13 60:8 61:9 68:17 72:21,22 75:12 76:5,18 77:10 77:13,16,18,24 78:16 79:11 80:14 81:2 85:20,22 88:5 92:6 96:4 104:18 106:17 107:14 109:10 111:13 121:2 122:5 140:19 140:25 142:11 142:20 145:25 172:9,10 181:16 188:17 83:6 113:2 120:10,18 133:4 136:1,2
**publication** 51:7 61:2 71:24 78:17 112:14 116:8 119:13 128:25 131:17 132:14 152:11 161:6 192:6
**publications** 130:2 173:7
**publicly** 229:6
**published** 20:10 52:1 55:22 76:3
**publishing** 48:15 50:7,24 60:14 75:11 76:11,18,24 77:18 78:9 79:4 109:8 115:10 122:13 122:18 131:10 159:16 168:14
**pull** 55:14 72:3
**pulled** 68:23 145:3
**purpose** 51:15 52:7,8 54:4,12 56:14 57:20 58:25 72:25 73:5 75:1 85:20 92:6
**purposes** 54:3 71:5 73:23 74:3,10,13 85:24 86:3 87:16,18 104:8 105:19,19 147:20
**pursuant** 107:1 153:23
**purview** 99:25 181:12,15,17 181:20 191:25 213:8
**push** 104:16
**put** 12:19 19:12 22:8 42:10 67:25 68:5,6 73:16 95:2 99:17 124:13 133:23 135:17 136:7,25 137:6 142:1 149:24 155:17 178:15 179:3 183:23 196:12 198:25 199:3 203:12 224:4
**puts** 143:15 144:2
**putting** 56:23 123:1 137:8 195:10 224:14

**q**

**quality** 5:4,5
**quantify** 108:8
**quarter** 27:8
**question** 9:19 9:21,23 10:3 10:24 11:17 22:23 25:12 26:23 29:3 30:15 31:14 33:20,24 34:3 38:17 39:7 48:7 59:22 66:19 69:7 71:19 72:20 73:24 75:25 76:22 80:22 82:11 84:1,18 85:6 94:4,7 101:16 102:12 105:2 109:13 110:6 115:23 116:7 117:12 118:1 120:13 121:23 122:21 123:17 128:13 128:22 132:11 139:3 142:23 146:10 148:25 156:15 159:19 160:8,18 161:4 161:20 163:5 163:19 164:10 164:18 166:9 166:23 167:8 167:14 170:16 171:5,7 178:5 183:9 186:22 186:24 187:3 196:22,22 197:3,4,4,7 200:10 201:8 204:20 206:7 206:16 207:8 212:2,5 214:10 215:10 217:14 219:4,17 220:4 221:7 222:3,4 227:5,21
**question's** 28:22

**questioner** 215:7
**questions** 9:15 13:4 43:22 48:21 49:4,18 73:22,25 74:4 96:19,24 116:23 119:1 129:3,10,13 142:24 143:13 148:20,21,23 199:8 203:20 210:23 216:23 218:20 221:9 222:11,17,21 223:5 231:9
**quick** 16:4 104:6
**quickly** 7:20 8:1 9:1 82:3
**quite** 7:19 12:15 79:10
**quote** 144:2
**quoted** 143:24

**r**

**r** 3:20 232:1
**r&s** 233:1,9
**race** 94:24
**raise** 61:20 121:17 123:10
**rambling** 106:1 120:15
**ran** 146:25
**rather** 189:1,12
**reach** 82:24 125:22 126:1,3 177:16
**reached** 139:12 139:14
**reaction** 78:17
**reactivation** 128:24
**read** 23:11 29:9 30:14,18 93:10 94:7,9 152:2,7 152:7 187:3,5 187:8 212:17 217:10,14,22 217:24,24 218:3 225:7,9 227:11,17
**reading** 31:17 159:10 167:21 172:7 212:19 232:24 233:9
**readjustment** 139:10
**ready** 27:4 103:14 152:15 170:4 197:18
**reality** 121:6
**realize** 11:18 104:5 229:22
**really** 7:10 11:12 34:5 64:11 91:23,24 110:14 122:10 129:3 156:18 203:12 219:24
**reason** 11:10 11:10 39:1 60:8 82:10 87:15 208:3 219:3
**reasonable** 10:14 67:5 84:4,13 124:17 143:12
**reasonably** 225:3 228:21
**reasoning** 145:16
**reasons** 51:6 55:21 90:8 141:9 147:11 221:5
**reassessing** 79:3
**recall** 23:5 32:11 36:19 46:17 65:14 69:21 79:15,20 99:15 101:1 109:21 111:6 121:15 132:24 144:9 145:2,15 151:9 169:16 204:21 207:14 222:16 223:3 224:4
**receipts** 179:11 179:25
**received** 29:8 38:21 39:1 62:15 200:1 205:4 216:13
**receives** 217:8
**receiving** 28:16 31:16 32:17 180:16 202:23 202:24
**recent** 33:13 40:4,6
**recently** 114:19
**recess** 31:1 65:6 103:21 168:5 197:12 221:20
**recitation** 162:6
**recognized** 120:25 190:24 190:25
**recollection** 212:1
**reconstruction** 139:8
**reconvene** 229:24
**record** 5:2,9 6:2 7:16 9:3,19 10:23 11:9,11 11:21,22 12:24 20:18 30:17,21 30:25 31:3,7,8 31:13 49:7 65:5,8,12 94:8 103:20,23 123:1,14 137:6

**[record - removed]**


137:9 138:13 143:11 163:2,3 163:17 168:4,7 168:11 187:7 197:2,11,14 207:20 218:2 220:23 221:1,4 221:4,5,10,14 221:19,22,25 230:1,2,7,13
**record's** 116:13
**recorded** 5:7 5:10
**recording** 5:4,8
**records** 87:17 106:17
**redact** 87:13 88:3 106:18
**redacted** 87:4,6 87:16,25 106:13,16
**redaction** 106:16
**redesign** 132:7 141:6,10,20 142:12 144:22 145:1 147:1 160:4 169:13 170:13,21 188:15
**redetected** 87:24
**reduce** 93:6,16
**reduced** 74:11 231:11
**reengage** 115:14
**reengaged** 114:17
**refer** 20:15
**reference** 159:6 160:2
**referenced** 232:6
**referred** 24:10 72:21 132:12 144:14 170:9
**referring** 20:14 62:6 98:9,13 125:5 139:25 143:18 153:19 159:22 160:9 160:24 161:11 198:15
**refresh** 199:9
**refusing** 152:20
**regard** 9:4 80:19 138:4
**regarding** 27:19 39:8 61:2 64:4 66:1 70:11 72:20,25 80:10 81:14 127:11 149:5 187:10 196:3 216:23
**regardless** 61:22 82:2,3
**regards** 119:13
**regular** 7:13 180:9
**reinsert** 133:21
**reinstate** 130:3
**reinstated** 114:19
**reinstating** 137:24
**reiterate** 31:14 107:25
**rejoined** 18:1
**related** 5:22 48:2 116:8 141:22 231:17
**relates** 119:5
**relations** 14:10 14:14 16:19 18:3,10
**relationship** 17:20,21,23
**relative** 71:9
**release** 74:19 75:5,8 79:24 80:2,6,10 106:25
**released** 81:10 90:4 232:22
**releases** 35:22 79:25 104:15
**relevant** 8:22 124:19 152:12 159:13,14 192:19 199:6 225:5
**rely** 141:1
**remain** 84:15 85:3 121:8 158:21
**remained** 54:21 120:9,17 122:14
**remaining** 158:22
**remains** 83:16 113:1
**remember** 7:22 24:15 35:21 46:15,16,17 62:23,25 94:21 144:6,11,16,25 199:7
**remembering** 21:8 205:5
**remind** 48:22
**reminding** 49:4
**remote** 11:2
**remotely** 5:17 6:1,14
**removal** 81:15 120:25 146:7 160:3,15 161:8
**remove** 82:9 88:5
**removed** 53:20 57:3 67:12,21 68:17 70:1 81:18 82:16,25 83:6,9 98:11 120:2 131:21

**[removed - resulting]**


133:13,22 136:4,6,17 138:19,21 144:18 145:13 145:17 146:16 146:18 147:16 161:13 201:19
**removes** 110:15
**removing** 54:4 69:5 81:7,11 110:10 146:9 188:7
**repeat** 9:23 73:24 93:8 94:4 200:10 201:8
**repeatedly** 49:16 161:21
**repeating** 215:5
**rephrase** 9:24 28:15 29:3
**report** 18:20,21
**reported** 1:22
**reporter** 1:24 3:6 5:19 6:24 7:5 11:13,14 12:5 22:11,14 30:14,16 94:6 142:14 147:24 168:1,21 187:4 217:21 218:1 221:13 231:7
**represent** 38:7
**representation** 208:6
**representative** 96:17 136:14 206:11
**represented** 96:17
**representing** 3:11,15,19 4:1 5:18 32:4
**represents** 8:13
**republished** 225:4 226:1 228:22
**reputational** 121:18 134:10
**request** 29:24 31:17 42:6 90:1,10,12 106:17 107:1 185:25 219:14 227:14
**requested** 27:10 29:15,17 30:17 31:19,24 94:8 160:13 187:7 188:6 209:7 210:4,20 211:14 217:24 218:2 233:1,9 233:10
**requesting** 161:5
**requests** 28:6,7 34:6 35:17
37:7 42:3 87:9 88:4 199:5 220:8 222:13
**require** 202:22
**required** 8:19 232:20
**research** 111:18 112:18 206:8
**respect** 19:5 102:17 160:21 161:18 226:10
**respectful** 31:9
**respectfully** 129:2
**respond** 28:6 37:7 73:22 222:12
**responded** 42:6
**responding** 41:8 219:18,21
**response** 29:21 34:3 39:19 42:3 102:6 153:1,11 160:21 161:17 164:14,21 166:7 167:3,17 196:8 204:7 208:24 212:17 219:14 226:8 227:11,24 228:9,12
**responses** 35:5 49:12,15 130:9
159:14 160:3 163:22 165:11 165:14 166:21 181:2,4 206:13 220:9 222:20
**responsibilities** 18:9 21:16 99:25 193:2
**responsibility** 69:20 191:24
**responsible** 19:4 67:14 192:24 213:10
**responsive** 30:2 34:6 41:23 48:11 227:14
**rest** 31:12 69:23,24 98:24
**restate** 105:25 160:7 163:19
**restrict** 122:15
**restrictions** 124:9
**restroom** 64:20
**result** 34:25 35:12 39:3 71:16 81:19 83:9 91:14 107:16 108:3 121:19 128:12 200:18 226:14
**resulted** 194:3 198:20
**resulting** 130:1

**results** 35:19 35:24 36:1,3 38:12,15 74:5 101:9 198:19 198:21
**retained** 230:17
**retract** 207:6
**retracted** 147:25
**return** 232:17 233:6
**reuse** 124:1
**revealed** 101:3
**revenue** 179:15 180:16 181:7 181:12 199:25 216:13,24 217:6
**review** 11:4 26:6 90:14 152:14 165:14 169:5 232:8,10 232:13 233:2
**reviewed** 165:10,11 223:13
**reviewing** 8:21 195:18
**reviews** 195:15
**reword** 149:2
**rfps** 30:3
**ridden** 51:25
**right** 20:24 21:6,8 25:2,17 30:8 42:12 49:8 53:11,13 54:13 56:2 64:8,8,17 66:6 67:5 72:21 75:12 82:7 85:15,15 88:18 96:22 100:16 101:10 103:6 108:1 110:15 114:10 117:11 119:9,14 122:11,18 126:7 129:17 129:18 130:19 133:19 136:8 139:2 142:7 147:4 154:15 155:21 156:21 158:2 163:2,16 165:5 169:9 172:8 173:17 176:5,18 178:22 179:19 182:17 183:13 186:1,12 188:24 192:20 197:9 199:7 201:15 202:7 202:18 203:5 212:23 214:18 220:12,15 223:5,20 229:14 230:6
**rings** 144:24
**risk** 208:12
**road** 3:16
**role** 14:5 18:9 19:5 20:9 21:6 21:13,16,24 22:6 41:7,17 41:18 65:19,20 125:1,3,8,14 140:14 148:16 149:5 178:24
**room** 33:10,11
**roshin** 4:2 6:11 32:8,12 33:7
**rossi** 125:14 126:4
**row** 172:8,19
**rpr** 1:23 3:5
**rsb** 4:5
**ruby** 3:20 6:20
**rule** 8:9,10,19 28:9 213:16,17 215:8,8
**rules** 30:12 162:18 208:10 233:8
**run** 59:7
**rush** 11:5

**s**

**safety** 57:21 58:25 60:9 72:21,23 75:12 76:5,18 77:13 77:16,18,24 85:20 89:7,10 89:12,13 92:6 96:4 107:14
**sandwiches** 103:7
**sarah** 4:2 6:10 32:12
**save** 116:10 128:21
**saving** 122:25
**saw** 23:2,3 56:9 98:21 108:11 108:12 134:19 195:24 196:3 210:23,23
**saying** 61:12 63:13 89:11 97:19 102:8 107:10 112:11 135:3,4,7,8 153:14 156:18 156:21 157:8 161:2,4 182:4 190:12 191:10 202:7,10,11 203:8 206:23 207:2 220:24 224:18
**says** 143:25,25 153:12 154:9 171:2 172:16 175:17 176:18 199:22 225:1 227:12 228:19 228:20

**[scale - serving]**


**scale** 178:17
**schedule** 232:10
**science** 146:21
**scope** 16:10 18:8 141:12 171:10 187:11
**scottsdale** 1:15 3:5,13 5:16
**scrape** 119:6
**scraped** 223:23 224:19 225:4 225:12,25 228:4,8,21
**scraping** 119:5 119:11 121:4 124:1
**screen** 5:7
**screenshot** 2:21 2:22
**screenshots** 173:24
**sealed** 232:20
**search** 27:17 34:5,14,17,21 34:21,24,25 35:8 36:17,20 36:23 38:3,9 38:11 39:3,21 40:12,17 42:3 42:3 47:9,9,11 47:16,23 48:10 48:10 54:16,21 59:14,18 101:4 101:8 172:13 175:10,12 177:2,13,14,18 178:16,18 179:4,4 182:5 182:5,10,16 184:5,6,12,17 185:4 188:23 189:3 193:5 194:3,15 197:24 198:18 198:18,20,24 200:4,17 201:17,17 204:24,24 210:1 218:19
**searched** 27:15 27:16,22 28:1 34:10,11,20 36:9,11 37:1,8 37:15,17 39:24 47:17 58:15,20 158:25
**searches** 34:5 35:13,19 36:4 37:23 38:10 40:23 41:1 59:22 182:6 213:1
**searching** 31:23 34:1 36:8 39:11 177:5
**sec** 155:5
**second** 97:5 104:6 144:4 173:14 217:2,5
**secretary** 16:5
**secure** 27:12 31:19
**see** 25:21 28:12 49:1,8 52:10 52:19,20,22 53:8 56:9 57:20 58:24 72:3 77:5,17 77:25 84:19 89:16 90:7 92:3,5 96:4 97:2,23 103:16 110:1,18 111:14,20,24 111:25 113:11 117:19 126:2 134:10,16 136:25 141:13 160:14,16 171:25 173:4 175:18,24 176:2,8 184:19 188:2 195:19 195:19 204:3 207:16 210:22 217:5,9 226:11 227:1 228:9
**seeing** 144:6 160:2 169:16
**seek** 222:12
**seeking** 108:17 159:12
**seem** 138:15 159:11,18
**seems** 127:15 171:1 172:9,14 189:1
**seen** 5:6 11:6,6 11:7 22:24 23:1 54:14 75:6 148:14 151:2 165:4 169:15 188:15 224:1
**sees** 110:19
**selected** 67:6
**senate** 15:23,25 16:16,21
**send** 185:18
**sense** 25:21 63:2,18 64:19 65:24 116:2
**sent** 38:21 39:1 43:18 223:1,2
**sentence** 187:2 202:21,24 217:5
**separate** 174:18 181:1
**september** 94:21 95:2,6 132:2 137:23
**served** 14:5 73:23 74:2 115:20,25
**serving** 14:3 125:8

**set** 67:25 68:10 68:12 148:2 150:15
**sets** 48:23
**setting** 181:25
**seven** 230:16
**several** 23:21
**shake** 9:5
**share** 19:13,24
**shared** 19:6
**sheridan** 17:16 17:20 20:24 21:10 79:10 80:18 81:3 100:1
**sheriff** 1:8 16:1 17:16 20:23,24 20:24 21:2,2,7 21:10 42:15,21 42:24 43:11 44:3,5,13,22 45:22 46:6 51:4 61:1 79:9 79:10,17 80:1 80:13,18 81:3 81:3 99:16 100:1 104:10 107:25 110:19 140:1 142:11
**sheriff's** 1:13 2:3 3:2 7:3 8:12 13:18 14:19 15:4,14 16:17,23 17:15 17:21,24 18:1 19:22 20:11,14 20:15,18,19,22 22:5,6 24:9 25:19,24 37:12 39:25 40:3 42:14 44:11,13 45:4,23 48:16 50:8 51:11 52:3,10,12,17 57:2,14 67:4 68:7,18 69:24 75:10 78:21 79:11 80:14 83:13 84:5 85:3 88:6 91:7 98:24,25 100:10 105:7,9 106:18,25 108:1,4 109:2 109:7,12 110:10,15 114:17 115:9 118:11,16 119:10 120:1,2 120:8,16,18,23 120:25 121:7 122:6 123:25 124:22 125:3 126:7,18 127:16 128:15 131:17 132:13 132:18 133:2 133:21 136:15 136:25 137:15 138:15,17 140:3,14,22 145:25 155:21 159:17 161:7 168:13 169:19 175:10 176:25 177:5,9 178:9 178:13,14,18 178:20,24 179:1,7,10,15 179:17,23 181:7 182:11 184:7,17 187:14,21 192:1 194:15 194:21 195:14 196:17 197:25 198:1,19 199:6 200:6,14,18 201:17 202:22 203:6,9 216:14 218:7 223:24 224:3,13 228:5
**sheriffs** 21:14 139:21 140:5
**shield** 103:4
**shoot** 129:16
**short** 30:9 65:11 104:4 168:2
**shortening** 93:5,16
**shorter** 93:5 97:3
**shortly** 65:13 75:9
**shot** 158:4
**show** 52:14 143:14
**showing** 143:21
**side** 59:22 173:1
**sides** 111:25 112:19
**sign** 232:16 233:5
**signature** 231:23 232:22 232:24,24 233:9
**signed** 151:7,13 165:8
**significantly** 92:5
**silence** 214:13
**silly** 132:10
**similar** 79:24 135:20 173:2 224:25
**similarly** 1:4
**simply** 163:3
**sir** 65:11 145:5 148:11 175:9 197:20
**sit** 129:7
**site** 177:17
**sites** 226:12
**sitting** 10:10,13 38:20 111:9 159:10,18 180:14 198:10

**[sitting - standard]**


201:15 213:12
**situated** 1:4
**situation** 38:14
**six** 191:14
**size** 56:22
**skill** 231:15
**skip** 7:21,21 46:3
**slb** 4:4
**slightly** 82:8
**slow** 56:23 57:4
**slowing** 69:3
**small** 175:23,23
**snarky** 138:12
**social** 18:10 105:15
**soft** 12:15
**solutions** 232:7
**somebody** 34:20 86:14 108:11 171:20 177:16 178:6 190:24 195:24 206:8 218:5
**someone's** 90:8 203:7
**soon** 64:24
**sophisticated** 9:2
**sorry** 8:10 9:10 12:22 23:18 24:14 25:10 36:3 50:25 63:3 65:3,22 73:24 75:16 77:14 87:22 90:18 93:7 94:6,20 95:18 98:20 99:22 102:21 117:6 124:25 125:20 141:4 144:16 145:5,9 148:9 150:10 170:3 175:23 178:4 186:23 187:1 191:3 199:21 202:15,16 206:25 222:9 228:19 229:22 230:8
**sort** 8:2 11:21 16:10 21:15,21 43:18 46:22 60:6 63:14 69:4 70:10,10 72:22 77:5,22 78:24 81:11,20 82:9,10 84:25 93:24 104:20 104:21 105:8 113:20,23 114:1,6,9 119:21 121:18 123:6 126:24 126:25 127:1,1 131:11 176:13 176:14
**sorted** 172:12
**sorts** 21:16 182:1
**sounds** 116:23 119:4 132:10 139:13 186:9 205:3,13
**south** 3:16,22
**southwest** 17:8
**speak** 23:23 42:22,25 43:6 69:2 79:9 80:1 125:15 140:21 163:14 181:25 208:16 229:5
**speaker** 12:20
**speaking** 8:21 9:11 12:10,11 26:17,24 30:6 30:10 41:18 57:9 140:15 161:25 162:2 162:22 220:5
**speaks** 77:13 77:15 159:7
**specialist** 69:8
**specific** 60:4 70:5 77:11,11 107:21 111:7 118:12 139:9 169:13,16 172:11 195:22 218:20 222:16 225:16 226:4,6 226:18
**specifically** 47:22 56:18 70:11
**specifics** 205:10
**specifying** 73:7
**speculate** 10:7 10:15 218:12
**speed** 10:5
**spell** 216:2
**spend** 179:12
**spent** 179:25 181:10
**spl** 1:6 5:15
**split** 67:19,19
**spoke** 7:16 24:16 25:8,16 26:2 79:22
**spokesman** 143:25
**spokesperson** 14:22
**spot** 64:8
**spyfly.com.** 176:1
**ss** 231:1
**staff** 18:21 45:24 98:23 126:16 195:12 195:18
**stahl** 1:23 3:5 5:19 231:6,24
**stamps** 169:8
**standard** 8:2 127:22

**standpoint** 96:5 161:21 163:7
**stands** 123:20
**start** 9:11 50:24 53:8 54:8,10 58:10 61:17 62:9,18 84:10,10
**started** 13:19 109:8 122:13 194:5 203:16 206:1
**starters** 27:22
**starting** 27:8 29:14 34:17,24 40:4 75:22 153:5,9 225:2 227:11
**starts** 168:23 169:10
**state** 3:6 5:25 6:1 48:6 162:8 175:20 199:25 217:6 231:1,7 232:9,12
**stated** 71:25 73:23 74:10 75:1 92:12,17 92:23 104:8,21 123:15,21 171:7
**statement** 74:12 123:3 143:5 144:6 207:7
**statements** 141:1 151:4
**states** 1:1 5:14
**stats** 72:3
**stay** 82:4 83:5,6
**steps** 99:15 124:1
**steve** 72:12
**stickers** 22:15
**stint** 14:14 22:5 40:4,6 46:25
**stints** 20:22 39:25
**stipulation** 232:21
**stop** 9:12 24:20 208:14 215:9 220:24
**stories** 85:25
**straight** 89:4,5 174:8
**strange** 66:19
**strategic** 60:8
**strategy** 208:7
**straus** 2:6 3:20 6:4,4 7:9 12:4 12:10,24 13:2 19:10,11 20:7 22:2,11,16,21 25:13,14 28:12 28:14,24 29:4 29:25 30:5,21 31:5,6 37:5,14 37:18 38:1,6 38:19,24 39:10 40:14,21 41:5 41:15 42:8 43:4 44:9,19 46:2 47:6,13 47:20 48:4,6,8 49:1,5,21 50:1 50:4,16,23 51:5,13 52:4 53:10 54:1,15 55:1 56:1 57:1 57:11,19 58:1 58:13,18 59:4 59:16,24 60:5 60:13,18,20 61:6,13,18 62:7 64:6,15 64:18,22 65:2 65:10 66:9,17 67:1,10,18 68:3,14,24 69:9,22 70:8 70:14,23 71:3 71:14,21 72:6 72:11,16 73:3 73:15,19,20 74:8,21,25 75:7,15,19 76:1,8,15,21 77:3,12 78:2,8 78:13 79:2,8 79:16,21 80:7 80:17,24 81:6 81:16 82:1 83:3,22 84:3,9 84:24 85:13 86:8 87:1,7 88:1,11,17 89:1,23 90:6 90:20 91:10 92:10,15,20 93:2,9,12,13,21 94:3,5,15,16,23 95:11,17,19,25 96:3,10,13,21 97:1,7,17 98:6 98:21,22 99:3 99:7,10,21 100:6,15 101:7 101:18,23 102:2,7,10,14 102:17,22 103:2,9,11 104:1,2,19 105:1,4,11,24 106:11,20 107:7,23 108:14 109:14 109:18,23 110:7,24 111:8 111:19 112:2,7 112:20 113:7 113:19 114:5 114:14 115:1,6 116:1,3,6 117:1,3,6,10,15 117:17,20 118:5,9,23 119:19 120:14 120:24 121:16

122:3,24
123:19,23,24
124:6 125:19
126:17,23
127:9,13 128:1
128:10,14,21
129:8,12,15,18
129:24 130:5
130:13,16,20
130:25 131:3,5
132:9,17,22
133:1,11,18
134:2,9,15
135:1,12,19
136:12,22
137:5,12,18,20
138:11,25
139:4,11,20
140:2,5,8,12
141:5,21 142:4
142:9,17,20
143:2,7,20,22
144:12 145:4
145:18 146:4
146:12 147:3
147:13,23
148:5,8,22
149:3,9,18,19
150:1,6,10,13
150:16,20,23
151:1,15,19
152:24 153:4
156:14 157:1
157:10,12,22
158:1,6,11,17
158:18 159:9
159:24 160:1
160:10,12,19
161:1,23,25
162:2,5,8,12,17
162:21,24
163:9,20 164:3
164:11,19
165:1,3,22
166:3,5,11,14
167:1,6,12,15
167:24 168:9
168:18 169:3
169:25 170:2
170:17,23
171:6,17 172:5
173:12 174:1,3
174:8,19,21,24
175:7,14
176:15,22
177:6,21 178:1
178:9,21 179:8
180:13,22
181:14 182:8
182:18,23
183:4,11,19
184:1,9,21
185:5,11,20
186:4,7,16,23
186:25 187:3,6
187:23 188:9
188:21 189:8
189:14,21
190:6,14 191:1
191:3,6,13,18
191:23 192:5
192:18,21
193:13,18,21
194:1,10,23
195:3,13 196:1
196:10,19,23
197:3,8,16
198:8,17 199:2
199:14,18,20
200:11,22
201:1,3,12
202:1,17,19
203:22 204:6
205:1,12,21
206:2,9,18,25
207:1,23,25
208:18,20,22
209:4,12,19
210:2,8,14
211:1,9,19
212:3,20 213:6
213:22,24
214:1,3,9,15,19
214:22 215:2
215:13,21
216:4,9,10,18
217:1,17,23
218:8,14,22
219:8,19,22
220:4,13,16,19
220:21,23
221:1,12 222:9
222:10,18
223:16,19
224:15 225:10
225:23 226:13
227:3,9 228:16
229:16,20,22
229:25 230:4,9
232:1

**stray** 124:25

**streamline** 7:18

**strictly** 8:1

**strike** 19:2
36:10 42:20
48:13 50:6
59:17 61:20
69:11 90:23
97:9 99:9
100:7 109:25
115:8 131:7
184:23 191:24
192:23

**structure** 46:23
47:4,5

**studied** 71:23

**study** 113:16
113:20,23
126:25

**stuff** 9:1 61:15
77:25 100:23
100:23 130:21
195:20 204:3

**submitted**
107:5 116:14

**subpart** 156:11
156:22 157:2
171:8

**substance**
13:10 135:21

153:8
**substantially** 21:15
**substantive** 153:1
**success** 71:9,24
**sufficient** 214:7
**suite** 3:16,22 4:3
**summarize** 38:8 153:12 197:23
**summary** 24:23 26:8 91:16
**summer** 115:24 128:16
**supervising** 19:15
**supervision** 231:12
**supervisor** 17:5 18:19 19:15 99:16 195:9
**supplement** 150:19 206:12
**supplemental** 148:1,4 153:11
**supposed** 180:21,24 184:5 208:10 208:11
**sure** 10:1 12:4 24:5 25:13,13 30:16,23 36:15 38:23 41:16,21 44:17 45:18 49:25 62:8 64:23 65:25 77:9 94:3,15 102:24 108:1 120:12 145:11 160:8 170:16 174:19 187:24 197:8 199:10 201:8 202:13
**surmising** 198:6 224:12 224:21 225:20
**survey** 77:22
**swear** 6:25
**sworn** 7:4 59:21 231:8
**system** 11:1 57:4 69:3,4 86:23 144:2

**t**

**t** 154:10
**table** 10:12 172:12
**tabs** 53:7
**take** 5:8 11:4,8 11:9,16 13:7 22:25 27:4 62:16 64:23 65:3 89:6,6 94:24 101:21 103:14 112:8 112:21 123:25 162:16 163:13 168:2 169:11 170:4 176:12 196:25 197:5 206:4,7 208:17 222:6
**taken** 3:3 5:11 31:1 65:6 89:17,19 90:9 103:21 168:5 186:1,1 197:12 198:25 199:4 221:20 231:6 231:10
**takes** 184:18 188:4
**talk** 32:20 60:18 61:15 75:8 80:10 82:21,21 88:12 88:19 104:15 104:15,16 108:22 109:4 110:10 220:25
**talked** 23:13,16 23:20,24,24 24:1,4,6 25:21 27:16 80:5 97:21 99:14,15 105:20 114:16 138:19 203:25 205:8,17 212:24 218:18 226:11,25
**talking** 19:19 28:5 56:7 58:11 72:9 91:11 99:6 104:7 108:7,7 117:12 149:13 173:22 192:11 193:9 206:1 215:4 220:19 224:7 228:3
**talks** 86:14
**targeted** 47:9
**tavarez** 3:21 6:18,18
**team** 24:2 40:12 69:23 88:9 209:24 210:12,19 212:13,17,24 212:25 215:14 216:20 218:15 218:18 219:9 222:12,21 223:13
**technical** 124:7
**technically** 133:20
**technologically** 57:16 133:23
**technology** 22:1 24:1 27:17 34:14 57:10 67:25 69:8 72:2,7,13 91:1 97:16,18 100:9 101:12 101:19,24 124:12 141:17

172:25 185:16 185:19 204:4,4 204:22 205:9 209:24 211:8 215:19 226:11 227:1
**telephone** 43:19,25
**telephonic** 43:13 44:8
**tell** 10:17 22:23 48:25 58:9 87:15,24,25 105:8 108:11 144:25 149:9 149:16 152:15 163:14 166:13 170:3 173:22 186:10 199:21 212:1 214:24
**telling** 25:11 85:24 89:12 149:4 179:3 205:8
**ten** 7:24,25 32:24 33:3,16
**tense** 82:7,11 172:17
**tenure** 20:21 40:3 42:14,24 44:3 73:21
**term** 36:17 38:9,11,15 87:23 119:5 128:24 131:8,9 180:15
**terms** 16:9 38:3 45:22 47:9,16 47:23 48:10 54:2 60:8 77:14 80:9 100:17 107:14 130:17
**test** 128:11
**testified** 7:5 29:6 33:8 34:1 45:21 49:11 60:7 91:14 106:22 119:9 124:16 161:12 186:9 189:16 203:15 207:4
**testify** 231:8
**testifying** 8:11 162:13 197:19 208:15 214:20 214:22,23,23 219:19
**testimony** 8:4,5 8:13 21:8 36:16 43:23 59:25 65:14 66:4 69:2 91:16 108:4 119:10,15 127:15 136:14 136:20 138:14 165:16 173:6 178:23 186:8 188:25 191:1,7 196:2 197:24 201:14,21 202:6 203:13 209:20 214:25 230:14
**text** 44:23,25 129:15,17
**thank** 7:10 12:25 25:13 28:13 30:6 31:5 50:3 65:11 99:8 104:3 151:18 168:10 197:17 199:14 217:25 229:18 230:9 230:11,12
**thanks** 230:6
**thereof** 231:19
**thereto** 231:10
**thing** 11:21 69:4 81:11,21 127:1 156:22 224:13
**things** 7:18,19 9:4 21:16 27:21 34:3 51:11,19,23 52:7 80:10 86:1 87:13 104:15 142:15 142:19,24 143:18 147:1 152:2 156:17 157:8 173:5,6
**think** 7:11,17 9:15 11:1 12:14,16 20:3 25:9,15 27:22 29:7 32:24 33:7,23 35:6 38:13,20,25 42:11 51:18 58:2 72:20 75:24 77:21 83:23 84:4,12 84:25 101:3,8 105:13,13 106:16 108:6 108:23 109:16 111:9,25 112:11 113:8 113:24,25 116:3 120:16 120:21 121:3 122:15 124:16 125:24 128:11 129:25,25 130:8 132:11 134:21 135:2,5 135:5 136:3 137:6,13 141:25 142:1,6 143:11 145:5,5 145:10,10 147:19 158:3 173:17 178:6 184:24 186:14 188:13,14,17 188:19,19

194:11 197:22 201:14 202:6 205:11,16 206:3,4,23 211:24 213:12 213:20 214:7 217:17 219:16 220:8 224:1 225:14 226:15 226:16,19 229:24
**third** 57:13 59:7 68:5 108:23 109:1 110:8,13,16 120:4 121:4 124:1 130:2 139:13 148:1,3 150:18 169:19 171:18 175:16 176:13 177:14 179:6 185:3,8 199:24 200:16 201:22 203:1 219:13 220:5 223:22 225:3 225:11,16,25 227:13 228:3 228:20,22 229:9
**thompson** 88:16 118:17
**thorough** 165:14
**thoroughly** 165:10,10
**thought** 65:1 102:21 106:21 187:1
**thousand** 54:19 54:20,20
**three** 35:21 53:15,19,21,22 53:25 54:5,9 55:4,5,7,12,17 56:15,18,18,19 57:3,15,22 58:10 59:10,19 60:1,4,10 62:18,20 66:2 66:3,5 67:13 67:21 68:10 69:12,17 70:1 70:22 74:2 75:2 81:8,12 81:19 82:5,15 82:22 84:11,12 84:14 85:8,9 85:11 88:20,21 92:4 93:3,4,15 93:23 94:17 96:5 97:3,12 98:10 109:3,4 110:3,11,13,14 121:9 126:6 158:22
**time** 5:25 7:11 7:15 9:8,17,18 11:4,7,8,10 13:19 14:7 15:4 17:20,24 18:2,23 21:1,8 22:25 23:2,4 24:1 25:9,16 25:18,20 27:5 29:8 31:15 44:22 46:6 49:9,11,17 51:4 53:20 60:16 61:8,12 61:12,13 62:5 62:6,17,18 63:7,15 64:4 64:11 66:5,11 67:6,7 68:2 70:6,7 73:8,13 73:16 76:16 82:10,16,23 83:9 85:1,4,5 88:20 91:13,23 93:16,24 94:18 94:24 96:6 97:3,13 98:12 99:4 103:14,16 109:7 114:23 116:10 117:22 122:14,16 124:14,19 125:6 126:16 128:21 129:20 131:15,16,20 132:8 135:17 136:2 138:5 139:8,19 140:4 140:11 141:10 141:12 145:12 145:16 152:12 152:14 154:3,4 155:20 158:23 159:13,14 165:4,11,13,14 169:11 170:4 173:3 174:25 177:3,15 182:15 188:15 189:7,13,22 191:20 192:12 192:15 193:15 196:11,17 199:22 200:3,5 200:6,13,16,19 201:5,9,15,16 201:20,21 202:2,4,5,7,25 203:11 204:1 205:4,25 207:3 207:4,4,13 209:7,10,17 210:4,19 211:13,16,17 212:2,4,9,11,16 222:17 223:15 224:5,11 225:6 225:21 232:10 232:18,25 233:7
**times** 21:6 32:18,20,22 62:25 111:13

140:19 142:10 143:24 192:13 195:18,23 213:20 214:8
**timing** 144:21 193:9
**title** 18:2,5 21:9 21:14,15
**titled** 142:11
**today** 7:15 8:3 8:9,15,23 13:12 22:9 29:6,18 38:20 39:15,22 67:3 111:9 112:18 159:10,18 162:13 165:2 180:14 198:10 201:15 208:23 213:12 225:17
**today's** 23:10 165:4 222:19 230:14
**together** 149:24
**token** 9:14
**told** 57:2,8 69:16 100:5,11 101:19 126:11 126:15 190:2
**took** 65:20 183:3 194:8
**tool** 56:11
**tools** 104:10
**top** 170:8
**topic** 24:8 34:21 35:2 36:20,23 84:4 95:22 100:25 111:7 223:3
**topics** 8:14,21 108:21 143:13
**total** 230:16
**track** 78:21
**tracking** 78:23
**traffic** 52:7 71:6 72:4 77:9 85:7 104:10 105:9 145:24
**train** 64:25
**transcript** 231:13 232:6,8 232:10,13,13 232:22 233:2,2
**transcription** 231:11
**transfer** 53:4
**transition** 52:25
**transparency** 51:10,16,20 52:8,9 60:8 71:10,16,25 76:12,25 77:15 104:7,22 105:18,19 106:3 107:13 146:2,6,16,17 146:18 147:15
179:12
**trial** 208:12
**tried** 125:24,24 125:25 207:17
**trouble** 12:17
**true** 117:3 151:4 231:12
**truth** 231:9
**truthfully** 13:12
**try** 7:25 9:6,19 10:6,25 31:14 46:3 73:16 129:20 146:24 193:16 203:19 205:9 207:14 207:14 217:16 226:21 230:4
**trying** 7:20 9:3 10:4 30:2,3 43:21,22 55:3 64:16 94:21 138:12,12 141:16 156:20 163:2,3 202:3 203:11 217:19 217:20 228:8 229:23
**turn** 27:2 151:20,21 168:24 169:21
**twice** 65:20
**two** 21:2,13,17 21:22 29:7 35:21 54:9,19 56:19 153:5,24 157:7 169:9 173:21 196:18 203:20 208:14 215:19
**type** 19:2,4 27:15 75:21 153:6 155:3,3 157:14,15,19 158:8 175:23

**u**

**uh** 102:9 103:2
**ultimate** 61:2
**ultimately** 61:23 63:25 111:11 112:23 128:5 154:22 213:9,10
**unaware** 227:13
**undated** 150:4
**under** 8:3 13:9 20:23 21:9,10 21:13,14,16 28:8 45:10 72:15 85:1,4 91:24 121:10 129:4 134:22 139:7 172:8 175:22 176:4 181:12,15,17 181:20 191:25 192:3,25 193:2 208:9 231:11

**undersheriff** 99:16
**understand** 8:6 8:23 9:22,25 10:1,2 11:25 25:17 28:25 29:2 36:16 41:16,21 42:16 43:23 44:12 53:13 67:17 75:24 77:9 80:22 106:23 110:5 115:2 120:12 123:2 123:10 131:9 135:2 140:25 142:22 154:18 154:21 159:15 170:16 174:10 188:2 201:8 202:14 203:8 208:9 213:20 214:6 215:12 219:16 220:11 227:21
**understanding** 8:16 16:20 25:2 37:6 50:18 51:6 53:12,14,18 61:1 67:24 68:9 93:22 112:11 115:23 119:21,23 122:11 128:15 129:21 138:7 153:19 154:18 170:11 172:1,6 172:18 173:6 176:10,16,23 177:24 178:6 181:5,24 200:23 217:11 219:12 227:10 227:19
**understood** 10:3 109:9 120:1,3 135:6 187:24
**unidentified** 12:20
**unit** 5:10
**united** 1:1 5:14
**unnecessary** 122:25
**unquote** 144:3
**update** 187:15
**updating** 141:18
**upload** 185:19
**usage** 124:8
**use** 46:8 56:12 64:20 82:7,10 85:24 100:24 122:5 131:8 187:18
**used** 36:23 38:3 70:11 97:4,4 98:10 174:14 188:17 230:16
**uses** 104:10 105:9 119:6
**using** 34:21 36:17 38:9 47:9 56:12,12 58:3 73:13 90:2,3 106:12 180:15
**usually** 84:21 84:22 105:15

**v**

**v** 232:4
**vaguely** 144:24
**valid** 215:1 220:13
**varied** 62:14
**vendor** 57:14 68:5 139:13 171:18 177:14 179:6 185:4,8
**vendors** 121:4
**verbal** 9:6 25:3 26:13
**verification** 2:18 150:3,4 150:10,12,17 151:12 165:8
**verified** 165:5 212:22,24,25
**verifying** 213:4 222:20
**veritext** 5:18,20 230:17 232:7,9 232:11,20
**version** 151:12 173:2
**versus** 5:13 64:12
**video** 5:7,10 103:10
**videographer** 4:6 5:1,19 6:13 6:24 30:24 31:3 65:4,8 103:18,23 168:3,7 197:1 197:10,14 221:16,18,22 230:2,8,13
**view** 68:17 109:24 121:2
**virtually** 5:4
**visible** 85:22
**visited** 24:1
**visitors** 171:3
**volume** 12:6
**volumes** 12:12
**voting** 142:11 144:2
**vs** 1:6

**w**

**w** 154:10
**wait** 229:21,21
**waived** 232:24 232:24
**waiving** 153:15 227:12 232:21
**want** 10:6 11:10,16,22,24

12:4,19 13:15 15:3 28:3 33:19 41:21 46:3 47:21,22 48:17,21,25 51:25 61:15,15 62:23 64:13 73:13 91:11 94:13,25 95:2 101:17 102:20 102:24 103:12 114:23 116:4 123:16 131:1 145:11 149:2 149:16 150:5 156:20 162:16 167:9 168:1 169:4,12 174:17 183:5 183:23 207:18 208:20 217:22 219:22 220:17 220:19,24 221:3,10,16
**wanted** 64:25 65:25 90:4 123:6,11 151:17 184:19
**warrants** 175:17
**waste** 129:20
**watch** 51:25
**watermarking** 124:9
**watermarks** 155:4 158:13
**way** 12:10,11 19:12 20:2,6 27:8 48:18 52:2 53:18 58:4 65:24 70:5,18 75:20 76:16 83:7 84:17 101:15 101:15 104:16 112:1 127:12 134:25 137:22 149:12,15 155:17 170:24 175:16 181:24 186:19 203:12 208:9 215:10 231:17,18
**ways** 146:24
**we've** 38:7,8 77:10 104:14 104:14,16 125:24 158:20 163:7 167:25 194:3 197:22 207:15 230:2
**web** 105:7 138:8 147:9 177:4 184:8 200:14
**website** 20:11 48:16 50:8 51:8,22,23 52:3,6,18,24 53:1,5,9 54:8 56:24 58:4 61:3 67:13,21 68:17,23 69:5 71:6 76:4 77:9 78:1,10 81:8 81:12 85:3 88:6 91:13 104:11,15,18 105:9,15,16 107:17,22 108:4 111:14 115:10,10 119:5,14 120:3 120:23 121:1 122:7 128:17 130:10 139:7 139:13 140:18 141:6,16 142:3 142:12 144:3 144:18 145:21 145:24 146:22 146:24 147:5 147:20,21 152:10 159:12 171:2,15,19 173:21 174:9,9 175:10 176:7 176:13,25 177:4,9,10,16 177:17,23 178:7,10 179:1 180:5 181:16 181:20,25 182:5,7,12 184:7,7,16,16 184:20 187:16 187:17 188:17 189:4 190:18 191:10,25 192:1,3,24 193:1 194:5,8 194:15 195:16 195:23 196:13 197:25 198:2 198:19 199:6 199:23 200:6 200:15,19 201:18,20 202:2,13,25 203:6 216:14 223:24 224:3,3 224:20 225:5 226:2,19 228:5
**websites** 108:23 109:1,3 109:10 110:8 110:13 113:1 119:11 178:3 223:22,25 224:1,6,12,21 225:16,18,25 226:6,8,20,22 227:19 228:10
**week** 192:16,19
**weeks** 53:22
**weighed** 127:2
**went** 13:20 14:21 16:15,17 16:17 34:12

36:12,13 39:6 44:17 60:4 63:15 68:1 89:4 130:10,10 135:16 139:7 147:2 157:21 177:4,4 178:17 179:5,21 186:18 187:18 188:16 197:25 204:4
**whatnot** 34:22
**whys** 117:5,8 117:10 130:18
**wide** 99:18 177:4 184:8
**widget** 170:10 171:2 172:10
**willems** 18:21
**wilson** 4:1 6:11
**windows** 63:15
**wise** 144:21
**withdrawing** 222:4
**witness** 2:1 5:6 6:25 7:4 8:19 12:11,19,22 19:8 20:5 21:24 28:1,23 29:2 30:11,20 31:11,11 37:4 37:15,21 38:5 38:17,23 39:5 40:10,20 41:4 41:11,13 42:6 43:2 44:7,16 46:1 47:3,11 47:18 48:20 50:14,19 51:2 51:10,18 53:7 53:24 54:7,24 55:24 56:17 57:8,18,24 58:8,17 59:3 59:12,21 60:3 60:12 61:5 62:5 66:8,15 66:24 67:9,17 67:24 68:9,22 69:7,15 70:4 70:13,21 71:2 71:12,19 72:2 72:12 73:2,9 73:11 74:7,17 74:24 75:5,14 75:24 76:7,14 76:20 77:2,8 77:21 78:7 79:1,6,15,20 80:5,16,21 81:14,25 83:2 83:21 84:1,7 84:17 85:11 86:6,22 87:6 87:22 88:8,15 88:24 89:22 90:1,18 91:9 92:9,14,19 93:1,20 94:1,4 94:11,20 95:9 95:23 96:8 97:15 98:5,17 99:14 100:4,13 101:6,15 104:14,25 105:2 106:6,15 107:3,20 108:6 109:12,16 110:5,22 111:6 111:17,24 112:6,17 113:5 113:13 114:4 114:13 115:18 118:1,8,16 119:18 120:12 120:21 121:14 121:23 122:1 122:20,23 124:4 126:14 126:21 127:8 127:10,22 128:9,18 132:6 132:16,23 133:9,17 134:1 134:8,18 135:15 136:11 136:20 137:3 138:2,7 139:6 139:17,25 140:3,10 141:3 141:15,25 142:25 143:1 143:12 144:9 144:24 145:15 145:23 146:9 146:20 147:7 147:18 148:19 149:23 153:3 157:7,11,18,23 158:9 159:22 159:25 160:7 160:24 163:19 163:25 164:7 164:17,25 165:2,20 166:1 166:8,23 167:20 168:17 169:24 170:15 171:13 172:4 173:11 175:12 176:12,21 177:2,12 178:5 178:13 179:3 180:9,19 181:10 182:4 182:14,21 183:2,8,17,23 184:5,15 185:3 185:10,15,24 186:5,14 187:14 188:13 189:6,12,20 190:1,22 191:2 191:5,17,22 192:3 193:7 194:7,19 195:2 195:8 196:8,15 198:6,12,15,24 199:17,19 200:10,25

**[witness - yep]**


201:2,7 202:10 203:25 204:12 204:15,18,21 205:8,24 206:6 206:23 207:12 207:19,25 208:1 209:2,10 209:16,23 210:6,12,22 211:6,17,24 212:17 213:18 215:9,18 216:16,22 217:15,19 218:5,12,18 219:1,7 220:2 221:6,14 222:7 222:16 223:12 224:9 225:9,14 226:10,24 227:7 228:14 229:4,12 230:12 231:8 231:10 232:13 232:16 233:2,5

**witnesses** 47:25 152:2

**wonderful** 8:25 13:14 14:11 15:8 17:18,25 18:7 19:1 20:17 23:8,22 27:7,20 29:12 34:9 65:11 197:17,21 216:9

**woods** 4:1 6:11

**word** 38:21 39:2 101:9 104:21 119:6 149:15

**words** 40:1 46:7 50:20 81:9 82:2 83:8 90:25 95:2 119:22 135:25 146:13 177:9 220:18

**work** 7:13 11:12 14:21 15:11 16:9,11 17:15 42:14 45:6,16 59:21 94:12 95:10,24 96:9,16 102:16 103:1 115:18 116:22 118:2 121:24 122:20 126:6 128:19 129:5 137:4 158:10 164:17 166:9,18,21 171:10,23 172:22 193:8 196:15 208:16 219:1 220:2 221:7 222:1

**worked** 16:25 20:23 21:1 71:15 97:18

**working** 13:17 15:9 17:24 21:7,14 42:21 97:15 124:20

**works** 57:10

**world** 177:4 182:11 184:8

**worried** 56:8

**writing** 70:16 70:17,25 74:11

**writings** 70:21 74:25

**written** 26:10

**wrong** 66:3 87:23 153:13 155:13 170:25 194:13

**wrote** 204:9

**x**

**x** 2:1 233:9

**y**

**yeah** 12:14,14 20:5,17 21:24 23:7 25:15,24 28:24 29:2 30:5 42:18 43:21 49:21 54:25 64:6,18 64:18,19 65:2 65:3 72:12 73:15 74:25 80:5,25 93:12 94:24 95:5,25 97:20 99:7 102:23 103:9 103:12 105:1 107:24 115:1 117:1 120:15 121:3 122:12 125:7 129:8,19 130:13,16 137:19 139:4,6 140:2 145:7,8 146:13 148:5 150:9,21 151:15 155:10 157:7 169:17 171:7 173:20 174:1,19 177:10 183:5 194:11,12 196:19 199:14 199:18 200:12 200:25 201:13 217:2 229:12 229:16

**year** 14:25 15:16 16:18 53:22 74:18 94:22 95:6 125:5 144:10 182:25

**years** 7:24,25 23:21 114:8 136:6 147:10 191:14

**yep** 46:13 47:7 142:8 174:1,3 176:3

**[zero - zoom]**


| z |
|---|
| **zero** 101:9 169:9 170:1 228:10<br>**zeros** 168:23 169:9,22 170:1<br>**zoom** 3:19 4:2 4:7 6:12 32:14 33:9 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.